1                IN THE UNITED STATES DISTRICT COURT

2                FOR THE EASTERN DISTRICT OF TEXAS

3                         TYLER DIVISION

4   INTELLECTUAL VENTURES II LLC, )(

5        PLAINTIFF,                )(   CIVIL ACTION NO.

6                                  )(   6:18-CV-299-JRG

7   VS.                           )(   TYLER, TEXAS

8                                  )(

9   GREAT WEST CASUALTY COMPANY,  )(   MARCH 8, 2019

10       DEFENDANT.                )(   8:24 A.M.

11              TRIAL TRANSCRIPT OF JURY TRIAL

12       BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

13           UNITED STATES CHIEF DISTRICT JUDGE

14
    FOR THE PLAINTIFF: Mr. Derek T. Gilliland
15                     Mr. Ty W. Wilson
                       NIX PATTERSON, LLP
16                     205 Linda Drive
                       Daingerfield, Texas 75638
17
                       Mr. Karl A. Rupp
18                     NIX PATTERSON, LLP
                       Advancial Tower
19                     1845 Woodall Rodgers Tower
                       Suite 1050
20                     Dallas, Texas 75201

21  COURT REPORTER:    Ms. Shelly Holmes, CSR, TCRR
                       Official Court Reporter
22                     United States District Court
                       Eastern District of Texas
23                     Marshall Division
                       100 E. Houston
24                     Marshall, Texas 75670

25  (Proceedings recorded by mechanical stenography, transcript
    produced on a CAT system.)

```
 1   FOR THE DEFENDANT: Mr. Michael J. Bettinger
                        Ms. Irene I. Yang
 2                      SIDLEY AUSTIN, LLP
                        555 California Street
 3                      Suite 2000
                        San Francisco, California 94104
 4
                        Mr. Harry Lee Gillam, Jr.
 5                      GILLAM & SMITH, LLP
                        303 South Washington Avenue
 6                      Marshall, Texas 75670

 7                      Mr. Andrew T. Langford
                        SIDLEY AUSTIN, LLP
 8                      2021 McKinney Avenue
                        Suite 2000
 9                      Dallas, Texas 75206

10                      Ms. Sharon Lee
                        Mr. Samuel A. Dillon
11                      SIDLEY AUSTIN, LLP
                        1501 K Street, N.W.
12                      Washington, DC 20005

13                      Mr. Paul J. Rogerson
                        SIDLEY AUSTIN, LLP
14                      One South Dearborn
                        Chicago, Illinois 60603
15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

(Jury out.)

THE COURT:  All right.  Counsel, with regard to the joint motion to modify Defendant's Motion in Limine No. 17, which was filed overnight in the IV II versus Great West matter, which, as we all know, is Case No. 6:18-CV-299, this joint motion being Document 287, I've discussed in chambers and off the record with both of the parties the proposed modification, which is jointly presented to the Court, and the Court finds no reason not to accept the joint modification.

Accordingly, I will order Defendant's MIL No. 17 modified for the limited purposes of, one, allowing the parties to use deposition testimony to impeach witnesses; and, two, allowing Plaintiff, IV II, to examine its expert witnesses regarding opinions based on materials produced and served by BITCO and allowing Great West to cross-examine Plaintiff's expert witnesses as to such opinions.

Also, by agreement of the parties, the Court has indicated that it is receptive to adding a short instruction related to this in its preliminary instructions to the jury such that when the Court instructs the jury on the existence and use of deposition testimony in the case, the Court will add the following instruction:  You may see

1   some references to a company called BITCO in some

2   deposition testimony or hear BITCO materials being

3   discussed during the examination of expert witnesses over

4   the course of this trial.  BITCO and Great West are

5   separate companies who are owned by the same parent

6   company.  However, BITCO is not a party to this lawsuit.

7          That's the modified instruction the Court has

8   discussed with the parties, and it's my understanding that

9   both Plaintiff and Defendant agree to that instruction to

10  be given by the Court at an appropriate juncture in its

11  preliminary instructions, as modified.

12         Is that agreeable to Plaintiff, Mr. Gilliland?

13         MR. GILLILAND:  Yes, Your Honor.

14         THE COURT:  To Defendant, Mr. Bettinger?

15         MR. BETTINGER:  Yes, it is, Your Honor.

16         THE COURT:  Okay.  All right.  Counsel, that will

17  complete the matter related to this joint motion to modify

18  Defendant's Motion in Limine 17.

19         We're off the record.

20         (Recess.)

21         (Jury panel in.)

22         COURT SECURITY OFFICER:  All rise.

23         THE COURT:  Thank you.  Be seated, please.

24         Good morning, ladies and gentlemen.  Thank you for

25  being here.  My name is Rodney Gilstrap, and I am the Chief

1 | United States District Judge for the U.S. District Court

2 | for the Eastern District of Texas.

3 | My permanent duty station is in Marshall, but

4 | I occasionally sit in other parts of the district when that

5 | comes necessary, and this case has been assigned to me, so

6 | I will be trying the case in Tyler, even though, when

7 | I'm not in Tyler, I'm usually in Marshall.

8 | Let me tell you a little bit about myself.  I've

9 | lived here in East Texas since 1981 when I got out of law

10 | school.  I practiced law in and around Marshall and the

11 | broader East Texas area for 30 years before I became a

12 | U.S. District Judge.  I've been on the bench here with this

13 | court since 2011.

14 | And I'll make a confession.  Early on, I was not

15 | born in Texas.  But as they say, I got here as fast as

16 | I could.  I came to Texas at the ripe old age of 18 to

17 | attend college and then stayed to go to law school at

18 | Baylor University in Waco.

19 | I am married, I have two grown children, and my

20 | wife owns and operates a retailer floral business.

21 | Now, I tell you all these things because in a few

22 | minutes, I'm going to ask each of you to give me the same

23 | kind of information about each of yourselves.  And I think

24 | you're entitled to know as much about me as I'm about to

25 | find out regarding each of you.

1          We are about to engage in the selection of a jury

2    in a civil case involving allegations of patent

3    infringement.  However, before we go any further, I'd like

4    to briefly review with you how we came to have our civil

5    jury trial system.

6          If you go back in ancient history and if you look

7    at the first five books of the Old Testament, the

8    Pentateuch, you'll find that the ancient Jewish Nation

9    empaneled juries to determine issues of property ownership

10   and property value.

11         The ancient Romans -- excuse me -- the Greeks

12   began using the jury system about 1500 BC.  And the Romans,

13   like many other things, borrowed the jury system from the

14   Greeks, and it was the Romans that brought the jury system

15   to what is today England when they conquered that island in

16   the

17   4th Century AD.

18         Now, after they brought the jury system to

19   England, it flourished there for 800 years until, in the

20   12th Century, a tyrannical king came to the throne of

21   Great Britain named King John, and King John developed many

22   disputes with his nobles that nearly led to a civil war.

23   And one of the issues that put the king in conflict with

24   his nobles was King John attempted to limit and do away

25   with the right to trial by jury.

1          Those disputes did not become a civil war in

2     England, and they were avoided by an agreement that was

3     reached between King John and his nobles at a location

4     called Runnymede.

5          And the document that the king signed that

6     restored the right to trial by jury in England and resolved

7     their disputes is a document I suspect many of you have

8     heard of.  It's called the Magna Carta.

9          In fact, ladies and gentlemen, 28 of our 50

10    United States have adopted in their own state constitutions

11    the exact language verbatim from the Magna Carta that

12    restores and guarantees the right to trial by jury.

13         So you can see, ladies and gentlemen, that the

14    right to trial by jury was deeply engrained in our

15    Founding Fathers as colonist subjects in colonial Britain

16    here in America.

17         And the right to trial by jury flourished in

18    Colonial America for over a hundred years until another

19    tyrannical king came to the throne of Great Britain.  This

20    time his name was King George, III.  And like King John,

21    King George, III attempted to limit and do away to the

22    right to trial by jury among his British subjects here in

23    America.

24         In fact, when Thomas Jefferson sat down to write

25    the Declaration of Independence which spells out the

numerous specific reasons why we were compelled to separate from Great Britain and form our own independent nation, one of the specific reasons set out in the declaration for our need to become independent was the effort by the king to limit and do away to the right to trial by jury.

Later, when we did gain our independence, we adopted our governing documents, including the Constitution.  And the Constitution was ratified with the express understanding among the 13 original states that it would immediately be amended to add something that you all know about called the Bill of Rights.

And embedded within the Bill of Rights, those first 10 amendments to our U.S. Constitution is the Seventh Amendment.  And the Seventh Amendment to our U.S. Constitution guarantees the right to a trial by jury in a civil dispute to every American citizen.

The Bill of Rights, including the Seventh Amendment, were ratified in 1791.  So for well over 200 years, every American has had a constitutionally guaranteed right to have a jury resolve its disputes where they are of a civil nature.

I always tell citizens who appear for jury duty, as you have this morning, that in my personal view, jury service is the second highest form of public service that any American citizen can render.  In my personal opinion,

1 the highest -- the highest form of public service that any

2 American can -- can render are those young men and women

3 that wear the uniform of our armed forces.

4       So by being here this morning, ladies and

5 gentlemen, and presenting yourselves for jury duty in this

6 case, in a very real way, you are acting as good citizens

7 to preserve, protect, and defend those guarantees in our

8 Constitution, including the right to trial by jury in a

9 civil case set forth in our Seventh Amendment.

10       Now, when the lawyers address you later this

11 morning as a part of the jury selection process, they're

12 going to ask you various questions, and I want you to

13 understand that they are not seeking to pry into your

14 personal affairs unduly.  They're not attempting to be

15 nosy, ladies and gentlemen.

16       But the lawyers in this case have the right and

17 the obligation to ask you questions for purposes of

18 securing a fair and an impartial jury to hear the evidence

19 in this case.

20       Now, I don't know if it will happen today.  It is

21 a rare occurrence.  It doesn't happen often.  But,

22 occasionally, in the jury selection process, a member of

23 the panel will be asked a question that they personally

24 view to be so personal and so private that they're not

25 comfortable answering it out loud in front of everyone

1   else.

2        If that should happen today -- and, again, I don't

3   think it's likely, but if it should, each of you have the

4   right simply to say in response, I'd like to talk about

5   that with Judge Gilstrap.  And if that's your response,

6   I'll provide an opportunity where you can answer that

7   question outside of the presence of everyone else on the

8   panel.

9        Again, I don't think it's likely, but I want you

10  to know that option is there.

11       The important thing, ladies and gentlemen, is for

12  each of you to give full, complete, and truthful answers to

13  the questions that you'll be asked.  And please keep in

14  mind, there are no wrong answers as long as your responses

15  are full, complete, and truthful.

16       Now, the trial in this case will begin today after

17  the jury is selected, and I expect that it will be

18  completed by Thursday of next week.  It's not an exact

19  science, but I have a very good idea of what the evidence

20  is going to be in this case, and I'm pretty confident to

21  tell you I believe we will be finished by or before the end

22  of Thursday of next week.

23       Now, I need to know if there are any of you on the

24  panel that if you were selected to serve on this jury,

25  either have a surgical procedure scheduled for you or an

1    immediate family member who is dependent upon you, or if

2    you have already purchased non-refundable airline tickets

3    to someplace.  If you have something that would make it

4    very difficult for you to serve if you were selected over

5    the course of time from now through Thursday of next week,

6    that's something I need to know about.

7            I'm not asking if it would be inconvenient,

8    because, quite honestly, ladies and gentlemen, jury service

9    is inconvenient, but it's very important.  But if there's

10   something more than a mere inconvenience of serving, if

11   there's something that would make it very difficult for you

12   to serve if you were selected, then I need to know about --

13   about that at this time.

14           And if that's the case, anybody on the panel who

15   feels they fall in that category, I'd like you to raise

16   your hand at this time and let me make a note of the

17   numbers.

18           No. 15.

19           COURT SECURITY OFFICER:  And 22.

20           THE COURT:  And 22.

21           Anybody else?  I only see two hands.

22           Okay.  Thank you very much, ladies and gentlemen.

23           At this time, I'm going to call for announcements

24   in the case of Intellectual Ventures II, LLC, versus Great

25   West Casualty Company.  This is Civil Case No. 6:18-CV-299.

1          And, counsel, as you make your announcements, if

2    you would identify yourselves, the members of your trial

3    teams, and any corporate representatives that you have with

4    you.

5          What says the Plaintiff?

6          MR. GILLILAND:  Your Honor, Derek Gilliland with

7    Nix Patterson.  Along with me is Ty Wilson and Karl Rupp

8    with my office.  And we're here on behalf of Intellectual

9    Ventures.  The corporate representative today's -- for this

10   trial is Cliff Win.  And we're ready to proceed.

11         THE COURT:  All right.  Thank you, counsel.

12         What says the Defendant?

13         MR. GILLAM:  Good morning, Your Honor.  Good

14   morning, everybody.  My name is Gil Gillam.  With me today

15   is Mike Bettinger and Irene Yang.  You'll be hearing from

16   both of these in this trial.  This is Brian Foote with

17   Great West.  He's our corporate representative.  We

18   represent Great West in this case.  Your Honor, we're

19   ready, as well.

20         THE COURT:  Thank you, counsel.

21         Now, ladies and gentlemen, as I've told you, this

22   is a case arising under the patent laws of the

23   United States.  And what the Plaintiff is claiming is that

24   their patent was infringed by the Defendant, and they're

25   seeking money damages because of that infringement.

1           The Defendant denies that it has infringed the
2   Plaintiff's patent, and the Defendant contends that the
3   patent asserted by the Plaintiff is invalid.
4           Now, what I've told you is a very informal, in
5   layman's term, overview of what the case is about.  I know
6   that each of you on the panel has seen the patent video
7   film prepared by the Federal Judicial Center.  And having
8   seen that, you already know more about a patent case than
9   most citizens in East Texas do when they appear for jury
10  duty.
11          As I mentioned, the lawyers on both sides will
12  shortly question the members of the panel to gather
13  information appropriate for them to exercise their strikes
14  and complete the process of selecting the jurors who will
15  try this case.
16          Again, ladies and gentlemen, there are no wrong
17  answers to the questions that you may be asked as long as
18  you give full, complete, and truthful responses.
19          Now, if in that questioning process you should be
20  asked a question -- any one of you should be asked a
21  question that I think is improper, I will certainly stop
22  the lawyers, and I will certainly intervene.
23          But I want you to understand, ladies and
24  gentlemen, these are all experienced trial lawyers.  They
25  know the rules that govern jury selection in this court.

1    They're familiar with the Court's local rules.  And I don't

2    expect that to happen.

3            But if an improper question should be asked,

4    I'll certainly not hesitate to intervene in the process.

5            One thing, however, I do want to call your

6    attention to before the lawyers begin their questioning,

7    because it's possible they will ask you about this during

8    the time they question the panel, is the burden of proof

9    that's going to be applied in this case.

10           In a patent case, the jury may be called upon to

11   apply two different burdens of proof.  The jury may apply a

12   burden of proof known as the preponderance of the evidence.

13   I'll say that again, the preponderance of the evidence.

14           And the jury may also apply a second burden of

15   proof known as clear and convincing evidence.  I'll repeat

16   that, clear and convincing evidence.

17           Now, if you're responding to the lawyers'

18   questions about your ability to apply properly the burden

19   of proof in this case, I need to instruct you that when a

20   party has the burden of proof on any claim or defense by a

21   preponderance of the evidence, that means that you, the

22   jury, must be persuaded by the credible or believable

23   evidence that that claim or defense is more probably true

24   than not true.  Let me repeat that, more probably true than

25   not true.

1          Sometimes this is talked about as being the

2    greater weight and degree of credible testimony.

3          Let me see if I can give you an example that may

4    help you understand what I'm talking about.  We don't have

5    a statue or a picture in here, but I think all of you have

6    seen, and I'm comfortable that all of you have seen images

7    or pictures of the statue of the Lady of Justice.  She's

8    blindfolded, and in her left hand above her she holds the

9    Scales of Justice that are equally balanced.  I'm sure all

10   of you have seen that at one time or another.

11         If you think about that image in regard to the

12   burden of proof of a -- of the preponderance of the

13   evidence, think about it this way.  Over the course of this

14   trial, evidence is going to be presented by the Plaintiff

15   and by the Defendant.  And that evidence will go on one

16   side of those scales or the other side of those scales.

17         Those scales start out exactly equal and exactly

18   balanced.  But over the course of the trial, evidence will

19   be put on each side of those scales by the competing

20   parties.

21         When all the evidence has been heard, the jury is

22   going to be asked to answer certain questions.  If the

23   party who has the burden of proof on any question has those

24   scales with all the evidence produced through the trial on

25   both sides of it, if those scales on balance should tip

1  toward the party who has the burden of proof by a

2  preponderance of the evidence, then they have met that

3  burden of proof, even if those scales tip ever so slightly.

4  That equates to the preponderance of the evidence.

5        On the other hand, ladies and gentlemen, with

6  regard to the second burden of proof that will be applied

7  in this case, that burden of proof is called clear and

8  convincing evidence.  And when a party has the burden of

9  proof on any defense by clear and convincing evidence, it

10  means that the jury must have an abiding conviction that

11  the truth of the party's factual contentions are highly

12  probable.  Let me say that again, an abiding conviction

13  that the truth of the party's factual contentions are

14  highly probable.

15        The clear and convincing evidence standard is a

16  higher standard than the preponderance of the evidence

17  standard.  If you think back to the example I gave you of

18  those Scales of Justice, and over the course of the trial,

19  though they start out balanced, evidence from both parties

20  is placed on one side or the other of those scales, and

21  when all the evidence is in, if a party has the burden of

22  proof by clear and convincing evidence and you look at

23  those scales, if they tip in favor of the party who has the

24  burden of proof and they tip more than ever so slightly, if

25  they definitely tip in favor of that party, then that party

1   has met the burden of proof of clear and convincing

2   evidence.  But they must tip more than ever so slightly.

3         Now, ladies and gentlemen, these two burdens of

4   proof that will be applied in this case are very different

5   and have nothing to do with a third burden of proof

6   I'm equally sure you've all heard about in the media and on

7   television and in other places, and that third burden of

8   proof is called beyond a reasonable doubt.

9         Beyond a reasonable doubt is the burden of proof

10  applied in a criminal case.  It has absolutely no

11  application whatsoever in a civil case.

12        You should not confuse beyond a reasonable doubt

13  with clear and convincing evidence.  It's not as high as

14  that.

15        If you think about the spectrum of evidence from

16  preponderance of the evidence on one end, where the scales

17  must be tipped but ever so slightly in favor of the party

18  with that burden, to on the other end of the spectrum,

19  beyond a reasonable doubt, where matters must be proven to

20  a very high degree of certainty, then the clear and

21  convincing evidence standard is somewhere in the middle.

22        Now, I give you these instructions about the

23  burdens of proof that will be applied in this case because

24  it's possible that one or more of the lawyers involved will

25  ask you in a few minutes about your ability to apply one or

 1  both of those burdens of proof to the evidence that will be

 2  presented in this trial.

 3          Now, before the lawyers address the panel,

 4  I'm going to let each of you at this point give me the same

 5  information about each of you that I gave you about me when

 6  we started a few minutes ago.

 7          Let me explain how we're going to do that.  We're

 8  going to do that one at a time.  Our Court Security Officer

 9  has a handheld microphone.  He's going to begin with

10  Panel Member No. 1.

11          And when the microphone is received, if you'll

12  stand, use the microphone -- it's a large room with a high

13  ceiling -- make sure you use that microphone so that we can

14  all hear you, and then if you'll give your answers to those

15  nine questions that are on the screens in front of you and

16  that you have in written form, as well.

17          Then we'll pass the microphone from

18  Panel Member No. 1 to Panel Member No. 2 and so forth and

19  so on until we cover everybody on the panel.

20          Also, ladies and gentlemen, after this is done and

21  when the lawyers ask their individual questions thereafter,

22  if you're asked a specific question as a member of the

23  panel, you should stand and you should wait until the

24  Court Security Officer brings you the handheld microphone,

25  and then answer the specific question that you're asked by

1    one of the lawyers in the case.

2         All right.  With that understanding, we'll begin

3    with Panel Member No. 1.  Ms. Hoffman, if you'll take the

4    microphone and stand and answer those nine questions for

5    us, please.

6         JUROR HOFFMAN:  Good morning, Judge.  Good morning

7    ladies and gentlemen.  I'm happy to be here.

8         My name is Rhonda Hoffman, and I live in Van,

9    Texas.  I have two grown children, a boy and a girl.  Right

10   now, I'm an assistant auditor at Van Zandt County

11   Courthouse in Canton.  I'm a retired teacher.  Taught 26

12   years.  I have a degree in -- a Bachelor of Science.  I'm

13   single at the moment.

14        Number 7 doesn't apply.  How -- that doesn't

15   apply.  The only jury I was on was a petit jury for a

16   traffic violation, and we quickly took the defendant's side

17   and fined him $1.00 plus court cost, so that was my only

18   experience.

19        THE COURT:  Was that in municipal court or

20   JP court?

21        JUROR HOFFMAN:  It was in a justice of the peace,

22   Precinct 1.

23        THE COURT:  Okay.  Thank you very much,

24   Ms. Hoffman.

25        If you'll pass the microphone to Panel Member

1  No. 2, Mr. Rudd.

2         JUROR RUDD:  Yes.  I'm Ross Rudd.  I have three

3  children.  They're all grown.

4         I work for Rudd Plumping Company.  I'm one of the

5  owners there.  And I've been there for 35 years.  I have a

6  high school education.

7         My spouse's name is Tammy Rudd, and she is

8  retired.  She was a secretary for Chapel Hill High School.

9  And I have had prior jury service.  I was on a federal jury

10  for -- on a criminal case.

11         THE COURT:  How long ago was that?

12         JUROR RUDD:  Probably 20 years ago.

13         THE COURT:  Is that the only prior jury service

14  you've had, sir?

15         JUROR RUDD:  Yes.

16         THE COURT:  Thank you.  Thank you.

17         If you'll hand the microphone to No. 3,

18  Ms. Edwards.

19         JUROR EDWARDS:  Good morning.

20         THE COURT:  Good morning.

21         JUROR EDWARDS:  I am Nicole Edwards, and I live in

22  Tyler.  I have no children.

23         Currently, I am the administrative assistant for

24  the Smith County Commissioners' Court.  I've worked there

25  for almost five years.  I have a Bachelor of Science degree

1   from Texas Christian University.  I am single.  Never been

2   married.

3        And my only prior jury service, I was actually

4   called to municipal jury service a few months ago, but they

5   actually settled before the jury could actually convene.

6        THE COURT:  Thank you very much, Ms. Edwards.

7        Next is No. 4, Mr. Robinson.

8        JUROR ROBINSON:  My name is Gary Robinson.  I live

9   in Martins Mill.  I have three children.  I'm retired from

10  the Dallas Water Department.  I worked there 32 years.

11       Okay.  My wife's name is Judy.  She's retired.

12  She was a bank teller for about 20 years.  And I was on a

13  DWI case probably 20 years ago.

14       THE COURT:  And where was that?

15       JUROR ROBINSON:  Kaufman County.

16       THE COURT:  And tell us about your educational

17  background.

18       JUROR ROBINSON:  High school.

19       THE COURT:  All right, sir.  Thank you very much.

20       JUROR ROBINSON:  All right.  Thank you.

21       THE COURT:  No. 5, Mr. Powell.

22       JUROR POWELL:  Good morning, Judge.

23       Scott Powell.  Three children.  Worked for ETEX

24  Telephone 30 years.  Outside plant supervisor the last six

25  years.

1          My wife's name is Virginia.  She works at

2  H&R Block.  Been there for 10 years.  And I've never been

3  on a jury here.  I'm looking forward to it.

4          THE COURT:  Thank you, sir.  Tell us about your

5  education.

6          JUROR POWELL:  High school.

7          THE COURT:  High school.

8          JUROR POWELL:  Henderson High School.

9          THE COURT:  Thank you, sir.

10         No. 6 is next, Ms. Whitaker.

11         JUROR WHITAKER:  My name is Teresa Whitaker.

12  I live in Tyler.  I have three grown children.

13         I work for Chapel Hill ISD as the HR specialist.

14  I've been with the district for 16 years.  I have a high

15  school education and currently enrolled in college.  I am

16  divorced, so I have no spouse.

17         I have served on a federal jury, but it's been

18  probably 30, 35 years ago, and it was a civil case.

19         THE COURT:  All right.  Thank you very much.

20         No. 7 is next.

21         JUROR HYZER:  My name is Karl Hyzer.  I live in

22  Chandler, Texas.  I have two adult children.

23         I currently work for UT Health East Texas Athens

24  as a security officer.  And I'm retired 26 years Federal

25  Bureau of Prisons where I was in corrections.  I have a

1   high school diploma and some college in criminal justice.

2          My wife's name is Becky.  She has always been a

3   homemaker, and no prior jury service.

4          THE COURT:  Thank you, sir.

5          If you'll hand the microphone to the Court

6   Security Officer, he'll take it around to Panel Member No.

7   8.

8          JUROR MENDIETTA:  Good morning, Your Honor.  My

9   name is Uvence Mendietta, and I'm from Palestine, Texas.

10  I have one daughter.  And I am retired.  I worked as an

11  engineer for the Union Pacific Railroad for 17 years, and

12  I was a correctional officer for 15 years.

13         THE COURT:  Where were you a correctional officer?

14         JUROR MENDIETTA:  At the Michael Unit here in

15  Palestine.

16         THE COURT:  Thank you, sir.

17         JUROR MENDIETTA:  I got a two-year college degree.

18  My wife's name is Diana Mendietta.  She's a teacher for

19  44 years and still working.

20         And that's --

21         THE COURT:  Have you ever had jury service before?

22         JUROR MENDIETTA:  No, sir.

23         THE COURT:  Have not.  Thank you, sir.

24         If you'll pass the microphone to No. 9, Ms. Bunt.

25         JUROR BUNT:  Good morning.  My name is Stacey

```
 1   Bunt.  I have two grown children.  I live in Longview.
 2          I work for Brian Bunt, who is my husband, and an
 3   attorney with Freeman Mills in Longview.  I've worked there
 4   for approximately 10 years, but I've worked for my husband,
 5   Brian, for probably almost 20.  I have a bachelor's degree.
 6          As I said, my husband is Brian Bunt, and he is an
 7   attorney in Longview.  I have not had any prior jury
 8   service.
 9          THE COURT:  All right.  Thank you, ma'am.
10          Next is No. 10, Mr. Upson.
11          JUROR UPSON:  Matthew Upson.  Two children.  I
12   work for American Electric Power.  I'm a serviceman there.
13   Been there 10 years.  I have a certificate from TSTC for
14   line work.
15          Spouse, Lindsay.  She stays at home, and she does
16   online sales through Monet.  She's been doing that for
17   about a year.  And no prior jury service.
18          THE COURT:  Thank you very much.
19          Next is No. 11, Mr. Johnson.
20          JUROR JOHNSON:  Good morning, Your Honor.
21          THE COURT:  Good morning.
22          JUROR JOHNSON:  My name is Danny Johnson.  I have
23   five grown children.
24          I work for Eastman Chemical Company in Longview as
25   a power distribution technician.  I've worked there about
```

1   10 years.  My educational background, high school, some

2   college, and most of it is technical -- technical

3   background.

4           My wife's name is Catherine.  She is a prior

5   bakery owner.  She's currently not working, and we sold the

6   bakery a couple of years ago.  She did that for about three

7   years.  And no prior service.

8           THE COURT:  All right.  Thank you, sir.

9           Next is No. 12.

10          JUROR CREMERS:  Good morning, Judge.

11          THE COURT:  Good morning.

12          JUROR CREMERS:  My name is Emily, and I live in

13  Lindale, Texas.  I do not have any children.  I work at

14  Kawa's.  It's a hibachi grill and sushi restaurant in

15  Tyler.  I've been there for four months.  I completed high

16  school.  I'm not married.

17          And I served at a jury -- I believe it was a

18  criminal case -- about a couple of years ago.

19          THE COURT:  And where was that?

20          JUROR CREMERS:  Smith County.

21          THE COURT:  All right.  Pronounce your last name

22  for us.

23          JUROR CREMERS:  Cremers.

24          THE COURT:  Cremers.  Thank you very much.

25          Next is 13, Ms. Coleman.

1          JUROR COLEMAN:  Yes.  I am Evelyn Coleman.  I have

2    two daughters up in Cleveland, Ohio.  I worked for Ohio

3    Bell in Cleveland for about 20 years and left when my

4    husband went full time at LaTerry.

5          I have some college.  Not a degree.  And my

6    husband's name is Keith Coleman, also known as The Damn

7    Yankee Blacksmith.  He's retired,

8    31 years as a master sergeant, and is having fun welding

9    and blacksmithing now.

10          THE COURT:  What branch of the service did he

11   retire from?

12          JUROR COLEMAN:  Army.

13          THE COURT:  Okay.

14          JUROR COLEMAN:  And this is the first time that

15   I have been called to the honorable duty of jury service.

16          THE COURT:  All right.  Thank you, ma'am.

17          JUROR COLEMAN:  You're welcome.

18          THE COURT:  Next is No. 14, Mr. Covey.

19          JUROR COVEY:  Good morning.  My name is Matthew

20   Covey.  I'm from Flint, Texas.  I have one two-year old.

21   I currently work for Hyster-Yale Group, a machinery

22   company.  We do data analytics for telemetry for forklifts

23   mainly.  I've worked there about a year and a half.

24          I have a Bachelor of Science in information

25   technology.  My spouse's name is Sonya, and she's an

1  elementary school teacher.  Worked there for about five

2  years.  And no prior jury service.

3          THE COURT:  All right.  Thank you very much.

4          Next is Panel Member No. 15.

5          JUROR SCHRECK:  Good morning.  My name is Debra

6  Schreck.  I have one grown daughter and currently have

7  custody of my great niece and nephew.  I work for the

8  City of Tyler, vehicle services department.  I've been

9  there for a little over 10 years.

10         I have a high school diploma.  My spouse's name is

11  Becky.  She's employed by Republic Services.  She's been

12  there for 27 years.  And I've served on a criminal case in

13  Smith County before.

14         THE COURT:  How long was that -- how long ago,

15  ma'am?

16         JUROR SCHRECK:  A long time.  10 years plus

17  probably.

18         THE COURT:  That's fine.  Thank you very much.

19         Next is No. 16, Mr. Elliott.

20         JUROR ELLIOTT:  My name is Carl Elliott.  I live

21  in Winona, Texas.  And I have two children that I have

22  custody of.  And I work for Crosby Group.  It's a

23  manufacturing company.  And been there 15 years.

24         THE COURT:  What do they manufacture?

25         JUROR ELLIOTT:  I am not married, divorced.

1          THE COURT:  What does Crosby Company manufacture?

2          JUROR ELLIOTT:  Lifting products, hooks, binders.

3          THE COURT:  And what do you do for them?

4          JUROR ELLIOTT:  I do -- I'm -- they call it a

5     trimmer maker, so in the forging process, I have to get the

6     things ready for the dies.

7          THE COURT:  So you work in the manufacturing

8     process?

9          JUROR ELLIOTT:  Yes.

10          THE COURT:  Okay.  Sorry for the interruption.

11          Go ahead.

12          JUROR ELLIOTT:  That's fine.  And I'm divorced.

13     And I served on a jury in Gregg County and -- actually two

14     in Gregg County.  Both civil.  And it was child custody

15     case.

16          THE COURT:  And how long ago was that,

17     Mr. Elliott?

18          JUROR ELLIOTT:  Like '83 -- 1983.

19          THE COURT:  All right, sir.  Thank you very much.

20          Next is No. 17, Mr. Turner.

21          JUROR TURNER:  My name is Clinton Turner.  Live in

22     Houston.  I have no children.  Director of human resources

23     for Pico Technologies Oil & Gas Company.  I have a

24     master's.  I've been with Pico for a year.  Was a CPA for

25     20 years prior to that.  I have no spouse.  And I have not

 1  had any prior service.

 2          THE COURT:  All right.  Thank you very much.  If

 3  you'll hand the microphone to No. 18, Mr. Lewis.

 4          JUROR LEWIS:  My name is Mike Lewis.  Two grown

 5  children.  Place of employment, I'm retired.  Just under

 6  30 years for a large water agency in Southern California.

 7  I, like you, Judge, got here as soon as I could.

 8          Educational background, JC degree and several tech

 9  certificates.  Kim, wife.  She's retired also.

10  Veterinarian technician.  No -- been in this stage many

11  times, but never served.

12          THE COURT:  All right.  Thank you, sir.

13          Next is No. 19, Ms. Waters.

14          JUROR WATERS:  Hi.  I'm Lindsay Waters, and I live

15  in Tyler.  I don't have any children.  I currently am

16  employed by the University of Texas Health Science Center

17  at Tyler as a physician recruiter for the UT Health system.

18  I've worked there about five years.

19          I have a Bachelor's from Cornell University.  My

20  husband's name is BJ.  He's currently unemployed and taking

21  care of some family members who are ill, but he's in the

22  golf business.  He's been a golf pro for many years.  And

23  I have never served on a jury before, but I have been

24  called many times.

25          THE COURT:  Thank you, ma'am.

```
 1              Next is No. 20, Mr. Harper.

 2              JUROR HARPER:  Hello.  My name is Terry Harper.

 3    I live in Wills Point.  No children.  I've been in real

 4    estate services for 30 years -- 30 years plus.  Brokerage

 5    owner, mortgage lending, all types in that.  I got a

 6    Bachelor of Arts from the University of Dallas.  I'm not

 7    married.  And I've been called but never served.

 8              THE COURT:  Thank you very much, sir.

 9              Next is No. 21.

10              JUROR ANDREWS:  Hi.  My name is Kaitlin Andrews.

11    I do not have any children.  I currently work as a nurse

12    over at Christus Good Shepherd in Longview.  I do their out

13    patient infusion kind of services.  I've worked there about

14    six years.  I have a Bachelor's of Science degree.  I'm not

15    married.  And I have not served on a jury before.

16              THE COURT:  Thank you, ma'am.

17              The Court Security Officer will get the microphone

18    from you.  He'll take it around to No. 22, Ms. Hambrick.

19              JUROR HAMBRICK:  Good morning.  My name is Karla

20    Nichols Hambrick.  I live here in Tyler, Texas.  I have two

21    grown children.  I currently work for Clinical Pathology

22    Lab.  I've been there 38 years.  It's a medical lab.

23    I retired from J.C. Penney's after part time -- after 28

24    years part time.  I'm currently working part time at Pier 1

25    Imports.  No spouse.  And some high school -- some college
```

1  education.  And no prior jury service.

2       THE COURT:  Thank you, ma'am.  If you'll hand the

3  microphone to Ms. Garcia, No. 23.

4       JUROR GARCIA:  My name is Evelyn Garcia.  And

5  I live in Tyler.  I don't have any children.  And

6  I currently work for M Chest Pharmacy as an accounts

7  payable specialist.  I've been there for almost two years.

8  I have a Bachelor's degree in business administration.  I'm

9  not married.  And I have no prior jury service.

10      THE COURT:  Thank you, ma'am.

11      Next is No. 24, Mr. Reding.

12      JUROR REDING:  Good morning.  My name is Garrett

13 Reding.  I live in small town, Benton, Texas.  I don't have

14 any children.  I work for JDS Surveying in Van.  I've

15 worked there for two and a half years.

16      I have a high school diploma.  I'm not married.

17 And I have not served.

18      THE COURT:  You actually work the surveying

19 crews --

20      JUROR REDING:  Yes, sir.

21      THE COURT:  -- or work in the office?

22      JUROR REDING:  No, I -- I'm a crew chief.

23      THE COURT:  Okay.

24      JUROR REDING:  Yes, sir.

25      THE COURT:  Thank you very much.

1          JUROR REDING:  Thank you.

2          THE COURT:  If you'll hand the microphone to

3    No. 25, Ms. Torres.

4          JUROR TORRES:  My name is Jeanette Torres.  I live

5    in Whitehouse.  I don't have any children.  I work for an

6    engineering firm in Tyler.  I've worked there since August.

7    Some college.  No spouse.  And I served on a jury in August

8    of last year.

9          THE COURT:  And what's the name of the engineering

10   firm that you work for.

11         JUROR TORRES:  IPM.

12         THE COURT:  Do they do civil engineering?

13         JUROR TORRES:  Yes.

14         THE COURT:  Okay.  Thank you very much, ma'am.

15         Next is No. 26, Mr. Allen.

16         JUROR ALLEN:  Thank you.  My name is Joe Allen.

17   I have two grown sons.  I work for Legacy Hospice here in

18   Tyler in administration.  I've been there for about

19   10 years.  I graduated from Texas College of Mortuary

20   Science in Dallas.  My wife of 34 years name is Alisa.  She

21   basically has been a homemaker all of our marriage.

22   I served on a jury in Tarrant County, Texas, probably

23   30 years ago -- 30 plus years ago.  It was a civil case.  A

24   back injury at work case.

25         THE COURT:  And that's the last time you've served

1   on a jury?

2        JUROR ALLEN:  I was empaneled in Athens, Texas,

3   probably 10 to 12 years ago, but the case was settled

4   before it got started.

5        THE COURT:  All right, sir.  Thank you very much.

6        JUROR ALLEN:  Thank you.

7        THE COURT:  Next is No. 27, Mr. Nichols.

8        JUROR NICHOLS:  Hello.  My name is Reginald

9   Nichols.  Tyler.  No children.  I work -- I work at Target

10  for 19 years.  High school education.  Never married.  No

11  prior service.

12       THE COURT:  All right, sir.  Thank you.

13       No. 28 is next, Ms. Jones.

14       JUROR JONES:  I'm Debbie Jones.  I live in

15  Longview.  I have two grown children.  I work for Sam's

16  Club.  I stock at night.  I've worked there 12 years.

17  Graduated high school.  No spouse.  And I served on a civil

18  jury, like, 30, 40 years ago.  It's too long ago.

19       THE COURT:  All right, ma'am.  Thank you very

20  much.

21       Thank you very much, ladies and gentlemen.

22       Now, I need to say a couple more things to you

23  before I turn the questioning over to the lawyers.

24       The jurors that are actually selected to serve in

25  this case will serve in the role as the judges of the

1    facts.  And the jurors selected will make the sole

2    determination about what the facts are in this case.

3         Now, my job as the Judge is to rule on questions

4    of law, evidence, and procedure, to maintain the decorum of

5    the courtroom, and to oversee the flow of the evidence

6    during the trial.

7         Also, let me say a couple of things to you about

8    our judicial system that hopefully will put things in a

9    proper perspective for you.

10        In any jury trial, such as this one, besides the

11   parties themselves, there are always three participants,

12   the jury, the Judge, and the lawyers.

13        With regard to the lawyers, it's important for

14   each of you to understand that our judicial system is an

15   adversary system, which means simply that during the course

16   of the trial, each of the parties, through their lawyers,

17   will seek to present their respective cases to the jury in

18   the very best light possible.

19        Now, it should be no surprise to any of you that

20   lawyers as a group are often criticized in the public and

21   in the media, and the Court is of the opinion and has

22   recognized that at least some of this is because of a basic

23   misunderstanding about our adversary system in which the

24   lawyers act as advocates for the competing parties.

25        As an advocate, a lawyer is ethically and legally

1   obligated to zealously assert his or her client's position

2   under the rules of our adversary system, and by presenting

3   the very best case possible on behalf of their clients, the

4   lawyers hopefully will enable the jury to better weigh the

5   relevant evidence, to determine the truth, and to arrive at

6   a just verdict based on the evidence.

7           Now, this adversary system of justice has served

8   our nation well for over 200 years, and America's lawyers

9   have been, are now, and will be in the future an integral

10  and indispensable part of the process.

11          So as we go forward over the course of this trial,

12  even though it's possible I might occasionally frown from

13  time to time at some of the lawyers, it's simply because

14  I'm trying to make sure that their advocacy doesn't get

15  outside the boundaries of our adversary system.

16          But please understand, ladies and gentlemen, they

17  are simply doing their jobs, and I think it's important for

18  you to keep that in mind as we go forward.

19          Also, ladies and gentlemen, let me tell you that

20  during the course of this trial, I'm going to do my very

21  best to make sure that none of you on the jury have any

22  idea about what I think about the evidence because

23  determining the facts in this case from the evidence is the

24  sole responsibility of the jury.  It's not my

25  responsibility.

1          So those of you selected on the jury should not

2     take anything you see or you hear or you think you see or

3     hear that comes from me as something that you should

4     consider about deciding and determining the ultimate facts

5     in this case.

6          All right.  At this point, we will now have

7     counsel address the panel on behalf of their respective

8     clients.

9          Mr. Gilliland, you may address the panel on behalf

10    of the Plaintiff.

11         MR. GILLILAND:  May it please the Court.

12         THE COURT:  Would you like a warning on your time?

13         MR. GILLILAND:  Yes, Your Honor.

14         Could I have a three-minute warning?

15         THE COURT:  You may.

16         MR. GILLILAND:  Good morning.

17         JURORS:  Good morning.

18         MR. GILLILAND:  Let's try that again.  It's a

19    beautiful day outside, and some of y'all are going to get

20    to experience the rest of it, and some of y'all are going

21    to get to learn a lot more about patent cases.

22         So good morning.

23         JURORS:  Good morning.

24         MR. GILLILAND:  Thank y'all very much for being

25    here.  Much like Judge Gilstrap, I believe that jury

 1 | service is the second highest service that we, as citizens
 2 | of the United States, can provide.
 3 |         And I know several of you, thanks to your
 4 | questionnaires and thanks to the questions you answered
 5 | before, have actually performed the first highest type of
 6 | jury -- of public service you can provide, and that's
 7 | military service.
 8 |         I believe Mr. Hyzer, Mr. Covey, Ms. Coleman's
 9 | husband, and Mr. Mendietta, I believe have all -- and
10 | I don't know if I missed anybody.  Anybody that I missed
11 | that's served in the military at any time?
12 |         Well, thank you very much for your service in the
13 | military.  And thank you all for performing the second
14 | highest service you can perform as citizens, and that's
15 | showing up for jury duty, because this is a very important
16 | case.  As you've seen, there are a lot of very serious
17 | lawyers on both sides of this case.
18 |         Now, my name is Derek Gilliland, and I am -- I'll
19 | actually answer the same questions y'all did to just give a
20 | little bit of my background.  But I am an attorney.  I live
21 | in Longview, Texas.
22 |         I've got four children, two of them in college and
23 | two of them in high school.  One of them is -- is playing
24 | soccer at UT Tyler now, and I was fortunate enough to go
25 | watch her play a little bit last night.

1          As I said, I work for Nix Patterson & Roach.  Been

2     there for -- or Nix Patterson.  Excuse me.  Been there for

3     10 years now, 11 years, I guess.  Time flies.  So it's

4     adding up.  I, of course, have a law degree from

5     Baylor University and an undergraduate degree in

6     engineering from Texas A&M.

7          My wife's name is named Kelly Gilliland, lives

8     with me.  We've been married for -- don't tell her I

9     hesitated, but I think it's 25 plus years.  She's a

10    veterinarian, a part-time veterinarian and a full-time mom

11    to the kids in Longview.

12         And I have been in your shoes on three separate

13    occasions, twice on criminal cases, once on a will contest,

14    and I have never gotten past this point.  For some reason,

15    I've never made it all the way on to a jury.

16         Now, with me today at counsel table are two of my

17    colleagues, Ty Wilson and Karl Rupp with my law firm

18    Nix Patterson.  And I'll just ask, do -- does anybody here

19    recognize either of those gentlemen or -- or know me?

20         Okay.  I don't see any hands.

21         And also with us at counsel table, as we

22    introduced, is Mr. Cliff Win.  He is the director of patent

23    litigation for a company called Intellectual Ventures.  Is

24    anybody familiar or recognize Mr. Win or familiar with his

25    company, Intellectual Ventures?

1              Okay.  I don't see any hands on that one.

2              How about, at opposing counsel's table, are two

3     attorneys from a law firm called Sidley.  And it's a

4     national law firm.  So we've got Ms. Irene Yang and

5     Mr. Mike Bettinger.  Does anybody recognize or know either

6     of those people?

7              And, finally -- and I don't see any hands, so

8     I'll take that as a no, nobody knows them.

9              Finally, we have Mr. Gil Gillam sitting at the

10    table for Great West.  And Mr. Gillam's primary office is

11    over in Marshall, Texas.  Does anybody know Mr. Gillam or

12    any of the people at his firm, his firm is Gillam & Smith?

13             Ms. Bunt, we'll see if we can get you a microphone

14    real quick.

15             JUROR BUNT:  Yes, I know Mr. Gillam.

16             MR. GILLILAND:  Okay.  And do you know his

17    partner, Melissa Smith, as well?

18             JUROR BUNT:  I don't know her.

19             MR. GILLILAND:  Okay.  And how long have you known

20    Mr. Gillam?

21             JUROR BUNT:  Several years.  He actually lives up

22    the street from me.

23             MR. GILLILAND:  Oh.  So y'all are neighbors.

24             JUROR BUNT:  Yes.

25             MR. GILLILAND:  And does the fact that you live

1   near Mr. Gillam or know Mr. Gillam, would that cause you to

2   start out favoring his side over our side of the case?

3          JUROR BUNT:  Probably not.

4          MR. GILLILAND:  Okay.  You said probably not.

5   That's kind of a hedge word.  You have some doubt in your

6   mind about it?

7          JUROR BUNT:  Well, he's -- I mean, I don't know

8   how to answer that, but it probably would not hinder my --

9   my decisions.

10         MR. GILLILAND:  Okay.  Now, the company that --

11  that Mr. -- you can go ahead and hand the mic back.  Thank

12  you very much.

13         The company that Mr. Smith [sic] represents and

14  the other attorneys represent is called Great West Casualty

15  Corporation, and it's primarily a trucking insurance

16  company.

17         And what this case is about is my client,

18  Intellectual Ventures, several years ago acquired, they

19  purchased a patent, much like you would purchase a deed to

20  property, and then over time, they came to believe and

21  we're here because we believe that Great West Casualty

22  Corporation infringes on that patent.  They trespass on

23  that patent.  And so we've alleged that they trespass.

24         Now, they, of course, claim that they don't

25  trespass, and if they -- they do trespass, then they claim

1    that the patent is invalid.

2            And then we also have allegations and -- and will

3    put on evidence about the value we think or the amount of

4    use that we believe they used Intellectual Ventures'

5    property.

6            And, of course, in addition to claiming they don't

7    trespass and that the patent is invalid, then Great West

8    says, well, if they do owe them anything, it's not nearly

9    as much as we say.  So those are the basic contentions of

10   the lawsuit.

11           Now, let me ask you this right off the bat,

12   knowing that Intellectual Ventures acquired the patent,

13   they did not come up with the invention -- and the

14   inventors of the patent -- we're going to refer to it as

15   the '177 patent.  The full number for it is 7,516,177.  And

16   those of you that make it on the jury will have a copy of

17   that in a notebook for you.

18           But the inventors of the '177 patent do not work

19   for Intellectual Ventures.  Intellectual Ventures acquired

20   it much like they would a deed to property or a piece of

21   real estate.

22           Now, knowing that Intellectual Ventures did not

23   invent the '177 patent but is asserting it against

24   Great West, does anybody have concerns or issues with that

25   or problems with the fact that Intellectual Ventures bought

1  the patent and is now asserting it, claiming that

2  Great West Casualty Corporation trespasses?  Does anybody

3  have a problem with that?  Any concerns about it at all?

4  Some folks do, you know.  It's no big deal.

5       All right.  Well, thank you very much.  I don't

6  see any hands, so I assume nobody has a problem with that.

7       Now, one of the things I do want to talk about,

8  too, though, is -- and you will hear and you've seen it on

9  your questionnaire is that there's a company that's

10 mentioned call BITCO.  And it's -- it's also owned by the

11 same parent corporation that the Defendant, Great West, is

12 owned by.

13      Now, I understand -- I think Ms. Bunt, you

14 indicated on your questionnaire that you're familiar with

15 BITCO.

16      Does anybody else here, have they ever heard of

17 Great West or BITCO or Old Republic Corporation?  All

18 right.  I don't see any other hands.

19      And let me ask you a question, Ms. Bunt, if we

20 could get you a microphone.

21      And you indicated, I guess, that your husband, who

22 you work for, does some work for BITCO?

23      JUROR BUNT:  That's correct.

24      MR. GILLILAND:  And would the fact that your

25 husband works for a company that's also owned by the same

```
 1  parent as the Defendant in this case, would that affect

 2  your ability to be fair and impartial in this case?

 3          JUROR BUNT:  I think that would, yes.

 4          MR. GILLILAND:  I really do appreciate your

 5  honesty.  Because what we're after -- and you can give the

 6  microphone back.

 7          What we're here today is to find out who -- who's

 8  the right juror for this case because we're not all suited

 9  to be jurors on every case.  You know, we all come into

10  court with -- with things that have happened in our lives

11  and backgrounds in our lives that -- that it would make it

12  very, very difficult to sit and be completely unbiassed.

13          I believe -- is it -- Mr. Robinson, are you the

14  retired fireman?  I'm sorry, who is the retired --

15  I thought somebody was retired fire -- fire department.

16  I got -- I got my notes off, I guess, a little bit.

17          Okay.  Let's see, Mr. Robinson, where are you

18  retired from?

19          JUROR ROBINSON:  Dallas Water Department.

20          MR. GILLILAND:  Dallas Water Department.  I guess

21  my hearing is as good as I thought it would be.  And if you

22  don't mind, would you tell us what you did at the water

23  department?

24          JUROR ROBINSON:  I was a plant operator.

25          MR. GILLILAND:  Okay.  I guess I heard Dallas
```

1   and -- and the water went so fast, I heard Dallas Fire

2   Department, so...

3          JUROR ROBINSON:  We just supplied the water.

4          MR. GILLILAND:  I got you.  Well, that's a very

5   important part of that process, isn't it?

6          JUROR ROBINSON:  Yes.

7          MR. GILLILAND:  And what did you do at the plant?

8          JUROR ROBINSON:  We made drinking water basically.

9          MR. GILLILAND:  Oh, did you -- did you operate the

10  equipment and run the -- the pumps and make sure everything

11  was working properly?

12         JUROR ROBINSON:  Yes, sir.

13         MR. GILLILAND:  Okay.  And how long were you

14  working there?

15         JUROR ROBINSON:  32 years.

16         MR. GILLILAND:  Okay.  Thank you very much.

17         Now, one of the things that can affect whether

18  somebody can, of course, be fair and impartial is whether

19  they have been involved in a lawsuit before.  And -- and

20  I understand from the questionnaires that several people

21  have been involved in a lawsuit.

22         If you could, if I could see a show of hands of

23  everybody who's been either a Plaintiff or a Defendant in a

24  lawsuit?  If you wouldn't mind, just raise your hands up

25  high to make sure we can get them.  Okay.  I see -- when

1  I call out your number, if you put your hand down.  So

2  I see No. 1, No. 2.

3       Anybody else on the first row?

4       Okay.  Second row?  No. 11.  Nobody else -- oh,

5  I'm sorry.

6       JUROR MENDIETTA:  Eight.

7       MR. GILLILAND:  Yes, sir, Mr. Mendietta.  Eight,

8  11.

9       Okay.  15.

10       Is that 18?  Thank you, sir.

11       20.

12       Okay.  Anyone else that's been a party to a

13  lawsuit?  Okay.  And Juror No. 1, is it Ms. Hoffman?

14       JUROR HOFFMAN:  Yes, sir.

15       MR. GILLILAND:  And can you tell us, what was the

16  nature of that lawsuit?

17       JUROR HOFFMAN:  We live across the road from

18  Pure Oil -- or Union Oil, I don't remember for sure.  They

19  since shut down that plant, but they were putting gases

20  into the atmosphere, and it's a tank farm there, so one of

21  the tanks burst, and it ran across my neighbor's property.

22       What happened is it was a large -- it was

23  everybody that lived across from this plant that jointly

24  sued the company.  Ours was because they -- because of this

25  chemical, they were in the air, and it smelled -- it

1   smelled really bad.  And my mother was dying, and so this

2   nauseous smell was in the air all the time.  And it had

3   been there for a long time.  We just -- at that time, it

4   was just really bad, and I guess because we were there so

5   much, that we noticed it the most.  But we felt like that

6   chemical was known to cause gastric cancer.  And that's

7   what she had.  And she was the only one of the whole family

8   that was there 24/7 for 20 years.  And that's the reason we

9   joined the suit.

10          MR. GILLILAND:  And you -- sorry, go ahead.

11          JUROR HOFFMAN:  The other part was the neighbor's

12  property got chemicals all on it.  So that's -- that's

13  basically -- she's the one that basically started it, but

14  the chemicals and the smell and the whole thing just kind

15  of snow-balled, and that was the reason.

16          MR. GILLILAND:  So you were a Plaintiff in that

17  lawsuit with a bunch of other people?

18          JUROR HOFFMAN:  We were.

19          MR. GILLILAND:  And do you recall who represented

20  you in that?

21          JUROR HOFFMAN:  It was -- no, I really don't know.

22  It's somebody from Austin maybe or -- it was one of the big

23  oil company lawyers.

24          MR. GILLILAND:  And how many years ago did that

25  resolve?

```
 1           JUROR HOFFMAN:  It happened in probably 2000 -- my

 2    mother died in '7, so it was two years after that, maybe

 3    2009.

 4           MR. GILLILAND:  And would anything about your

 5    experiences having been a Plaintiff in that have any affect

 6    on your ability to sit in judgment on this case?

 7           JUROR HOFFMAN:  No.  It didn't have anything to do

 8    with that.

 9           MR. GILLILAND:  Thank you.  Thank you,

10    Ms. Hoffman.

11           I believe it was Mr. Rudd, did you raise your

12    hand, sir?

13           JUROR RUDD:  Yes, sir.

14           MR. GILLILAND:  And -- and you had mentioned

15    you -- do you own or work for or both Rudd Construction?

16           JUROR RUDD:  I'm the owner, and I work for it.

17           MR. GILLILAND:  Okay.  And you raised your hand.

18           Have you been a party to a lawsuit before?

19           JUROR RUDD:  Yes.  We fired a man, and he claimed

20    that he was told that he was hired for life, and sued us

21    over it.  And we had to go to court over it.

22           MR. GILLILAND:  Okay.  And how long ago was that?

23           JUROR RUDD:  Probably five years.

24           MR. GILLILAND:  And has that -- has that case, has

25    it resolved?  Is it done?
```

1          JUROR RUDD:  Yes, it resolved.

2          MR. GILLILAND:  Okay.

3          JUROR RUDD:  Well, actually it resolved before it

4   went to court.

5          MR. GILLILAND:  Okay.  So you didn't get all the

6   way to this stage of the case?  And would anything about

7   that -- the fact that you had been sued, would that affect

8   your ability to sit on this case?  Would you kind of feel

9   for the Defendant or kind of lean towards them since you've

10  been in the Defendant's shoes before?

11         JUROR RUDD:  No.

12         MR. GILLILAND:  Okay.  And let me ask you just

13  kind of changing gears a little bit.  With -- with your

14  construction company and you being the owner of it,

15  would -- would sitting in court for potentially a week, you

16  know, up until next Thursday, would that affect your

17  ability to pay attention to the case knowing that you got

18  all that stuff back at the office to deal with?

19         JUROR RUDD:  No.

20         MR. GILLILAND:  Okay.  Thank you very much.

21         I believe we -- nobody else on the front row has

22  been in a lawsuit, have they?  All right.  No hands.

23         So we'll go to Mr. Mendietta, No. 8.

24         JUROR MENDIETTA:  Yes, sir.  In 1989, I had a

25  personal injury, and the late John O'Quinn was -- was my

1    lawyer.  And there was another one back in the '80s.  They

2    dropped my wife's car from the lift, and they didn't want

3    to pay for the repairs or anything like that, so I didn't

4    have a choice, you know, to get a lawyer for that.

5         But as far as my personal injury, that was back in

6    1989, and we didn't settle until 1993, four years later,

7    I believe.

8         MR. GILLILAND:  Okay.  So having -- having been a

9    Plaintiff, I guess, in those two situations, would that

10   affect your -- your ability to be fair and impartial in

11   this case?

12        JUROR MENDIETTA:  No, sir, not at all.

13        MR. GILLILAND:  Okay.  Let's see, I think we

14   had -- thank you very much, Mr. Mendietta.

15        Is it Mr. Johnson?

16        JUROR JOHNSON:  Yes, sir.  Yes, sir.  It happened

17   about 15 years ago.  I was a Plaintiff in a case.  I worked

18   for a construction where I injured my eye pretty badly.

19        MR. GILLILAND:  Pardon me, your eye?

20        JUROR JOHNSON:  Yes.

21        MR. GILLILAND:  Oh.

22        JUROR JOHNSON:  My left eye.  And my employer

23   was -- had problems with paying medical bills, and he never

24   would pay the medical bills.  So that was the reason for

25   the lawsuit.  He still never wound up paying for the

1  medical bills because we didn't -- didn't go that far with

2  it.  The lawyer firm that I used wanted to fight for more

3  than the medical bills, and I just didn't want to do that.

4          MR. GILLILAND:  So did you wind up just dropping

5  the whole --

6          JUROR JOHNSON:  Just dropping it.

7          MR. GILLILAND:  How long ago was that?

8          JUROR JOHNSON:  About 15 years.

9          MR. GILLILAND:  And it sounds like that wasn't --

10 since you just dropped the whole thing, was not necessarily

11 a positive experience?

12         JUROR JOHNSON:  No, not at all.

13         MR. GILLILAND:  Would that affect your ability to

14 sit in judgment on this case?

15         JUROR JOHNSON:  No, sir.  Fair is fair.

16         MR. GILLILAND:  Okay.  Thank you very much,

17 Mr. Johnson.

18         And I believe we come over here to Ms. Schreck.

19         And you've been a party to a lawsuit?

20         JUROR SCHRECK:  We're currently -- our family is

21 currently involved in a lawsuit against Oncor Electric

22 Company.  My nephew that we raise and my great niece and

23 nephew that we currently have custody for his father was

24 electrocuted.

25         MR. GILLILAND:  Okay.  And that's still ongoing?

```
 1              JUROR SCHRECK:  And it will probably be ongoing

 2      for a long time.

 3              MR. GILLILAND:  And who is representing you on

 4      that?

 5              JUROR SCHRECK:  Roberts & Roberts.

 6              MR. GILLILAND:  Here in Tyler?

 7              JUROR SCHRECK:  Yes.

 8              MR. GILLILAND:  Anything about your experience

 9      with that lawsuit affect your ability to sit on this case?

10              JUROR SCHRECK:  No.

11              MR. GILLILAND:  Thank you very much.

12              I believe No. 18, Mr. Lewis; is that right?

13              JUROR LEWIS:  My wife and I were a defendant in

14      a -- I don't remember the exact wording, but it was -- it

15      was a breach-of-contract-type of issue.  We owned a world

16      champion stallion and did a breeding operation with him.

17              In the process of purchasing him, the lady we

18      purchased from was sued for breach of contract, and then we

19      were lumped into it for kind of induction or inducing her

20      into breach of contract.

21              MR. GILLILAND:  I see.

22              JUROR LEWIS:  So it was -- it was -- it ended

23      up -- all of it getting pitched, but it was a very, very

24      expensive episode for us with -- you know, we countersued

25      for fees, which, you know, they just told us, well, that's
```

1    part of doing business.  So that was it.  And that was

2    about

3    20 years ago.

4         MR. GILLILAND:  Okay.  That's what I was going to

5    ask, how long ago that was.

6         JUROR LEWIS:  Yes.

7         MR. GILLILAND:  And would anything about that

8    affect your ability to sit on this case?

9         JUROR LEWIS:  No.

10        MR. GILLILAND:  And then I think the last person

11   we had was No. 20, Mr. Harper.

12        JUROR HARPER:  I owned a real estate brokerage,

13   and one of my agents was sued for not disclosing that there

14   was a spot on a 1-acre lot that didn't quite drain properly

15   where the previous -- where the seller that we were

16   representing had a volleyball court, and the kids had sort

17   of padded the -- it had washed out because it was a sandy

18   area, and so they -- but it was -- we ended up winning.

19        MR. GILLILAND:  Oh, okay.  And how long ago was

20   that, Mr. Harper?

21        JUROR HARPER:  It's probably been seven or eight

22   years.

23        MR. GILLILAND:  And would it -- did that affect

24   your ability to -- I mean, did it kind of jade you towards

25   lawsuits or --

1          JUROR HARPER:  Not really.

2          MR. GILLILAND:  Would you be able to put that

3     aside and listen to the evidence?

4          JUROR HARPER:  I believe I would.

5          MR. GILLILAND:  And let me ask you, since you've

6     got the mic, you have a real estate brokerage?

7          JUROR HARPER:  I had a real estate brokerage, yes.

8          MR. GILLILAND:  Okay.  And how long have you been

9     in the real estate business?

10         JUROR HARPER:  Since about 1985.

11         MR. GILLILAND:  And one of the things I want to

12    ask you, too, is in the real estate business, of course,

13    people buy property, and then they sell property, right?

14         JUROR HARPER:  Yes, sir.

15         MR. GILLILAND:  And in your experience -- well,

16    let me ask it this way:  Do people typically sell property

17    for the amount they paid for it, or do they try and get

18    more than what they paid for it?

19         JUROR HARPER:  Well, typically, you know, the

20    market -- you know, it increases.

21         MR. GILLILAND:  And --

22         JUROR HARPER:  Increases in real estate.

23         MR. GILLILAND:  Yes.  I'm sorry.  Go ahead.

24         JUROR HARPER:  Value increases in real estate.

25         We're lucky.

1          MR. GILLILAND:  And -- and if, let's say, oil was

2     found under a piece of property, how does that seem to

3     affect the value?

4          JUROR HARPER:  Depends on who has an interest.

5          MR. GILLILAND:  All right.  So if you bought the

6     property and got mineral rights with it and they find oil

7     under your property, are people typically limited to what

8     they paid for that property?

9          JUROR HARPER:  Well, they're actually two

10    different things.  There's a value in mineral rights, and

11    there's a value in property -- in property rights.

12         MR. GILLILAND:  Yeah.  And what I'm getting at,

13    though, is, if you own the mineral rights, then the people

14    pay for minerals, they have to pay for what they use of the

15    minerals.

16         JUROR HARPER:  Absolutely.

17         MR. GILLILAND:  And they're not limited to how

18    much you paid for the property, are they?

19         JUROR HARPER:  No.

20         MR. GILLILAND:  Okay.  And -- and the reason I ask

21    that -- and you can pass the microphone back, but the

22    reason I ask that is, in this case, as I said, Intellectual

23    Ventures bought the patent, and now, we're asserting the

24    patent, of course, and saying Great West trespasses on that

25    patent.

1          And we're asking for a substantial amount of

2   money, tens of millions of dollars for the use Great --

3   Great West has made of the property that Intellectual

4   Ventures owns.

5          Now, knowing that, one, does anybody -- if they --

6   just hearing that number, think that there's no way I could

7   ever return a verdict for tens of millions of dollars;

8   I don't care what the evidence shows?

9          Does anybody feel that that's just too much money,

10  regardless?

11         And I see -- is it 28?  Yeah.  Ms. Jones?  And

12  you're nodding your head.  Do you agree with that; that's

13  just too much money; you'd never be able to award tens of

14  millions of dollars?

15         JUROR JONES:  That's quite a bit amount, yes.

16         MR. GILLILAND:  Okay.  And I understand.  You

17  know, and that's the way it is.  Some of us -- that's just

18  a lot of money.

19         THE COURT:  Ms. Jones, please stand up.

20         MR. GILLILAND:  Oh, sorry.

21         THE COURT:  I like to see you.

22         JUROR JONES:  Sorry.

23         THE COURT:  Go ahead.

24         MR. GILLILAND:  Yeah.  And so I guess, in your

25  opinion, tens of millions of dollars would be just too much

```
1   money no matter what is at stake?

2          JUROR JONES:  Yes, sir.

3          MR. GILLILAND:  Okay.  And that's fair.  I mean,

4   that's -- and that's exactly the kind of honesty we need to

5   get to in this voir dire process.

6          Does anybody feel the same way as Ms. Jones?

7          JUROR LEWIS:  I do.

8          MR. GILLILAND:  Okay.  And raise your hands.

9   Let's do it that way.  So we can get everybody.

10         Mr. Lewis?

11         JUROR LEWIS:  Yeah.

12         MR. GILLILAND:  You feel the same way, that tens

13  of millions is just too much?

14         JUROR LEWIS:  Yeah.  I watch this stuff all the

15  time, and I'm just shaking my head.  I don't get it.  But

16  I guess -- you know, it could apply, you know, to a certain

17  situation.  I guess, if there was a value there and that's

18  shown, then I guess maybe.

19         MR. GILLILAND:  Maybe?

20         JUROR LEWIS:  Just -- yeah.

21         MR. GILLILAND:  And so you're open to --

22         JUROR LEWIS:  I'm open to it.

23         MR. GILLILAND:  -- the evidence?

24         JUROR LEWIS:  Yeah.

25         MR. GILLILAND:  But it's still a lot of money?
```

1          JUROR LEWIS:  Yeah.

2          MR. GILLILAND:  Okay.  And No. 16, Mr. Elliott?

3          JUROR ELLIOTT:  Yes, sir.

4          MR. GILLILAND:  And --

5          JUROR ELLIOTT:  I agree with what he said.  It is

6    a lot of money.  I guess the evidence will -- may -- may

7    would prove that to be correct, but that's a lot of money.

8          MR. GILLILAND:  Well, and let me put it this way:

9    If the evidence in this case is that it's -- that the use

10   equates to about $20 million, would you be able to consider

11   that evidence, or are you going to say, man, that's just

12   too much money?

13         JUROR ELLIOTT:  I could consider the evidence,

14   I guess.

15         MR. GILLILAND:  Okay.  Okay.  Thank you very much.

16         Anybody else feel the same way, that that's just

17   too much money?

18         Ms. Bunt, and -- and...

19         JUROR BUNT:  I feel like that's a lot of money.

20         MR. GILLILAND:  Okay.

21         JUROR BUNT:  Yeah.

22         MR. GILLILAND:  Very good.  And would you be able

23   to consider the evidence on that?

24         JUROR BUNT:  I could consider the evidence, but it

25   is still a lot of money.

```
 1            MR. GILLILAND:  Still a lot of money.  Fair
 2    enough.
 3            I understand.
 4            All right.  Let me ask this:  One of the things
 5    those of you that get on the jury are going to hear is that
 6    you don't have to even know a patent exists to be liable
 7    for trespassing or liable for infringing the patent.  You
 8    can infringe a patent without ever knowing the patent
 9    existed.
10            Okay.  Now, this is kind of a scaled question, so
11    what I want to do is ask a question -- I'm going to make a
12    statement, and if you completely agree with the statement,
13    then you would consider yourself a 10, and if you disagree,
14    then you would consider yourself a 0, and then you can be
15    anywhere in between.
16            Does that make sense?  It's kind of a scaled then.
17    0, I disagree, and 10, I completely agree.
18            And here's the statement is that -- does anybody
19    here completely agree or -- or strongly agree with the
20    statement that to be held responsible for patent
21    infringement, you should have to prove that the company
22    accused of infringement knew about the patent before the
23    company was sued?
24            Who feels like a company should have to know that
25    the patent exists to be sued for patent infringement?
```

1          JUROR SCHRECK:  I do.

2          MR. GILLILAND:  Okay.  Ms. Schreck, you strongly

3   agree with that?

4          JUROR SCHRECK:  I strongly agree with that.

5          MR. GILLILAND:  Anybody else strongly agree with

6   that or even partially agree with that?  We've got -- keep

7   your hands if you raise them up, please, so we can make

8   sure we get all the numbers.

9          We've got Mr. Johnson, No. 11; Ms. Schreck, 15;

10  16, Mr. Elliott; 17, Mr. Turner.

11         Anybody else that I missed?

12         And -- and while I'm thinking about it, I may have

13  misheard.  Mr. Turner, if you wouldn't mind, where did you

14  say you live?

15         JUROR TURNER:  Houston.

16         MR. GILLILAND:  Pardon?

17         JUROR TURNER:  Houston.

18         MR. GILLILAND:  If you wouldn't mind standing up.

19         JUROR TURNER:  Houston.

20         MR. GILLILAND:  So you actually live in Harrison

21  County Houston now?

22         JUROR TURNER:  Yes.

23         MR. GILLILAND:  Okay.  And not in -- not in Smith

24  County or up here anywhere?

25         JUROR TURNER:  I have a second home in Gregg

 1   County.

 2           MR. GILLILAND:  But your residence is down in

 3   Houston?

 4           JUROR TURNER:  Correct.

 5           MR. GILLILAND:  Okay.  Thank you, sir.

 6           Okay.  Now, one of the things that happens in a

 7   patent case -- has anybody here ever tried to get a patent?

 8   Raise your hand if you've ever applied for or tried to get

 9   a patent.

10           Okay.  One of the things that you'll see in a

11   patent case is things get pretty technical.  You get into

12   the weeds, and this patent involves computer -- computer

13   software and kind of the IT stuff that maybe Mr. Covey

14   might be familiar with from -- from his work.

15           And one of the things I'm curious about because it

16   is a lot to pay attention to and a lot to take in is

17   I'd like to know if there's somebody -- how many of you

18   here really agree with the statement that you -- you really

19   enjoy taking things apart and figuring out how they work,

20   really tinkering into them and getting down into the weeds

21   on -- on how stuff operates?

22           Anybody here enjoy that kind of thing, really

23   tinkering with stuff, taking it apart, figuring out what

24   makes it work?

25           THE COURT:  You have three minutes, counsel.

1          MR. GILLILAND:  Thank you, Your Honor.

2          Mr. Johnson, you enjoy doing that?

3          JUROR JOHNSON:  Yes, sir, I do.  It's a big part

4     of my job.

5          MR. GILLILAND:  And remind me, again, where you

6     work, sir?

7          JUROR JOHNSON:  I work for Eastman Chemical

8     Company.  I'm a power distribution technician.

9          MR. GILLILAND:  Okay.  Anybody else like

10    Mr. Johnson that enjoys tinkering with things and figuring

11    out how they work?

12         Mr. Covey, you look like you're kind of nodding

13    your head.  Are you agreeing, or are you just kind of

14    rocking in your chair?

15         JUROR COVEY:  I actually prefer the --

16         THE COURT:  Let's turn the microphone on.  Let the

17    Court Security Officer do that.

18         COURT SECURITY OFFICER:  Test.

19         JUROR COVEY:  Actually prefer to take a more

20    iterative approach from the ground up rather than just this

21    is the way something exists.

22         MR. GILLILAND:  Okay.  So really know how it's

23    built from the ground up?

24         JUROR COVEY:  Yes, sir.

25         MR. GILLILAND:  Okay.  Thank you very much.

```
1          Anybody else in the jury box, Rows 1 or 2, that
2   really enjoying tinkering with things or taking them apart,
3   or -- or knowing how they work and built from the ground
4   up?
5          Anybody out here in the gallery feel that same
6   way?
7          Okay.  And the last thing -- one of the things
8   that we cannot do as lawyers is -- is a lot of times if you
9   wind up on the jury, you be thinking, oh, I wish -- I wish
10  they'd have asked that question, or I wonder about this
11  other thing.  We try and hit all the stuff we think is
12  important, but sometimes we can't get all of the
13  information to you.
14          Is there anybody here that -- that has a real hard
15  time making a decision if they feel like they don't have
16  all of the information?  Anybody feel that way up here in
17  the jury box in Rows 1 or 2?  I don't see any hands.
18          How about anybody out in the gallery?  Anybody
19  feel like you got to have all the information, or you
20  can't -- can't make a decision?
21          There we go, Mr. Nichols.
22          JUROR NICHOLS:  You say all information?
23          MR. GILLILAND:  Yeah, what I'm -- what I'm getting
24  at is -- is, you know, there's just some people -- and my
25  wife accuses me of this -- you know, called paralysis by
```

1   analysis.  I just have too many questions, and I have a

2   hard time sometimes making a decision until I have all the

3   answers.

4           Is that kind of how you feel?

5           JUROR NICHOLS:  Yes, especially with all the money

6   going out.

7           MR. GILLILAND:  I understand.  I understand.

8           Anybody else feel the same way as Mr. Nichols,

9   just raise your hand?

10          Okay.  Ms. Bunt, again.  We don't need the

11  microphone.  We'll just write down we've got No. 9 and

12  No. 17, Mr. Turner.

13          Okay.  Last question because I think I'm about out

14  of time.  Is there anything that sitting where you are that

15  you're thinking, you know, if I was in IV's shoes or if

16  I was Mr. Gilliland, I would want to know this?  Is there

17  something that I haven't asked that you think would be

18  important for me as a lawyer trying to do the best job

19  possible for my client to know?

20          Is there anybody that feels like there's something

21  I haven't asked that you'd really like to tell us, so we

22  can know whether or not you can be a fair and impartial

23  juror in this case?

24          THE COURT:  Your time has expired, counsel.

25          MR. GILLILAND:  Thank you very much.

1          THE COURT:  All right.  Mr. Gillam, you may

2    address the panel on behalf of the Defendant.

3          Would you like a warning on your time?

4          MR. GILLAM:  Yes, Your Honor, if I could be told

5    when I have three minutes, as well, please?

6          THE COURT:  I will.  Proceed when you're ready.

7          MR. GILLAM:  Good morning again, everybody.

8          Again, my name is Gil Gillam.  I'm one of the

9    lawyers that represents Great West in this case.  You know,

10   I've already noticed one problem here.  My name is Gillam,

11   and his name is Gilliland, and so these things are going to

12   kind of bump up against one another during the trial of

13   this case.  I can assure you that's not one of the

14   important facts that you're going to have to worry about in

15   this case.  You've got Judge Gilstrap, you've got

16   Derek Gilliland, and you've got Gil Gillam, so we've got a

17   lot of things working here with the Gils going on.

18          Let me tell you a little bit about myself.  I've

19   practiced law in East Texas for about 40 years now.  I've

20   got a wife who lives in Longview with me.  And we've got

21   three children, as well.  They're all grown now.  And we've

22   got three little grandchildren that live up in the McKinney

23   area.  I attended college and law school down at Baylor, as

24   well, and I've had jury service.  I've actually made it

25   past the point where you are.  I actually got to serve on

1  two juries.  One was a DWI, and one was a parking ticket at

2  a Walmart in Longview.

3       Now, let me introduce you to -- again, to the

4  other folks who are going to be working with me on this

5  case.

6       This is Mike Bettinger.  This is Irene Yang.  You

7  met them a few moments -- you'll be hearing from both of

8  them during the trial of this case.

9       Our client, Great West, is an insurance company

10  that its business is to provide insurance to truckers and

11  trucking companies.  And it's been around about 60 years.

12  You're going to hear more about it during the -- during the

13  case itself.

14       We've got a representative of the company with us

15  here today.  I introduced him to you earlier.  This is

16  Brian Foote.  You're actually going to hear from Mr. Foote

17  during the trial of this case.  He is the supervisor of

18  system development.  Integrally involved in the thing that

19  we're talking about here today.  The very thing.

20       So you're going to hear from Mr. Foote during the

21  trial of this case.  The interesting thing will be whether

22  or not we hear anything from anyone from Intellectual

23  Ventures in this case.

24       Now, I agree with everybody else that jury service

25  is one of the most important things that -- one of the most

1    important civic duties that we can -- we can perform.  All

2    jury duty is important.  And it's -- you don't want to make

3    promises at the beginning of the trial that you may not be

4    able to keep, but I can promise you, the issues that you're

5    going to decide in this case are more important than that

6    DW -- than the traffic ticket case that I sat on in

7    Longview about 10 years ago.

8            These are very serious issues involved in this

9    particular lawsuit that those of you that are seated on the

10   jury are going to get to hear.

11           So on behalf of Great West and on behalf of the

12   folks that I'm working with today, I want to thank you also

13   for being here.

14           Now, Judge Gilstrap has given us a few minutes to

15   tell you what we think this case is about, and it's

16   basically about three issues:  Infringement, invalidity,

17   and damages.

18           First, let me talk about infringement just very

19   briefly.

20           The Plaintiff in this case, Mr. Gilliland's

21   client, claims that we infringe what's called Claim 14 of

22   this '177 patent.  The claim is very specific in that it's

23   got a couple of requirements in that patent.

24           You're going to hear two important words, "manage"

25   and "content."  And you'll -- you'll see why those are

1  important as we walk through this case.

2       As a part of Great West's business, they came up

3  with a website that has what's called portals, or views,

4  different portals that you can look at.  You'll hear all

5  about this in the trial.

6       The only information that can be changed due to

7  some regulations which govern what Great West can do is

8  records about certain -- personal information about drivers

9  and insurers.  That's the only thing that can be changed.

10  And that's going to be an important fact you hear, things

11  like driver's license numbers and status and birthdays and

12  things like that.

13       The reason that that's important is that we think

14  what's going to happen in this case is Intellectual

15  Ventures is going to admit to you that information about

16  users like that is not content.  That's one of the things

17  we talked about a few moments ago, managing content.

18       So changing information about truckers, changing

19  information about users is not managing content as is

20  required by the patent.

21       So our position in this case very specifically is

22  that we don't infringe this patent.

23       The second issue is the validity of the patent,

24  and our position in this case, which you'll hear about, is

25  this patent should not have been issued by the

1   United States Patent Office.  Why?  Because there was an

2   online education website that came out a couple years

3   before this patent came out which did exactly the same

4   thing.

5           You'll remember from the patent video what that's

6   about.  It's called prior art.  Did exactly the same thing.

7           THE COURT:  Mr. Gillam, you need to get on to

8   specific questions.

9           MR. GILLAM:  We will.  Yes, Your Honor.

10           The other issue is damages, and we don't believe

11   that the damages merit what they're claiming for tens of

12   millions of dollars in this case.

13           Now, you've been kind enough to provide some

14   information to us about -- on your questionnaires.

15           How many of you -- I know several of you put this

16   on your -- on your questionnaire.  How many of you have had

17   serious issues with insurance companies because that's who

18   we represent in this case?

19           Can I see a show of hands again?

20           Mr. Elliott.  Yes, sir, what was the issue that

21   you had with the insurance company?

22           JUROR ELLIOTT:  I was driving on the loop here in

23   Tyler, and a lady run a stop sign and hit my truck.  And

24   their insurance did -- did pay for some damages on my

25   truck, but it wasn't enough to cover all the damages.  And

1    I did end up just selling the truck because it looked like

2    junk.

3           MR. GILLAM:  All right.  I actually represent an

4    insurance company in this case, and we all have -- thank

5    you, sir, for your -- for your answer.  Let me ask you

6    this, though.  Anything about that -- that experience with

7    an insurance company, since I represent one in this case,

8    that's going to let me start off a little bit further

9    behind than perhaps --

10          JUROR ELLIOTT:  Yes, it will.

11          MR. GILLAM:  -- the Plaintiffs in this case?

12   Pardon me?

13          JUROR ELLIOTT:  Yes, it will.

14          MR. GILLAM:  It will.

15          All right, sir.  Thank you.

16          Anyone else?  Anyone else had an issue with an

17   insurance company that comes to mind?

18          How many of you had like a medical claim or

19   something like that that wasn't paid?  You thought that the

20   insurance company should paid this, and then -- all of you

21   that think a company should pay your medical bill or your

22   insurance company should, and they don't do it, that's not

23   what I'm talking about here.

24          I'm talking about something like what Mr. Elliott

25   said here a moment ago, a serious problem with an insurance

1  company that -- so you really have a mad feeling about

2  companies like that.

3          Anybody else like that?

4          Mr. Allen, I read on your questionnaire --

5  I thought you had a dispute with an insurance company,

6  perhaps someone had canceled your homeowner's insurance or

7  something like that?

8          JUROR ALLEN:  Yeah.  It wasn't a real dispute.  It

9  was a slab leak situation, and I had one slab leak that the

10  insurance company paid for.  I had a second slab leak, and

11  they paid for it.  The third slab leak, they wanted to

12  cancel my homeowner's insurance.

13          We basically agreed that each of us would pay half

14  of the slab leak, and I could continue with my insurance.

15  I don't consider that to be what you're calling a real

16  serious dispute.  It was a dispute.

17          MR. GILLAM:  All right, sir.  Thank you.

18          Anybody else that I missed on that?  Anyone?

19          Yes, sir.  Juror No. 20.

20          JUROR HARPER:  20.

21          MR. GILLAM:  Yes, sir, Mr. Harper.

22          THE COURT:  If you'll use the microphone, please,

23  Mr. Harper.

24          JUROR HARPER:  Currently, I'm in the process --

25  I had an adjustor come out, and my insurance carrier sent

1  the adjustor out.  They said it was $1800 worth of damage.

2  It was less than my deductible.  I agreed with it because

3  of a previous claim that I had that I had no reason to --

4  to question the adjustor.

5          And then when I got the contractor out, this

6  became tens of thousands of dollars worth of damage that

7  the adjustor didn't see.  And -- and after looking at it, I

8  felt like I was being played a little bit maybe.

9          MR. GILLAM:  All right, sir.  I'll -- again,

10  representing an insurance company.  Anything about that

11  experience that you had that's going to start me off behind

12  in this case?

13          Different insurance company and different

14  situation, but to the extent that, you know, insurance

15  companies rub you the wrong way, that's who I represent in

16  this case.  Anything about it that's going to --

17          JUROR HARPER:  No, I don't think so.

18          MR. GILLAM:  I'm sorry, sir?

19          JUROR HARPER:  I don't believe so, no.

20          MR. GILLAM:  All right, sir.  Thank you,

21  Mr. Harper.

22          Now, you introduced -- a few moments ago nobody

23  said they knew anybody at the Plaintiff's table over here.

24  Again, you've got Mr. Gilliland, Mr. Wilson, and Mr. Rupp.

25  No one knew these folks; is that correct?  Anyone?

1           All right.  Mr. Gilliland asked you some questions

2      about being a party to a lawsuit.  I don't want to go back

3      and replow all that same ground.  But let me ask you a

4      couple of questions.

5           Mr. Mendietta.

6           JUROR MENDIETTA:  Yes, sir.

7           MR. GILLAM:  Yes, sir.  Mr. O'Quinn represented

8      you in a personal injury case way back?

9           JUROR MENDIETTA:  '89.  We settled in '93.

10          MR. GILLAM:  All right.

11          JUROR MENDIETTA:  Four years later.

12          MR. GILLAM:  Okay.  So you've obviously been in

13     the same kind of shoes as the Plaintiffs are in this case.

14     In other words, somebody bringing a lawsuit against a

15     defendant, correct?  Different -- different situation, but

16     you've been a plaintiff, and they're the Plaintiff in this

17     case.

18          JUROR MENDIETTA:  Right.  I believe it's the same

19     situation, but mine was injury.

20          You know what I'm saying?

21          MR. GILLAM:  Yes, sir.

22          JUROR MENDIETTA:  Personal injury.

23          MR. GILLAM:  Yes, sir.

24          JUROR MENDIETTA:  So that's the difference,

25     I believe.

```
1            MR. GILLAM:  All right.  Anything about the fact

2    that you've been a plaintiff, and I obviously represent the

3    Defendant, anything about the fact that you've been a

4    plaintiff that's going to start me off behind in this case

5    when we begin the evidence that you can think of --

6            JUROR MENDIETTA:  No, sir.

7            MR. GILLAM:  -- about your personal situation?

8            JUROR MENDIETTA:  Not really.

9            MR. GILLAM:  All right.  Thank you, sir.

10            Ms. -- on the front row there, Ms. Hoffman.  And

11    we -- we've -- you described that situation with your

12    relative.  And that -- that case has been resolved now?

13            JUROR HOFFMAN:  Yes, sir.

14            MR. GILLAM:  Was it resolved to your satisfaction?

15            JUROR HOFFMAN:  Well, not necessarily, but, yes,

16    it was resolved, and we settled.

17            MR. GILLAM:  Okay.

18            JUROR HOFFMAN:  And it was -- it was also with the

19    people that live -- I mean, we all lived right there.

20            MR. GILLAM:  Yes, ma'am.

21            JUROR HOFFMAN:  And so my husband was the one that

22    worked the land, and he was out there, you know, a lot.

23            MR. GILLAM:  Yes, ma'am.

24            JUROR HOFFMAN:  So, yes, it was settled.

25            MR. GILLAM:  All right.  Well, you were a
```

1  plaintiff, though, in a lawsuit, your family was?

2       JUROR HOFFMAN:  Yes.

3       MR. GILLAM:  Again, I represent the Defendants.

4  You've been in the Plaintiff's shoes before.  Anything

5  about that that's going to start them off a little bit

6  further ahead in a situation like this over a patent

7  lawsuit?

8       JUROR HOFFMAN:  I don't think so.

9       MR. GILLAM:  All right.  Thank you, ma'am.

10       JUROR HOFFMAN:  Uh-huh.

11       MR. GILLAM:  Let me go to No. -- Juror No. 3,

12  Ms. Edwards.

13       You work with the County Commissioners?

14       JUROR EDWARDS:  Yes, sir.

15       MR. GILLAM:  Do you do any work with -- or do you

16  have any particular experience with websites, any -- any

17  special training in websites, that type of thing?

18       JUROR EDWARDS:  Very, very basic, putting in

19  information, but it's like on a very elementary level.

20       MR. GILLAM:  Okay.  Nothing -- no particular

21  specialized training in it, though?

22       JUROR EDWARDS:  That's correct.

23       MR. GILLAM:  All right.  And I may have written

24  this down wrong.  Do you have experience in the

25  insurance -- in the insurance -- in a world insurance

1   agency and things like that?

2          JUROR EDWARDS:  A bit.  I'm -- I'm licensed to

3   actually sell life insurance through Primerica.

4          MR. GILLAM:  Okay.  And have you actually -- have

5   you actually done that?

6          JUROR EDWARDS:  No.  My business world is very,

7   very slow and low at this point in life.  But I was trying

8   to disclose as much as possible.

9          MR. GILLAM:  Got a license to do it, though?

10         JUROR EDWARDS:  Yes.

11         MR. GILLAM:  Okay.  Thank you, ma'am.

12         Let's go beyond lawsuits for a second and not just

13  limit it to lawsuits.  Have any of you ever filed a

14  grievance or made a claim against someone other than in a

15  court of law?

16         Does that ring a bell for anybody on the panel?

17  Anybody?

18         Has anybody ever wanted to file a lawsuit and then

19  just decided at the last minute, I'm not going to do it?

20  Anybody?

21         Front row?

22         Second?

23         Anybody?

24         Excuse me.  Pardon me.

25         Anybody here?

1           All right.  Outside of your appearance here today,

2    and outside of jury duty, any of you had any dealings with

3    the court system other than Ms. Bunt over there, I'm sure,

4    but anybody that's had any dealings with the court system,

5    say, in the last five years, other than jury duty, this

6    kind of thing?

7           Ms. Schreck?

8           JUROR SCHRECK:  We were involved in a --

9           MR. GILLAM:  I'm sorry.  You need to get that

10   microphone here.

11          JUROR SCHRECK:  After my nephew died, we were

12   involved in a custody case for the kids.

13          MR. GILLAM:  Okay.  Yes, ma'am.  I think you did

14   tell us about that.  I appreciate that.

15          Anybody else, other than Ms. Schreck, that that --

16   that applies to there?

17          Has anyone -- nobody's -- I think I read this,

18   nobody's filed for a plaintiff -- for a patent, correct?

19          Anybody have a family member file for a patent?

20          Has anybody ever invented anything, where you

21   thought this sounds like a great idea; I may think about

22   trying to get a patent on it?  Anybody on this side of the

23   room here?

24          What about over here?  Anybody?

25          Has anybody ever come up with an idea, and

1    somebody else took your idea, and they used it for their

2    own benefit?

3              Quiet room.  Anybody?

4              All right, sir.  Mr. Turner, tell me about that,

5    sir.

6              JUROR TURNER:  I studying school in Guadalajara.

7    I wrote a paper, and one of the roommates borrowed my

8    computer.  And the next day I was called in and told that

9    I plagiarized and stole their work.

10             MR. GILLAM:  Uh-oh.

11             JUROR TURNER:  And I had to withdraw from the

12   course.

13             MR. GILLAM:  All right, sir.  Thank you.

14             Anybody else?

15             Has anybody on the panel ever had any disputes

16   with a corporation that you can think of?  Disputes with a

17   company, other than the things we've talked about already?

18             Any claims like that that you filed?

19             What about this, anybody believe that lawsuits are

20   necessary to keep companies honest?  Let's see a show of

21   hands.

22             Yes, sir, we haven't talked to you yet.  This will

23   be Mr. Robinson.  No, sir, I'm sorry, Mr. -- Mr. Powell.

24             JUROR POWELL:  Yes, sir.

25             MR. GILLAM:  Yes, sir, Mr. Powell.  Tell me about

1  that.

2          JUROR POWELL:  I just think that if you couldn't

3  sue somebody for something, then you -- I had a generator

4  get stolen on my watch back when I was -- back when I was

5  working outside.  And I had just left a few minutes, went

6  and checked another one, came back, and he stole it.  And

7  we went to court like three or four times, and he never did

8  show up.  And I guess he just settled out of court or

9  whatever, but it made me look bad, pissed me off.  It was

10 wintertime, and he had hooked his -- hooked up his swimming

11 pool with it.  Everybody else --

12         MR. GILLAM:  I understand.  So you -- you think

13 that lawsuits really are necessary then to try to keep

14 people honest?

15         JUROR POWELL:  Yes.

16         MR. GILLAM:  Okay, sir.  Thank you.

17         Who feels the same way as Mr. Powell?  Anybody?

18         What about the back row there?

19         Mr. -- let's see, it's No. -- No. -- let me ask --

20 Ms. Cremers, let me ask you about that.  We haven't -- we

21 haven't heard from you yet.

22         How do you feel about that?

23         JUROR CREMERS:  I believe that that's true.  They

24 are to keep people honest.  I think people should show up.

25         MR. GILLAM:  People just stand up and --

1          JUROR CREMERS:  Yes.

2          MR. GILLAM:  -- be responsible for their actions?

3          JUROR CREMERS:  Yes, sir.

4          MR. GILLAM:  So you think lawsuits are a necessary

5    part of that to keep people honest?

6          JUROR CREMERS:  Yes, sir.

7          MR. GILLAM:  Okay.  Thank you, ma'am.

8          Ms. Coleman?

9          JUROR COLEMAN:  Okay.  I don't know about being

10   necessary.  They should be optional, you know, depending on

11   the individual.  But if you feel that you've been wronged,

12   you know, you try to settle it out of -- without going to

13   court, but if you can't and it's meaningful to you, you

14   should have the right to do that.  That's -- that's -- it

15   should be an option.

16         MR. GILLAM:  Thank you, ma'am.

17         Anybody ever boycotted a company where you've

18   gotten mad at something some company was doing and you

19   thought, by golly, I'm not going to buy from that company

20   again?

21         We've got a few.  We've got No. 18, Mr. Lewis

22   again; Ms. Schreck again.

23         JUROR SCHRECK:  Our family boycotts Tyson because

24   of the practices that they have decided to adopt here of

25   late.

1          MR. GILLAM:  Okay.  Mr. Lewis, what about you?

2          JUROR LEWIS:  I do it every day.  I mean, there's

3    always someone that pops up that, you know, dictates what

4    I do.

5          So, I mean, it's just -- you typically -- it's a

6    belief.  You know, it's a moral -- moral thing to me.  And

7    if I don't agree with that, I don't -- I don't -- I don't,

8    you know, use their services or purchase their products.

9          MR. GILLAM:  Thank you, sir.

10         What about anybody on these two rows up here?

11   Anybody feel the same way?  Anybody?

12         That's Mr. -- Mr. Rudd down there.  Ms. Edwards,

13   both of you?

14         Any other hands on the back row back there?  Let's

15   see, Mr. Upson, let me ask you.  We haven't heard from you

16   yet, I don't think.

17         How do you feel about that?

18         JUROR UPSON:  Boycotting a product?

19         MR. GILLAM:  Yes, sir, boycotting -- boycotting a

20   product or boycotting a company because you -- you got --

21         JUROR UPSON:  I've never had anything as far as --

22   that's upset me that I would boycott a product for.

23         One that comes to mind is the NFL.  The people

24   would boycott, but that -- I've never been upset over

25   something to boycott a certain product.

 1          MR. GILLAM:  All right, sir.  Thank you.

 2     Appreciate you.

 3          Anybody ever written a letter to an editor in a

 4     newspaper?

 5          Judge Gilstrap talked to you about the burden of

 6     proof in this case.  Does everybody notice that the

 7     Plaintiff got to go first a few moments ago?  It's going to

 8     be that way throughout the entire trial.  The Plaintiff is

 9     going to go first, and we're going to go second.  Do you

10     know what that is?  Anybody got any ideas of why that is?

11          Well, it's because Judge Gilstrap told you a few

12     moments ago, the Plaintiff has the responsibility of coming

13     forward with evidence to prove this claim of infringement.

14     They've got the burden of coming forward and proving the

15     damages that they seek.

16          Now, I need to ask you a question about

17     infringement.  You're going to actually have the language

18     of this claim that's being asserted in this case.  It's

19     Claim 14 of the '177 patent.  And it's going to actually

20     have elements to -- to the claim.  You'll have a juror

21     notebook, by the way, that's going to show you this, the

22     actual claim.

23          But a patent infringement case is kind of like the

24     game of bingo, okay?  You've got certain elements that they

25     have to be able to prove.  And if they prove them all,

1  they've got infringement.  But it's like a game of bingo.

2  If they've got B-I-N-G, and they don't prove them all,

3  there's not infringement.  Close doesn't get you there.

4  B-I-N-G doesn't count.

5       So my question for you is this.  Is there any one

6  of you that will not hold Intellectual Ventures to the

7  burden of proving infringement in this case?

8       Anyone on the front row?

9       Anybody on the second row?

10       Third or fourth?  Anybody?

11       Is there anybody that as you're sitting here

12  today, and I know you have not heard the evidence in this

13  case yet, but you're thinking, you know what, if they've

14  got most of it right, if they're pretty close, then, you

15  know, maybe we ought to go ahead and find infringement?

16       You haven't heard the evidence, but you think, you

17  know, they're close, maybe that's something we should do?

18       Anybody that feels that way as you start off

19  today?

20       All right.  Any of you ever been accused of doing

21  something that you didn't do?  Anybody?  Everybody?  Surely

22  when you were a kid?  Or maybe you did it, I don't know.

23       Anybody that's been accused of doing something

24  they didn't do?  How did it make you feel?  It's that kind

25  of question I've got for you.

1          Intellectual Ventures has the right to bring this

2    lawsuit -- absolutely has the right to bring this case.

3          Is there anyone out there that does not believe

4    that my client, Great West, does not have just as much

5    right to stand up here and defend itself against a claim

6    that it does not believe is a valid claim?  Anyone that

7    does not believe my client has just as much right to stand

8    up here and defend itself?  If so, I need to see your

9    hands.  Anybody?

10          Anyone believes that because this case has worked

11   its way through the system and it's in -- it's now in front

12   of a jury, that just on that fact alone, that the Plaintiff

13   must be entitled to something here?

14          Some of you served in state court.  Some of you

15   served in municipal court.  This is a federal court.  It's

16   a step up, several steps up.

17          Anyone that believes that because this case is in

18   federal court, that the Plaintiff simply -- because of that

19   fact alone, the Plaintiff must be entitled to something

20   because the case has gotten through the system into federal

21   court?

22          Anybody feel that way at all?

23          Mr. Gilliland told you that they're asking for a

24   lot of money in this case.  It's something like $20 million

25   or so.  And we told you our case is that we don't think

1  you'll get to that question because we don't think there's

2  infringement.

3          But because we do not infringe or because our

4  position is we do not infringe, we don't believe the

5  Plaintiff is entitled to anything.  And if the Plaintiff

6  does not prove infringement in this case, are you willing

7  to award zero?  Is there anybody that says, you know what,

8  I'm just not going to do that?  I'm not going to do that?

9          Anybody as we sit here?

10         All right.  You saw on the video a little while

11 ago -- and I touched on it a few moments ago -- that

12 sometimes jurors are called upon to consider the validity

13 of the patent, whether it should have been issued at all.

14 And you're going to be asked to do that in this case.

15         How many of you think it's pretty hard to get a

16 patent?

17         Okay.  Juror No. 7, Mr. Hyzer, we haven't talked

18 to you very much.  What's your belief about that?  What's

19 your -- and do you have some background that --

20         JUROR HYZER:  No.  I think patents -- you know,

21 watching the video, the patent has got to be something that

22 hadn't been thought of before, a new technology.  I mean,

23 it's pretty -- you know, the technology now has advanced so

24 much in the past few years, there's got to be something in

25 the past that related to something that he's trying now.

1    I mean, how can you find something new?

2            MR. GILLAM:  Yes, sir.

3            JUROR HYZER:  It's very difficult now, you know,

4    after all these years to come up with new ideas.

5            THE COURT:  Three minutes remaining, Counsel.

6            MR. GILLAM:  Because of that, Mr. Hyzer, do you

7    believe that once a patent has been issued by the United

8    States Patent Office, that it should not be taken away?

9            JUROR HYZER:  No.  It's possible that they

10   erred --

11           MR. GILLAM:  All right, sir.

12           JUROR HYZER:  -- in issuing.

13           MR. GILLAM:  How many of you feel like Mr. Hyzer,

14   that it's difficult to get a patent?

15           Other hands?

16           All right.  Anybody else?

17           Is there anybody -- thank you, sir.

18           Is there anybody that thinks maybe because it is

19   difficult to get a patent, that once you got it, a juror --

20   a jury should not have the role of taking that patent away?

21   Is there anybody that feels that way -- feel that way?

22           Anybody?

23           That once the United States Patent Office issues a

24   patent, you, as a jury or as a juror in a case, simply go,

25   you know, if they've issued this patent, I cannot take that

1    away?

2            Anybody feel that way?

3            Let me close with this, similar to the question

4    that Mr. Gilliland asked a few moments ago.  You know, we

5    try to ask all the questions we can think of to ask that

6    might impact the decisions that we have to make, and

7    sometimes we miss some of them.

8            But as you sit there and as you kind of listened

9    to what they had to say and you kind of listen to what we

10   have to say, is there anything that any of you think about

11   that says, you know, if that lawyer would have just asked

12   me that one question, he would have known that's

13   something -- or he would have -- that is something that he

14   would have wanted to know in making a decision as to

15   whether or not I should sit as a juror in this case, for

16   Plaintiff or for Defendant?

17           Excuse me.  Anybody -- anybody think of anything?

18           As you're sitting out there, is there something,

19   as you kind of listened to what's gone on, you think, gosh,

20   those guys -- there's something that's kind of gnawing at

21   me that they really ought to know about, knowing the

22   limited amount that you know about this case?  Anybody?

23           All right.  Thank you so much for your time today.

24   Look forward to working with the eight of you that are

25   selected as jurors in this case.

```
 1              Thank you.

 2              THE COURT:  Counsel, approach the bench, please.

 3              (Bench conference.)

 4              THE COURT:  All right.  Does Plaintiff have any

 5  challenges for cause?

 6              MR. GILLILAND:  Yes, Your Honor.  We challenge

 7  Ms. Bunt.

 8              THE COURT:  No. 9?

 9              MR. GILLILAND:  Yes, sir, No. 9.  And No. 16 and

10  No. 18.

11              THE COURT:  16 is Mr. Elliott?

12              MR. GILLILAND:  Yes, sir.

13              THE COURT:  All right.  What after that?

14              MR. GILLILAND:  No. 18.

15              THE COURT:  Mr. Lewis?

16              MR. GILLILAND:  And then I'm not exactly sure if

17  it's a cause, Judge, but 17 is outside the district.  So we

18  would challenge him for cause, not being a resident of the

19  district.

20              THE COURT:  He's got a home in Longview, and

21  I don't know where he claims his homestead.  I'm a little

22  bit leery about getting into that.

23              MR. GILLILAND:  Well, and I thought he said --

24              THE COURT:  I've seen clerks consider his

25  residence address and be summonsed.
```

1          MR. GILLILAND:  Well, I believe he said his
2   residence is in Houston, and he has a second home here in
3   Longview -- or in Tyler.
4          THE COURT:  If he's got a home in Houston, he's
5   got a home in Longview.
6          MR. GILLILAND:  Okay.  Okay.
7          THE COURT:  Which one is his permanent residence?
8   Where is he registered to vote?  Where is his driver's
9   license registered?  We don't know any of that information.
10          Do you want me to go into that with him?
11          MR. GILLILAND:  I don't think we'll get to him,
12   so...
13          THE COURT:  Okay.
14          MR. GILLILAND:  So we'll -- we'll not challenge
15   him on that basis.
16          THE COURT:  Okay.  All right.  What about
17   Defendants?  Do you have challenges for cause?
18          MR. GILLAM:  We don't have any challenges for
19   cause, Your Honor.  But we do not agree with some of their
20   challenges, obviously.
21          THE COURT:  Well, we'll take those up at the
22   bench.
23          MR. GILLAM:  Certainly.
24          THE COURT:  So I'm going to send the rest of the
25   jury out for recess, except I'm going to hold back

1   Ms. Bunt.  Ms. Schreck indicated, No. 15, a scheduling

2   problem.

3   No. 16, Mr. Elliott, No. 17, and Ms. Hambrick also

4   indicated a scheduling problem.

5         MR. GILLILAND:  I believe it was No. 18.  I think

6   you said 17.  I'm sorry.

7         THE COURT:  I'm sorry.  18, Michael Lewis.

8         MR. BETTINGER:  Yes.

9         MR. GILLILAND:  And in that case, Your Honor,

10   I think we may get to No. 17.

11         THE COURT:  Tell me about what you want to do

12   about it, Mr. Gilliland.

13         MR. GILLILAND:  Well, I'd like to know where he

14   claims his permanent residence.

15         THE COURT:  I'll bring him up.  We'll talk to him

16   here at the bench.

17         Is there anybody else that I haven't identified,

18   counsel for either party thinks I should retain and not

19   release for recess so that we can question them here at the

20   bench?

21         MR. BETTINGER:  No, Your Honor.

22         MR. GILLAM:  Not from the Defendant, Your Honor.

23         MR. GILLILAND:  No.

24         THE COURT:  All right.  If you'll take your seats,

25   please.

```
 1              (Bench conference concluded.)

 2         THE COURT:  All right, ladies and gentlemen.  I'm

 3  going to excuse most of you for recess at this time.  And

 4  when you are in recess, I'm going to ask a couple of things

 5  of you.

 6         First of all, when you exit the courtroom through

 7  the double doors in the back during recess, the water

 8  fountains and the restrooms are easy accessible.  Take

 9  advantage of those.  But do not leave the building.  Do not

10  wander around.  Stay in the general area of this courtroom,

11  if you will, please.

12         Secondly, don't discuss anything that's happened

13  in here this morning.  And let me remind all of you of

14  something.  You have heard exactly zero evidence in this

15  case.  What the lawyers tell you and what the lawyers argue

16  to you is not evidence.

17         So I can tell you without a doubt, there's been no

18  evidence presented.  So you should not discuss anything

19  that's happened in the courtroom this morning.  Talk about

20  your grandkids, talk about sports, talk about anything you

21  want to talk about with each other, but don't discuss

22  anything that's happened in here.

23         And if you'll stay in the immediate area, we will

24  have you back here after recess as soon as possible.

25         Now, the following members of the panel, I'll
```

 1   ask -- I'm going to ask to stay where you are and not join

 2   the rest of the panel during recess.  And when the rest of

 3   the panel leaves, if you'll just step out of the way and

 4   let everyone else by you and then remain in your respective

 5   seats, please.

 6          And those are No. 9, Ms. Bunt; No. 15,

 7   Ms. Schreck; No. 16, Mr. Elliott; No. 17, Mr. Turner; No.

 8   18, Mr. Lewis; and No. 22, Ms. Hambrick.

 9          If those folks would stay where they are, let

10   everyone else excuse themselves for recess, I will visit

11   with each of you here at the bench one at a time after the

12   remainder of the panel have exited the courtroom.

13          So with the instructions to those of you that I

14   did not ask to stay behind not to discuss anything that's

15   happened in here and to stay in the immediate area, those

16   of you not identified are excused for recess at this time.

17          COURT SECURITY OFFICER:  All rise for the jury

18   panel.

19          THE COURT:  Mr. Hyzer, why don't you start us out

20   the door.  Thank you.

21          (Jury panel out.)

22          THE COURT:  All right.  Be seated, please.

23          Counsel, approach.

24          Ms. Bunt, would you come up and join us, please?

25          (Bench conference.)

1         THE COURT:  Good morning, Ms. Bunt.

2         JUROR BUNT:  Good morning.

3         THE COURT:  This is our microphone, and if you and

4 I can just talk quietly here --

5         JUROR BUNT:  Okay.

6         THE COURT:  -- at the bench.

7         I know your husband real well.  I'm sure we've met

8 over the years.  But I understand you indicated because

9 BITCO was a company owned by the same parent that owns

10 Great West and they are your husband's client --

11        JUROR BUNT:  Yes, sir.

12        THE COURT:  -- that that would affect your ability

13 to be fair and impartial; is that correct?

14        JUROR BUNT:  I think so, in this situation.

15        THE COURT:  Well, that's understandable.  I can

16 tell you on behalf of both Plaintiff and Defendant, the

17 Court also just appreciates your candor.

18        Mr. Gilliland, do you have any questions for

19 Ms. Bunt?

20        MR. GILLILAND:  No further questions, Your Honor.

21 Thank you, Ms. Bunt.

22        THE COURT:  Mr. Gillam, any questions?

23        MR. GILLAM:  No, Your Honor.

24        THE COURT:  Ms. Bunt, I'm going to let you join

25 the rest of the panel outside for recess.  Just don't

1   discuss anything that's happened.

2           JUROR BUNT:  Yes, sir.

3           THE COURT:  Thank you.

4           (Juror exits courtroom.)

5           (Bench conference continued.)

6           THE COURT:  I'm going to excuse Ms. Bunt for

7   cause.

8           (Open court.)

9           THE COURT:  Ms. Schreck, would you come up,

10  please?

11          (Bench conference continued.)

12          THE COURT:  Good morning.

13          JUROR SCHRECK:  Good morning.

14          THE COURT:  This is our microphone.  If you and

15  I can just talk quietly here.  You indicated early on that

16  if you were selected to serve, you might have a serious

17  problem with scheduling and being able to be here the

18  entire time.  Tell me about that.

19          JUROR SCHRECK:  I already had a business trip

20  planned for next week to go down to the Austin area, that

21  it was in conjunction with spring break that the kids are

22  off.  And I tried to talk to her.  I didn't get informed

23  about having to go do -- I'm supposed to videotape four

24  trucks being demoed down in the Austin area for my boss and

25  send them back here.  So they're willing to pay for my trip

```
 1   down there now.  So that's one thing.  And my spouse --

 2        THE COURT:  That's the microphone.  You'll hurt my

 3   court reporter's ears if you keep doing that.

 4        JUROR SCHRECK:  Sorry.  And I'm also caring for my

 5   spouse that just had a major tumor removal, eight pounds.

 6   She's not going to be able to go back to work until April.

 7   And I just can't -- I don't have anybody else.  I'm a wit's

 8   end.

 9        THE COURT:  Set aside, if you will, your

10   work-related travel.  What I hear you telling me is you've

11   got a family issue where you're caring for a spouse, and

12   I assume there's not anybody else that can fill that role?

13        JUROR SCHRECK:  There's not.  I've already lost

14   all those.

15        THE COURT:  Did you tell me you have young

16   children in the home who will be out over spring break?

17        JUROR SCHRECK:  Two.

18        THE COURT:  Okay.  Mr. Gilliland, do you have any

19   questions of Ms. Schreck?

20        MR. GILLILAND:  No, I don't, Your Honor.

21        THE COURT:  Mr. Gillam?

22        MR. GILLAM:  I do not, Your Honor.

23        THE COURT:  Okay.  Ms. Schreck, thank you for your

24   candor.  I'm going to let you join the rest of the panel

25   outside.  Just don't discuss what we talked about in here.
```

1   Thank you.

2          (Juror exists courtroom.)

3          (Bench conference continued.)

4          THE COURT:  Based on her need to provide care for

5   a family member recovering from surgery and apparently no

6   alternative care for her children who are out of school,

7   I'm going to exclude Ms. Schreck.

8          (Open court.)

9          THE COURT:  Mr. Elliott, would you come up,

10  please, sir?

11         (Bench conference continued.)

12         THE COURT:  Good morning.

13         JUROR ELLIOTT:  Good morning.

14         THE COURT:  This is our microphone.  If you and

15  I can just talk quietly here.

16         During the questioning this morning, you talked

17  about the problem you'd had with an insurance company,

18  and --

19         JUROR ELLIOTT:  Yes.

20         THE COURT:  -- you said basically, as I recall,

21  that given that experience and the severity of it, that you

22  just didn't think both sides would start off equal in your

23  mind in this case since one of them is an insurance

24  company.

25         JUROR ELLIOTT:  Correct.

1          THE COURT:  Is that -- is that how you feel about

2     it?

3          JUROR ELLIOTT:  I've just had bad experiences.

4          THE COURT:  And would those bad experiences keep

5     you from being able to treat both the Plaintiff and the

6     Defendant equally and fairly?

7          JUROR ELLIOTT:  I don't mean to offend anybody,

8     but being honest, I think it would.

9          THE COURT:  That's why you're up here.  And we all

10    appreciate your candor.  If -- if those experiences were

11    such, and only you know the extent -- if those are such

12    that you don't feel like you could treat both sides fairly,

13    that's something that we need to get out in the open.

14         JUROR ELLIOTT:  Yes, sir.

15         THE COURT:  Mr. Gilliland, you have any questions

16    of Mr. Elliott?

17         MR. GILLILAND:  Just briefly.

18         If the Court instructs you, could you follow the

19    Court's rules and set aside your personal feelings and

20    follow the law and evidence in this case?

21         JUROR ELLIOTT:  Sir, I just think it's corporate

22    greed.  I don't -- I don't think I could.

23         MR. GILLILAND:  I don't have any more questions.

24         Thank you, sir.

25         THE COURT:  Mr. Gillam, do you have any questions?

```
 1              MR. GILLAM:  I do not, Your Honor.

 2              THE COURT:  Mr. Elliott, I'm going to let you join

 3    the rest of the group outside.  Just don't discuss anything

 4    we've talked about in here.

 5              JUROR ELLIOTT:  Yes, sir.

 6              THE COURT:  Thank you.

 7              JUROR ELLIOTT:  Thank you.

 8              (Juror exits courtroom.)

 9              (Bench conference continued.)

10              MR. GILLAM:  Your Honor, we would challenge No. 16

11    for cause.

12              THE COURT:  Well, the Plaintiff's challenged him

13    for cause, and he's just told us he can't be fair and

14    impartial, so I'm going to excuse him.  I'm going to grant

15    the joint challenge for cause.

16              (Open court.)

17              THE COURT:  Mr. Turner, would you please join us?

18              (Bench conference continued.)

19              THE COURT:  Good morning.

20              JUROR TURNER:  Good morning.

21              THE COURT:  Step up.  This is our microphone, if

22    you and I can just talk quietly here.

23              The reason you're up here is because we don't know

24    if you're a resident of this district or if you're a

25    resident of the Southern District down in Houston.  We know
```

1   you have two houses.  You told us you live in Houston.

2          The question is, are you a qualified citizen to

3   serve on this jury in this district, or are you a resident

4   and have your permanent home someplace else?  I don't know

5   where you -- your driver's license says you live and your

6   tax return says and all these things.  Tell us -- tell us

7   about your situation.

8          JUROR TURNER:  I have a home in Longview.  I work

9   and live in another home in Houston.  I've been there

10  probably 15, 20 years.

11         THE COURT:  Where are you registered to vote, what

12  address?

13         JUROR TURNER:  Gregg County.

14         THE COURT:  Because jurors are selected in this

15  district at the present through voter registration.

16         JUROR TURNER:  Correct.

17         THE COURT:  So even though you have another home,

18  you still haven't changed your voter registration?

19         JUROR TURNER:  Right.

20         THE COURT:  And on your driver's license, what --

21         JUROR TURNER:  It's this home here --

22         THE COURT:  It says Longview?

23         JUROR TURNER:  -- Longview home.

24         THE COURT:  Mr. Gilliland, do you have any

25  questions?

1          MR. GILLILAND:  The only thing I would ask is do

2  you consider yourself -- do you consider your Houston home

3  to be your permanent residence or your Gregg County home?

4          JUROR TURNER:  I spend 95 percent of my time in

5  Houston.  I come to this house probably six times a year,

6  six weekends -- six weeks maybe out of a year.

7          MR. GILLILAND:  And would serving on a jury up

8  here be a major inconvenience for you?

9          JUROR TURNER:  It's --

10          THE COURT:  Understand that all jury service is an

11  inconvenience.

12          JUROR TURNER:  Right.  It's the same as -- I mean,

13  work is there, and I'm here.  It's the same as having a job

14  here.  I still wouldn't be at work.

15          THE COURT:  You're not asking me to excuse you

16  because of your residence or your work in Houston, are you?

17          JUROR TURNER:  My position -- I travel quite a

18  bit.  I'll have to make some arrangements to cancel my

19  travels.

20          THE COURT:  And I assume that would happen if you

21  were called for jury duty in Houston, too?

22          JUROR TURNER:  That is for Houston.  I'm supposed

23  to go to Cairo on Monday, but I will have to call and

24  cancel that.

25          THE COURT:  Okay.  Is there anything else that you

1  think I should know about your ability to serve as a juror

2  here?

3          JUROR TURNER:  I think we're good.

4          THE COURT:  Mr. Gillam, do you have any questions?

5          MR. GILLAM:  I do not, Your Honor.

6          THE COURT:  Mr. Turner, I'm going to let you join

7  the rest of the group outside.  Just don't discuss what

8  we've talked about in here.

9          JUROR TURNER:  Thank you.

10          (Juror exists courtroom.)

11          (Bench conference continued.)

12          THE COURT:  Mr. Gilliland, do you -- do you

13  challenge Mr. Turner as unqualified to serve in this case?

14  I mean, he has not given us any indication that he can't be

15  fair and impartial.

16          MR. GILLILAND:  No.

17          THE COURT:  The only issue that is -- is whether

18  he is a proper member of the venire panel here because

19  facts related to the two homes that he owns and where his

20  place of business is.

21          MR. GILLILAND:  Yeah, I would -- I would challenge

22  him on the basis of him not being a resident in the

23  district since he said his home has been in Houston for the

24  last 15 or 20 years.  He just hasn't changed his voter

25  registration for some reason.  So the --

```
 1              THE COURT:  Or his driver's license.

 2              MR. GILLILAND:  Or his driver's license, correct.

 3    So we would challenge him on that basis.

 4              THE COURT:  All right.  I'll carry -- quite

 5    honestly, I want the benefit of checking with the county --

 6    excuse me, with the district clerk about this.  I'm going

 7    to carry this challenge.  And I'll let you know what I've

 8    determined is appropriate here before you strike your list.

 9              I'll bring up Mr. Lewis next.

10              (Open court.)

11              THE COURT:  Mr. Lewis, would you come up, please,

12    sir?

13              (Bench conference continued.)

14              THE COURT:  Good morning, sir.

15              JUROR LEWIS:  Good morning.

16              THE COURT:  This is our microphone, if you and

17    I can just talk quietly.

18              JUROR LEWIS:  Okay.

19              THE COURT:  There were questions about the

20    Plaintiff planned to ask this jury for something on the

21    order of $20 million.  And like other members on the jury

22    panel, you said that's an awful lot of money.

23    Understanding that you haven't heard any evidence in this

24    case --

25              JUROR LEWIS:  Correct.
```

```
1         THE COURT:  -- if you heard all the evidence and

2    if the evidence otherwise might support an award of that

3    size, could you return such a verdict, or is it just an

4    amount of money that's so large, you couldn't return a

5    verdict no matter what the evidence was?

6         JUROR LEWIS:  It would be within the context

7    of what we hear in here.  You know, I mean, it's just

8    an exorbitant amount of money, but if it's -- if that's

9    it, that's it.

10         THE COURT:  So it could be justified through the

11   evidence?

12         JUROR LEWIS:  Yes, correct.

13         THE COURT:  Okay.

14         JUROR LEWIS:  Yes, sir.

15         THE COURT:  Mr. Gilliland, do you have questions

16   for Mr. Lewis?

17         MR. GILLILAND:  If the evidence supports a

18   verdict -- or a damage award of $20 million, will you be

19   able to do that if that's what the evidence supports or

20   shows?

21         JUROR LEWIS:  Yeah.  Within the context, if

22   it's -- if the evidence supported that, I'd be able to do

23   that,

24   I believe.

25         THE COURT:  Mr. Gillam, do you have any questions?
```

```
1              MR. GILLAM:  I do not, Your Honor.

2              THE COURT:  Okay.  All right.  Mr. Lewis, thank

3    you.

4              JUROR LEWIS:  Sure.

5              THE COURT:  I'm going to let you join the rest of

6    the group outside.  Just don't discuss what we've talked

7    about in here.

8              JUROR LEWIS:  Okay.  Very good.

9              (Juror Lewis leaves the courtroom.)

10             THE COURT:  I'm not going to excuse Mr. Lewis.

11   I'll deny the challenge for cause by Plaintiff.

12             (Open court.)

13             THE COURT:  Ms. Hambrick, will you come up,

14   please?

15             (Bench conference continued.)

16             THE COURT:  Good morning, ma'am.

17             JUROR HAMBRICK:  Good morning.

18             THE COURT:  This is our microphone.  I'm just

19   going to talk with you quietly up here.

20             When we started today, I asked for people who

21   might have a serious problem being able to be here the

22   entire time of the trial if they were selected, and you

23   raised your hand.  Tell me about that.

24             JUROR HAMBRICK:  Well, I purchased some tickets

25   back in January to go out of town, and it was going to
```

1   leave this coming Thursday, the 14th.  And being that I got

2   the notice --

3           THE COURT:  Are these airline tickets?

4           JUROR HAMBRICK:  No.  They're tickets to go to a

5   play that's out of town.

6           THE COURT:  Okay.

7           JUROR HAMBRICK:  And the play starts at 7:00

8   o'clock, and it's in Dallas.  And so I was thinking, well,

9   after it got pushed back to the 8th, that I would probably

10  be done.  I didn't try to get it deferred or anything so --

11  thinking it would be done and over with by then, but since

12  you're telling me it's going to be going to the 13th -- I

13  mean, to the 14th, which is next Thursday, so --

14          THE COURT:  Well, none of us know exactly.

15          JUROR HAMBRICK:  Right.

16          THE COURT:  And once the jury has heard all the

17  evidence and I've given them my instructions and counsel's

18  presented their final arguments, it's going to be up to the

19  jury as to how long it takes them to make a decision.

20          JUROR HAMBRICK:  Yes, sir.

21          THE COURT:  We could get a decision in 30 minutes,

22  and we might be 10 hours waiting and still not have a

23  decision.

24          JUROR HAMBRICK:  Right.

25          THE COURT:  So that's just something that there's

 1  no way to know when the process would be ultimately

 2  complete.

 3          JUROR HAMBRICK:  Right.  Yes, sir.

 4          THE COURT:  So let me understand this:  The

 5  tickets are to a play in Dallas.

 6          JUROR HAMBRICK:  Uh-huh.

 7          THE COURT:  And the play starts at 7:00 o'clock in

 8  the evening --

 9          JUROR HAMBRICK:  Yes.

10          THE COURT:  -- on Thursday of next week?

11          JUROR HAMBRICK:  Uh-huh.

12          THE COURT:  Now, are these -- are these tickets

13  that could be rescheduled?  Is it a one-time performance?

14  Are they going to be performing whatever it is for the next

15  month, and you could reschedule it?  Tell me about that.

16          JUROR HAMBRICK:  It's a one-time performance.

17          THE COURT:  Okay.

18          JUROR HAMBRICK:  And --

19          THE COURT:  Were they expensive tickets?

20          JUROR HAMBRICK:  (Laughing.)

21          THE COURT:  I take that as a yes?

22          JUROR HAMBRICK:  Yes.

23          THE COURT:  Okay.  All right.  Mr. Gilliland, do

24  you have any questions?

25          MR. GILLILAND:  I don't.

106

```
1              THE COURT:  Mr. Gillam?

2              MR. GILLAM:  No, sir.

3              THE COURT:  Ms. Hambrick, thank you for your

4   candor.  I'm going to let you join the rest of the group

5   outside.  Just don't discuss what we talked about in here.

6              JUROR HAMBRICK:  Okay.  Thank you so much.

7              (Juror Hambrick leaves the courtroom.)

8              MR. GILLAM:  I don't think you're going to get to

9   her anyway.

10             THE COURT:  I'm going to excuse her.

11             MR. GILLAM:  Who is it to?

12             MR. GILLILAND:  22.

13             MR. GILLAM:  No.  What's she going to see?

14             MR. GILLILAND:  A play.  She never said exactly

15  why.

16             THE COURT:  Just a minute, guys.  I've excused

17  No. 9 for cause.  I've excused No. 15 for scheduling

18  issues.  I've excused No. 16 for cause.  I have not excused

19  No. 18.  And I've excused No. 22.  The only one still

20  unresolved is No. 17.

21             There's no reason he can't serve, and there's no

22  indication he can't be fair and impartial.  And I'm not

23  sure we can determine with any absolute certainty as we

24  stand here at the bench today, but I don't want to keep

25  somebody on the panel that there's an issue with from
```

```
 1   Plaintiff.
 2           If Plaintiff is going to maintain their challenge
 3   against Mr. Turner, I'm going to need about 15 or 20
 4   minutes before I can tell you whether I'm going to excuse
 5   him or not, and only then are you going to be able to
 6   strike your list.
 7           MR. GILLAM:  Right.
 8           THE COURT:  Mr. Gilliland, you want to maintain
 9   your challenge on 17?
10           MR. GILLILAND:  Yes, Your Honor, I think we do.
11           THE COURT:  All right.  Well, it's a quarter after
12   11:00, counsel.  Take 15 minutes, and then I'll see you
13   back here in 15 minutes, and I'll give you an answer on
14   No. 17.
15           MR. GILLAM:  Yes, Your Honor.
16           MR. GILLILAND:  Thank you, Your Honor.
17           (Bench conference concluded.)
18           THE COURT:  The Court will stand in recess until
19   11:15.
20           COURT SECURITY OFFICER:  All rise.
21           (Recess.)
22           COURT SECURITY OFFICER:  All rise.
23           THE COURT:  Be seated, please.
24           Where's Plaintiff's counsel?  I said we would
25   recess until 11:30.  Any idea?
```

1          Let me ask the Court Security Officer to see if he

2     can find Plaintiff's counsel and get them in the courtroom.

3          COURT SECURITY OFFICER:  There's one already

4     headed that way, sir.

5          THE COURT:  Okay.  Thank you.

6          And also, I need you to find Mr. Turner,

7     Panel Member No. 17, and ask him to return to the

8     courtroom.

9          COURT SECURITY OFFICER:  Yes, sir.

10          THE COURT:  Just No. 17.

11          Don't make me wait on you again, Mr. Gilliland.

12          MR. GILLILAND:  Understood, Your Honor.  My

13     apologies.

14          THE COURT:  I said 11:30.

15          Mr. Turner, you've indicated to the Court that you

16     have a home in Houston where you've lived approximately the

17     last 15 years and that you spend about 95 percent of your

18     time at that address; is that correct?

19          JUROR TURNER:  That's correct.

20          THE COURT:  Let's get -- let's get him a handheld

21     microphone, please.

22          JUROR TURNER:  That's correct.

23          THE COURT:  All right.  You also indicated to me

24     at the bench that you were registered to vote in Gregg

25     County where you have a second home?

1          JUROR TURNER:  That's correct also.

2          THE COURT:  And you also indicated to me that your

3     driver's license address shows your home address or the

4     address of your second home in Gregg County; is that

5     correct?

6          JUROR TURNER:  That's correct.

7          THE COURT:  Can you tell me why in 15 years in

8     Houston you haven't reregistered to vote or changed your

9     driver's license?

10         JUROR TURNER:  I just never have.  I have also

11    kept this home in Longview.

12         THE COURT:  Have you -- have you voted in the last

13    15 years?

14         JUROR TURNER:  I have.

15         THE COURT:  So you come to Longview to vote?

16         JUROR TURNER:  I do.

17         THE COURT:  Well, to be a qualified juror in this

18    district, you must be a resident of this district, and

19    residence is a combination of several things, including

20    your intent.

21         And I did not ask you point blank, but from the

22    answers to the questions you gave me, my assumption is that

23    all other things being equal, you would tell me that you

24    intend your home to be at your address in Houston; is that

25    correct?

```
 1              JUROR TURNER:  If I spend that much time there,
 2   yes.
 3              THE COURT:  If you were equally between Longview
 4   and Houston and had nothing else to do and someone said go
 5   home, would you go north or would you go south?
 6              JUROR TURNER:  I would definitely go to the city.
 7              THE COURT:  I take that to mean Houston?
 8              JUROR TURNER:  Houston.
 9              THE COURT:  Okay.  Then I'm going to find that
10   you're not qualified to serve as a juror in this district.
11              I would suggest to you strongly that you
12   reregister to vote in Houston at your address there because
13   you might well get summoned for jury duty in this district
14   again.  And while I detect no malice, you have certainly
15   caused a headache for the Court this morning.
16              JUROR TURNER:  My apologies to all of you.
17              THE COURT:  All right.  That -- that clarifies --
18   that clarifies what I needed to clarify, Mr. Turner.
19   You're not going to serve on this jury because you're not
20   qualified to serve on this jury.
21              JUROR TURNER:  Okay.
22              THE COURT:  But I'm going to ask you to return to
23   the rest of the panel that's on recess that's outside the
24   courtroom and not to discuss anything about this matter or
25   anything that's happened in the courtroom this morning.
```

1          JUROR TURNER:  Very well.

2          (Juror Turner leaves the courtroom.)

3          THE COURT:  All right.  Counsel, I'm going to give

4    you until a quarter until 12:00 to strike your list.  I'm

5    excusing Mr. Turner, No. 17.  I've already advised you as

6    to the other issues.  By my calculations, that means you

7    should probably strike through Panel Member No. 20.

8          Have your strike list back to Ms. Lockhart, the

9    courtroom deputy, in the next 15 minutes.  The Court stands

10   in recess.

11         (Bench conference concluded.)

12         COURT SECURITY OFFICER:  All rise.

13         (Recess.)

14         (Jury in.)

15         COURT SECURITY OFFICER:  All rise.

16         THE COURT:  Be seated, please.

17         All right, ladies and gentlemen.  If you will

18   listen carefully when your name is called, if you'll come

19   forward and take your seat in the jury box.  I'm going to

20   seat eight jurors in this case, and I'd like to have the

21   first four centered in the front -- or on the front row of

22   the jury box and the second four behind then centered on

23   the second row of the jury box.

24         And if the jury person called for the jury will

25   come in the jury box on that far end, walk down, and leave

1    two seats vacant, stand in front of the third seat from the

2    end, then juror two, three, and four, we'll stack up behind

3    them, and then jurors five, six, seven, and eight can come

4    on the second row and stand directly behind those jurors on

5    the front row, and that will center our eight jurors with

6    four on the front row and four on the second row.

7            So it all depends on whoever gets called first,

8    and if he or she will stand in front of the third chair,

9    leaving two vacant chairs from the end on this first row,

10   that should allow everybody to orient from there and center

11   our jury in the box.

12           So with that, Ms. Lockhart, will you call the

13   names of our panel members selected to serve as jurors in

14   this case.

15           COURTROOM DEPUTY:  Yes, sir.

16           Nicole Edwards, Gary Robinson, Teresa Whitaker,

17   Karl Hyzer, Matthew Upson, Danny Johnson, Emily Cremers,

18   and Terry Harper.

19           THE COURT:  All right.  Please be seated.

20           Those of you not selected to serve on this jury,

21   I'm about to excuse you at this time, but I want to excuse

22   you with the thanks and appreciation of the Court, the

23   Court staff, and, ladies and gentlemen, I can tell you the

24   lawyers and the parties in this case on both sides

25   appreciate your service here this morning as well.

1          Even though you were not selected to serve on this

2    jury, every one of you has done a very real and important

3    public service by interrupting your daily lives, being

4    here, presenting yourself for jury duty.  Every one of you

5    had other places to be this morning, other things to do

6    that were important in your lives.  You set those aside,

7    and you made a sacrifice to come and present yourself for

8    jury duty.

9          And even though you weren't selected, you have

10   facilitated the process that otherwise the Court would not

11   have been able to carry out.  And you have done very real

12   and important public service that the Court recognizes and

13   thanks you for.

14         Ladies and gentlemen, the Court is dependent upon

15   good lay citizens who will present themselves when

16   summonsed for jury duty like you have been this morning,

17   and

18   I appreciate what you've done very much.

19         The clerk's office and Ms. Green in the clerk's

20   office who you've worked with will be glad to assist you

21   with regard to any documentation you might need for an

22   employer who wants to know why you didn't show up at work

23   this morning, or anything else that can be helpful to you,

24   the clerk's office will be more than happy to work with

25   you.

1          I can guarantee they're going to want to recover

2     those very expensive plastic numbers and little round

3     badges that you're wearing.  Unfortunately, you don't get

4     to keep those as a souvenir.

5          If you have any questions about your service as

6     members of this venire panel, the clerk's office will be

7     happy to help you and work with you.  Again, ladies and

8     gentlemen, even though you weren't selected, thank you so

9     much for being here, for making the sacrifice, and for

10    being good citizens and serving your country by presenting

11    yourself this morning.

12         With that, those on the panel not selected to

13    serve on the jury are now excused.

14         (Remaining jury panel out.)

15         THE COURT:  All right.  Please be seated.

16         At this time, I'm going to ask the eight members

17    of our jury to stand and be sworn by the courtroom deputy.

18         Please stand, ladies and gentlemen.

19         (Jurors sworn.)

20         THE COURT:  Please be seated.

21         Ladies and gentlemen, before we break for lunch,

22    I have a couple of important instructions I need to give

23    you.  If you will give me your attention, I'll proceed to

24    give you these instructions, and then we will break for

25    lunch.

115

1          I do need to let you know, as a matter of

2    housekeeping, the Court has signed an order indicating that

3    it's important that you remain in the courtroom during --

4    or the courthouse during lunch each day.

5          That means the government will buy you lunch and

6    bring it to you in the jury room every day, and you're not

7    going to have to leave the building and search around

8    somewhere in downtown Tyler to have lunch and then get

9    back.

10          That will also allow the Court to take a less

11   lengthy lunch break, and it should help us get more

12   evidence in each day.

13          So as we go forward, plan on having lunch provided

14   each day during your service as jurors in this case.

15          Now, at this point, I need to give you these

16   additional instructions regarding your service as jurors.

17   Do not discuss this case with anyone.  That's absolutely an

18   essential instruction.

19          As a matter of fact, ladies and gentlemen, my

20   practice is to remind you of that just about every time you

21   get up out of those chairs to leave the jury box.

22          And let me tell you why.  It is absolutely

23   essential that at the end of the trial, when you've heard

24   all the evidence which has come in through what's been

25   presented in this courtroom and when you are asked to

1  answer questions that the Court's going to give you in

2  writing, it's essential that the only information you have

3  to draw upon to answer those questions will be the

4  testimony that you've heard from this witness stand under

5  oath and subject to cross-examination, any sworn testimony

6  presented to you by video deposition, and the exhibits

7  which the Court has examined and found to be admissible

8  under the rules of evidence and has admitted as exhibits in

9  the trial.  That is the entire universe of evidence that

10 you should consider when you retire to deliberate on your

11 verdict.

12        Therefore, it is absolutely essential that you not

13 communicate or discuss this case with anyone in any way.

14 Otherwise, you will be opening yourselves to additional

15 information that is improper and would taint the entire

16 process.

17        One reason I give this instruction repeatedly is

18 because if in any case it's violated, in all likelihood, we

19 will have to start completely over with a new jury, and all

20 the time, money, and effort that has been put into this

21 trial will be wasted.

22        So when you get home tonight, unless you live

23 alone, whoever is there to meet you, the first question

24 you're going to get, and I promise you this is going to

25 happen, they're going to say, tell me what happened in

1   federal court in Tyler today.  Don't even try to answer

2   that question, because if you even try to answer it, you'll

3   almost assuredly violate my instruction to you.

4        Just tell whoever it is that asks that question,

5   that very firm federal judge told you in no uncertain terms

6   not to talk about the case with anyone.  And when the case

7   is over and when you've been released, you'll be free to

8   discuss it with them, but until then, you cannot and must

9   not discuss this case with anyone.

10        And when I say don't discuss the case, ladies and

11   gentlemen, I mean don't communicate about it in the

12   broadest possible sense.  Don't send an email.  Don't text.

13   Don't get on any form of social media and post or tweet or

14   whatever else people do on social media.  Don't communicate

15   whatsoever in any way about this case with anyone.

16        And also, ladies and gentlemen, just so I can be

17   completely clear, that instruction applies to the eight of

18   you when you're together.

19        You are not to discuss this case among the eight

20   of you until such time as all the evidence has been

21   presented, I have given you my final instructions on the

22   law to apply, and counsel for the parties have presented

23   their closing arguments to you.

24        At that point, I will direct you to retire to the

25   jury room and to consider and deliberate on your verdict.

1  At that moment in time, you are permitted to discuss the

2  case among each other.

3        As a matter of fact, ladies and gentlemen, at that

4  moment in time, it becomes your duty to discuss the case

5  among the eight of you in an effort to reach a unanimous

6  verdict in this case.  But until that time, you must not

7  communicate with each other in any way about the case.

8        So throughout this trial, when you're on recess,

9  when you're gathered in the jury room for lunch or in the

10  morning before we start, talk about anything you want to

11  talk about, but do not discuss anything that's happened

12  over the course of the trial.

13        In that same vein, ladies and gentlemen, you're

14  not to do any research about anything related to this case.

15  You are not to go home and get on your computer and do a

16  Google search of Plaintiff or Defendant or this lawyer or

17  that lawyer or this witness that you heard.  You are not to

18  do any research of any kind in any way.

19        That includes the old-fashioned kind at the

20  library where you pull an encyclopedia off the shelf.  Do

21  not do any research of any kind.

22        And in that regard, ladies and gentlemen, all of

23  us pretty much -- all of us these days carry a smartphone

24  with us.  And while it's a very good telephone, it's also a

25  mini computer that's available at any time to do searches

1   on the Internet with.

2          I'm going to ask you when we come back from lunch

3   today, if you have a smartphone that you have with you

4   today, leave it in the jury room.  And when you come back

5   tomorrow, I'm going to ask you either to leave that

6   smartphone at home or leave it in your vehicle.  If you're

7   in a position where regarding your business or some

8   important family matter, you need to check for a text

9   message or an email, you'll have an opportunity over the

10  lunch break or during other recesses, if it's important, to

11  go to your vehicle and check your phone.

12         But I don't want any of you tempted when you're

13  hearing new things and new concepts to pull out your

14  smartphone and open a browser and do any research while

15  you're in the jury room.  That is just as improper as

16  everything else I've talked to you about.

17         So don't communicate about the case in any way

18  with any person, including the eight of yourselves.  Don't

19  do any research whatsoever about anything involved in this

20  case.

21         Also, ladies and gentlemen, I don't think this is

22  likely, but I can't tell you that it's not possible, so

23  I need to visit with you about it, and that's this.

24         This is an important case.  There is a lot at

25  stake.  These are important issues.  And while I don't

1  think it's likely, it is possible, given the importance and

2  the scope of this case and what's at stake, that some third

3  party might, during this trial, attempt to approach you and

4  influence your decision about how you will decide the facts

5  in this case.  That could happen.  I can't tell you that it

6  won't.  I don't think it will happen, but it's within the

7  realm of possibility.

8       If at any time before I have discharged you from

9  your duty as jurors in this case, anybody approaches you in

10  any way that you feel uncomfortable about or uneasy about

11  related to your service as jurors, then you should

12  immediately notify Ms. Green in the clerk's office.  She

13  will let me know, and I will deal with it.

14       I don't think it's likely.  But, again, this is

15  not an unimportant case, and there's a lot at stake for

16  both the Plaintiff and the Defendant, and it is within the

17  realm of possibility that that might happen.  I just want

18  to make you aware of that.

19       One other thing, ladies and gentlemen, and then

20  I'll let you break for lunch, and that is this.  Over the

21  course of this trial, there are going to be unavoidable

22  times when you are coming and going from the courthouse,

23  perhaps over a break or a recess, certainly in the mornings

24  and in the evenings when you're going to unavoidably, in

25  the hallway, in the restrooms, on the elevator, you're

1    going to be in close contact with one or more of these

2    lawyers, one or more of the witnesses, one or more of the

3    corporate representatives.

4         I want you to understand this.  When that happens,

5    they're not going to speak to you.  If you should walk in

6    right next to one of these lawyers first thing in the

7    morning, they're not going to say, good morning, how are

8    you today, I hope you have a good day.  They're not going

9    to be the friendly and outgoing and gregarious kind of

10   people that we're used to in East Texas.

11        Again, it goes back to the same fundamental

12   principle that you should have absolutely nothing to

13   consider or take into account when you answer the questions

14   in this verdict other than what came in as sworn testimony

15   during the trial from the witnesses and the exhibits that

16   the Court has admitted into evidence.

17        So when one of those people just walks right by

18   you or just stares at the wall and doesn't speak, don't

19   take that as being rude.  Don't take that as being

20   unfriendly.  Don't hold that against them.  Understand

21   simply that they are doing what the Court requires of them.

22        All right.  Ladies and gentlemen, I'm told by the

23   clerk's office that your lunch is available for you in the

24   jury room.

25        I'm going to excuse you with these instructions

1    for lunch.

2          It is about seven or eight minutes after 12:00.

3    We will attempt to reconvene at 1:00 o'clock.  At that

4    time, I will give you my preliminary instructions, and the

5    lawyers for both of the parties will present their opening

6    statements.

7          After the opening statements are presented, then

8    we'll proceed with the Plaintiff's case, and they'll call

9    their first witness.

10          Follow all the instructions I've given you, ladies

11    and gentlemen, of course, including not to discuss the case

12    among yourselves.

13          With that, the jury is excused for lunch at this

14    time.

15          COURT SECURITY OFFICER:  All rise for the jury.

16          (Jury out.)

17          THE COURT:  All right.  Counsel, be seated,

18    please.

19          All right.  Is there anything from either

20    Plaintiff or Defendant that needs to be raised with the

21    Court before we recess for lunch?

22          MR. GILLILAND:  Nothing from the Plaintiff, Your

23    Honor.

24          MR. GILLAM:  Not from the Defendant, Your Honor.

25          THE COURT:  We stand in recess until 1:00 o'clock.

1          COURT SECURITY OFFICER:  All rise.

2          (Recess.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7


8

9     /S/ Shelly Holmes  _____                 3/8/19
     SHELLY HOLMES, CSR, TCRR                      Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25