1                 IN THE UNITED STATES DISTRICT COURT

2                 FOR THE EASTERN DISTRICT OF TEXAS

3                             TYLER DIVISION

4     INTELLECTUAL VENTURES II LLC,  )(

5          PLAINTIFF,                )(   CIVIL ACTION NO.

6                                    )(   6:18-CV-299-JRG

7     VS.                           )(   TYLER, TEXAS

8                                    )(

9     GREAT WEST CASUALTY COMPANY,  )(   MARCH 8, 2019

10         DEFENDANT.                )(   1:03 P.M.

11                 TRIAL TRANSCRIPT OF JURY TRIAL

12           BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

13             UNITED STATES CHIEF DISTRICT JUDGE

14

      FOR THE PLAINTIFF: Mr. Derek T. Gilliland
15                        Mr. Ty W. Wilson
                          NIX PATTERSON, LLP
16                        205 Linda Drive
                          Daingerfield, Texas 75638
17
                          Mr. Karl A. Rupp
18                        NIX PATTERSON, LLP
                          Advancial Tower
19                        1845 Woodall Rodgers Tower
                          Suite 1050
20                        Dallas, Texas 75201

21    COURT REPORTER:    Ms. Shelly Holmes, CSR, TCRR
                          Official Court Reporter
22                        United States District Court
                          Eastern District of Texas
23                        Marshall Division
                          100 E. Houston
24                        Marshall, Texas 75670

25    (Proceedings recorded by mechanical stenography, transcript
      produced on a CAT system.)

```
 1   FOR THE DEFENDANT: Mr. Michael J. Bettinger
                       Ms. Irene I. Yang
 2                     SIDLEY AUSTIN, LLP
                       555 California Street
 3                     Suite 2000
                       San Francisco, California 94104
 4
                       Mr. Harry Lee Gillam, Jr.
 5                     GILLAM & SMITH, LLP
                       303 South Washington Avenue
 6                     Marshall, Texas 75670

 7                     Mr. Andrew T. Langford
                       SIDLEY AUSTIN, LLP
 8                     2021 McKinney Avenue
                       Suite 2000
 9                     Dallas, Texas 75206

10                     Ms. Sharon Lee
                       Mr. Samuel A. Dillon
11                     SIDLEY AUSTIN, LLP
                       1501 K Street, N.W.
12                     Washington, DC 20005

13                     Mr. Paul J. Rogerson
                       SIDLEY AUSTIN, LLP
14                     One South Dearborn
                       Chicago, Illinois 60603
15

16

17

18

19

20

21

22

23

24

25
```

<pre>
                        P R O C E E D I N G S

           (Jury out.)

           COURT SECURITY OFFICER:  All rise.

           THE COURT:  Be seated, please.

           All right, counsel.  Is there anything we need to

take up before I bring in the jury and begin with the

Court's preliminary instructions?

           MR. GILLILAND:  Nothing from the Plaintiff, Your

Honor.

           MR. GILLAM:  No, Your Honor, not from the

Defendant.

           THE COURT:  Let's bring in the jury, please.

           COURT SECURITY OFFICER:  All rise for the jury.

           (Jury in.)

           THE COURT:  Please be seated.

           Welcome back from lunch, ladies and gentlemen.

I now have some preliminary instructions that I want to give

you before we start with opening statements from the lawyers

and then get on to the evidence.

           You've now been sworn as the jury in this case, and

as the jury, you are the sole judges of the facts, and as

such, you will decide and determine all the facts in this

case.

           As the judge, I will give you instructions on the

law.  I will decide questions of law that arise during the
</pre>

1  trial, handle any matters relating to evidence and

2  procedure, I'll oversee the flow of the evidence, and I'll

3  maintain the decorum of the courtroom.

4          Now, at the end of the evidence, I'll give you

5  detailed instructions about the law to apply in deciding

6  this case, and I'll give you a list of questions that you

7  are then to answer.  This list of questions is called the

8  verdict form.  And your answers to those questions will need

9  to be unanimous, and those answers to those questions will

10  constitute the verdict -- the jury's verdict in this case.

11          Now, let me tell you briefly what this case is

12  about.  This case involves a dispute regarding one certain

13  United States patent.  I know that you saw the patent video

14  this morning prepared by the Federal Judicial Center, but

15  I want to give you some instructions now and on the record

16  about a patent and how one is obtained.

17          Patents are either granted or denied by the

18  United States Patent and Trademark Office, which you'll

19  often hear referred to simply as the PTO.

20          A valid United States patent gives the patentholder

21  the right, for up to 20 years from the date the patent

22  application is filed, to prevent others from making, using,

23  offering to sell, or selling the patented invention within

24  the United States or from importing it into the

25  United States without the patentholder's permission.

1              A patent is a form of property called intellectual

2      property, and like all other forms of property, a patent may

3      be bought or sold.

4              A violation of the patentholder's rights is called

5      infringement.  The patentholder may try to enforce a patent

6      against persons it believes to be infringers by filing a

7      lawsuit in federal court, and that's what we have in this

8      case.

9              The process of obtaining a patent is called patent

10      prosecution.  To obtain a patent, one must first file an

11      application with the PTO.  The Patent and Trademark Office

12      is an agency of the United States Government, and it employs

13      trained examiners who review applications for patents.

14              The application includes what is called a

15      specification.  The specification contains a written

16      description of the claimed invention telling what it is, how

17      it works, how to make it, and how to use it.

18              The specification concludes or ends with one or

19      more numbered sentences.  These numbered sentences are

20      called the patent claims.

21              When a patent is granted by the U.S. Patent and

22      Trademark Office, it's the claims, ladies and gentlemen,

23      that define the boundaries of its protection and give notice

24      to the public of those boundaries.

25              Patent claims exist in two forms referred to as

1    either independent claims or dependent claims.

2           An independent claim does not refer to any other

3    claim in the patent.  It is independent.  It's not necessary

4    to look at any other claim to determine what an independent

5    claim covers.

6           On the other hand, a dependent claim refers to at

7    least one other claim in the patent.  A dependent claim

8    includes each limitation or element of that other claim or

9    claims to which it refers, or as we sometimes say, from

10   which it depends, as well as those additional limitations or

11   elements recited within the dependent claim itself.

12          Accordingly, to determine what a dependent claim

13   covers, it's necessary to look at both the -- the dependent

14   claim itself and the independent claim or claims from which

15   it refers or from which it depends.  The claim at issue in

16   this case is a dependent claim.

17          Now, the claims of the patent-in-suit use the word

18   comprising.  Comprising means including or containing.  A

19   claim that includes the word comprising is not limited to

20   the methods or devices having only the elements recited in

21   the claim, but also covers other methods or devices that add

22   additional elements.

23          Let me give an example.  If you take a claim that

24   covers a table and the claim recites a table comprising a

25   tabletop, legs, and glue, the claim will cover any table

1  that contains these structures, even if the table also

2  contains other additional structures, such as a leaf to go

3  in the tabletop or wheels to go on the ends of the legs.

4        Now, that's a simple example using the word

5  comprising and what it means.  In other words, it can have

6  other features in addition to those covered by the patent.

7        Now, after the applicant files the application with

8  the PTO, an examiner reviews the application to determine

9  whether or not the claims are patentable, that is,

10  appropriate for patent protection, and whether or not the

11  specification adequately describes the invention that is

12  claimed.

13        In examining a patent application, the examiner

14  reviews certain information about the state of the

15  technology at the time of the application and the app -- and

16  the time the application was filed.

17        The PTO, through its examiners, search for and

18  review this type of information that was publicly available

19  or was submitted with the application by the applicant.

20        This type of information is called prior art.  The

21  examiner reviews this prior art to determine whether or not

22  the invention is truly an advance over the state of the art

23  at the time.

24        Prior art is defined by law, and at a later time,

25  I'll give you specific instructions about what constitutes

prior art.  However, in general, prior art includes information that demonstrates the state of the technology that existed before the claimed invention was made or before the application for a patent was filed.

A patent contains a list of certain prior art that the examiner has considered.  The items on this list are called the cited references.

Now, after the prior art search and examination of the application, the examiner informs the applicant in writing of what the examiner has found and whether the examiner considers any claim in the application to be patentable, in which case it would be allowed.

Now, this writing from the examiner to the applicant is called an office action.  Now, if the examiner rejects the claims, the applicant has an opportunity to respond to the examiner to try and persuade the examiner to allow the claims.

The applicant also has the chance to change or amend the claims or to submit new claims, and the papers generated in the -- in this process, going back and forth between the examiner and the applicant, are called the prosecution history.

And this process may go back and forth between the examiner and the applicant for some time until the examiner is ultimately satisfied that the application meets the

1    requirements for a patent, and in that case, the application

2    issues as a United States patent, or in the alternative, if

3    the examiner ultimately concludes that the application

4    should be rejected, then no patent is issued.  Sometimes

5    patents are issued after appeals within the PTO or to a

6    court.

7         The fact that the PTO grants a patent does not

8    necessarily mean that any invention claimed in the patent,

9    in fact, deserves the protection of a patent.

10        Now, while issued United States patents are

11   presumed to be valid under the law, a person accused of

12   infringement has the right to argue here in federal court

13   that a claimed invention in a patent is invalid.

14        It's your job, ladies and gentlemen, as the jury to

15   consider the evidence presented by the parties and determine

16   independently and for yourselves whether or not the

17   Defendants have proven that a patent is invalid.

18        Now, to help you follow the evidence in this case,

19   I'll give you a brief summary of the positions of the two

20   parties.

21        As I'm sure you all know, the party that brings a

22   lawsuit is called the Plaintiff.  The Plaintiff and the

23   owner of the patent in this case is Intellectual Ventures II

24   LLC, and you will hear them referred to throughout the trial

25   simply as either the Plaintiff or as Intellectual Ventures.

1   You may occasionally hear them referred to in an even

2   shorter form as IV.

3        And as you all know, the party against whom a party

4   is filed is called the Defendant.  The Defendant in this

5   case is Great West Casualty Company, which you'll hear

6   referred to throughout the trial as either the Defendant or

7   simply Great West.

8        Now, as I told you during jury selection, this is a

9   case of alleged patent infringement.  And as I may have

10  already mentioned, there is one patent at issue in this

11  case.  That patent is United States Patent No. 7,516,177.

12  And patents, you should know, are commonly referred to by

13  their last three digits.

14       So in this case, the patent at issue will be

15  referred to as the '177 patent.  You may hear it called the

16  '177 patent.

17       And this patent may be also referred to throughout

18  the trial as either the patent-in-suit or the asserted

19  patent.  All those references mean the '177 patent.

20       This patent, the '177 patent, generally relates to

21  an apparatus for distributing content through one or more

22  distributed information access points on a user's

23  centralized access point.

24       You're going to have a copy of the patent-in-suit

25  in your juror notebooks, which will be passed out to you in

1    a few minutes.

2           Now, the Plaintiff in this case, Intellectual

3    Ventures, contends that the Defendant, Great West, is

4    infringing Claim 14 of the '177 patent by making, using --

5    by making or using products and systems that include

6    Intellectual Ventures's patented technology.

7           Intellectual Ventures also contends that it's

8    entitled to money damages as a result of that infringement.

9           The Defendant in the case, Great West, denies that

10   it is infringing the Plaintiff's patent, the patent-in-suit,

11   and contends that Claim 14 of the '177 patent is invalid as

12   being anticipated or obvious in light of the prior art.

13          Now, ladies and gentlemen, I know that there have

14   been many new words and new concepts that have been thrown

15   at you today.  I'm going to define a lot of these words and

16   concepts for you as we go through these instructions.

17          The attorneys in the case are going to discuss them

18   in their opening statements.  And the witnesses are going to

19   help you understand these through their testimony in the

20   case.

21          So, please, do not feel overwhelmed at this point.

22   I promise you, it will all come together as we go through

23   the trial.

24          One of your jobs in this case, ladies and

25   gentlemen, is to decide whether or not Claim 14 of the '177

1   patent has been infringed and whether the patent is invalid.

2        If you decide that Claim 14 of the patent-in-suit,

3   the '177 patent, has been infringed by the Defendant and is

4   not invalid, then you'll need to decide what amount of money

5   damages should be awarded to the Plaintiff as compensation

6   for that infringement.

7        Now, my job is to tell you what the law is, handle

8   rulings on evidence and procedure, and conduct the trial as

9   efficiently as possible while maintaining the decorum of the

10  courtroom.

11       In determining the law, ladies and gentlemen, it's

12  specifically my job to determine the meaning of any claim

13  language from within the asserted patent that needs

14  interpretation.

15       I have already determined the meanings of the -- of

16  the language in the claims in the patent-in-suit.  And you

17  must accept the meanings of those terms that I give you and

18  use those meanings when you decide whether or not

19  Claim 14 of the asserted patent has or has not been

20  infringed and whether or not any claim is invalid.

21       You're going to get a document in a few moments

22  that will reflect those meanings and constructions that the

23  Court has already arrived at.

24       Now, for any claim term for which I have not

25  provided you with a specific definition, then you should

1    apply the plain and ordinary meaning in that case.  However,

2    if I've provided you with a definition, you're to apply my

3    definition to those terms throughout the case.

4           However, my interpretation of the language within

5    the claim should not be taken as an indication to you that I

6    have any personal opinion at all regarding the issues such

7    as infringement and invalidity.  Those issues, ladies and

8    gentlemen, are yours to decide and yours alone to decide.

9           I'll provide you with more detailed instructions on

10   the meaning of the claims before you retire to deliberate on

11   your verdict.  In deciding the issues that are before you,

12   however, you'll be asked to consider specific legal rules,

13   and I'll give you an overview of those rules now.  And then

14   at the conclusion of the case, I'll give you more detailed

15   instructions.

16          The first issue that you're asked to decide is

17   whether the Defendant, Great West, has infringed Claim 14 of

18   the '177 patent, and whether the Plaintiff, Intellectual

19   Ventures, has shown -- excuse me, the Plaintiff,

20   Intellectual Ventures, must show by a preponderance of the

21   evidence that Claim 14 has been infringed.

22          And there are a few different ways that a patent

23   can be infringed.  I'll explain the requirements for each of

24   these types of infringement to you in detail at the

25   conclusion of the case.

1          But, in general, a Defendant may infringe an

2     asserted patent by making, using, selling, or offering for

3     sale in the United States or importing into the

4     United States a product meeting all the requirements of a

5     claim within the asserted patent or a product that practices

6     a method or process covered by the asserted patent.

7          As I say, I'll provide you with more detailed

8     instructions on the requirements for infringement at the

9     conclusion of the case.

10          The second issue that you'll be asked to decide is

11     whether the asserted patent is invalid.  Invalidity is a

12     defense to infringement, therefore, even though the

13     U.S. Patent and Trademark Office or the PTO has allowed the

14     asserted claim and even though a patent is presumed under

15     the law to be valid, you, the jury, must decide whether that

16     claim in this case is invalid after hearing the evidence

17     presented during the trial.

18          You may find a patent claim to be invalid for a

19     number of reasons, including because it claims subject

20     matter that is not new.

21          For a patent claim to be invalid because it is not

22     new, Defendant must show by clear and convincing evidence

23     that all of the elements of a claim are sufficiently

24     described in a single previous printed publication or

25     patent.  We call these items prior art.  If a claim is not

 1  new, it is said to be anticipated by the prior art.

 2          You'll need to consider a number of questions in

 3  deciding whether the invention claimed in the asserted

 4  patent is anticipated.  And I'll provide you with more

 5  detailed instructions on these questions at the conclusion

 6  of the trial.

 7          If you decide that any claim of the patent-in-suit

 8  has been infringed and is not invalid, then you'll need to

 9  decide whether the Defendant's infringement has been

10  willful.

11          Another way that a claim can be found to be invalid

12  if it is shown to be -- is if it is shown to be obvious.

13  Even though a claim may not be anticipated because every

14  element of the claim is not shown or sufficiently described

15  in a single piece of prior art, the claim may still be

16  invalid if it would have been obvious to a person of

17  ordinary skill in the field of technology of the patent at

18  the relevant time.

19          Now, you'll need to consider a number of questions

20  in deciding whether the invention claimed in the asserted

21  patent is obvious.  And I'll provide you with more detailed

22  instructions on these questions at the conclusion of the

23  trial.

24          You'll also need to decide in that case what amount

25  of money damages should be awarded to the Plaintiff -- that

1    is, Intellectual Ventures -- to compensate it for any

2    infringement that you may find.

3         A damage award, ladies and gentlemen, must be

4    adequate to compensate the patentholder for the

5    infringement.

6         Damages may arise in the form of lost profits, but

7    in no event may a damage award be less than what the

8    patentholder would have received had it been paid a

9    reasonable royalty for the use of its patent.

10        However, the damages you award, if any, are meant

11   to compensate a patentholder, and they're not meant to

12   punish the Defendant.  You may not include in any damages

13   award an additional amount as a fine or penalty above what

14   is necessary to fully compensate the patentholder for the

15   infringement.

16        Additionally, damages may not be speculative.  And

17   the Plaintiff, Intellectual Ventures, must prove the amount

18   of its damages for the alleged infringement by a

19   preponderance of the evidence.

20        I'll give you more detailed instructions on the

21   calculation of damages for the alleged infringement of the

22   patent-in-suit at the conclusion of the trial, including

23   giving you specific instructions with regard to the

24   calculations of lost profits and a reasonable royalty.

25        However, ladies and gentlemen, the fact that I'm

1  instructing you on the issue of damages does not mean that

2  the Plaintiff is or is not entitled to recover damages.

3         Also, ladies and gentlemen, please be aware that

4  over the course of the trial, you're going to be hearing

5  from a number of witnesses in this case, and I want you to

6  keep an open mind while you're listening to the evidence and

7  not decide any of the facts until you've heard all the

8  evidence.

9         This is important.  While the witnesses are

10  testifying, remember, ladies and gentlemen, you, the jury,

11  will have to decide the degree of credibility and

12  believability to allocate to each of the witnesses and the

13  evidence that they provide.

14         So while the witnesses are testifying, you should

15  be asking yourselves things like this:  Does the witness

16  impress you as being truthful?  Does he or she have a reason

17  not to tell the truth?  Does he or she have any personal

18  interest in the outcome of the case?  Does the witness seem

19  to have a good memory?

20         Does he or she have the opportunity and ability to

21  observe accurately the things that they've testified about?

22  Did the witness appear to understand the questions clearly

23  and answer them directly?  And, of course, does the

24  witness's testimony differ from the testimony of any other

25  witness?  And if it does, how does it differ?

1          These are some of the kinds of things that you

2    should be thinking about while you're listening to each and

3    every witness.  Also, ladies and gentlemen, let me talk to

4    you briefly about expert witnesses.

5          When knowledge of a technical subject may be

6    helpful to you, the jury, a person who has special training

7    and experience in that particular field -- we call them an

8    expert witness -- is permitted to testify to you about his

9    or her opinions on those technical matters.

10         However, you're not required to accept an expert

11   witness's or any other witness's opinions at all.  It's up

12   to you to decide who -- whether you believe any expert

13   witness or any witness and whether what they testify to, in

14   your view, is correct or incorrect and whether or not you

15   want to believe what they say.

16         Because as I've told you, you, the jury, must

17   determine the degree of credibility and believability of all

18   the witnesses and the amount of weight, if any, to be given

19   to the testimony presented.

20         Now, I -- I anticipate that there will be expert

21   witnesses testifying in support of both sides in this case.

22   But when an expert witness is called to testify, it will be

23   up to you to listen to their qualifications, and when they

24   give an opinion and explain the basis for it, you'll have to

25   evaluate what they say, whether you believe it, and to what

1   degree, if any, that you want to give it weight.

2          As I said, judging and evaluating the credibility

3   and the believability of each and every witness is an

4   important part of your job as jurors.

5          Now, during the trial, it's possible that there

6   will be testimony from one or more witnesses that's going to

7   be presented to you through what is called a deposition.  In

8   trials like this, it's difficult, ladies and gentlemen, to

9   get every witness here in court at the same time so that

10  they can testify in person.

11         So the lawyers for each side, before the trial,

12  take the depositions of the witnesses.  In a deposition, a

13  court reporter is present, the witness is sworn and placed

14  under oath, just as if they were personally in court, and

15  the parties, through their counsel, ask them questions, and

16  they answer them, and those questions and their answers are

17  recorded.  Often they are video-recorded.

18         Portions of these video-recordings of the questions

19  and answers taken during a deposition may be played back to

20  you during this trial so that you can see those witnesses

21  and hear their testimony.

22         That deposition testimony is entitled to the same

23  consideration, insofar as possible, and is to be judged as

24  to its credibility, weight, believability, and otherwise

25  considered by you, the jury, in the same way as if the

witness had been present and given their testimony from the

witness stand in open court.

Also, ladies and gentlemen, you may see some

references to a company called BITCO in some of the

deposition testimony, or you may hear BITCO materials being

discussed during the examination of expert witnesses over

the course of this trial.

BITCO and Great West are separate companies which

are owned by the same parent company.  However, BITCO is not

a party to this lawsuit.

Now, during the course of the trial, it's possible

that the lawyers will make certain objections, and when they

raise objections, I will give rulings on those objections.

It's the duty of an attorney to object when the

other side offers testimony or other evidence that the

attorney believes is not proper under the rules of the Court

or the rules of evidence.

Now, upon allowing the testimony or other evidence

to be introduced over the objection of an attorney, the

Court does not, unless expressly stated, indicate an opinion

about the weight or effect of that evidence.

As I've told you, you, the jury, are the sole

judges of the credibility and believability of all the

witnesses and the weight and effect to give to all the

evidence.

1           Now, ladies and gentlemen, I want to compliment the

2    parties in this case, both the Plaintiff and the Defendant,

3    because prior to today, the issues regarding the

4    admissibility of exhibits to be introduced through this

5    trial has already been taken up by the Court with the

6    parties through their counsel in advance of the trial.

7           You may not understand this, but we have spent

8    hours going through thousands of pieces of paper that you

9    will not have to see or listen to, and the Court has heard

10   arguments about the admissibility of those documents

11   previously, and I've ruled on those issues about

12   admissibility, and we've determined already what documents

13   are admissible and what documents are not admissible as

14   exhibits in this case.

15          That means when the parties choose to, they can

16   present to you exhibits during the trial that I've already

17   ruled on as to their admissibility, and you will not have to

18   sit there and listen to the arguments back and forth about

19   whether a document is properly admissible or not.

20          You may not understand this, but I can promise you,

21   many hours have been saved in advance of this trial by doing

22   that, and you have been saved the privilege and honor of

23   listening to all of that as a part of this trial.

24          So I want to compliment both Plaintiff and the

25   Defendant for working diligently with the Court through

1    that.

2            That means, if a party shows you an exhibit during

3    the course of the trial, I've already ruled on the

4    admissibility of it, and they can simply show it to you and

5    ask such questions as they wish to put it in a proper

6    context.

7            Also, it's possible, however, that certain

8    objections in other regards may arise during the course of

9    the trial.

10           If I should sustain an objection to a question

11   addressed to a witness, then you must disregard the question

12   entirely, ladies and gentlemen, and you may draw no

13   inference from its wording or speculate about what the

14   witness would have said if I had allowed them to answer the

15   question.

16           On the other hand, if an objection is made to a

17   question addressed to a witness and I overrule that

18   objection, then you should consider the question and the

19   answer just as if no objection had been made in the first

20   place.

21           You should understand, ladies and gentlemen, that

22   the law of the United States permits a federal district

23   judge such as myself to comment to the jury regarding the

24   evidence in a case, but such comments from the judge to the

25   jury are only an expression of the judge's opinion, and the

1   jury may disregard those comments in their entirety because,

2   as I've told you, you, the jury, are the sole judges of the

3   facts in this case.

4        I want you to know that even though the law may

5   permit me to make such comments, as I indicated to you

6   earlier -- earlier, I'm going to work very hard and

7   diligently to ensure that you have no idea about what

8   I think about the evidence because, again, weighing and

9   considering the evidence as to its believability and

10  credibility and the weight to give to it is the sole

11  function of the jury in this trial.

12       Now, the court reporter in front of me, ladies and

13  gentlemen, is going to take down every word that's been said

14  in this courtroom throughout the trial.  However, the

15  written transcript of what she takes down is not going to be

16  available to you when you retire to deliberate and consider

17  your verdict in this case.

18       The transcript is prepared in case there's an

19  appeal of this decision to a higher court.  That means

20  you're going to have to rely on your memories of the

21  evidence that's been produced during the trial.  You are not

22  going to have the written transcript of the testimony.

23       Now, in a moment, you're each going to be given a

24  juror notebook.  I want you to note that in the back of this

25  notebook, you're going to find a blank legal pad that you

1  can use, if you choose to, to take notes on throughout the

2  course of the trial.  You'll also find a pen in the front

3  pocket of that notebook that you can use for note taking

4  purposes if you need an extra pen.

5          It's up to each of you, ladies and gentlemen, to

6  decide whether or not you want to take notes over the course

7  of this trial, and if you do, how detailed you want those

8  notes to be.

9          But remember, any notes that you take are for your

10  own personal use only.  You're going to have to rely on your

11  memory of the evidence that's produced during the trial.

12  And that's why you should be paying close attention to each

13  and every witness.

14          You should not abandon your own recollection

15  because somebody else's notes indicate something

16  differently.  Your notes are to refresh your recollection,

17  and that's the only reason for which you should be keeping

18  them, if you decide to take them.

19          I'm now going to ask the Court Security Officer to

20  pass out these juror notebooks to each member of the jury at

21  this time.

22          You'll notice, ladies and gentlemen, in these

23  notebooks you'll find that there's a pen in the front

24  pocket.

25          Under the first tab, you'll find a complete copy of

1   the '177 patent, the patent-in-suit.

2          You'll also find what's called a claim construction

3   chart.  That is the document that reflects the Court's prior

4   constructions or definitions for various terms from within

5   the language of the asserted claim.

6          And those constructions on the right-hand side

7   regarding those terms on the left -- or actually it's in the

8   middle column here, those are the constructions and

9   definitions that I have given you and that you're required

10  to apply to that language in determining the issues of

11  infringement and validity.

12         Now, behind the claim construction chart, you'll

13  also find numerous tabs for individual witnesses.  The

14  Court's required that these notebooks have a page for each

15  witness that might testify during the trial that has

16  superimposed at the top of that page a head-and-shoulders

17  photograph of the witness, together with their name.  The

18  remainder of each of these pages are simply ruled lines that

19  you can use for note taking purposes if you wish to.

20         The Court's found that it's helpful to the jury

21  when you retire to deliberate and you've heard from many

22  witnesses, to be able to look back and refresh your memory

23  with a picture of the person who testified.  And that's why

24  those witness pages are in here.

25         You'll also find at the back of the notebook, as

1   I told you, a three-hole punched legal pad that you can use

2   for note taking, as well.

3          Now, these juror notebooks, ladies and gentlemen,

4   should be in your possession at all times.  They should

5   either be with you in the jury box, or they should be with

6   you in the jury room, but you shouldn't leave them anywhere

7   else.

8          There will be times through the trial when I'm

9   going to call for a short recess that I will tell you, you

10  may simply close and leave your notebooks there in your

11  chairs in the jury box.  But unless I do that, you should

12  take it with you to the jury room.

13         And, certainly, at the end of the day, when you're

14  dismissed for the evening, you should take those notebooks

15  and leave them closed on the table in the jury room where

16  you can then pick them up the next morning.

17         Now, in a moment, ladies and gentlemen, we're going

18  to be hearing opening statements from the lawyers in this

19  case.  These opening statements are designed to give you a

20  roadmap of what each side expects that they'll be able to

21  prove by way of the evidence that they anticipate.

22         Also, ladies and gentlemen, remember, as I've told

23  you, what the lawyers tell you is not evidence.  The

24  evidence is the sworn testimony presented in open court by

25  the witnesses subject to cross-examination and also the

1    exhibits that the Court has already considered and found

2    admissible and admitted into evidence.  That is the sole

3    evidence -- sole source of the evidence in this case.

4            What the lawyers tell you is their impression of

5    the evidence and what they hope the evidence will be able to

6    show to you.  But remember, what they tell you is not

7    evidence.

8            Now, after the opening statements are given by both

9    Plaintiff and then Defendant, the Plaintiff will proceed to

10   put on its evidence in this case.  That's called the

11   Plaintiff's case-in-chief, and they will call their

12   witnesses.  Once all the Plaintiff's witnesses have

13   testified, the Plaintiff will rest their case-in-chief.

14           Then the Defendant will proceed to put on its

15   case-in-chief and call its witnesses.

16           Once all the Defendant's witnesses have testified,

17   the Plaintiff has an opportunity, if it chooses, to call

18   what are referred to as rebuttal witnesses to rebut anything

19   that's been presented during the Defendant's case-in-chief.

20           After the Plaintiff's rebuttal witnesses, if the

21   Plaintiff calls any, then at that point, ladies and

22   gentlemen, you will have heard all the evidence in this

23   case.  And at that point, I will give you written

24   instructions on the law that we've talked about and that you

25   must apply in this case.

1            Those final instructions from me to you, the

2    Court's charge to the jury it's sometimes called, are going

3    to be given to you two ways.

4            I will give them to you orally on the record, just

5    as I'm doing now, and I will provide each of you with your

6    own printed copy of those instructions which you'll be able

7    to take to the jury room with you and refer to, if you wish

8    to, during your deliberations.

9            Now, after I give you my final instructions on the

10   law, as I say, sometimes called the Court's charge to the

11   jury, then the attorneys in the case will present their

12   closing arguments.

13           Once they've presented their closing arguments to

14   you, then I will instruct you to retire to the jury room and

15   to deliberate upon the verdict so that you can consider and

16   answer in a unanimous fashion the questions that will be

17   contained in the verdict form.

18           Again, your unanimous answers to those questions

19   within the verdict form will constitute the jury's verdict

20   in this case.

21           Let me remind you again, ladies and gentlemen, that

22   as we go through this trial and you see one or more of these

23   lawyers, the witnesses, the corporate representatives in and

24   around the courthouse in the common areas, they're not going

25   to engage in conversation with you.  They're not going to be

1  friendly or speak to you.  Don't hold that against them.

2  Don't think they're being rude.  They're simply following

3  the Court's instructions.

4         Because as I've said several times already, it is

5  essential that when you deliberate on your verdict and

6  consider your answers to those questions, the sole source of

7  the information that you should draw upon in coming to your

8  answers must be only the testimony presented in open court

9  under oath subject to cross-examination and the exhibits

10  that the Court has deemed admissible under the rules of

11  evidence and which the Court has admitted into evidence.

12  That must be the entire and sole universe of information

13  that you draw upon when you consider and answer the

14  questions in the verdict form.

15         Now, with those instructions, ladies and gentlemen,

16  we'll proceed to opening statements by the party -- parties.

17         Plaintiff may now present its opening statements to

18  the jury.

19         MR. GILLILAND:  May it please the Court.

20         THE COURT:  Would you like a warning on your time,

21  Mr. Gilliland?

22         MR. GILLILAND:  If I could have five minutes, Your

23  Honor.

24         THE COURT:  I'll warn you at five minutes

25  remaining.  Please proceed with your opening when you're

1    ready.

2           MR. GILLILAND:  Thank you, ladies and gentlemen,

3    for your time and your attention, both so far and to come.

4           As we said in opening, what you're doing now, or as

5    we said in voir dire, what you're doing now is really the

6    second highest service, I believe, that a citizen can render

7    in our country, and so, we really appreciate that.

8           And, especially, I know the lawyers on both sides

9    appreciate your time and attention to this case because it

10   is a very, very important case to both parties, and

11   especially to my client, Intellectual Ventures.

12          Now, we're here today -- let's bring up the first

13   slide, please -- because Great West failed to ensure that it

14   was not infringing someone's patents and has refused to

15   accept responsibility for that.

16          You see Great West, as we sit here -- this is part

17   of their homepage on the Internet -- is a trucking

18   company and it -- or a trucking insurance company.  They

19   primarily provide insurance to fleets of trucking companies

20   and to truck drivers around the United States.

21          They're headquartered up in, I believe, it's

22   Nebraska, but they've got facilities all over the U.S.  If

23   you've driven to Six Flags in Arlington, you'll have driven

24   past one of their big facilities that's here in Texas.

25          And they sell insurance through agents that are

 1   located all over the U.S., many of which are in our district

 2   right here in East Texas.

 3         Now, what's interesting is that Great West in --

 4   around the 2000 time period, put out their first website,

 5   and it was what's considered kind of a static or brochure

 6   website.  It just provided information.  People could go in

 7   and read it, but there was not much in the way of

 8   interaction that occurred with that website.

 9         Now, as time went by, they realized they needed a

10   more robust website, be able to provide more information for

11   insureds, for agents, and for employees within Great West

12   itself.

13         And so if we can have the next slide, please.

14         The testimony is going to show that around 2013,

15   they launched the first website that would allow insureds to

16   log in securely and interact with their insurance

17   information through Great West, what we'll call an insured

18   portal.

19         And then eventually in 2014, they added to that the

20   ability for agents to log into the website and provide

21   information and check up on claims and manage policies and

22   that sort of information.

23         And then finally in 2015, it became available for

24   employees of Great West to also log into the same website

25   and interact with the information, set up claims, add

1  drivers, check on things for insureds or agents who had

2  called in.

3       And they would all log in through the same portal

4  because this system that they implemented, it recognized,

5  based on who was logging in, whether you were an insured, an

6  agent, or employee and then presented the information you

7  needed to -- and gave you the ability to add and interact

8  with that information in several different ways.

9       And it was a great tool, and it was very important

10  for their business.  The documents are going to show that

11  they needed it to keep up with competition and to keep up

12  with what their competitors were doing if they wanted to

13  stay competitive and continue to sell insurance.

14       But the problem is that they never checked to make

15  sure they weren't stepping or trespassing on someone else's

16  property.

17       And that's what brings us here today, is the '177

18  patent.  And this is the front page of the patent.  It's

19  going to be Plaintiff's Exhibit 1 in this case.  And you've

20  got a copy of it there in your notebooks.  And the important

21  claim at issue in this case that we're here talking about --

22       If we could go to the actual exhibit,

23  Mr. Cartwright, and go to the very last page, please.

24       So let's back up one more page just because I want

25  to show something.

1          So starting on the second to the last page of the

2    patent, there's a paragraph that says:  The invention

3    claimed is.  And that's really where the metes and bounds of

4    the invention contained in the patent start.  And you have

5    several different claims that the Court has described to you

6    as some are independent claims and some are dependent

7    claims.

8          And, now, if you go to the very last page, and

9    you'll see down here in the bottom of the left column is

10   Claim 14.  That describes the metes and bounds or the

11   boundaries for the claim at issue in this case.

12         And it says -- and you'll hear a lot of testimony

13   about this -- that it claims the apparatus of Claim 11, and

14   as the Court described for you, that makes Claim 14 a

15   dependent claim.

16         It means you have to look back to see what

17   boundaries Claim 11 sets, and then you add to it the

18   additional requirement of Claim 14:  Wherein the centralized

19   access point is further operative to enable a user to manage

20   any content contributed by them.

21         And what we're going to do is, as you look through

22   this patent, what you're going to see is that there's a lot

23   of references to HowZone.  And that's the website that the

24   inventors who, on the face of the patent, are identified as

25   John Knapp and Ed Snyders.  It's a website that they put

1    together and that embody the invention that they describe in

2    their patent.

3            Now, as I said, you're not going to hear -- you're

4    not going to hear from the inventors because they don't own

5    the patent anymore.  Intellectual Ventures owns the patent

6    today.  They bought it, much like a deed to property would

7    change hands over time.  And Intellectual Ventures --

8            If we can go back to the first page.

9            So Intellectual Ventures acquired this patent

10   around 2008.  And that would have been about five years

11   before the first infringing portal was launched by the

12   Defendant.  But let me walk you through.

13           Some interesting things you'll learn about the

14   patent is that the first thing is, down here in the

15   left-hand column, it has related U.S. application data.  You

16   see that it says it's a continuation of Application

17   No. 09/569,361 filed on May 11th, 2000, now Patent

18   No. 6,769,010.  That is what you'll hear referred to in

19   patent cases and possibly in this case as the parent

20   application.

21           So you can file a patent application, and you can

22   get a patent to issue on the claims in the patent, but you

23   can keep the application alive through a continuation so

24   that you can get claims to cover more parts of the invention

25   than what the first patent covered.

1        And so this patent, the '177 patent, is a

2   continuation of a patent that was filed on May 11th, 2000.

3   And so it dates all the way back to May of 2000 as far as

4   when the invention was created.

5        And so that's -- when you get later in the case and

6   you'll hear people talking about priority date, that's the

7   priority dates.  That's the earliest date this patent is

8   entitled to priority.  And that's the date you've got to

9   look at when you're comparing it to what else was out there

10  at the time.

11       And you'll recall I said that was the date,

12  roughly, when Great West has launched its first static web

13  page, was about the time the parent application was filed.

14       Now, this continuation application -- if we could

15  scroll up a little bit, Mr. Cartwright -- was filed on

16  June 28th, 2004.  And that's the date that this application

17  was filed, but, as I said, it was a continuation.  So you'll

18  hear it called a child application that comes from this

19  May 2000 application.

20       And then further up towards the time, you'll see

21  the inventors are a gentleman named John Knapp and Ed

22  Snyders.  And you'll see the assignee on it is called

23  Botalini Corporation.  Well, that was an entity that

24  Intellectual Ventures owned when they acquired the patents.

25       So that's -- it's not the same name, but that was a

1  different entity that Intellectual Ventures II LLC, owned

2  and had acquired this patent.  And that's who they listed as

3  the assignee when this patent issued.  Well, by the time the

4  patent issued, the inventors were no longer a part of it.

5  It was owned by Intellectual Ventures, who had seen value in

6  it and bought it in 2008.

7          And so that's, in part, why the inventors are not

8  involved in this case.  They don't own the property anymore.

9  Intellectual Ventures owns the property.

10          Now, you heard, I think, in voir dire the mention

11  that you may not hear anything from anybody at Intellectual

12  Ventures.  And I'll tell you that's right.  Nobody from

13  Intellectual Ventures is going to take the witness stand and

14  testify to you about this because what Intellectual Ventures

15  did is not what matters for infringement.

16          As Your Honor told you, you measure infringement by

17  the claims.  And you compare the claims -- compare the

18  claims to the accused apparatus.

19          And so that's what you're going to hear, what the

20  claims cover, and you're going to hear what the Defendants

21  do because that's what's important when you're deciding

22  whether or not somebody infringes a patent.

23          Now, to help you with understanding infringement in

24  this case, we're going to bring into this court and put on

25  the witness stand an expert, a computer science professor

1   from Cal Polytechnical Institute, Dr. Hugh Smith.

2        Dr. Smith is in the courtroom here, and he will

3   testify to you, and he will walk through -- and he's going

4   to be our first witness in just a minute.

5        And he will walk through what the invention covered

6   in the -- is covered in the '177 patent, and he will go

7   through the definitions that the Court gave us and are

8   included in your notebooks, and he'll describe how all of

9   that fits with what the Defendants do to show that they

10  actually infringe the patent.  The Great West portal does,

11  in fact, infringe Claim 14.

12       And an example of that that you're going to see

13  is -- if we could go to Slide 4, please -- is this Drivers

14  List By Policy.  You'll hear him talk about that.

15       And this is where Great West agents can log into

16  that portal, and they can add, they can change, and they can

17  delete drivers for different trucking companies, and then

18  that information permeates the rest of the portal, what

19  insurance is covered, what the claims are, who's involved in

20  the wreck where that claim is.

21       That's a key piece of information for what

22  Great West does, and Dr. Smith is going to explain to you

23  how all of that infringes, trespasses on Claim 14 of the

24  patent.  He will talk about other parts of it as well and

25  how those also impact the patent.

1          Now, once we've proven that, as -- as you heard in

2    voir dire, the Defendants, they're going to start off --

3    Great West is going to start off riding one horse, and

4    they're going to say, well, we don't infringe.  We don't do

5    what Claim 14 does, but after we've proven it to you,

6    they're going to -- they're going to change horses.

7          They're going to switch and say, well, if we do

8    infringe, if we actually are on Intellectual Ventures's

9    property, then it's not a valid patent.

10          They're going to ask you to define that the '177

11    patent filed back in 2004 from a parent in 2000, they're

12    going to ask you to find that that patent is worthless.  And

13    that's because if you find that patent invalid in this case,

14    you tear it up for all time for all cases.  And that's why

15    when we get to the validity part of the case, they have the

16    much higher burden to show that it was by clear and

17    convincing evidence an invalid patent, and that you have to

18    have -- I think it was in the Court's word an abiding

19    conviction that the evidence shows that it was invalid.

20          And that's a much higher burden because as

21    I said, if you decide it's invalid, you decide it's invalid

22    for all time, and that the trained examiners at the

23    U.S. Patent and Trademark Office made a mistake when they

24    allowed it in the first place.  And so we hope you hold them

25    to that higher burden because we're going to do that

1   ourselves.

2         Now, once we get through validity, they're --

3   I think Mr. Gillam mentioned it in voir dire, and they've

4   definitely raised the issue up to this point.  I expect

5   they'll continue to where they're going to switch horses

6   again.

7         They're going to say, well, even if that patent is

8   infringed, even if we are on their property and even if the

9   patent is -- well, maybe it is valid, we don't owe them near

10  as much money as they say we do.

11        And we're going to bring in two experts to help you

12  understand the damages here.  And as His Honor said, the

13  damages should be no less than a reasonable royalty for use

14  of the invention.

15        And so the experts we're going to bring in is

16  Ms. -- Ms. Mary O'Neil, who -- if we can see that, please.

17        Ms. O'Neil has been working in the insurance

18  industry for over 40 years, and she's going to explain to

19  you how the numbers underlying the damage calculation are

20  reasonable in light of what happens in the insurance

21  industry and that -- and that these portals are very, very

22  valuable to the insurance business.

23        And then on top of that, we're going to have

24  Mr. Michael Lasinski, and Mr. Lasinski, he's got his

25  bachelor's in electrical engineering, but after working for

1   Ford Motor Company for a few years, decided that accounting

2   and finance was where his heart was and he got a BA -- MB --

3   an MBA, a Master's of Business Administration in finance and

4   accounting and has worked in the field of valuing

5   intellectual property both for trials but outside trials, as

6   well, for decades.

7          And he's going to take the stand, and he's going to

8   walk you through just how much use the Defendants have

9   engaged in of the '177 patent.

10          And he's going to measure that use by how many

11   times somebody goes and looks at a page for the first time

12   in what we'll call unique page views, where they go in and

13   say, you pull it up one time, and you're looking at the

14   drivers.  First time that day.  You're looking at the claims

15   one time that day.

16          Now, you may look at it four or five times in a

17   day, but if you log on and you look at it one time during

18   that login, that's going to be a unique page view.

19          But it's a lot more than just merely logging on

20   because you might look at a dozen page views -- unique page

21   views all tying back to this driver data during one log on.

22          And so he's going to show you that that's the use

23   they made, and he's going to walk you through a calculation

24   that explains to you how by doing -- allowing this to happen

25   with the website, avoids having to have people answer the

1   phone and answer these questions.

2          And just a little cost of the -- roughly $2.75 that

3   it would cost to answer the phone is avoided every time

4   somebody is able to go on and self-serve, get the

5   information themselves without having to call in.

6          And $2.75 of money saved when you consider all the

7   times that people go on and use this invention comes out --

8   is going to come out to just a hair over $20 million.

9          That's how much use it's getting.

10         But he's also going to explain to you there are a

11  lot of other benefits, and I'm sure you can see it, and

12  Ms. O'Neil will explain these to you and so will

13  Mr. Lasinski, that there are a lot of other benefits that

14  come from having this portal.  You've got happy customers.

15  You've got agents that are no longer going somewhere else.

16  You've got them tied in to your system, so they're coming to

17  you when they need something.

18         And all of those benefits, we're not asking for

19  those.  We're not even including those in how much use the

20  Defendants have made of Intellectual Ventures's invention.

21  So we're limiting it just to the cost of those phone calls

22  avoided.

23         And I suspect when the Defendant gets to that

24  point -- when Great West gets to that point, that their

25  damage expert is going to say either you should be stuck

1  with what you paid for it, which I'll tell you the evidence

2  is going to show that when Intellectual Ventures bought this

3  patent, the '177 patent, it was just an application.  It was

4  not an issued patent.  And so for $300,000,00, they bought

5  one issued patent and two applications.  And then they had

6  to see them through to get the patent to issue.

7        But when years later oil was discovered under their

8  property, they should be allowed to the full value of how

9  much Great West has used their property and not simply what

10  they paid for it on the front end.

11        And on top of that, I think the Defendants are

12  going to say, well, you should just look at log ins, how

13  many times somebody put in their user ID and password.

14        Well, that doesn't count how much use of --

15  somebody's making -- someone could log in, as -- as we all

16  know.  And then just leave it on all day, use it all day

17  long, and all you see is the one single log in.  So you

18  don't get a true measure of how much somebody has used it.

19        It'd be like trying to measure how much you use

20  your cell phone, your smartphone, about how many times a day

21  you turn it on, as opposed to how many times a day you go to

22  it and pull up something on it and flip through it.  You

23  know, the use is a lot more than just how many times a day

24  you turn it on and how many times you log in.

25        So at the end of the day, once we've presented all

```
 1    of that evidence to you and we'll present documents --
 2    you'll see the Defendant's own documents that are going to
 3    demonstrate the benefits that they obtained and that they
 4    anticipated from these portals right in line of what
 5    Ms. O'Neil is going to say and what Mr. Lasinski is going to
 6    say.  And once you see all of that, I think you'll see the
 7    value that they've made out of using Intellectual Ventures's
 8    invention, and I hope that you will hold them accountable to
 9    let them know that it's only fair when you trespass on
10    somebody's property without making sure that you don't
11    trespass, it's only fair that you pay for how much use you
12    made of that property.
13         Thank you.
14         THE COURT:  All right.  Defendant's may now present
15    their opening statements.
16         MR. BETTINGER:  Thank you, Your Honor.
17         THE COURT:  Would you like a warning on your time,
18    Mr. Bettinger?
19         MR. BETTINGER:  Three minutes is fine, Your Honor.
20         THE COURT:  All right.  You may proceed when you're
21    ready.
22         MR. BETTINGER:  Good afternoon, ladies and
23    gentlemen.  My name is Mike Bettinger.  And along with my
24    colleagues, Gil Gillam and Irene Yang, we represent
25    Great West, an insurance company for truckers.  Also, with
```

1    us today, as you've heard, is the Great West corporate

2    representative, Brian Foote, who has worked at the company

3    for going on 25 years.  This year is his 25th anniversary at

4    the company.  He designed the Great West website and is here

5    to tell you -- explain to you how it actually works.  And

6    also to explain to you the regulations that Great West must

7    -- must follow as being in the insurance industry and the

8    documents that can't be altered or changed in any way.

9         Earlier, we heard a little about you.  It's only

10   fair that I tell you a little about me.  Out of law school,

11   I clerked for a federal judge and have been a lawyer since

12   that time.  Been happily married going on 29 years this year

13   to Linda.  Have three daughters, all in their mid to --

14   early to mid-20s.  They're on their own now, but still a lot

15   of excitement with three daughters and what they're -- what

16   lies ahead in their life.

17        Let's then, if we could go -- pull up the first

18   slide.  As you saw, same slide, but Great West provides

19   Workers' Compensation and casualty insurance for long haul

20   truckers.

21        So trucker gets hurt, misses work, slips a disk,

22   something like that happens, we provide Workers'

23   Compensation insurance to pay that driver until he can get

24   back on the job.  Going down the highway, car stops suddenly

25   on slick road and icy road, and there's an accident, we

 1  provide the casualty insurance, make sure that whatever load

 2  is on the truck gets delivered in time, makes sure that if

 3  anyone is injured, they get taken care of and pay for the

 4  damage to the car and truck.  We only handle commercial long

 5  haul trucking insurance.

 6          We -- you will hear in this case that trucking

 7  moves 80 percent of the goods in our country.  80 percent of

 8  the goods moved by trucks.  There's a lot of trucks out

 9  there, but we don't do personal or home insurance, just

10  truckers.

11          We can go to the next slide.

12          You'll also hear from -- evidence in the case how

13  Great West got its start, and it's based in South Sioux

14  City, Nebraska, South Sioux City, Nebraska, and it got

15  started in 1956, was started by a fellow by the name of

16  Mr. Joe A. Morten.

17          Eight hundred employees throughout the middle of

18  the country really from Tennessee to Idaho and from Nebraska

19  to Texas.  It's kind of the real range of the company and

20  where it operates.

21          And we work with 210 insurance agencies in that

22  same area, including some, as you heard, here in Texas.

23  What we have up on the screen here is a picture of

24  Great West's home office there in Nebraska.

25          You'll also hear how Great West got to where it is

1    today through the Great West witnesses that we will present.

2         It goes back to what is known -- now known as

3    Veterans Bridge, and that's a bridge that connects Iowa and

4    Nebraska over the Missouri River.  We have a picture of it

5    up here.

6         Trucks used to pass over that bridge in the old

7    days carrying livestock or grain and had to be weighed, had

8    their fuel measured and would have to pay taxes because

9    they're going from one state to the next.

10        Well, Mr. Morten saw an opportunity.  He met with

11   his drivers on the bridge, and as their trucks were being

12   weighed, he offered to help calculate the taxes owed.

13        What happened then in the U.S. is we started to

14   pass laws requiring that these trucks be regulated as they

15   travel around the country and went from state to state, and

16   they had to be registered to operate in each of the states.

17        Well, Mr. Morten being the entrepreneur that he was

18   began handling all of that paperwork, and eventually what

19   happened is Great West, in 1956, was formed as an insurance

20   company for truckers.

21        His son, Joe W. Morten -- senior was known as

22   Joe A., the son Joe W. -- returned home after serving as a

23   lieutenant in the U.S. Army and took over the business and

24   grew it to what it is today.

25        Now, as you heard from counsel, Plaintiff in this

 1   case is Intellectual Ventures II, a limited liability

 2   corporation.  It's based in Seattle, Washington.  The II

 3   behind Intellectual Ventures is a Roman Numeral II,

 4   Intellectual Ventures II, and it's a limited liability

 5   corporation based in Seattle, Washington.

 6            As counsel told you, you won't hear from them.

 7   They're not showing up.  There's no witness that you'll hear

 8   from Intellectual Ventures II in this case.  And as we've

 9   heard from counsel, you won't hear from either one of the

10   inventors in this case either.  They're not going to be here

11   to explain their invention.

12            You're hearing only from the expert that they

13   brought to the case, experts who you will see are paid to

14   provide testimony.  No -- no witnesses from Intellectual

15   Ventures.  No -- neither one of the inventors will be here:

16   They will not bring anyone to testify to you, the ladies and

17   gentlemen of the jury, about the patent and about the nature

18   of their business.

19            As I said earlier, and as -- we heard that

20   earlier -- that Intellectual Ventures II bought the patent

21   in 2008 and did not invent the '177 patent, didn't ever

22   develop any product that used that patent, that '177 patent.

23            So that's a little bit about the parties.  Let's

24   turn to what the evidence will be.  And there's three --

25   over the next three to four days, and there's three key

 1  points we want to leave you with.

 2          The first is that Great West designed its own

 3  website for truckers.  You'll hear evidence that the website

 4  meets requirements for maintaining and saving all

 5  information that's relating to rate setting.  And that's --

 6  what that means is how an insurance premium is determined.

 7          You'll hear there's regulations.  You cannot edit

 8  information, you can't change it because you have to save it

 9  for the auditors when they come in.

10          The second point, Great West's website does not

11  infringe the '177 patent.  You'll hear evidence that the

12  Great West website only allows for information about users,

13  information about users to be changed, not content as --

14  which is required by the '177 patent.  Information about

15  users, everybody in the case agrees, that's not content.

16          And the third point is the '177 patent is not

17  valid.  And we're not here to say, oh, if you don't

18  infringe, then it's not valid.  We're telling you both.  We

19  don't infringe, and the patent also actually is not valid.

20          Before the '177 patent was ever filed, you'll hear

21  evidence that there was a website a year and a half earlier

22  that allows teachers to post content, like daily lessons for

23  the students, and manage that content that they're going to

24  give to their students.

25          That's what the '177 patent describes.  That was an

1  invention a year and a half before, making it what you've

2  heard called prior art.

3       So let's take a deeper dive and look at the first

4  point.  Great West designed its own website for truckers.

5  You will hear testimony from Mr. Foote sitting here in court

6  that Great West rolled its website out over a three-year

7  period, from 2013 to 2015.

8       And he will explain that the design included three

9  portals, one called the insured portal for the truckers

10  themselves, another called the agent portal for the

11  insurance agents that work with Great West, and the third

12  called the employee portal, which was for the Great West

13  employees.

14       Mr. Foote will explain why he selected this portal

15  design to ensure that each of the user groups, the insured

16  truckers, the agent -- insurance agents, and the employees,

17  each of those groups could view information that's important

18  to them on the website.

19       The testimony will explain that the portal design

20  also helps with this underwriting and what's called rate

21  setting information.  You'll hear testimony about market

22  conduct exams where auditors come in and look at the books

23  and the importance of having -- maintaining all the

24  information for the company so that when they go to conduct

25  that audit, those documents will be there.

1          The state regulators come in and they -- what they

2     do is determine Great West's rates and make sure that

3     they're in line with the market.  That's what the evidence

4     will be.

5          Let's turn then to the second point to remember,

6     and that is Great West's website does not infringe the '177

7     patent.  Remember the patent video you saw earlier today

8     where the gentleman -- and His Honor also mentioned it in

9     his instructions this afternoon -- that the most important

10    part of the patent is the claims.

11         The claims are the numbered paragraphs at the end

12    of the patent, and they describe the invention.  As the

13    gentleman in the patent video explained, to prove

14    infringement of a patent, the Plaintiff here, which is

15    IV II, must prove that each element of the claim is present.

16         If any one element is not there, there can be no

17    infringement.  Each element has to be there.

18         If we could go to the next slide to give you an

19    example.

20         Say you have a patent for a soccer ball.  The claim

21    requires that it be made of leather, stitched together,

22    filled with compressed air and round.  And let's say someone

23    accuses a football of infringing.

24         Well, the first element, it's made of leather; the

25    second element, it's stitched together; the third, it's

1    filled with compressed air; but the fourth element, it's not

2    round, it's oval.  You wouldn't have infringement because

3    you don't meet each element of the claim.  That's how the

4    infringement analysis works.

5          If you go to the next slide, as you've heard, this

6    claim is -- this case is about one claim, Claim 14, which

7    we've set out on the screen for you, and you've heard

8    mention that it's called a dependent claim because it starts

9    out with the apparatus of Claim 11.

10         So you have to look at that apparatus which is

11   described in Claim 11, and then that apparatus in Claim 11,

12   it goes on to say:  Wherein the centralized access point, so

13   you have a centralized access point, and that's operative to

14   enable a user to manage any content, manage any content

15   contributed by them.

16         So let's break that down a little bit because this

17   is what the case is going to be about, this claim, and

18   whether we infringe.

19         So the first point is that that -- you have to have

20   a centralized access point.  That's what the claim requires.

21   And you may be asking yourself, well, what in the heck is

22   that?  But here, IV II tells us what it is.  It says it's a

23   web page.  It's identified the web page that it says is the

24   centralized access point, which makes the job a lot easier.

25   We'll just go to those web pages.

1          And if we could, on the next slide, here are the

2     two web pages that they say are the centralized access

3     points that you have to have for the claim.  One in the

4     agent port, it's called a Drivers List By Policy Page.  In

5     the employee portal, it's called a homepage.

6          So those are our centralized access points.  It's

7     required for Claim 14.

8          And then if we go back to the claim, once you have

9     those centralized access points, they have to enable a user

10    to manage any content contributed by them, to manage any

11    content to contributed by them.  The patent, the '177

12    patent, gives us an indication of what is content.

13         If we can go -- you'll see in the -- in the patent

14    that you have in your books, there are figures that kind of

15    describe the invention through figures.  And Figure 42 is

16    what's called a figure describing content contributions.

17         So Figure 42 is kind of funny.  It's on two pages

18    in the patent, 42A and 42B.  It's referred to as Figure 41

19    at one point and then 42 at a -- Figure 42 says, here, we'll

20    get -- we'll show you what content contributions are.  And

21    one is how to clear a clogged drain.

22         So we know that from the patent, if you have

23    content contribution, how to clear a clogged drain.  And

24    then you go to Figure 45, and -- and it opens up how do you

25    clear a clogged drain.  And here's the content.  It

1  described how -- how you clear a clogged drain.  It's

2  content.  It's an article.  It's telling you what you do.

3  And that's what the patent says -- refers to as content.

4         And in this case, it's not only that what content

5  is, we know what content is not.  IV II has admitted in

6  its -- in an undisputed fact in this case that content does

7  not include information about users.  Content does not

8  include information about users.  That's an undisputed fact

9  in this case, and it's a fact that IV II admits.  And the

10 experts agree.

11        So content is not information about users.  Why is

12 that important?  Well, because Claim 14 requires that you

13 have to contribute content, you have to manage content.  If

14 there is only information about users, there just -- there

15 can't be any content for purposes of how Claim 14 reads.

16        And if there is no content, then the element of

17 Claim 14 is not present, and -- and there is no

18 infringement.

19        Let's go a little deeper dive because this is --

20 we've been living this, and you're hearing this all for the

21 first time.  But if we look on the screen -- see, you first

22 have to identify the centralized access point for Claim 14,

23 and IV II says, well, that's the Drivers List By Policy

24 page.  We know that.  They say -- there's two centralized

25 access points.  The first one is Drivers List By Policy.

1          Well, on the right-hand side, we've -- we've

2    recreated that for you.  The Drivers List By Policy page,

3    you'll hear evidence in the case is Exhibit GWX-494.

4          You go to the next screen, and you look down at

5    what is on the Drivers List By Policy page, it's personal

6    information about drivers.  That's what it's referring to.

7    Driver's name, your driver's license, a date of birth,

8    status, experience, employment, and an MVR which you'll hear

9    evidence about it's called a motor vehicle record which is

10   personal information about a driver.

11         The agent -- this is the only information that an

12   agent can touch in the -- in the portal.  They can't touch

13   any of the other information such as all that information is

14   required for those market conduct exams, the stuff you have

15   to keep for the auditors, can only -- the only thing they

16   can change here is information about a user.  And we know

17   that's not content.

18         Using the football -- soccer ball example, on the

19   left, the evidence shows, okay, you have to be able to

20   manage content on the left.  And over on the right, all you

21   have is information about users.  You don't have content.

22   You don't infringe the claim because that's the only thing

23   that they point to for manage of content is this Drivers

24   List By Policy page, which is information about users.

25         There's one other area where they point to.

1           And if you can go to Slide 22.

2           This is the other -- remember, there were two areas

3   for the centralized access point.  The other was called that

4   homepage for the employee portal.  So the first portal was

5   the agent.  This is the employee portal, and it says the

6   homepage would be the centralized access point.

7           So over on the right, and this is GWX-530, you'll

8   see it in the case, the homepage is blown up.  And it

9   has a -- you can -- you can click on a section called Report

10  Rates.  When you're on that page, you can click on a section

11  called Report Rates.

12          If we go to the next slide.

13          And, again, Claim 14, we've put it up there.  What

14  the evidence will be is Claim 14 requires that you manage

15  any content, but the only thing that happens in -- and

16  you'll hear from -- from Mr. Foote is that the employees can

17  only contribute new reports -- make new reports.  They can't

18  go in and manage any old reports.  And you can't because you

19  have to keep this stuff for the audit.  You can't go in and

20  change these reports, and that's what the evidence will be.

21          So if we use that football -- soccer ball example

22  again, the claim, Claim 14, requires managing any content.

23  And over on the right with Report Rates, all you're able to

24  do is create a new report.  You can't manage or change or

25  edit an existing report.  You can only create a new report.

```
 1          So with that, those are the two -- that's the
 2   non-infringement position we've held in this case.  We've
 3   held this position for three years.  It's taken that long to
 4   get here, but that's the -- that's what we've been saying
 5   for three years.
 6          When you finally get down to identifying a
 7   centralized access point, that's all that's there, and our
 8   website does not infringe.
 9          If we could hit quickly the third point.  The
10   '177 patent is not valid.  And we get into this -- this is
11   an area where we have the burden of proof to show you that
12   the patent is not valid.  We'll have an expert witness,
13   Dr. Crovella, who will come and explain it to you.
14          Let me give you a brief overview of what that
15   testimony will be.  May 2000 is the date here when the
16   patent was filed.  So we look before May of 2000, all right,
17   that's going to be your prior art.  You look before that.
18          What you see on the screen now and what
19   Dr. Crovella will testify about is you had a number of
20   websites before 2000.  Some we've listed here.  Excite, the
21   Microsoft MSN, the Yahoo!, The Weather Channel page were all
22   websites that existed before this patent was ever filed.
23          In 1998, there was a system that came out, and this
24   was a year and a half before the '177 patent.
25          In 1998, there was a system came out -- out of
```

 1   Connecticut called the Computer Based Educational System in

 2   November of 1998.  And what that -- what that --

 3   Dr. Crovella will explain is this is a system that allowed

 4   teachers to post lessons for their students.  So a teacher

 5   could go in on the website, type in a lesson for the

 6   student, the student could then log on and review the

 7   lesson.

 8        And what happened is the teachers could go in and

 9   modify and edit those lessons, depending upon the particular

10   needs of the student.  So there they really do have what the

11   patent is talking about.  That would be content.  That

12   lesson is content.  You're contributing it.  The teacher is

13   contributing it.  And then the teacher can modify it.  Go in

14   and modify that contact for the students -- for the

15   particular students.

16        You'll -- you'll hear -- you'll see figures --

17   Dr. Crovella will point you to figures, including Figure 9

18   of the patent, where it explains how the teacher can go in

19   and create, copy, and modify lessons to allow the students

20   to view the content.

21        Dr. Crovella will explain that this website was

22   never presented to or considered by the Patent Office.

23        As -- as Judge Gilstrap said earlier, there are

24   what are called cited references in the patent.  This

25   website was not one of them.  The Patent Office just never

 1  had an opportunity to see this particular reference before

 2  issuing the patent.

 3       Dr. Crovella will explain that the website was a

 4  year and a half before the '177 patent, and as a result,

 5  it's prior art, and the '177 patent is not valid.

 6       So I know that I speak for all of the

 7  800 employees of Great West in saying thank you for your

 8  service on the jury.  Thank you for giving us the

 9  opportunity after three years to finally come in and explain

10  our story to a jury of our peers.  We look forward over the

11  next three or four days to presenting you with the evidence,

12  to show you that Great West designed its own website for

13  truckers.  Great West's website does not infringe the '177

14  patent, and the '177 patent is not valid.

15       So thank you for your time.

16       THE COURT:  Counsel, does either party wish to

17  invoke the Rule?

18       MR. GILLILAND:  Your Honor, Plaintiff would like to

19  invoke the Rule and exclude experts and representatives from

20  it.

21       THE COURT:  All right.  The Rule has been invoked

22  excluding expert witnesses and corporate representatives.

23       That means over the course of the trial, if you are

24  anticipated to be a fact witness in this case, then you

25  should remain outside the courtroom until such time as

1    you're called to testify.

2         Expert witnesses and corporate representatives are

3    excluded from the Rule and may remain in the courtroom

4    throughout the trial, but in that regard, the Rule has been

5    invoked.

6         All right.  Before Plaintiff calls their first

7    witness and we begin the Plaintiff's case-in-chief, we're

8    going to take a short recess, ladies and gentlemen.

9         This is one of those opportunities where you can

10   simply close your notebooks and leave them in your chairs.

11        Let me remind you to follow all my instructions,

12   including not to discuss the case with each other, and we'll

13   have you back here shortly to proceed with the Plaintiff's

14   first witness.

15        With that, the jury is excused for recess.

16        COURT SECURITY OFFICER:  All rise for the jury.

17        (Jury out.)

18        THE COURT:  Be seated, please.

19        Mr. Bettinger, Joint Motion in Limine No. 11, which

20   both Plaintiffs and Defendants agreed to, provides that

21   there should be no commentary regarding the absence of

22   potential witnesses over whom a party has no control.

23        Plaintiff has no control over the inventors in this

24   case.  And you argued during your opening statement, which

25   was pretty close to opening argument, that the Plaintiffs

1  would not be bringing either of these inventors here to

2  testify today.  It seems to me that may be clear violation

3  of Joint Motion in Limine No. 10 [sic].

4          Plaintiffs didn't raise it, but I'd like an

5  explanation.

6          MR. BETTINGER:  Yes, Your Honor.  Counsel said that

7  neither one of the inventors would appear in his opening

8  remark.  That's why I mentioned it.

9          THE COURT:  So what you're telling me is you

10  believe Plaintiffs opened the door to it?

11         MR. BETTINGER:  Yes, Your Honor.  I thought it was

12  just restating what they were told.

13         THE COURT:  Well, if Plaintiff said it, I may have

14  missed that.

15         Do you recall saying that, Mr. Gilliland?

16         MR. GILLILAND:  I did, Your Honor.  I believe

17  I commented that neither of the inventors would be here.

18  I don't remember exactly how I phrased it, but I said in

19  passing I don't think they'd hear from them, so...

20         THE COURT:  Well, this case is about who is here,

21  not who's not here.  And I want to carefully follow that

22  motion in limine going forward.

23         Unless there's a clear discarding of it by the

24  other side, we don't need to talk about anybody that's not

25  under the direct control of either side who has happened --

```
 1   who happens not to testify.

 2           MR. BETTINGER:  Yes, sir.

 3           THE COURT:  Just wanted to clarify that.

 4           All right.  Let's take a short recess.  We'll be

 5   back and continue with Plaintiff's first witness.

 6           The Court stands in recess.

 7           COURT SECURITY OFFICER:  All rise.

 8           (Recess.)

 9           COURT SECURITY OFFICER:  All rise.

10           THE COURT:  Be seated, please.

11           Counsel, am I correct that the proposal is to offer

12   the stipulated agreement of the parties before the jury when

13   they return and before Plaintiff calls their first witness;

14   is that right?

15           MR. GILLILAND:  Yes, Your Honor.

16           MR. BETTINGER:  Yes, Your Honor.

17           THE COURT:  Have you all discussed how we're going

18   to do that?

19           MR. BETTINGER:  Yes.

20           THE COURT:  Tell me what the plan is.

21           MR. GILLILAND:  The plan, Your Honor, as

22   I understand it, Mr. Rupp will read the stipulated facts

23   into the record from the podium, and then call the first

24   witness.

25           THE COURT:  All right.  And after he reads that,
```

1    I'll ask Defendants if they agree that those are stipulated

2    to.

3              MR. BETTINGER:  Thank you, Your Honor.

4              THE COURT:  Okay.  Then is there anything else that

5    either side needs to raise with me before we bring the jury

6    back out?

7              MR. GILLILAND:  Nothing from the Plaintiff, Your

8    Honor.

9              MR. BETTINGER:  Nothing for the Defendants, Your

10   Honor.

11             THE COURT:  Okay.  Let's bring in the jury, please.

12             COURT SECURITY OFFICER:  All rise for the jury.

13             (Jury in.)

14             THE COURT:  Please be seated.

15             Ladies and gentlemen, the Court is advised that the

16   parties have agreed to certain facts in the case.  That's

17   what we call a stipulation.  And at this time, counsel's

18   going to present the stipulation on the record in the

19   presence of the jury.

20             Mr. Rupp, if you'll go to the podium and read the

21   agreed or stipulated facts into the record, please.

22             MR. RUPP:  Notice of uncontested facts.  Plaintiff,

23   Intellectual Ventures II LLC, and Defendant, Great West

24   Casualty Company, hereby notify the Court that the parties

25   agree to the following uncontested facts:

1          Number one, this Court has subject matter

2     jurisdiction over this case.

3          Number two, this Court has personal jurisdiction

4     over the parties for purposes of this case.

5          Number three, Plaintiff filed its original

6     complaint against Defendant on January 20, 2015, styled as

7     Intellectual Ventures II LLC, versus Great West Casualty

8     Company, Case No. 6:15-CV-00060.

9          Number four, Plaintiff is a Delaware limited

10    liability company having its principal place of business at

11    3150 139th Avenue Southeast, Bellevue, Washington, 98005.

12         Number five, Defendant is a Nebraska registered

13    corporation having its principal place of business at 1100

14    West 29th Street, South Sioux City, Nebraska, 68776.

15         Number six, the application leading to issuance of

16    U.S. Patent No. 7,516,177 (the '177 patent) was filed on

17    June 28th, 2004.

18         Number seven, the earliest effective filing date

19    for the patent-in-suit is May 11th, 2000.

20         Number eight, the inventors identified on the face

21    of the '177 patent are John R. Knapp and Edward K.E.

22    Snyders.

23         Number nine, Plaintiff currently holds on right,

24    title, and interest to the patent-in-suit and has standing

25    to bring this lawsuit.

 1          Number ten, Plaintiff possesses all rights of

 2   recovery under the patent-in-suit.

 3          Number eleven, for purposes of the reasonable

 4   royalty analysis in assessing damages for patent

 5   infringement by Defendant, the date of the hypothetical

 6   negotiation is on or around July 2013.

 7          Number twelve, the asserted claim of the

 8   patent-in-suit is Claim 14.

 9          Number thirteen, Claim 11, which Claim 14 depends

10   on, is invalid.

11          Number fourteen, Defendant stipulates that the,

12   quote, administrative interface, end quote, element of

13   Claim 11 of the '177 patent is satisfied for purposes of

14   infringement.

15          Plaintiff will not use this stipulation to suggest

16   that any other element of Claim 11 or 14 of the '177 patent

17   is satisfied by Defendant.  Defendant does dispute that it

18   has infringed Claim 14 of the '177 patent.

19          Number fifteen, the scope of, quote, content, close

20   quote, as claimed in Claims 11 and 14 of the '177 patent

21   does not include, quote, links to content, information about

22   content, and information about users, including information

23   about which content a user has chosen, close quote.

24          Sixteen, Plaintiff has alleged that the following

25   Defendant functionality meets the, quote, the centralized

1   access point, close quote, limitation of Claim 14 which

2   Defendant disputes.

3           Agent portal, a Drivers List By Policy page, as

4   discussed on Pages 68 to 69 of Attachment 3 of the Hugh

5   Smith infringement expert report against Defendant, and

6   employee portal, a homepage, as discussed on Page 79 of

7   Attachment 3 of the Hugh Smith infringement expert report

8   against Defendant.

9           No other aspect of Defendant's functionality is

10  alleged to be, quote, the centralized access point, close

11  quote, of Claim 14.

12          THE COURT:  Mr. Rupp, Plaintiff stipulates to these

13  facts?

14          MR. RUPP:  Plaintiff does, Your Honor.

15          THE COURT:  Mr. Bettinger, does Defendant stipulate

16  and agree to these facts?

17          MR. BETTINGER:  Yes, Your Honor, Defendant agrees.

18          THE COURT:  All right.  Thank you, counsel.

19          With that, ladies and gentlemen, we'll proceed to

20  begin the Plaintiff's case-in-chief.

21          Plaintiff, call your first witness.

22          MR. RUPP:  Plaintiff calls Dr. Hugh Smith.

23          THE COURT:  Dr. Smith, if you'll come forward and

24  be sworn by our courtroom deputy, please.

25          (Witness sworn.)

```
 1          THE COURT:  Please have a seat on the witness

 2   stand, sir.

 3          All right, counsel.  Proceed with your direct

 4   examination.

 5          HUGH SMITH, Ph.D., PLAINTIFF'S WITNESS, SWORN

 6                     DIRECT EXAMINATION

 7   BY MR. RUPP:

 8   Q.  Good afternoon, Dr. Smith.

 9   A.  Good afternoon.

10   Q.  Would you please introduce yourself to the jury.

11   A.  Yes.  My name is Hugh Smith, and I'm -- I live in

12   California, San Luis Obispo, California.

13   Q.  Dr. Smith, have you created a slide presentation to help

14   us follow along with your presentation here today?

15   A.  Yes, I have.

16   Q.  And is that what we see up on the screen in front of us

17   now?

18   A.  Yes, it is.

19   Q.  Have these slides that we'll be seeing today been

20   provided to the lawyers for the Defendants, Great West, in

21   advance of today?

22   A.  Yes, they were.

23          MR. RUPP:  Next slide, please.

24   Q.  (By Mr. Rupp)  Dr. Smith, what are you showing us here

25   on Slide No. 2?
```

1  A.  So this is information about my background, where -- my

2  education, my work experience, and where I'm working now.

3  So I got my bachelor's degree from Xavier University in

4  Cincinnati, and my Ph.D. and master's degree from Michigan

5  State University, and that was all in computer science.

6         I also worked at Procter & Gamble for seven years

7  prior to going back to grad school.  So I graduated with my

8  undergrad and then went and worked for seven years and went

9  back.  And as part of that work at Procter & Gamble,

10  I worked in their IT department.

11         And then following, I've also done mobile

12  application development work.  I had a mobile app that was

13  on the market for three or four years.

14         And then I finally, I'm currently a full-time

15  professor at Cal Poly in the Department of Computer Science

16  and also in the computer engineering program.

17  Q.  Have you served at Cal Poly University in any type of

18  leadership positions?

19  A.  So I was the director of the computer engineering

20  program for five years.

21  Q.  Is Cal Poly well-known for its engineering programs?

22  A.  So Cal Poly is very well-known for its computer

23  engineering program.  We're very, very competitive in terms

24  of the students we bring in, yes.

25  Q.  Would you give the jury an idea of what kind of

1  coursework you teach at Cal Poly?

2  A.  So I teach many aspects of computer science and computer

3  engineering.  I teach in hardware and software areas.  I've

4  done website development work.  I've worked on projects and

5  led teams of projects on that type of work.

6          I've also worked -- developed my own robot, and

7  that robot is something I teach with, and I teach my

8  students how to program that robot.

9  Q.  Do you lend the expertise that you've developed through

10  your education, your work experience, and your experience in

11  academia to those of us who have need to consult with

12  experts in computer science?

13  A.  Yes.  So I've worked on a number of cases that are

14  related to hardware or software technology.  So they're all

15  related in terms of their hardware and software kind of

16  functionality.

17  Q.  And are you here today in that capacity?

18  A.  Yes, I am.

19  Q.  What is your role -- or in what role were you retained

20  in this case?

21  A.  So I was retained as an expert witness to look at

22  whether Great West infringes the '177 patent.

23  Q.  Have you ever been qualified as an expert witness in a

24  federal district court before today?

25  A.  Yes, I have.

1    Q.  And on approximately how many occasions have you been

2    qualified as an expert witness in a federal district court?

3    A.  Approximately seven times.

4    Q.  Would that have been in fields related to computer

5    science?

6    A.  Yes, computer science and computer engineering.

7    Q.  Have you ever been tendered as an expert witness in a

8    federal district court and rejected as an expert witness by

9    the Court?

10   A.  No, I have not.

11            MR. RUPP:  Your Honor, we tender Dr. Smith as an

12   expert in computer science.

13            THE COURT:  Is there objection?

14            MR. BETTINGER:  No objection, Your Honor.

15            THE COURT:  Then the Court will recognize the

16   witness as an expert in the designated fields.

17            Proceed, counsel.

18   Q.  (By Mr. Rupp)  Dr. Smith, you told us briefly what your

19   role was.

20            Can you give us a summary of what it was exactly

21   you were asked to do in this case?

22   A.  So I was asked to look at the Great West portal system

23   and determine if that system infringes Claim 14 of the

24   '177 patent.

25   Q.  Now, were you here during the opening statements a

1  little while ago?

2  A.  Yes, I was.

3  Q.  And did you hear the discussion of the lawyers informing

4  the jury that there would be a variety of issues, including

5  both infringement and invalidity?

6  A.  Yes, I -- I heard that.

7  Q.  Were you retained as an expert to provide any opinions

8  or testimony with respect to invalidity?

9  A.  No, I was not.  So I was only retained to provide an

10  opinion in terms of infringement.

11  Q.  And with respect to infringement, Dr. Smith, would you

12  tell us, please, what opinion, if any, you reached?

13  A.  Yes.  So I will go through my analysis in detail as part

14  of this -- my talk.  But I -- after reading -- looking

15  through the documentation, expert witness -- the witnesses

16  from Great West and going through the patent, that, in fact,

17  Great West's portal system does infringe Claim 14 of the

18  '177.

19  Q.  Is that an easy and quick process to reach that opinion?

20  A.  No, it's not.  There's a significant amount of

21  information that I went through.  As shown here, so

22  there's -- you start off with -- and they mentioned earlier

23  today the file history or the prosecution history of the

24  patent and the patent itself.  You start there.

25          The Court then defines terms, and you heard the --

1  the Judge also talk about the terms that have been defined,

2  and I'll use those term in my work.  And I'll -- I'll show

3  you where I applied those.

4          I also went through the witness statements from the

5  Great -- Great West witnesses, their technical, their

6  manuals, and things like that, website, all those kind of

7  documents in order to come up with my opinion.

8  Q.  Did you prepare and submit an expert report in this

9  case?

10  A.  Yes, I did.

11  Q.  And what, generally speaking, was in the expert report

12  that you prepared and submitted?

13  A.  So that expert report really laid out my analysis of the

14  Great West system and how it applies to the '177 patent.

15          In other words, we'll go through, and I'll show you

16  that analysis, but we went through it step-by-step in terms

17  of how the system applies to the '177 patent.

18  Q.  Was your expert report submitted to the lawyers for the

19  Defendant, Great West, in this case?

20  A.  Yes, the -- the Defendants did receive that report.

21  Q.  If you would, take a look with me, Dr. Smith, at the

22  next slide that we have up on the screen, and tell me, is

23  this the patent that's at issue in this case or some portion

24  of it?

25  A.  Yes, this is.  So this is the -- the front of the

1   '177 patent, so it's the first page of the patent.

2   Q.  And is the patent at issue in this case an exhibit that

3   the jury will have back with it when it comes time to reach

4   its decision?

5   A.  Yes, this is labeled as PX-1.

6   Q.  When was the '177 patent issued, Dr. Smith?

7   A.  So the '177 patent was issued in April of 2009.

8   Q.  And what is the earliest date of the invention or the

9   priority date that's described -- for the invention that's

10  described in the '177 patent?

11  A.  So it's a fairly old patent.  If -- when you look down

12  on the bottom left-hand side, you see where it say says a

13  continuation and it gives the date of May 11th, 2000, so

14  that's the date that the inventors came up with their -- or

15  put out their invention in terms of the -- of what's in the

16  '177.

17  Q.  And what's shown in Slide No. 7 that we see there in

18  front of us?

19  A.  This is also from the -- the face of the patent, the

20  front of the patent, so PX-1.  And this is the title of the

21  patent.  It's an Apparatus For Distributing Content Objects

22  to a Personalized Access Point of a User Over a

23  Network-Based Environment and Method.

24  Q.  And what does this tell us?

25  A.  So what the patent is about is being able to distribute

1  content to people, but being able to do it with this

2  personalized access.

3       In other words, controlling the access of where

4  that data is being able to be seen, grouping that content,

5  grouping it so certain people can see it, and also being

6  able to manage that content where you can add the content,

7  and then you can modify the content.  And that's really what

8  this is talking about.  And it also then includes that being

9  done over a network.

10 Q.  Did you prepare any material for the ladies and

11 gentlemen of the jury that shows an overview of the

12 Defendant, Great West's, system that is accused of

13 infringement in this case?

14 A.  Yes, I did.

15 Q.  What is shown in Slide No. 9 here, Dr. Smith?

16 A.  So this is what we call the externally facing website in

17 a sense where it's if you're coming in from outside and you

18 were to enter the URL or the address of Great West's system,

19 this is the page that would come up to allow you to log in.

20 And so this is -- you can see the -- the email address and

21 the password there.  And, in fact, that's the page that

22 comes up when you want to go and log in to the system.

23 Q.  What would a person do to get this first web page to

24 appear on their computer?

25 A.  Well, they would either go to Great West -- well, Google

```
 1   it and go to Great West.  And then there there'll be a link

 2   that they can go into to be able to log in to the system,

 3   and this is the screen that would then show up.

 4   Q.  And could you explain to the jury, please, how a system

 5   user would start to use the Great West system that's accused

 6   of infringement?

 7   A.  So they would enter their -- as I said earlier, they

 8   would enter their user name and password and hit sign in

 9   which would then take them to the first page.

10   Q.  And is that first page for an agent user shown in the

11   slides that you prepared?

12   A.  Yeah.  So this is PX-445, and this shows the landing

13   page that an agent would see once they logged into the

14   system.  So we've got -- you know, this is fairly familiar.

15   You log in, and then you go to your landing page.  In this

16   case, it would be the agent landing page.

17   Q.  And what happens if an agent who has navigated to this

18   page that you have up on the screen, Plaintiff's

19   Exhibit 445, and then clicks on the drivers tab in the upper

20   drop-down menu out to the right of where it says home?

21   A.  So when you would select that tab, it would actually

22   bring up a list of menu options of things you can do,

23   including listing drivers and searching drivers, and it

24   allows you to go into the driver information, and, in fact,

25   add new drivers.
```

1   Q.  And what's shown in Screen No. 11, sir?

2   A.  So this is a -- listing of drivers.  In this case, this

3   company which is A & A trucking only has one driver.  And

4   it's showing that driver's information on the screen there.

5        And so if there had been more drivers for this

6   company, there'd be more drivers listed there.  In this

7   case, there was only one driver.

8   Q.  And is this one place that one would wind up if one were

9   an agent clicking through from the page that we saw before?

10  A.  Yes, this is -- this is one place they would wind up.

11  Q.  Is there a limitation on who can see this information

12  built into the Great West system?

13  A.  So the agents can see all the drivers for any company

14  that they're the agent for.  A company can -- so in this

15  case A & A Trucking would only be able to see their

16  information, and then employee -- so there's really three

17  sets of users.  Employees would be able to -- Great West

18  employees would be able to see all -- all the drivers that

19  are in the system.

20  Q.  If an agency has multiple agents who work for it, can

21  one agent see information that another has entered on a page

22  like this one that's Slide No. 11?

23  A.  Yeah.  So everyone in the agency can see the truckers

24  for that agency.

25  Q.  Now, Dr. Smith, you spoke earlier about having reviewed

1  sworn deposition testimony as part of your analysis of the

2  Defendant's systems.

3       Did you review and rely upon any testimony from a

4  gentleman who worked at Great West named Jim Arends?

5  A.  Yes, I did.

6  Q.  And who is Jim Arends?

7  A.  So he was a Great West executive VP of information

8  technology.

9  Q.  And as reflected here on Slide No. 12 you've prepared

10  for us, what did Great West's executive vice president,

11  Mr. Arends, say about Great West's web portal system?

12  A.  So he was being asked about the portal system and -- and

13  earlier in the opening, you saw that there's three types of

14  users.

15       But, in fact, what he's saying is we really have

16  one portal, and then we have different users coming into

17  that portal.  And so he says here:  We only have one portal,

18  but different people can access it.

19  Q.  And did he speak about the different types of users in

20  his sworn testimony?

21  A.  Yes, he did.  So he was asked:  So we have agents, Great

22  West employees, and then insureds; is that right?

23       And the answer was:  Yes.

24  Q.  As part of your expert technical analysis, did you look

25  at the different component parts of the Defendant,

1  Great West's, system?

2  A.  Yes, I did.

3  Q.  And what are you showing us here on Slide No. 14?

4  A.  So this is a very high-level network -- high-level

5  architecture of the system.  And it's based on the testimony

6  and the documents from Great -- Great West.

7  Q.  Did you look into how this Great West system that's

8  accused of infringement evolved or changed over time?

9  A.  Yes, I did.

10  Q.  And then did you also, Dr. Smith, prepare for the jury

11  some slides that would illustrate your infringement analysis

12  in this case?

13  A.  Yes, I did.

14  Q.  What claim of the '177 patent were you asked to look at

15  as an expert in this case?

16  A.  So, in particular, I was asked to look at Claim 14,

17  which you can see there on the bottom of the screen.  But as

18  it's been pointed out a couple of times today, Claim 14 is

19  dependent on Claim 11, and so, therefore, in a sense, if all

20  of that is Claim 14, all of Claim 11, and the -- what's in

21  Claim 14 becomes Claim 14.

22  Q.  What's Slide No. 17, Dr. Smith?

23  A.  So it's a little bit difficult when you're looking at in

24  the patent to break it down and discuss it in --

25  piece-by-piece.

1       So all I've done here is broken up that claim, so

2  if we were to go back -- you know, what you just saw,

3  Claim 11 and Claim 14, and we broke them out into what we

4  call elements.

5       And so each one of those elements is something

6  that's required of the system in order to infringe.  And, in

7  fact, I would have to show -- or I will show that each one

8  of those elements is present in the Great West system.

9  Q.  And you mentioned that that is an obligation and a

10  requirement on your part.

11       Did you conduct your analysis in view of that

12  obligation and requirement?

13  A.  Yes.  So when I did my analysis, I actually went through

14  each claim element by itself and looked for that in the

15  Great West system and see what was present based on the

16  documentation and the testimony that was available.

17  Q.  And what would happen if, in your expert opinion,

18  one or more of these required elements was missing from

19  the Defendant, Great West's, system?

20  A.  So if one of these elements was missing, then Great West

21  would not infringe Claim 14.

22  Q.  And I think we've touched a little bit on this before,

23  but, Dr. Smith, this looks like an awful lot more than

24  what's in Claim 14.  Can you take the jury through why that

25  is if we're telling the jury that this is all about

1    Claim 14?

2    A.  So if you go to the next claim -- next slide -- I'm

3    sorry -- so as -- as has been talked about today, Claim 14

4    is what we say is dependent on Claim 11.  And so, therefore,

5    what I'm trying to show here with -- with the red boxes is

6    all of that in Claim 11 needs to be present in Claim 14 in

7    order to -- in order for Great West to infringe Claim 14.

8           And by the way, the A, B, C, D, and E there that

9    I've got boxed in, those are there just to make it easier

10   for us to talk about.  That's not part of the claim.  The

11   claim language is the language that's in the middle boxes.

12   Q.  So, Dr. Smith, from this point forward in your slides,

13   even though those A, B, C, D, and E elements are coming from

14   Claim 11, do you treat them as though they're part of your

15   analysis of Claim 14?

16   A.  Yeah.  So they are actually part of Claim 14.

17   Q.  Through what lens or from what perspective do you, as a

18   technical expert, perform your analysis of potential patent

19   infringement?

20   A.  So as you go through the patent and the claims, you're

21   looking at it as in the eyes of somebody that is what we

22   call a person of ordinary skill in the art in 2000.  In

23   other words, as you're interpreting the claims, what does

24   that mean in 2000?

25          And, now, while I use my -- my Ph.D. and my

 1   advanced degrees in terms of my analysis, in other words,

 2   I go quite into detail in terms of the technical analysis,

 3   this is how you view it from more of an interpretation

 4   standpoint.

 5          And, in particular, it's a bachelor's degree in

 6   electrical engineering and computer science or computer

 7   engineering and two to three years of related experience.

 8   Q.  All right.  Let's launch right into these elements, if

 9   we may.

10          And what are you showing us here in Slide No. 20?

11   A.  So this is called the preamble, and it says:  An

12   apparatus for distributing content through one or more

13   distributed information access points to a centralized

14   access point of a user comprising.

15   Q.  What is a preamble in a patent?

16   A.  So the preamble sort of gives you scope or the feel

17   for -- I would say more the feel for what's going to be in

18   the rest of the patent.

19          In -- in this case here, it's an apparatus, means

20   it's some kind of system.  Some kind of system is being

21   described in this particular claim, and in addition, as was

22   talked about earlier, is the word comprising.  And when the

23   word comprising is there, it's saying that all the other

24   claim elements are what makes up that preamble.

25          In other words, if you show or if I show that

1   A through E, and Claim 14, are all met, in fact, then you

2   have shown in this case that that preamble is also met.

3   Q.   I notice that there's a reference in the first line of

4   the preamble to an apparatus.

5        What is that?

6   A.   So as I said, the apparatus is -- it's a system, so it's

7   some kind of system that provides -- there's a number of

8   different types of claims that can be written.  In this

9   case, it's an apparatus claim, which was talking about a

10  system.

11  Q.   And in performing your expert technical analysis of the

12  patent, what, if any, portions of this preamble did you find

13  noteworthy?

14  A.   So in -- as the -- as was talked about earlier today,

15  the Court may define certain terms and give those to us.

16       And, in fact, there are two terms in the preamble

17  that the Court has defined.  One is distributed information

18  access point, and the other is a centralized access point of

19  a user.

20  Q.   How did the Court define that term centralized access

21  point of a user for us?

22  A.   So the term centralized access point of a user is

23  defined as the user's network resource that can be used to

24  access content.

25  Q.   Now, we talked a little bit about constructions that the

1   Court gives us.  Does the Court construe every word or every

2   term that appears in the patent necessarily?

3   A.  No, it does not.

4   Q.  And if the Court has not given us a construction, how do

5   you, as an expert undertaking this type of technical

6   analysis, determine what a term means?

7   A.  So this is where that that person of ordinary skill in

8   the art comes in.

9        In other words, that's how you interpret the claim

10  language is based on what a person of ordinary skill in the

11  art, in 2000, would have interpreted that claim language.

12  Q.  And then I know that we said that this is in the

13  preamble, but is the preamble the only place where a

14  centralized access point of a user comes into play in this

15  patent?

16  A.  No.  This -- this particular claim term -- we call it a

17  claim term -- is found in a number of different places

18  within the patent and -- or within the claim, and I did

19  apply this same definition each time that that claim term

20  was found in the claim.

21  Q.  And when you say you applied this same definition, did

22  you apply the definition given to us by the judge in this

23  case?

24  A.  Yes, I did.

25  Q.  And you mentioned also that the Court gave us a

1  definition or a construction for the term distributed

2  information access point.

3          What was that meaning?

4  A.  So the Court -- the Court defined this as a network

5  resource which was delivered to one or more users and

6  enables a user to interact with a centralized access point.

7          So this is talking about providing the ability --

8  more of a general ability to be able to get to more specific

9  information.

10          So your centralized access point is of the user,

11  where the distributed information access point is more

12  general.

13  Q.  And is distributed information access point also a term

14  that appears in various different claim elements as we make

15  our way through this analysis?

16  A.  Yes.  This term is also found in a number of the claim

17  elements.

18  Q.  And each time that it appears, did you apply the

19  definition given to us by the Court?

20  A.  Yes, I did.

21  Q.  What is the first claim element, moving on to the next

22  screen here that you have, Dr. Smith, that you have out to

23  the right of the letter A?

24  A.  So the first claim element states:  At least one server

25  operative to store one or more of, (a), content, (b), links

1  to content, (c), information about content, and, (d),

2  information about users, including information about which

3  content has -- which content a user has chosen.

4  Q.  And this may be fairly basic, but would you tell us what

5  a server is.

6  A.  So a server is a computer system or systems that is

7  running software that provides services to you.  So you

8  typically go to a server in order to get information, and

9  then it's delivered to you.

10        So if you think about it on your -- your -- when

11  you're going to Google or whatever, right on your computer,

12  you have your web browser, and then your web browser then

13  reaches out to the server and brings the information back

14  from the server.

15  Q.  Now, we spoke a little earlier about some testimony from

16  Great West's executive vice president, Mr. Arends, and we've

17  been introduced to Mr. Foote earlier during the day today.

18        Did you also review sworn deposition testimony that

19  Mr. Foote gave in this case?

20  A.  Yes, I did.

21  Q.  And what did Mr. Foote have to say in his sworn

22  testimony about this issue of whether or not there is at

23  least one server operative to store certain material?

24  A.  So Mr. Foote said that -- when he was asked about the

25  servers, and it says:  And the servers that house those

 1  databases?

 2          In this case, we're talking about the IBM portal

 3  and where the portals lives?

 4          And he says:  Correct.

 5          And the servers that house the actual portal

 6  itself?

 7          Correct.

 8          And so this is talking about the servers that are

 9  actually in their data center.

10  Q.  What did this tell you?

11  A.  It told me that, in fact, they have servers in their

12  data center that have both the database and the portal

13  software.

14  Q.  And then was there further testimony Mr. Foote gave you

15  that you found relevant to this first element of the claim?

16  A.  Yes.  So in this case here, he was asked:  Where is the

17  data for the active policies pulled from?  Is it the DB2

18  server and the IBM mainframe?

19          And it said:  It would be between the DB2 server

20  and the VSAM tables.

21          And once again, this is telling me, so the DB2 is

22  database.  The database server, that's an IBM database

23  technology, and the VSAM tables are also IBM technology, and

24  they reside on an IBM mainframe.

25          And so he's just confirming my understanding of

1    that this, yes, runs in their data center on a server, an

2    IBM mainframe.  This part of it runs on that IBM mainframe.

3           THE COURT:  Dr. Smith, would you slow down just a

4    little bit, please?

5           THE WITNESS:  Sure.

6           THE COURT:  Thank you.  That'd be helpful.

7           Let's continue.

8    Q.  (By Mr. Rupp)  And why was this testimony meaningful to

9    you in the context of whether or not the Great West system

10   uses servers that are operative to store content?

11   A.  Because the claim element actually requires that the --

12   the system or the apparatus store that content, and so this

13   was confirming to me that, in fact, those databases existed.

14   Q.  And how does that relate to the diagram that we talked

15   about earlier and which is, again, reproduced here at

16   Slide No. 28?

17   A.  So what we see here is there's two main sets of hardware

18   that are being supported, and this is in the data center in

19   South Sioux City, Nebraska, is there's the Intel hardware

20   which runs the portal software, and then there's the IBM

21   mainframe which runs some other software but in addition

22   contains the databases, the VSAM table, and also the user

23   authentication information or the -- we call it an LDAP

24   table.

25   Q.  Dr. Smith, did you also find some of the documents

1   produced by the Defendant, Great West, in this lawsuit or

2   certain pages of their website were relevant to your

3   technical analysis?

4   A.  Yes, I did.

5   Q.  And what are you showing us here in Slide No. 29,

6   Dr. Smith?

7   A.  So this is a screen of an insured, and in this case

8   they're looking at the Drivers List By Policy.  So this if

9   an insured -- insured person came into the system, they

10  would be able to look at which drivers are on a particular

11  policy.

12  Q.  Is this an exhibit that the jury will have in evidence

13  when it comes time to make their decision whether or not the

14  Defendant, Great West, infringes?

15  A.  Yes.  This is PX-164.

16  Q.  And what does this exhibit tell you in relationship to

17  this claim element that we are analyzing of whether or not

18  there is a server that's operative to store content in the

19  Great West system?

20  A.  So this is the content about the -- the truck drivers.

21         And so, in other words, this contains their

22  driver's license number, their date of birth, are they

23  active in -- as a driver, and their employment status,

24  things like that.  So it's about -- it's content about the

25  drivers that are on this particular policy.

1          Now, these are not users of the system, per se.

2    This is -- this is the information about who's on the

3    policy.

4    Q.  Let's talk about that for a minute if we may, Dr. Smith.

5          Were you in the courtroom during the opening

6    statements today?

7    A.  Yes, I was.

8    Q.  Did you hear both sides' opening statements?

9    A.  Yes, I did.

10   Q.  And did you hear when the lawyer for Great West said

11   that they don't infringe because it's not content but rather

12   information about users that's involved in this Drivers List

13   By Policy?

14   A.  Yes, I did.

15   Q.  When was the first time you ever heard anyone say that

16   in this case before today?

17   A.  So today was the first time that Great West has actually

18   put forward that argument in terms of non-infringement for

19   their system.

20   Q.  How long have you been involved in the lawsuit,

21   Dr. Smith?

22   A.  I believe I came on in late 2015.

23   Q.  And do you have a counterpart, someone on the other side

24   that performed an analysis similar to the one that you

25   performed on behalf of the Defendant, Great West?

1  A.  So Great West has -- has an expert who you'll hear from

2  next week.  And, in fact, he received my report on

3  infringement and then provides a rebuttal report.

4  Q.  And the point that was argued by the lawyer for

5  Great West in the opening statement about whether or not

6  this is information about users or its content.

7       Did you see that anywhere in Dr. Crovella's

8  145-page report?

9  A.  So, no, this wasn't in the rebuttal report, so then

10 I received their expert's rebuttal report.  And in that

11 rebuttal report they bring up their arguments, and there was

12 no argument at all about the fact that they were trying to

13 claim that drivers were users.

14 Q.  Have you seen this point being made or advanced in any

15 of the documents that you've reviewed in this case?

16 A.  No, I have not.  And, in fact, what you can see from the

17 agent page which -- where the drivers are being put in, in

18 fact, all they're asking for is things like the driver name,

19 their license information.  They can actually pull, you

20 know, DMV records.  So you can add 15 drivers, but you're

21 not adding 15 users.

22      So in this case, it's actually somebody from the

23 company is pulling in -- pulling up this information, and

24 it's listing those drivers that are actually on that policy.

25 Q.  Were both yourself and Dr. Crovella deposed and have

1  sworn testimony taken from you for several hours for each of

2  you?

3  A.  Yes, six or eight hours.

4  Q.  Did anyone suggest to you during your deposition that

5  this was not user -- that this was not content because it

6  was user information?

7  A.  No, I was not asked about that during my deposition.

8  Q.  Did Dr. Crovella, the Defendant's expert witness on

9  non-infringement, give any deposition testimony suggesting

10 that this was not content because it was information about

11 users?

12 A.  So related to the Great West system, no, there was no --

13 I saw no testimony from any of the witnesses, including

14 their expert, that -- anything about the drivers being users

15 are trying to claim that that's information about users

16 rather than content.

17 Q.  Okay.  Now, who can add drivers in this system

18 functionality that we're talking about here?

19 A.  So in this case here what we're looking at is this --

20 this is actually an insured interface but the agents can add

21 the drivers to the policies.

22 Q.  And how does that fact play into whether or not this is

23 truly content or information about users?

24 A.  Because there's no indication or there's no -- you know,

25 if you go through the agent user manual or you go through

1  the testimony about the agents, there's nothing that says,

2  oh, by the way, here create a user ID or put in a password

3  for them.

4          No, all you're really putting in is their name,

5  their license information, pulling -- pulling a D -- DMR --

6  or DVR record -- Department of Motor Vehicle record.  Those

7  kinds of things are what you're doing.  You're not adding a

8  user to the system.

9  Q.  Based on your expertise, your training, and your

10  analysis in this case, would a person of ordinary skill in

11  the art agree that the information that's set out in

12  Plaintiff's Exhibit 164, Slide 29, is not content but rather

13  information about users?

14  A.  No, no, I don't believe anybody would believe that

15  that's actually information about users.  I believe this

16  information is for the policies.  This information is for

17  their business, not about logging in to the system.  So this

18  is not about users, but it's about the truckers.  And in

19  this case, they're truckers for this particular company.

20  It's not about who's using the system.

21  Q.  Now, when you were doing your analysis of the systems

22  here, was there certain information that you excluded from

23  being considered infringing because, in fact, it was

24  information about users?

25  A.  So there is some log-in information and things like that

1   that I would not consider information -- consider content,

2   but that is information about the users.  So, in other

3   words, user name and password, things like that.  But that's

4   not what we're seeing here on this screen.

5   Q.  Did Mr. Foote give us any sworn testimony previously

6   that was important to you with respect to the claim element

7   dealing with a server storing information about users?

8   A.  So -- yes.  So this -- this is actually talking about

9   what -- what I was -- in terms of authenticating or logging

10  into the system, user name and password.

11          So what Mr. Foote here is talking about is the user

12  is going to enter the -- I'm sorry, I'll slow down.

13          The user is going to enter their user name and

14  password, and then he says:  So the users then

15  authenticated, we grab back the attributes.

16          Meaning we grab back are they an agent?  Are they

17  an insured?  And the attributes say you're an agent or an

18  employee, and so that's the -- the user information that the

19  patent is talking about, it's not driver's name and driver

20  number.

21  Q.  And is that the content that you identified for

22  Claim 14 purposes as being infringing?

23  A.  So I identified the driver information as the content

24  for Claim 14 and not this information as described by

25  Mr. Foote.

1   Q.  All right.  Dr. Smith, in light of what we've gone

2   through with respect to the Great West documents, website,

3   and the sworn testimony, did you reach an opinion on whether

4   or not the Great West system meets this first element that

5   we have highlighted here?

6   A.  Yes, it does.  In fact, it does meet this claim element.

7           MR. RUPP:  Next slide.

8   Q.  (By Mr. Rupp)  What's the next element, Dr. Smith?

9   A.  So element -- I would call B is:  A centralized access

10  point of a user accessible via a communication link and

11  operative to provide the user with access to content chosen

12  by or for the user.

13  Q.  And this one sets out that centralized access point

14  concept that the Court gave us the definition for, right?

15  A.  Correct.  So this contains the term that was -- that was

16  defined by the Court, a centralized access point of a user.

17  Q.  So what does this mean to you as an expert who's

18  analyzing the system?

19  A.  So this is talking about being able to -- to go to your

20  centralized access point over a network and being able to

21  pull down specific information or personal information --

22  information that's been provided for you or that you've

23  picked.  In other words, it's not information that -- it's

24  more personalized.

25  Q.  Does the Great West system allow you to reach a

1  centralized access point as a user that's accessible by

2  a communication link?

3  A.  That's the website address you would go to in order to

4  enter the portal system, the Great West portal system, and,

5  in fact, that just shows that it's over a network.

6  Q.  Would you reach this web address utilizing a

7  communication link?

8  A.  Yes, you would.

9  Q.  And what are you showing us -- oh, I'm sorry.  What

10  exhibit is this here that the jury will have in front of it

11  in Slide No. 35?

12  A.  So in Slide 35 and in Slide 36, that's PX-170, and it's

13  the first page of that document.

14  Q.  Okay.  And what else does this same page of Plaintiff's

15  Exhibit 170 tell you, Dr. Smith?

16  A.  So this is just saying that, in fact, you're going to

17  log in to the system, and you're going to provide your user

18  name and password, and the reason that's important is, as

19  we've already said, this content is for you.  I mean, it's

20  not -- it's personalized.

21        And so by entering your user name and password,

22  you're able to then -- the system can then determine are you

23  an agent, an insured, or an employee and, therefore, provide

24  you with the information that's relevant to you.

25  Q.  And, now, that communication link can't just take us

1   anywhere; it has to take us to a centralized access point,

2   right?

3   A.   Correct.

4   Q.   Does it?

5   A.   So this is an example of a centralized access point.

6        This is the Drivers List By Policy, and, in fact,

7   when you go to that URL that I showed you, the -- go to the

8   website for Great West, you enter your user name and

9   password, you can then, using the menus, get to this

10  information here, which is on PX-150, and, in fact, that

11  would allow you to see the data that's meant for you to see.

12  Q.   And does this web page meet the definition that the

13  Court provided for us with respect to what a centralized

14  access point must be in the context of the '177 patent?

15  A.   Yes, it does.

16  Q.   What are you showing us here in Slide No. 38, Dr. Smith?

17  A.   So this is another centralized access point.  In this

18  case, it's for the employee.  It's labeled GWX-389.  And in

19  this case, what happens is, after the employee has put in

20  their user name and password and been authenticated and they

21  come into the system, this screen will actually come up,

22  which allows them to access their data.

23  Q.   And we've been talking up to this point a lot about

24  agents.  Is this the centralized access point for a

25  different kind of user of the Defendant, Great West's

1    system?

2    A.  This is actually for the employee.  In fact, it's for

3    Brian Foote.

4    Q.  All right.

5           MR. RUPP:  Next slide, please.

6    Q.  (By Mr. Rupp)  And then the claim element also requires

7    that that centralized access point provide the user with

8    access to content chosen by or for the user, right?

9    A.  Yes, that's correct.

10   Q.  How does the exhibit that you have here at Slide 39

11   relate to that requirement?

12   A.  So as a -- after they've logged in -- and you can see on

13   the bottom there where it's actually showing the -- the

14   effective date and the entry date of this information,

15   this -- this is about mileage in order to calculate a

16   premium, and so when that information has been added or

17   modified, this will show up here.

18   Q.  And is this content?

19   A.  Yes, this is content.

20   Q.  And based on what you heard from the Defendant's counsel

21   in opening statement, do they appear to challenge that this

22   is content?

23   A.  I don't recall them challenging this is content, but...

24   Q.  Fair enough.

25          What exhibit is this that the jury will have?

1    A.   So this is GWX-389.

2    Q.   All right.  Did Mr. Foote give you any sworn testimony

3    to go on with respect to this claim element?

4    A.   So once again, this was talking about that centralized

5    access point and being able to see content for you as the

6    user.  And what Mr. Foote says is, we know who the agent is

7    based on their agent ID.  We went back out and requested

8    that information to display back to them.

9         And so what this is just telling me is the way the

10   database is structured in such a way is that they will then

11   go back, after you've logged in, they've got information

12   about you, which then they can use in the database to

13   extract the information that you're a allowed to see.

14   Q.   Based on the sworn testimony that you reviewed from

15   Great West and the exhibits that you've identified, did you

16   form an opinion of whether or not the Great West system

17   meets this second element you have listed out next to the

18   letter B?

19   A.   Yes, I have.

20   Q.   And what is that opinion?

21   A.   And, yes, they do infringe this claim element.

22   Q.   What is the next thing you analyzed, Dr. Smith?

23   A.   So C says:  At least one distributed information access

24   point accessible via a communication link and operative to

25   implement one or more of, (a), list one or more content

1  objects; (b), allow a user to choose content for addition to

2  their centralized access point; and, (c), provide the user

3  with log-on access to their centralized access point.

4  Q.  And did you locate evidence that indicated the

5  Great West system meets this required element of the claim?

6  A.  So in this -- this -- we've seen this before.  This is

7  PX-170, Page 1, and once again, this is allowing a user to

8  enter their user name and password.

9          And, in fact, what the evidence shows is that once

10  that happens, it goes back to something we call an LDAP

11  table or directory and pulls up the user's credentials which

12  will then allow the user to access the system.  And so

13  that's what's going on behind the scenes based on entering

14  their user name and password.

15  Q.  Was there further sworn testimony from the Great West

16  executive vice president, Mr. Arends, that was relevant to

17  this point?

18  A.  Yes, there is.

19  Q.  And what was that?

20  A.  It says:  Once you sign in on, you're going to be taken

21  to the landing page, the homepage.  And then he goes on to

22  say:  Then our program knows which agency they're signed in

23  as, and we would retrieve the data, returning only that

24  information that's related to that agency.

25          So that's just explaining or confirming what I've

1  already said, is that once you have already logged in, that

2  information goes and pulls up your credentials, and it's --

3  based on those commercials is what allows you to see the

4  data that you're allowed to see.

5  Q.  Now, Dr. Smith, did the evidence that you reviewed

6  indicate that the employee users sign on to the Great West

7  system in the same way that, say, for instance, agent users

8  do?

9  A.  So the employees use something called a single sign-on,

10  which means, once they sign on to the system and they're

11  within their what we call an intranet, which is local to --

12  it's within the company network versus the Internet, which

13  is external.

14         And once you're within the intranet and you sign

15  in, and you give the single sign-on, which still goes

16  through the process when you access the system of pulling

17  your credentials to know who you are, but you only have to

18  enter your user name and password once.

19  Q.  Are there any commonly used single sign-on systems or

20  equivalent single sign-on systems you can think of that the

21  jury might already be familiar with?

22  A.  You may have done this with -- you go to a website, and

23  they say, do you want to join this website, and you go to --

24  and they say, okay, but you're going to join as Google, and

25  you go and you click the Google link, and you sign into

1  Google, and then that authenticates you for that website,

2  that's the same kind of thing here as the single sign-on.

3       So once you've authenticated one place, that

4  authentication is then trusted everywhere else you're going.

5  Q.  And is this single sign-on process that you learned

6  about through your review of the evidence in this case with

7  respect to Great West employees consistent with what the

8  '177 patent requires here in this claim element we're

9  discussing?

10  A.  Yes, it does.

11  Q.  Did you reach a determination, then, Dr. Smith, of

12  whether or not the Great West system meets the claim element

13  that you have there next to the letter C?

14  A.  Yes, I have, and, yes, it does.

15  Q.  What is the next claim element that you analyzed,

16  Dr. Smith?

17  A.  So the next claim element, which I labeled D, is:  An

18  administrative interface in communication with the server

19  and operative to create groupings of content into one or

20  more distributed information access points.

21  Q.  Dr. Smith, were you present in the courtroom when I read

22  that long recitation of agreed facts between the parties?

23  A.  Yes.  It was called the stipulations, yes.

24  Q.  And was one of those relevant to your analysis with

25  respect to this Element D on administrative interface?

1   A.  Yes, it is.  And it's a -- Great West stipulates that

2   this exists in their system.

3   Q.  And what does that mean, stipulates?

4   A.  That means they agree that it is in their system.

5   Q.  All right.  Then did you make a determination whether or

6   not that Element D was met?

7   A.  In fact, yes, it is met then.

8   Q.  And what's the next claim element that you analyzed,

9   Dr. Smith?

10  A.  So the next element is:  Wherein a user is enabled with

11  the capability to log on to their centralized access point

12  from one or more distributed information access points and

13  access content chosen from one or more distributed

14  information access points.

15  Q.  And is this another example like those that you told us

16  about before where the patent brings in some of the similar

17  concepts and terms at various different points in the claim

18  elements?

19  A.  Yes, so this is -- first of all, the word "wherein,"

20  it's talking about or qualifying some of the previous

21  A through D.  And, in addition, it's also using the terms

22  "centralized access point" and the "distributed information

23  access point," which is some of the terms that we've talked

24  about earlier.

25  Q.  Could you remind us what your finding was that you told

1  us about earlier with respect to the issue of whether or not

2  the Great West system user is enabled with the capability to

3  log on?

4  A.  So this is just qualifying the claim to say that when

5  you log on, that you're actually able to see information

6  specifically for you.

7  Q.  And then that log on has to take you to a centralized

8  access point?

9  A.  Yes, it does.  And, in fact, in the Great West system,

10  once you've logged on, you can then go to your centralized

11  access point -- in this case a drivers list, and see the

12  content.

13  Q.  All right.  And then it goes on to say in this claim

14  element that you need to be able to access content chosen

15  from one or more distributed information access points; is

16  that right?

17  A.  That's correct.

18  Q.  Did you determine whether or not that was the case?

19  A.  So this is on PTX -- or, I'm sorry, PX-151, Page 31.

20  And when you log in or when the agent logs in, they're able

21  to go across that top bar and select the drivers tab.  And,

22  in fact, that would allow you to go to your drivers list.

23        Now, all the agents would see a drivers tab, but

24  when you select that drivers tab, it takes you specifically

25  to your information and not information for, let's say, a

1  different agency.

2  Q.  What is, by the way, if you recollect, this Plaintiff's

3  Exhibit 151?

4  A.  So I believe this is the agent's manual -- the training

5  manual that the agents receive.

6  Q.  Did you consider that to be a reliable source of

7  information for you in conducting your analysis?

8  A.  So the testimony is, is that, in fact, it is a reliable

9  description of how an agent would use the system.  In fact,

10  I did use it as evidence, as I show here.

11  Q.  Were there other pages in that same agent portal user

12  manual that likewise led you to conclude that the

13  Great West system has this functionality?

14  A.  So here what you can see is the -- when -- when you go

15  across the tabs, there's one called tools and systems.  And

16  if you select that, you can then go to the Report Rate work

17  list which will also show you content specifically to you

18  and also allow you to modify that content.

19  Q.  And where is this evidence found within that Plaintiff's

20  Exhibit 151 user manual?

21  A.  So it's on Page 65.

22  Q.  What are you showing us here in Slide No. 52, Dr. Smith?

23  A.  So you're -- the claim requires you to be able to see

24  content that's been chosen for you or by you.  And it's --

25  and here, what I'm showing in PX-172 is the information

1  about that trucker, and with the name and different

2  information, including their driver's license number and the

3  MVR status, in other words, have you pulled information

4  about that driver from the Department of Motor Vehicles.

5  Q.  Based on the sworn testimony that you reviewed and the

6  documents that Great West provided and the jury will have in

7  evidence, did you make a determination whether or not the

8  Great West system meets this element that you've labeled as

9  Claim E?

10 A.  Yes, that they do implement this element in their

11 system.

12 Q.  And does that take us to -- up to the heart of

13 Claim 14, Dr. Smith?

14 A.  So that shows the claim elements of Claim 11, and now,

15 we're going into Claim -- the additional element of

16 Claim 14.

17 Q.  All right.  And what is that additional element of Claim

18 14 that the jury would need to find in order to agree with

19 you that Great West's system infringes the patent?

20 A.  So Claim 14 states:  The apparatus of Claim 11 wherein

21 the centralized access point is further operative to enable

22 a user to manage any content contributed by them.

23 Q.  What does any content mean?

24 A.  So the -- the Court was actually asked to define that

25 term also, and it means one or more -- manage one or more

1    stored content.

2    Q.  Could you tell us in normal people language what that

3    means?

4    A.  That means that you need to be able to modify -- in this

5    case manage, modify, add -- not add, but delete, change, or

6    something like that the content that's in the system.  And

7    it just needs to be -- you don't have to be able to modify

8    all content.  It just needs to be some of the content that's

9    in the system.

10   Q.  And even before the Court had provided that

11   construction, is that the lens through which you were

12   looking at or analyzing both the patent and the Great West

13   system?

14   A.  Yes.  So in my infringement analysis, when I analyzed

15   this particular claim, that is the construction that I was

16   applying -- or that is the idea that I was applying.

17   Q.  All right.

18        MR. RUPP:  Next slide, please.

19   Q.  (By Mr. Rupp)  What are you showing us here in

20   Slide 55?

21   A.  So this is -- we've seen this before.  This is that

22   centralized access point that takes us to the drivers list.

23   Q.  And is this the Plaintiff's Exhibit 150 that we've

24   talked about before?

25   A.  Yes, it is.

1   Q.  And here again, this is another instance where the

2   centralized access point is coming back up, but it is the

3   same centralized access point that we talked about before,

4   or a different one?

5   A.  No, it's the same centralized access point that we

6   talked about before.  And if you could go back one slide,

7   please?

8          So what we can see here is along -- just above the

9   driver name, you can see a number of radio buttons or -- or

10  click buttons -- things you can click.  One is you could go

11  and add a new driver which would be going and adding more

12  content, but you can also copy and move the driver.  You

13  can -- if you look over, you can also delete the driver.  So

14  this is where you get that ability to go and do the managing

15  of that content.

16  Q.  Now, when we were reading -- or when you were reading

17  for us that Claim 14, it mentioned contributing content.

18         Did that mean anything to you, the idea of

19  contributing content?

20  A.  So in the language of Claim 14, it talks about your

21  managing content contributed.  And when it's talking about

22  that contributing, it means other people can see it.  In

23  other words, it's not just content that you can see.  It's

24  content that others -- others can see.

25  Q.  And is that the lens through which you analyzed the

1  patent and the allegedly infringing system of the Defendant,

2  Great West?

3  A.  Yes, that is -- that is how I analyzed the system.

4  Q.  And did you find that that was met -- that eschew of

5  accessibility to other users with respect to content that

6  had been contributed?

7  A.  Yes, I did.  And, in fact, I -- I have some evidence

8  that I'll show.

9  Q.  Okay.  What are you showing us here in Slide 56,

10  Dr. Smith?

11  A.  So one is in order to manage content contributed by you,

12  you have to have to actually contribute the content or you

13  have to have the ability to contribute content.  And then

14  this is the ad new driver screen.  And in this case, this is

15  where you would put in information about that driver,

16  including their first name, last name, their license

17  information.

18       And sort of talking about that, you know, the users

19  versus information or content, there's nothing in here about

20  how you log in to the system as a driver.  This is driver's

21  license information to go on a policy so that they can bill

22  you for that policy.

23  Q.  Is this page that you're talking about also from one of

24  the exhibits the jury will have in front of it?

25  A.  So this is from PX-169, Page 39.

1  Q.  What are you showing us in Slide No. 57, Dr. Smith?

2  A.  So this allows you to actually add or update a driver.

3  So this is getting into managing that content.  And so this

4  is that type of screen where you would do that.

5  Q.  Well, since we've reached that point, tell us what you

6  understand to be meant by managing content as that's used in

7  Claim 14?

8  A.  So that could mean updating the content, it could be

9  deleting the content, or somehow modifying the content is

10  really what we're talking about.

11  Q.  And so how does Page 43 of Exhibit 169 relate to this

12  question that we have of whether or not there's managing and

13  contributing content?

14  A.  So this would allow you to change the driver personal

15  information and -- and even the -- the driver -- the pulling

16  of the driver's records you could do here, also.

17  Q.  What are you showing us in Slide No. 58, Dr. Smith?

18  A.  So this is another one of the tabs that I talked about

19  earlier on the centralized access point.  This allows you to

20  move or copy drivers.

21  Q.  Is this management?

22  A.  Yes, this would also be part of the management.

23  Q.  And is this from the same exhibit but at a different

24  page?

25  A.  So this is PX-169, Page 43.

1  Q.  Was there another page in that same exhibit, PX-169,

2  that you found relevant to or important for this analysis?

3  A.  So this is another one of the tabs that was on the

4  centralized access point which allows you to delete a driver

5  from -- from the -- the system.

6  Q.  If you can delete a driver from the system, then you

7  have contributed on to the system, is that managing

8  content that you have contributed?

9  A.  Yes, it is.

10  Q.  And this screen told you what?

11  A.  That you can, in fact, manage that content.

12  Q.  All right.

13      What are you showing us here in Slide No. 60?

14  A.  So in Slide 60 -- we've seen this slide before, but this

15  is PX-164, and this is actually an insured user being able

16  to look at their drivers.

17      So the driver information is actually added by

18  agents, but an insured user can only see the drivers for

19  that particular company.  They can't see -- you know, the

20  agent can see a lot of companies and a lot of drivers, but

21  that company can only look at -- or that insured can only

22  look at their -- their -- their drivers.

23  Q.  Would you say that again a little more slowly?

24      Who is accessing or seeing content contributed by

25  whom?

1  A.  So in this case, the insured is seeing -- insured users,

2  the company that's being insured, their user can see the

3  content that was implement -- inputted by the agent.

4  Q.  And what company or insured user is being presented as

5  the user that's accessing this information on this

6  particular screen?

7  A.  So that would be George Ackerson.

8  Q.  Okay.  What are you showing us here in Slide 61,

9  Dr. Smith?

10  A.  So this is another centralized access point of the

11  system.  In this case, it would be the centralized access

12  point seen by the employees of Great West.

13  Q.  So are you moving now from your analysis of whether or

14  not the agent user analyzes -- or excuse me -- is able to

15  have the functionality described in Claim 14 to whether the

16  employee user does?

17  A.  Yes.  So this shows how the employees can, in fact,

18  manage content that they have contributed.

19  Q.  And we've seen this one before, but would you tell us,

20  please, for the record what exhibit this is that the jury

21  would have in front of it?

22  A.  So this is GWX-389.

23  Q.  All right.

24        MR. RUPP:  Next slide, please.

25  Q.  (By Mr. Rupp)  What does Slide 62 tell us about whether

111

1   or not the employee user is enabled to manage any content

2   contributed by them?

3   A.  So what this shows is that the employee can actually,

4   one, contribute content, in other words, they can put in the

5   content for -- in order to -- for billing information in the

6   end, like mileage, so that they can come up with the

7   premiums.

8          In addition, it also shows -- if you look, there's

9   an actual button on there, but if you look to the right of

10  that, it shows a correction button, and, in fact, if you

11  make a correction to it, while the date cannot be removed

12  from the system, it can be modified so that the correction

13  can then be inserted into the system.

14  Q.  I want to pause for a minute here and slow down and make

15  sure we're clear on what it is you're talking about from

16  this exhibit.

17         First of all, what exhibit is this that the jury

18  will have?

19  A.  This is GWX-389.

20  Q.  And you mentioned that there is a button that allows the

21  employee user to do a correction; is that right?

22  A.  So if you pull -- so there -- right now highlighted and

23  bolded is the actual, but if you were to actually go make a

24  change to an existing one, then the correction button would

25  be highlighted, and we -- no -- yeah -- and that would then

1  be able to go into the system as a corrected rather than an

2  actual.

3  Q.  Why was that important to you when you were conducting

4  your review of the evidence in your analysis?

5  A.  So the question became can the employees actually modify

6  the data that is -- they're putting into the system.  And

7  the answer is, yes, they can correct that data.  And so it

8  might have been one entry before, and now, it's a different

9  entry in terms of what's going to finally be used.

10        And if you -- when we look at the patent and we

11  read the patent, the patent also talks about a similar use

12  of the data, where someone can write a report, and then if

13  they want to modify that report, they actually have to

14  modify a different version.  The version that's been

15  published is still there until it's been -- another version

16  is then uploaded.

17        And so you're not actually modifying the version

18  that was there; you're modifying a new version, which is how

19  this system here is working.

20  Q.  Did you see any evidence, testimony or documentary, from

21  Great West disputing whether or not the employee user has

22  the ability to submit a corrected report through this page?

23  A.  No.  There was no evidence that -- that, in fact -- to

24  the fact that you could not make a correction via this page.

25  Q.  And is there any question in your mind whether or not

113

1    that is -- in fact, constitutes the management of content?

2    A.   That would be management of content as described by the

3    patent.

4    Q.   What are you showing us in Slide 63, Dr. Smith?

5    A.   So then the question becomes if you're -- if you're

6    putting content in there, can others see?

7            And first of all, other employees can actually see

8    that content, but in addition, as it talks about here, on

9    billing details, you can also see that content.  And it says

10   here that the reporting and umbrella policies will also show

11   this type of information, and the screen we were looking at

12   before was the reporting screen.

13   Q.   Now, I want to make a point of clarification because

14   I keep asking you these questions.  These slides that we're

15   looking at here, they are not evidence that the jury will

16   have, correct?

17   A.   My understanding is you will not have this -- you will

18   have the documents.  Like this one is PX-151, Page 20, you

19   will have that, but you will not have my slides.

20   Q.   All right.

21           MR. RUPP:  And then next slide, please.

22   Q.   (By Mr. Rupp)  Was there some sworn testimony from

23   Great West executive vice president, Mr. Arends, that was

24   relevant to and on point as to this claim element?

25   A.   So this is really talking about, if you contribute

1  content, who can see it?  And in this case, they're saying

2  that if it's an employee, they have access to all the

3  agents.  But if it's an insured, they only have access to

4  their account, so basically, their company data.

5  Q.  In light of the evidence that you reviewed and that

6  you've discussed here in court today, sworn testimony and

7  documents that will be in front of the jury when they are

8  making their decision, did you determine whether or not

9  Claim 14 itself and the elements that are set out in the

10 patent are met by the Defendant, Great West's, system?

11 A.  Yes, that, in fact, the Great West system -- portal

12 system includes this functionality.

13 Q.  And that brings us to the next question, Dr. Smith,

14 which is, did you find that every single element required in

15 Claim 14 was met through sworn testimony and documentary

16 evidence or the website pages of the Defendant, Great West,

17 as to Great West's system?

18 A.  Yes, I did.

19        And you'll notice at this point there's not a

20 checkmark next to the preamble, and that brings us back to

21 the word comprising.

22        So because I've been able to show all the claim

23 elements below that are met -- and what the comprising

24 says -- and you heard this earlier -- the system must

25 include this.  It can include more, but it must include

1   this.  And, in fact, I've shown that it does include this,

2   and so, therefore, the preamble is also met.

3   Q.  And, therefore, Dr. Smith, what is your ultimate expert

4   opinion based upon the technical analysis that you performed

5   in this case?

6   A.  That Great West, using its portal system, does infringe

7   Claim 14 of this patent.

8            MR. RUPP:  Pass the witness.

9            THE COURT:  Cross-examination by the Defendant?

10           MR. BETTINGER:  Yes, Your Honor.

11           THE COURT:  You may proceed, Mr. Bettinger.

12           MR. BETTINGER:  Thank you, Your Honor.

13                    CROSS-EXAMINATION

14   BY MR. BETTINGER:

15   Q.  Good afternoon, Dr. Smith.

16   A.  Good afternoon.

17   Q.  You've been active in the field of computer science and

18   computer engineering for over 30 years, haven't you?

19   A.  Yes, that's correct.

20   Q.  And during that time and prior to this lawsuit, you

21   never heard of the '177 patent, did you?

22   A.  No, I had not heard of the '177.

23   Q.  And during that time, you had never heard the

24   howzone.com website that's mentioned in the '177 patent,

25   have you?

1   A.   That's correct.  I had not.

2   Q.   And you had never heard of '177 inventor John Knapp

3   before this litigation, had you?

4   A.   No, I had not.

5   Q.   And in your 30 years in the industry, you had never

6   heard of the '177 inventor, Ed Snyders, the inventor on the

7   '177 patent, correct?

8   A.   No, I had not.

9   Q.   And you've never worked for an insurance company?

10   A.   No, I have not.

11   Q.   And you've never done any research on the insurance

12   industry, have you, sir?

13   A.   No, I have not.

14   Q.   You've never worked for a company that provided

15   insurance to truckers?

16   A.   No, I did not.

17   Q.   Never had to work with the regulations that govern

18   companies that provide insurance to truckers, have you?

19   A.   No, I have not.

20   Q.   Never been involved in any market conduct exams with

21   state regulators, have you?

22   A.   No, I have not.

23   Q.   And you don't know the requirements of what information

24   must be saved from market conduct exams by insurance

25   companies, do you?

1  A.  No, I do not.

2  Q.  Sir, you've never designed a portal system to be used in

3  the insurance industry, have you?

4  A.  I think I've already answered that, but, no, I have not.

5  Q.  And you've had an opportunity to read the '177 patent

6  many times, correct?

7  A.  That's correct.

8  Q.  There is no discussion at all in the patent about

9  insurance, is there?

10  A.  No, there's not.

11  Q.  And the '177 patent doesn't have any examples using the

12  insurance industry, does it?

13  A.  No, it does not.

14  Q.  All right.  As you've testified, Claim 14 is the claim

15  at issue in this case, correct?

16  A.  Yes, that is correct.

17  Q.  And it's what you and others have referred to as the

18  dependent claim?

19  A.  Yes.

20  Q.  Meaning it depends from that Claim 11, right?

21  A.  Yes.

22       MR. BETTINGER:  Okay.  If we can put up PX-1 --

23  PX-1, which is Plaintiff's Exhibit No. 1.  And show

24  Claims 11 and 14, please.

25  Q.  (By Mr. Bettinger)  So we're looking at Exhibit PX-1,

1   the '177 patent, with Claims 11 and 14.  And I just want to

2   walk you through that to make sure we're on the same page,

3   okay?

4          It says claim first -- 14 first requires a -- and

5   I'm reading from Claim 14, sir.

6          Do you have that in front of you?

7   A.  Okay.  Yes.

8   Q.  Claim 14 first requires the apparatus of Claim 11,

9   correct?

10  A.  Correct.

11  Q.  And then Claim 14 requires a centralized access point,

12  correct?

13  A.  Correct.

14  Q.  All right.  And then that centralized access point -- so

15  you've got the apparatus of Claim 11, and then you have a

16  centralized access point, correct?

17  A.  Yes.

18  Q.  And then that centralized access point is further

19  operative to enable a user to manage any content contributed

20  by them, correct?

21  A.  Yes, that's correct.

22  Q.  All right.  And you've reviewed the '177 patent?

23  A.  Yes, I have.

24  Q.  Many times in this case, I take it, right?

25  A.  I've read it.

1  Q.  Yeah.  And you've reviewed the figures?

2  A.  I've looked through the figures, yes, multiple times.

3  Q.  All right.  And that includes Figure 42.  And it's that

4  42A and 42B that are combined and referred to as Figure 42?

5  A.  The patent is fairly long.  It'd be best to bring those

6  up.

7  Q.  Sure.  We can do that.  And if you have the patent in

8  front of you, sir, it's Figures 42.  And we'll put that on

9  the screen.

10 A.  Actually, I don't have the patent.  I have the claims,

11 but I do not have the patent.

12 Q.  I apologize.  Would you -- would you like a copy?

13 A.  I can look at this right now if that's what you're

14 asking questions about.

15 Q.  Sure.  Sure.  So we -- this is Figure 42A and 42B

16 combined as referred to as Figures 42 in the patent.

17          Do you recall that?

18 A.  Yes.

19 Q.  All right.  And this is a list of content contributions,

20 correct?

21 A.  So I believe that's a list of papers or articles that

22 could have been written.  It would be easiest if we were

23 actually looking at the -- the specification in terms of

24 being able to describe exactly what it is because the

25 specification talks about these.

1   Q.  Sure.

2         MR. BETTINGER:  So if we could pull up from the

3   patent Column 46, Lines 38 through 39?

4   Q.  (By Mr. Bettinger)  It describes Figure 42, a screen

5   display showing content contributions that a user has made

6   to the applicant's website.

7         Do you see that?

8   A.  It would be helpful if I could get a copy of the patent.

9   Q.  Sure.

10        MR. BETTINGER:  My apologies.

11        THE COURT:  We have notebooks to distribute for

12   this witness --

13        MR. BETTINGER:  I do, Your Honor.

14        THE COURT:  -- on cross?  Let's go ahead and do

15   that now.

16        MR. BETTINGER:  Your Honor, if Ms. Seery could

17   approach.

18        THE COURT:  She has leave to present the notebooks.

19        All right.  Let's proceed.

20   Q.  (By Mr. Bettinger)  My apologies, sir.

21        Do you have the patent in front of you?

22   A.  Yes, I do.

23   Q.  Okay.  And at Column 46, Lines 38 through 39, it

24   describes Figure 42 as being a diagram of a screen display

25   showing content contributions that a user has made to

1  applicant's website.

2          Do you see that?

3  A.  Yes.

4  Q.  Okay.  So if we go back to Figures 42 of the patent,

5  listed there content contribution, and those were

6  contributions from John Knapp, one of the inventors,

7  correct?

8  A.  Correct.

9  Q.  All right.  And if we go down a little past halfway, do

10 you see where it says how to clear a clogged drain is one of

11 the entries?

12 A.  Yes, I do.

13 Q.  Okay.  So one of the content contributions that John

14 Knapp made was how to clear a clogged drain, correct?

15 A.  He wrote some article -- according to the way the

16 system's laid out, he would have written an article that

17 would talk about that.

18 Q.  Okay.  And then at Figure 45, if you would kindly turn

19 to that in PX-1, which is the '177 patent.  At Figure 45,

20 are you familiar with that screen called clearing clogged

21 drains?

22 A.  I've seen it before, yes.

23 Q.  Okay.  And that then shows the content of the

24 contribution which is of clearing clogged drains.  There's

25 the content, correct?

122

1  A.   That's correct.

2  Q.   Okay.   So you agree that Screen 45 is showing us

3  content?

4  A.   It contains content.

5  Q.   Now, in this case, we also know what content is not,

6  correct?

7  A.   Correct.

8        MR. BETTINGER:   And if we could put up --

9  Q.   (By Mr. Bettinger)   If you could look in your binder at

10  GWX-761 -- GWX-761, which was the statement of -- the notice

11  of uncontested facts?

12  A.   Uh-huh.

13  Q.   Do you have that, sir?

14  A.   I -- I found it, yes.

15  Q.   And if you look at No. 15?

16  A.   Yes.

17  Q.   In this case, it's undisputed, and you agree, correct,

18  that the scope of content, as claimed in Claims 11 and 14 of

19  the '177 patent, does not -- my screen is not showing does

20  not include -- does not include links to content -- does not

21  include information about users.

22        Do you see that?

23  A.   Correct.   That's actually part of Claim 11A.   So as

24  I was applying the -- my analysis, this was built into the

25  analysis.

1    Q.   Okay.  So you agree that for purposes of Claim 14,

2    content does not include information about users, correct?

3    A.   So information -- as the patent talks about, information

4    about the users like their log on information and things

5    like that, it's not content, I agree.

6    Q.   No, I'm sorry.  That wasn't my question.

7            You agree that the scope of content does not

8    include information about users, correct?

9    A.   Correct.

10   Q.   So if you -- all you're doing is contributing

11   information about users, you're not contributing content,

12   are you?

13   A.   So the way the claim was written, I would not have

14   considered that content.

15   Q.   No, let me ask that again, sir.

16           If you're not -- if you are contributing

17   information about users, then you're not contributing

18   content, correct?

19   A.   I believe that's correct.

20   Q.   And if all you're doing is managing information about

21   users, then you're not managing content, correct?

22   A.   That would be -- I would agree with you.

23   Q.   So for purposes of Claim 14, all you contribute is

24   information about users, then you would not be contributing

25   content?

1   A.   I agree.

2   Q.   And then you would not be infringing Claim 14 because it

3   requires that you contribute content, correct?

4   A.   Correct.   Claim 14 requires the managing -- contributing

5   and managing content.

6   Q.   And then -- similar question, if all you're doing is

7   managing information about users, then you're not managing

8   content, correct?

9   A.   Maybe I misunderstood your last question.   I thought

10   that was your last question, but...

11   Q.   The first one was contributing.

12   A.   Oh, okay.

13   Q.   The last question -- let me ask again for you, sir.

14       If all you are managing is information about users,

15   you're not man -- managing content, correct?

16   A.   Correct.

17   Q.   And if you're not managing content, you can't infringe

18   Claim 14, correct?

19   A.   That would be correct.

20   Q.   All right.

21       MR. BETTINGER:   If we could, Mr. Simmons -- strike

22   that.   Let me --

23   Q.   (By Mr. Bettinger)   If we could go back to Claim 14 of

24   the -- of the patent, sir.

25       MR. BETTINGER:   And if you would put that up on the

1    screen for us?

2          Thank you, Mr. Simmons.

3    Q.  (By Mr. Bettinger)  And having the -- the language

4    of Claim 14 in front of you, you agree, sir, that you

5    have to contribute content before you can manage it,

6    right?

7          You have to contribute content before you can

8    manage it?

9    A.  That's correct.

10   Q.  And for purposes of Claim 14, once content has been

11   contributed or added, it then has to be managed, right?

12   A.  No.

13   Q.  So if all you do is contribute content, that's not

14   enough under Claim 14, correct?

15   A.  So the way that the Court has defined any is you must be

16   able to manage some of the data because any is defined as

17   one or more stored content.

18   Q.  Let me try that again.

19         If all you've done is contributed content, you've

20   not infringed Claim 14, correct?

21   A.  If your system -- that answer can be yes or no.  If you

22   want, I'll explain.

23   Q.  Sure.

24   A.  The system -- if -- if all you do is -- all one user

25   does is contribute content, they don't manage it, the system

1    still infringes if the system allows them to manage the

2    content.  So it's not -- you're saying an absolute when

3    that's not the case.

4    Q.  Let me ask it this way:  If all one user does is

5    contribute content and that manager -- and that user does

6    not then manage the content --

7    A.  Okay.

8    Q.  -- or that content is then not managed, that wouldn't

9    infringe, correct?

10   A.  The system would still infringe.  You're --

11   Q.  But if the system is not managing the content -- or let

12   me ask it this way, sir:  You have to contribute content,

13   and then that content has to managed by someone in order to

14   infringe, correct?

15   A.  Correct.  So if you remove the ability to manage

16   content, stripped it out of the system, the system would not

17   infringe.

18   Q.  So if you just add content and then no one comes along

19   and manages it, that doesn't infringe Claim 14, does it?

20   A.  If your system allows them to manage content, then the

21   apparatus that we're talking about -- and as you read the

22   claim, Claim 14 starts off with, the apparatus of Claim 11.

23        So if that apparatus allows you to manage the

24   content, then that apparatus allows you to manage content.

25   Q.  Right.  But what I'm asking you, if the apparatus does

1  not allow to manage content, all you're doing is

2  contributing content, apparatus does not allow you to manage

3  it, that doesn't infringe Claim 14, does it, sir?

4  A.  Okay.  That wasn't the question you had asked, but I

5  would agree with you that if the system doesn't allow you to

6  manage content, then you don't infringe the claim.

7  Q.  All right.  And you agree, don't you, sir, that adding

8  content is a different step than managing content, correct?

9  A.  Yes.  So the content has to be added before you can

10 manage it.

11 Q.  And if everybody in the system can only look at the

12 content, you agree that's not managing the content, correct?

13 A.  I think I've answered it, but, correct, if you can't --

14 if the system doesn't allow managing of the content, then

15 that apparatus wouldn't allow -- wouldn't infringe.

16 Q.  Right.  And you agree that if you can't manage content,

17 you can't meet the requirements of Claim 14, right?

18 A.  So you're saying your system doesn't allow management of

19 content -- content.  Then it wouldn't infringe.  I think

20 I've agreed with that.

21 Q.  And that's because Claim 14 requires that you have to be

22 able to manage content, correct?

23 A.  That's correct.

24 Q.  And you agree that adding a user is not managing

25 content; it's contributing, correct?

1   A.  So adding a user would be putting in a user.  I'm not

2   sure -- when you're talking about a user, that's not

3   content.

4   Q.  Well, when we asked you that question in your

5   deposition, you didn't have any trouble answering it, did

6   you?

7   A.  I don't recall.

8          MR. BETTINGER:  If we could pull up --

9   Q.  (By Mr. Bettinger)  And you have your deposition

10  transcript there.

11         MR. BETTINGER:  -- Page 84, Lines 2 through 5.  If

12  Mr. Simmons can pull that up?

13  Q.  (By Mr. Bettinger)  We asked you the question:  And

14  adding a user is not managing; it's contributing; is that

15  right.

16         And you said:  Answer:  I think that's -- yes.

17  I think that's as we discussed earlier today.

18         Correct?

19  A.  Yeah.  That's a good answer.

20  Q.  No, adding a user is not managing; it's contributing

21  content, correct?

22  A.  Adding a user is managing?

23  Q.  No.  Adding a user is not managing; it's contributing

24  content, correct?

25  A.  Okay.

1  Q.  Is that correct, sir?

2  A.  What I -- what your question here is, is a user is not

3  managing it; it's contributing it.  So, yes, adding a user

4  is not managing it; it's contributing it.

5  Q.  Thank you, sir.

6  A.  Yeah.

7  Q.  And just adding content is not the management of content

8  that Claim 14 requires, correct?

9  A.  Correct.

10  Q.  All right.  Let's then turn, if we could, to your

11  infringement analysis.

12        And that would go back to Claim 14 and start with a

13  centralized access point, okay, of Claim 14.

14  A.  Okay.

15  Q.  All right.  In your direct testimony, sir, you testified

16  that the Drivers List By Policy page of the policy portal is

17  the centralized access point of the agent portal, correct?

18  A.  It is a centralized access point, yes, of the agent

19  portal.

20  Q.  Okay.

21        MR. BETTINGER:  If we could then put up GWX-494,

22  GWX-494?

23  Q.  (By Mr. Bettinger)  All right.  And placing before you,

24  sir -- and it's in your binder, too, if you'd like to look

25  at it there -- GWX-494, that is the Drivers List By Policy

1    page of the agent portal, correct?

2    A.  Correct.

3    Q.  And as you testified in your direct, first the agent can

4    add information about a new driver, right?

5    A.  They can, correct.

6    Q.  And that is simply adding or contributing a driver,

7    right?

8    A.  Yes.

9    Q.  So that would be adding a driver, not managing, correct?

10   A.  Correct.  That would be contributing, yes.

11   Q.  As opposed to managing, correct?

12   A.  Yes, as opposed to managing, yeah.

13   Q.  All right.  And when a new driver is added, that driver

14   can be assigned a user name and password, correct?

15   A.  Not my understanding that when you're adding a driver,

16   you assign a user name and password to them.

17   Q.  You have -- you do not understand that a driver can be

18   assigned a user name and password in the Great West website,

19   sir?

20   A.  No, that's not what I said.  I said, when you add a

21   driver, you do not assign a user name and password.  That

22   doesn't mean you can't assign a user name and password, but

23   when you're adding a driver, the content that you're adding

24   is about the driver.

25   Q.  So -- so you agree that a driver can be assigned a user

1    name and password, correct?

2    A.  Well, my understanding would be anybody could assign --

3    be assigned a user name and password, but this data is about

4    the driver in terms of their driving ability, not about

5    their user name and password.

6    Q.  And you would agree that once you're assigned a user

7    name and password, you can be a user of the Great West

8    website correct, sir?

9    A.  I think that's correct.

10   Q.  So once you're assigned that user name and password,

11   you're then a user of the Great West website, correct?

12   A.  You are -- that user name and password makes you a user

13   of the Great West -- Great West website, yes.

14   Q.  Okay.  I'd like to now, sir, walk through the driver

15   information that the agent can actually update on the

16   Drivers List By Policy page.

17   A.  Okay.

18   Q.  To do that, if we could -- GWX-493.  It's

19   Exhibit GWX-493.  And I believe it's in your binder as well.

20          And just to orient ourselves, sir, when you're on

21   that Drivers List By Policy page, when you click the driver

22   name, it will take you to this page, correct, the driver

23   detail?

24   A.  Correct.

25   Q.  All right.  And you're familiar with this driver detail

1  page?

2  A.  Yes, I've seen it before.  I don't know about this

3  particular one, possibly, but, yes, I've seen a driver

4  detail page.

5  Q.  I'll represent to you that this is the one that comes

6  from the agent portal.

7  A.  Okay.

8  Q.  Okay.  And you see the first entry at the top there is

9  driver personal information?

10  A.  Yes, I do see that.

11  Q.  And do you see next to it there's an edit button for

12  driver personal information?

13  A.  Yes, I do.

14  Q.  All right.  And then if you click on that edit button,

15  that will then take you to another screen, correct?

16  A.  Correct.

17  Q.  All right.

18        MR. BETTINGER:  And if we could, then, go to

19  GWX-482, Page 51?  GWX-482, Page 51.

20  A.  I can see that one.

21  Q.  (By Mr. Bettinger)  Okay.  Yeah.  And this is the screen

22  in the agent portal that you would be taken to if you

23  clicked on that button, correct?

24  A.  Correct.

25  Q.  All right.  And this is what's called the update driver

1   personal information that you're taken to, correct?

2   A.  Yes.

3   Q.  And as the name indicates, this is personal information

4   about the driver.

5   A.  Yes.

6   Q.  So this is a driver -- let's say that this is a driver

7   who has a user name and password, so it can use the

8   Great West website, okay?

9   A.  Yes.

10  Q.  You can update personal information about that user

11  right here, correct?

12  A.  I would say, no.  This is not updating information about

13  that user; it's information about the driver.  It doesn't

14  have anything -- any tie into the user.  There's no user

15  name and password.  There's no email even.  So there's no

16  tie into that.  This is just information for the policy.

17  Q.  But the driver is a user of the Great West website,

18  correct?

19  A.  Correct.  And the patent does differentiate between

20  those two.  So in this case, this would be content.

21  Q.  Let me get this straight, though.  So the driver -- just

22  to be clear, the driver is a user of the Great West website,

23  correct?

24  A.  Correct.

25  Q.  All right.  And as a user of that website, they have a

1  user password and a user name, correct?

2  A.  Correct.

3  Q.  So now they're a user?

4  A.  Correct.

5  Q.  All right.  And here, that driver -- information about

6  that same driver who's a user is going to be updated,

7  correct?

8  A.  So as I said, the patent differentiates between the two.

9  And this is actually information about a policy.  It's the

10  driver on that policy.

11  Q.  It's the same driver, isn't it?

12  A.  So it probably is the same -- in your example, it is the

13  same person, correct.

14  Q.  Correct.  So that driver who's a user is now having

15  their personal information updated on this page, aren't

16  they?

17  A.  Okay.  I would -- I would agree that that person -- that

18  exists would be having their information updated here.

19  Q.  And that information -- that personal information that's

20  being updated includes a first name, correct?

21  A.  Correct.

22  Q.  A middle name?

23  A.  Yes.

24  Q.  A last name?

25  A.  Yes.

1  Q.  A suffix, such as, you know, junior or something?

2  A.  Yes, that's on the screen here.

3  Q.  Yeah.  Gender?

4  A.  Yes.

5  Q.  Date of birth?

6  A.  Yes.

7  Q.  And years of experience, correct?

8  A.  Yes.

9  Q.  And that's all referred to as driver personal

10  information, correct?

11  A.  Correct.

12  Q.  Okay.  And that's what can be updated on the driver list

13  if you click on that first button, correct?

14  A.  Correct.

15  Q.  All right.

16        MR. BETTINGER:  Mr. Simmons, if we can go back to

17  GWX-493 and go down to the second entry of licenses -- I'm

18  sorry, of Great West driver status information?

19  Q.  (By Mr. Bettinger)  So we're on Exhibit 493, and we're

20  going through each of the entries here as to what can be

21  done by the agent when they click on that page, okay?

22  A.  Okay.

23  Q.  All right.  And for Great West driver status

24  information, the agent can't do anything to change that, can

25  they?

1  A.  Say that again.

2  Q.  For this information, the Great West driver status

3  information, the agent can't do anything to change that

4  information, can they?

5  A.  Not from this screen.

6  Q.  Correct.  We then go down to the next entry.  Strike.

7       Let me then ask if they can't do anything to change

8  any information on that entry, they can't manage any of that

9  information, correct?

10  A.  That would be correct.

11  Q.  Okay.  We then go down to licenses.

12       Do you see there the next entry down says licenses?

13  A.  Yes, I do.

14  Q.  And there's a button you can click to add license?

15  A.  Yes.

16  Q.  All right.  And if we click that button, that then takes

17  us to GWX-490.

18       Add license to driver, correct?

19  A.  Correct.

20  Q.  All right.  And this is a screen where you can -- the

21  agent can add a license to the driver, correct?

22  A.  That's correct.

23  Q.  There -- you cannot delete the old license.  You can

24  simply add a new license, correct?

25  A.  That's correct.

1   Q.  And you would agree that a driver's license identifies a

2   driver, wouldn't you?

3   A.  Yes.

4   Q.  I take it when you flew from California, you used your

5   driver's license to get through the airport?

6   A.  Yes.

7   Q.  As identification?

8   A.  Yes.

9   Q.  So that would be driver identification, a driver's

10  license?

11  A.  Yes.

12  Q.  All right.

13        MR. BETTINGER:  If we could then go back to 493,

14  please, Mr. Simmons, Exhibit GWX-493, and we'll go down to

15  the next series -- entries after a license?

16  Q.  (By Mr. Bettinger)  You have MVR information and MVR

17  violation information for all licensees.

18        Do you see those entries, sir?

19  A.  Yes, I do.

20  Q.  Okay.  The agent can't do anything to edit, modify,

21  delete, or anything with respect to that information, can

22  they?

23  A.  Not from this screen.

24  Q.  So -- so the agent can't then manage any of the MVR

25  information or MVR violations information for all licensees,

1  correct?

2  A.  Not from this screen, no.

3  Q.  Okay.  If we then go down to the next entry on 493, sir,

4  it's the Great West claims and reported incidents.

5         Do you see that?

6  A.  Yes, I do.

7  Q.  All right.  And the agent can't do anything to modify,

8  delete, or change any of the information in the Great West

9  claims and reported incidents, correct?

10  A.  Not from the screen, no.

11  Q.  So, therefore, the -- the agent cannot manage any

12  information in this Great West claims and reported

13  incidents, correct?

14  A.  Not from this screen, no.

15  Q.  And then finally, if you go down to the Great West

16  employment information.

17         Do you see that?

18  A.  Yes, I do.

19  Q.  And then to the right, it says:  Add to account.

20         Do you see that button?

21  A.  Yes.

22  Q.  And if you click on that button, you go to GWX-482, Page

23  57, correct?  And that's the update employment information

24  screen from the agent portal?

25  A.  Yes.

1  Q.  Are you familiar with that?

2  A.  Right.

3  Q.  So you can add status and hire date, correct?

4  A.  Yes.

5  Q.  All right.  And if that's for the -- would be for the

6  same driver we've talking about here, that would be updating

7  information about that driver who is a user of the Great

8  West website, correct?

9  A.  So it would be updating that driver, correct.

10  Q.  And this -- that would be information about that driver,

11  correct?

12  A.  Yes, this would be information about the driver.

13  Q.  So if we could -- just to recap, there's three -- do you

14  agree that there were three buttons on the driver detail

15  page, GWX-493, that could be -- in which the agent could

16  press to -- with respect to changing information?

17  A.  It doesn't -- 493.  It was a different GWX.

18  Q.  GWX-493 should be the driver detail page.

19  A.  Okay.  Yes.  When you -- I thought you were talking back

20  about the Drivers List By Policy page.

21  Q.  I'm sorry?

22  A.  Go ahead.

23  Q.  493, the driver detail page, there are three buttons

24  there, correct, that the agent can go on to make -- do

25  anything with respect to the information contained?

1  A.   So you're talking about the adding -- I'm trying to

2  figure out what buttons you're talking about because there's

3  things across the top also.

4  Q.   Yeah, those three that we just reviewed.

5  A.   Okay.   Yes.

6  Q.   So one is driver personal information, right?

7  A.   Correct.

8  Q.   And that allows you to edit information about the

9  driver, correct?

10  A.   Their personal information, correct, yeah.

11  Q.   Right.   And that -- in the situation we were talking

12  about, that driver was a registered user of the Great West

13  website, correct?

14  A.   In your example, you said he was.

15  Q.   Yes.   And then the next entry down, licenses, the agent

16  can add a license, correct?

17  A.   Correct.

18  Q.   Agent cannot change an existing license, correct?

19  A.   My understanding from the screen, that's correct.

20  Q.   And then the third -- the only other item in which the

21  agent can make any changes is at the Great West employment

22  information -- that button right there, correct?

23  A.   Correct.

24  Q.   And there, the agent can change the driver's status and

25  the hire date, correct?

141

1   A.  Correct.

2   Q.  And that would be information about that driver,

3   correct?

4   A.  That's correct.

5   Q.  All right.  You're aware, sir, that when a driver is

6   deleted from the Great West -- on the Drivers List By

7   Policy, that -- that they're simply detached from the

8   policy, that they're not removed from the website at all?

9   A.  Yes.  I think I misstated that during my direct, but,

10  yes, they would be removed from that list.

11  Q.  Just removed from the list, but they would still be part

12  of the website, correct?

13  A.  They would still be in the databases, yes.

14  Q.  And the information about them would still be maintained

15  in the Great West website, wouldn't it, sir?

16  A.  That would be my understanding.

17  Q.  All right.  Earlier today, I believe you mentioned on

18  your direct examination that the term "information" about

19  users was limited to just a user name and password.

20          Do you recall that?

21  A.  I don't know if I was quite that direct, but the

22  information about their log-in information which might be

23  user name and password, possibly email address.

24  Q.  Okay.  Possibly email address you would now add to that?

25  A.  Well, user name and password is really the key things

1  that I've been looking at.

2  Q.  Okay.  But when we asked you in your deposition -- we

3  asked you about information about users, you -- you said

4  there was more than that to information by users than just a

5  password, user name, and perhaps email, correct?

6  A.  I don't recall.

7  Q.  Well, do you recall that you told us that bookmarks were

8  information about the user?

9  A.  No, I do not recall that.

10          MR. BETTINGER:  If you could turn to Page 177,

11  Lines 13 through 19 of your deposition.

12          THE COURT:  Counsel, approach the bench, please.

13          (Bench conference.)

14          THE COURT:  It's improper impeachment if he says he

15  doesn't remember.  You have to refresh his recollection

16  first.

17          MR. BETTINGER:  That's what I was doing --

18          THE COURT:  Refresh his recollection outside the

19  presence of the jury.

20          MR. BETTINGER:  He put it on the screen, I'm sorry.

21          I'm sorry.

22          THE COURT:  So how much more cross do you have.

23          MR. BETTINGER:  10 minutes.

24          THE COURT:  What about redirect.

25          MR. RUPP:  Probably no more than 10 minutes.

143

1          THE COURT:  All right.  Let's continue.

2          (Bench conference concluded.)

3          THE COURT:  Let's proceed.

4          MR. BETTINGER:  Thank you, Your Honor.

5    Q.  (By Mr. Bettinger)  Have you had an opportunity to read

6    that?

7    A.  No, I'm sorry, I didn't catch the lines.

8    Q.  No problem.  177, Lines 13 through 19.

9    A.  So that is -- so, yeah, okay, now, I recall this.  And

10   so the claim language is actually information about users

11   including information about which content a user has chosen,

12   and the bookmarks, I believe, would have fallen underneath

13   the information about which user -- which content a user has

14   chosen.  So that's -- that's why I would consider it to fit

15   under that D.

16   Q.  But when asked about bookmarks, did you not you say that

17   would constitute information about the user?

18   A.  No, I actually said so that would constitute the

19   information about the user, including information about

20   what -- which content the user has chosen.

21          So, in fact, it looks like -- so it would be the

22   qualifier about what content the user has chosen is my exact

23   words.  So it's pretty much completely consistent with what

24   I just said.

25   Q.  But you were also asked about browsing history.

1           Do you recall that?

2   A.  I --

3   Q.  I could direct your attentions to Lines 20 to 24, if

4   you'd like.  That browsing history is information about a

5   user?

6   A.  No, and it goes on to say, including information about

7   which content a user has chosen.  So -- so you're taking it

8   out of context of what the claim actually requires.

9           The claim specifically states information about

10  users, including information about which content the user

11  has chosen.  And so I am equating both the bookmarks and the

12  history information -- or the browser information I was

13  talking about here, I'm sorry, with that content that they

14  have chosen.  It's that qualifier that's on there.  And

15  I think the question that was asked was very clear that it

16  was talking about that qualifier, and my answer was very

17  clear that it was talking about that qualifier.

18  Q.  Sure.  But even with that qualifier it's still

19  information about users?

20  A.  Well, in this case it's information about users

21  including information about which content the user has

22  chosen. So it's information about the content that user has

23  chosen that included as information about that user.

24  Q.  It's information about users, and that information

25  includes something else, but it's information about users,

1  right?

2  A.  Okay.  I can get you there.

3  Q.  So -- so in your deposition, when we asked you those

4  questions, you had a broader definition of information about

5  users than just user name, password, and perhaps email,

6  didn't you, sir?

7  A.  I -- I had exactly what the claim states, and, in fact,

8  my answers states exactly what the claim states.

9  Q.  Just to be clear in this case, sir, it is your position

10  that for a driver who has a user name and password and,

11  therefore, can use the Great West website, that driver, the

12  first name, that driver's first name is not information

13  about a user, isn't that right?

14  A.  So I would say that the content that's added through the

15  driver's license's list web page is not about that user,

16  it's about the driver.

17  Q.  But my question is that first name is not information

18  about that user, that's your position in this case?

19  A.  I would say it's not tied to that user.  There's no

20  tying to that user between that name and the user's ability

21  to log into the system.

22       MR. BETTINGER:  And if we can go back, Mr. Simmons,

23  and put up GWX-482, Page 51?

24  Q.  (By Mr. Bettinger)  And that's -- you have 482 in your

25  book, as well, in that update driver personal information.

1          And just to be clear, sir, it's your position that

2   all those entries, first name, middle name, last name,

3   suffix, gender, date of birth, years of experience, it's

4   your position that for a driver who has a password and user

5   name, so is a user of the Great West system, that

6   information about that user, that is not information about

7   that user, correct?

8   A.   It's not information about the user.  It's information

9   about the driver and the system separates that, yes.

10  Q.   If we could turn to the other centralized access point

11  that you identified, which is employee portal Report Rate.

12          Do you recall that?

13  A.   Yes, I do.

14  Q.   Okay.  And if we could, just orient ourselves, that's at

15  GWX-761, Stipulation 16.  GWX-761.

16          So the other employee portal you've identified is

17  the employee portal and the homepage, correct?

18  A.   Correct.

19          MR. BETTINGER:  All right.  And if we can pull up,

20  Mr. Simmons, GWX-530?

21  Q.   (By Mr. Bettinger)  That is the homepage, correct?

22  A.   Yes.

23  Q.   And then if you look in the column over to the right,

24  there's a -- there's an entry for report rates, correct?

25  A.   Correct.

1    Q.  If you click on that, you then get to the report rates

2    page; is that fair?

3    A.  Yes, that's fair.

4    Q.  Okay.

5          MR. BETTINGER:  If we could go to GWX-531,

6    Mr. Simmons?  It's 532?  Go to 531 first, though, please.

7    Q.  (By Mr. Bettinger)  Okay.  And this is that page,

8    correct?

9    A.  Correct.

10   Q.  All right.  And there are two buttons that -- that can

11   be clicked, right, display history is one of them?

12   A.  Yes.

13   Q.  All right.  And if you click on display history, that

14   then takes you to GWX-532, correct?

15   A.  Which is the history -- history page, yes.

16   Q.  History page, yeah?

17   A.  Yeah.

18         MR. BETTINGER:  If we could -- right there.

19   GWX-532.

20   Q.  (By Mr. Bettinger)  And that's -- that shows each of the

21   policy and the rates that have been entered, correct?

22   A.  Correct.

23   Q.  And that is a historical -- goes back in time, it's the

24   history of the policies, correct?

25   A.  Correct.

1   Q.  All right.  And are you aware that that has to be

2   maintained by law?

3   A.  Correct.  That's why the correction can be done.

4   Q.  And then -- well, let me ask you about that because

5   that -- these -- you understand these all have to be

6   maintained by law?

7          They cannot be destructed, correct?

8   A.  That's my understanding.

9   Q.  So if there's any correction that has to be done, it has

10  to be in a new document, right?

11  A.  So if the correction is done, you would enter it on the

12  previous screen, and then it would be recorded as a

13  correction.

14  Q.  Well, but the underlying document is not corrected, it's

15  a new document that's then saved, right?

16  A.  So if you go back to the previous screen.

17  Q.  Sure.  We'll go back?

18          MR. BETTINGER:  531.

19          THE COURT:  Let me interrupt a minute.

20          Dr. Smith, it's not your place to tell the lawyer

21  to go back to another screen.  If he asked a question you

22  don't understand, say you don't understand.  If he asks a

23  question and you understand it, then answer it.  But don't

24  direct him to show you something else or tell you that you

25  need to see something else.  If you can't answer the

1   question from what he's asked you or shown you, tell him.

2   If you can, answer it, all right?

3           THE WITNESS:  Yes, Your Honor.

4           THE COURT:  All right.  Let's proceed forward.

5           And, Mr. Bettinger, if -- if you believe the

6   witness -- several times you've said that's not what

7   I asked.  If you believe the witness is non-responsive, then

8   you need to raise it with the Court, and the Court will deal

9   with the witness, all right?

10          MR. BETTINGER:  Yes, Your Honor.

11          THE COURT:  All right.  Let's proceed.

12          MR. BETTINGER:  Mr. Simmons, if we can pull up 531,

13  GWX-531, please?

14  Q.  (By Mr. Bettinger)  So each time that a new policy is

15  created, the old policy is kept, correct?

16  A.  That's my understanding.

17  Q.  And then there's a new policy that's created, and then

18  that, too, is kept as -- as a new policy, correct?

19  A.  If it's a new policy, correct.

20  Q.  So you would be adding a new policy -- the correction

21  would be adding a new policy, correct?

22  A.  Okay.

23  Q.  All right.  This -- thank you for your time.

24          MR. BETTINGER:  I have no further questions, Your

25  Honor.

1          THE COURT:  You pass the witness.

2          MR. BETTINGER:  Yes, I do.

3          THE COURT:  All right.  Mr. Rupp, do you have

4    redirect?

5          MR. RUPP:  Briefly, Your Honor.

6          THE COURT:  Okay.

7    Q.  (By Mr. Rupp)  Dr. Smith, do you know anyone who does

8    what you do, in other words, provide expert analysis,

9    technical analysis in the area of computer science whom you

10   believe knows every patent that's important in computer

11   science?

12   A.  No, I don't.

13   Q.  Do you know anyone who knows every inventor of every

14   patent that's important in the field of computer science?

15   A.  No, I don't.

16   Q.  You were asked whether or not there was anything in the

17   '177 patent that specifically called out content having to

18   do with insurance companies.

19          Do you recollect that?

20   A.  Yes, I do.

21   Q.  Is there anything in the '177 patent that limited it to

22   something other than insurance information?

23   A.  No, there's no limiting feature there.  In fact, what

24   I have to show is the claim itself is really the focus.

25   Q.  Do you recall in Mr. Bettinger's opening when he put up

1    a slide from the video that had the excerpt below it, the

2    claims are the most important part of the patent?

3    A.  Yes.

4    Q.  And then what did he show you when he began asking you

5    about Figures 41 and 42?  Was that part of the claims of the

6    '177 patent?

7    A.  He was showing me the specification.

8    Q.  And is the specification part of that most important

9    part of the patent, or is it something different?

10   A.  The specification guides us on our reading of the claim,

11   but it's not the claim.  The claim is actually the invention

12   that's being disclosed.

13   Q.  Is there anything that you saw in the '177 patent, as

14   you studied it, that says or suggests that only articles

15   about clogged drains are content?

16   A.  No.

17   Q.  Did you see anything in the '177 patent that suggested

18   in any way, either in the claims or the specification or the

19   figures, that only articles of whatever nature can be

20   content?

21   A.  No.

22   Q.  There were a number of screens that you were shown where

23   you were asked whether or not from that particular screen a

24   user could manage contributed content.

25          Do you recollect those series of questions?

1   A.  Yes.

2   Q.  And in a number of those, I noted that your answer was:

3   Not from this screen.

4         Do I recall that correctly?

5   A.  Yes.

6   Q.  Would you care to explain your answer further?

7   A.  So some of the other screens do allow like -- you to

8   delete it, delete a driver or move a driver or copy a driver

9   so there are other options available.

10        In addition, there's the option of asking for DMV

11  report or -- or setting that up.  You can actually click

12  that button.  So there were just other pieces of data that

13  could be managed that were included with that driver.

14  Q.  Under the requirements of the patent, do you need to be

15  able to manage the contributed content on every single page

16  where that content may appear?

17  A.  No.

18  Q.  Does it make a difference to whether Great West

19  infringes the '177 patent if there is some information that

20  can be contributed that then cannot be managed?  So some

21  information can be contributed, but then you can't manage

22  it.

23        Does that make a difference?

24  A.  No.  You do not have to be able to manage all the

25  contributed content.

1    Q.   Why not?

2    A.   So that's the way that Claim 14 is written, and the

3    Court actually defined the word "any" in terms of meaning --

4    managing one or more stored content.

5    Q.   So if Mr. Bettinger shows us that there are one, two,

6    five, or ten different pieces of content that can be

7    contributed but then that content cannot be managed, is that

8    important in any way to the analysis of whether or not Great

9    West infringes Claim 14?

10   A.   No, it's not.

11   Q.   Do you recollect during the opening statement -- first

12   of all, let me orient you to what I'm going to ask you

13   about.

14         You've been asked a lot about whether or not

15   information about drivers is user information or content in

16   the context of the Great West system.

17         Do you recall that?

18   A.   Yes.

19   Q.   And when I was talking to you on direct examination,

20   what did you tell me about the first time that you heard

21   anyone from Great West say or voice that opinion?

22   A.   Was today during opening.

23   Q.   And did you also hear during the opening statement when

24   Mr. Bettinger said that this has been their position for the

25   last three years?

1   A.   I heard him talk about this case is three years old, and

2   they've had these positions for three years, yes.

3   Q.   Were you missing for any part of those three years with

4   respect to this case, or were you participating in it

5   throughout the case?

6   A.   I was available for the case throughout that time.

7   Q.   And was that statement correct or incorrect in your

8   opinion, the statement that this has been their position for

9   three years?

10  A.   So as far as I know, this is the first time -- well,

11  this is the first time I've heard of it.  And it wasn't in

12  their expert's report, nor was it in any of the other

13  documents.  And I've seen no evidence of how this would play

14  out.

15  Q.   Did any of the questions that Mr. Bettinger asked you

16  and the answers that you gave cause you to rethink or doubt

17  any of the testimony that you gave the jury on direct

18  examination with respect to whether or not the Defendant,

19  Great West's, system, infringes?

20  A.   No, it does not.

21          MR. RUPP:  Pass the witness.

22          THE COURT:  Further cross-examination?

23          MR. BETTINGER:  No, Your Honor.

24          THE COURT:  All right.  You may step down,

25  Dr. Smith.

1          All right.  Plaintiffs, call your next witness.

2          MR. GILLILAND:  Your Honor, at this time, we would

3  like to play the video deposition of Mr. Jim Arends.  This

4  clip is a total of 12 minutes, 16 seconds long, with 9

5  minutes, 54 seconds on behalf of the Plaintiff, 2 minutes,

6  and 12 seconds on behalf of the Defendant.

7          THE COURT:  Proceed with your witness by

8  deposition.

9          (Videoclip played.)

10          QUESTION:  You're an employee of Great West, right?

11          ANSWER:  I am.

12          QUESTION:  And what's the location that you office

13  out of for Great West?

14          ANSWER:  Great West is -- I'm at their 1100 West

15  29th Street, South Sioux City, Nebraska.

16          QUESTION:  Okay.  How long have you worked at Great

17  West?

18          ANSWER:  It'll be 27 years the first of November.

19          QUESTION:  And what is your current job title at

20  Great West?

21          ANSWER:  I'm the executive vice president of

22  information technology.

23          QUESTION:  And how long have you had that position

24  for?

25          ANSWER:  Nine years, approximately.

```
 1              QUESTION:  Did you have any other jobs prior to

 2    working at Great West?

 3              ANSWER:  I did.

 4              QUESTION:  Okay.  What -- what were they?

 5              ANSWER:  I was -- I held various IT positions at

 6    American Freight Systems in Sioux Falls, South Dakota.

 7              QUESTION:  What was the name of that company again?

 8    I didn't hear --

 9              ANSWER:  American Freight Systems.

10              QUESTION:  Okay.  About how long did you do that

11    for?

12              ANSWER:  10 years.

13              QUESTION:  Okay.  And what did you do before that?

14              ANSWER:  I was a programmer for Goodyear Tire and

15    Rubber Company in Lincoln, Nebraska.

16              QUESTION:  And how long did you have that job for?

17              ANSWER:  A little over three years.

18              QUESTION:  And you can kind of see where this is

19    going.

20              What did you do before that?

21              ANSWER:  I was in the -- I was in the U.S. Army.

22              QUESTION:  How long were you in the Army for?

23              ANSWER:  Three years.

24              QUESTION:  What type of stuff did you do in the

25    Army?
```

1          ANSWER:  I was a data communications specialist.

2          QUESTION:  Where were you stationed?

3          ANSWER:  Fairbanks, Alaska, and Fort Meade,

4    Maryland.

5          QUESTION:  And prior to -- to the Army, what --

6    what did you -- what were your -- what jobs did you have?

7          ANSWER:  I went into the Army right after

8    I graduated from a community college.

9          QUESTION:  Okay.  Where did you go to school?

10         ANSWER:  I went to Central Nebraska Community

11   College in Hastings, Nebraska.

12         QUESTION:  And do you have any -- any other

13   education besides that -- besides at Central Nebraska

14   Community College?

15         ANSWER:  I have a Bachelor's of Business

16   Administration from Sioux Falls College in -- excuse me --

17   Augustana College in Sioux Falls, South Dakota.

18         QUESTION:  And when did you get that BBA degree?

19         ANSWER:  1988.

20         QUESTION:  So you were -- it looks like you were

21   working during that time?

22         ANSWER:  I was.

23         QUESTION:  What position were you in?

24         ANSWER:  I was in -- at -- excuse me -- at American

25   Freight Systems in Sioux Falls.

1        QUESTION:  Have you ever been deposed before?

2        ANSWER:  No.

3        QUESTION:  What are your -- what are some of

4   your -- well, let me just ask it this way.  You said you

5   were the executive vice president of information technology

6   at -- at Great West, and you've held that for about nine

7   years; is that right?

8        ANSWER:  Yes.

9        QUESTION:  What are your current job duties?

10        ANSWER:  I have overall responsibility for all the

11   computer-related services at Great West Casualty.  I also

12   provide services through my unit -- provide services to some

13   of the other Old Republic subsidiaries, and I'm on the

14   management committee.

15        QUESTION:  How long have -- has -- have those

16   three things been your job duties for?

17        ANSWER:  Since I've held the title of EVP of IT.

18        QUESTION:  So for -- like that whole nine-year

19   period we're talking about?

20        ANSWER:  Yes.

21        QUESTION:  Okay.  What -- you said application

22   development.

23        What -- what is application development?

24        ANSWER:  We write a lot of -- of the systems that

25   are used at Great West Casualty rather than buy them.

1          QUESTION:  When you say write, you mean actually

2    program the code?

3          ANSWER:  Yes.

4          QUESTION:  You said that Great West writes a lot of

5    the systems that they use -- that the company uses.

6          Why does Great West write a lot of the code for the

7    systems that they use?

8          ANSWER:  Great West is a niche insurance company.

9    We only insure trucks.  A lot of the commercial software

10   that's available for insurance companies isn't really

11   appropriate for -- or doesn't -- doesn't service our needs

12   in the special market.

13         QUESTION:  You said that Great West is a niche

14   company that insures trucks?

15         ANSWER:  Yes.

16         QUESTION:  Can you elaborate on that a little bit?

17         ANSWER:  Our customers are over-the-road trucking

18   companies.

19         QUESTION:  So this will be the companies that --

20   that -- well, what are some examples of some of these

21   companies?

22         ANSWER:  We have -- we have customers that may only

23   have one tractor and trailer, and we may have companies that

24   have a hundred or more tractors and trailers.

25         QUESTION:  So you're talking about companies

1    that -- that are actually the trucking companies themselves

2    and not a company that would provide freight to those

3    trucking companies?

4         ANSWER:  Correct.

5         QUESTION:  Okay.  So it would be something like --

6    a company like a -- you know, a moving company?

7         What are some of the examples of those trucking

8    companies?

9         ANSWER:  We wouldn't insure moving companies.

10   Typically, our -- most of the companies that we insure haul

11   freight of some kind for hire.  They might be hauling

12   cattle.  They might be hauling grain.  They might be hauling

13   general commodities.

14        QUESTION:  So something like J.B. Hunt or one of

15   those companies?

16        ANSWER:  Companies like that.

17        QUESTION:  Okay.  And what's the reason that the

18   commercial software that's for insurance companies doesn't

19   fit that niche line of business?

20        ANSWER:  We find that most of the insurance

21   software is geared towards personalized smaller companies,

22   and they don't fit the needs of insureds who have big trucks

23   and -- with a lot of weight.

24        QUESTION:  And what is special about big trucks

25   with a lot of weight that that software doesn't exactly

1  match?

2          ANSWER:  We capture information that you typically

3  wouldn't find in your personal lines.  We need to know

4  information about where they -- where they haul freight to,

5  what kinds of freight they haul, what kind of safety

6  programs they might have.

7          QUESTION:  What about information about actual

8  drivers of the trucks?

9          ANSWER:  We do get information about the drivers.

10          QUESTION:  Is that one of the reasons that most

11  commercial software doesn't work?

12          ANSWER:  No.  A lot of commercial software would

13  also get driver information.  It's just that the size of the

14  equipment that we haul, the kinds of commodities that they

15  haul is more special.

16          QUESTION:  And why is that?

17          ANSWER:  Again, there are -- because there aren't a

18  lot of companies in the business that we are relative to the

19  number of insurance companies that are available, most of

20  the software is aimed at the biggest part of the market,

21  which is smaller commercial lines and personal lines.

22          QUESTION:  Are there other portals besides the

23  agent portal?

24          ANSWER:  We only have one portal, but different

25  people can access it.

1    QUESTION:  Okay.  So have you heard of something

2    called the insured's portal?

3    ANSWER:  Yes.

4    QUESTION:  And what is the insured's portal?

5    ANSWER:  It's the same portal as the agent portal.

6    QUESTION:  So we have agents, Great West employees,

7    and then insureds; is that correct?

8    ANSWER:  Yes.

9    QUESTION:  Is there any information in the -- the

10   portal has about the particular agent?

11   ANSWER:  No.

12   QUESTION:  So what is the log-in that an agent uses

13   to get into the portal?

14   ANSWER:  We assign them a user ID and password.

15   QUESTION:  And is that user name and password used

16   in any other way in the portal?

17   ANSWER:  No.

18   QUESTION:  So after they sign on, it's the agency

19   number that's used to gather information?

20   ANSWER:  Yes.

21   QUESTION:  I've logged into the portal.  I want to

22   see some claims information about my customers that I've

23   signed up for Great West.

24   Walk me through the process from when I click on

25   something that would display that claims information, like

1  one of the tabs, and how that information -- that shows up

2  to me on the portal.

3        ANSWER:  Once you sign on, you're going to be taken

4  to the landing page, homepage.  And the various tabs then

5  describe what kind of information, whether it's policy,

6  claims.

7        And if they clicked on the claims tab, then our

8  program knows which agency they're signed in as, and we

9  would retrieve the data, returning only the information

10 that's related to that agency.

11       QUESTION:  So when I log on to the system and

12 I click on the claims tab to view claims for my people who

13 I've signed up for Great West, how does the DB2 system or

14 the VSAM system know to provide me the right information?

15 Is it because it has my user ID?

16       What -- what's the process there?

17       ANSWER:  There has to be a program that actually

18 retrieves the data and is part of the logic of that program,

19 it's determined, retrieve records that meet this criteria.

20 In that case, the right being the agency's number.

21       QUESTION:  So this list of search results, how

22 would the portal generate such a list as the one we're

23 looking at on Page 9 of Exhibit 2?

24       ANSWER:  It would depend on -- excuse me -- it

25 would depend on who's actually done the access.

```
 1            QUESTION:  Okay.  How -- how does that matter?

 2            ANSWER:  If it's an employee, they have access to

 3   all of our agents.  If it's an agent, they only have access

 4   to their information.

 5            QUESTION:  So if it's an -- so of those two --

 6   well, let me ask this:  What about insureds?

 7            ANSWER:  If an insured signed into the portal, they

 8   would only see information related to their account.

 9            QUESTION:  What do you need to be able to access

10   the portal as a Great West employee?

11            ANSWER:  A user ID and a password.

12            QUESTION:  And how do you get that?

13            ANSWER:  It's assigned to you by the security

14   department.

15            QUESTION:  And when -- how is that assigned?

16            ANSWER:  When they become an employee of the

17   company.

18            QUESTION:  Are there any employees that would not

19   have a user ID and a password assigned to them?

20            ANSWER:  No.

21            (Videoclip ends.)

22            THE COURT:  Does that complete this witness by

23   deposition?

24            MR. GILLILAND:  It does, Your Honor.

25            THE COURT:  All right.  Approach the bench,
```

 1 | counsel.
 2 | (Bench conference.)
 3 | THE COURT:  Is there anyone else?
 4 | MR. GILLILAND:  Yes, Your Honor.
 5 | THE COURT:  How long do you expect it to be?
 6 | MR. GILLILAND:  About 30 minutes.
 7 | THE COURT:  Do you have any idea about the cross?
 8 | MR. GILLAM:  I didn't hear what you said.
 9 | MR. GILLILAND:  About 30 minutes.
10 | MR. GILLAM:  Probably 15 or 20 minutes or so.
11 | THE COURT:  We're going to take a short recess, and
12 | then we'll come back, and we'll put her on and see if she
13 | finishes for the day.
14 | MR. BETTINGER:  Okay.  Thank you, Your Honor.
15 | MR. GILLAM:  Thank you, Your Honor.
16 | MR. GILLILAND:  Thank you, Your Honor.
17 | (Bench conference concluded.)
18 | THE COURT:  Ladies and gentlemen of the jury,
19 | we're going to take a short recess before we hear from
20 | the next witness.  If you will simply close your
21 | notebooks and leave them in your chairs, that will be
22 | perfectly fine.
23 | Don't discuss anything about the case.  Follow all
24 | my other instructions, and we'll have you back in here
25 | shortly to continue with one more witness today.  The jury

1    is excused for recess.

2            COURT SECURITY OFFICER:  All rise for the jury.

3            (Jury out.)

4            THE COURT:  The Court stands in recess.

5            COURT SECURITY OFFICER:  All rise.

6            (Recess.)

7            COURT SECURITY OFFICER:  All rise.

8            THE COURT:   Be seated, please.

9            Let's bring in the jury, please.

10           COURT SECURITY OFFICER:  All rise for the jury.

11           (Jury in.)

12           THE COURT:  Please be seated.

13           Plaintiff, call your next witness.

14           MR. GILLILAND:  Your Honor, we call Ms. Mary

15   O'Neil.

16           THE COURT:  All right.  Ms. O'Neil, if you'll come

17   forward and be sworn, please.

18           (Witness sworn.)

19           THE COURT:  Please have a seat on the witness

20   stand.

21           Mr. Gilliland, do you have binders to pass out?

22           MR. GILLILAND:  I do, Your Honor.

23           Would now be the appropriate time?

24           THE COURT:  Let's get it done, yes.

25           MR. GILLILAND:  May we approach, Your Honor?

1      THE COURT:  You may.

2      All right, Mr. Gilliland.  You may proceed with

3  direct examination of the witness.

4            MARY O'NEIL, PLAINTIFF'S WITNESS, SWORN

5                    DIRECT EXAMINATION

6  BY GILLILAND:

7  Q.  Would you please give us your full name?

8  A.  Mary O'Neil.

9  Q.  And where do you live, Ms. O'Neil?

10  A.  2430 Parkside Lane, Pittsburgh, Pennsylvania.

11  Q.  And have you helped create some slides to assist the

12  jury in understanding your testimony today?

13  A.  I have.

14      MR. GILLILAND:  If we can go to the second slide.

15  Q.  (By Mr. Gilliland)  And will you please tell us about

16  your educational background.

17  A.  Yes.  I have a bachelor's degree in mathematics from the

18  Pennsylvania State University, and a master's degree in

19  statistics from the Pennsylvania State University.

20  Q.  And in addition to your formal education, do you hold

21  any professional designations?

22  A.  Yes.  I'm a fellow of the Casualty Actuarial Society.

23  I'm a member of the American Academy of Actuaries, a

24  chartered life underwriter and a chartered financial

25  consultant.

1  Q.  And what does it mean to be a fellow of the Casualty

2  Actuarial Society?

3  A.  There are a series of 10 examinations required to become

4  a fellow of the Casualty Actuarial Society.  These

5  examinations deal with topics in insurance, mathematics,

6  statistics.  They primarily have to do with finance and

7  insurance.

8  Q.  And how about -- what does it mean to be a member of the

9  American Academy of Actuaries?

10  A.  In order to become a member of the American Academy of

11  Actuaries, which is the umbrella organization for all

12  actuaries, is the requirement to be a member of a -- a

13  fellow of the Casualty Actuarial Society.

14          There are -- under the umbrella of the American

15  Academy of Actuaries, there are life actuaries, pension

16  actuaries, and property casualty actuaries, which the

17  Casualty Actuarial Society.

18  Q.  And then what does it mean to be a chartered life

19  underwriter?

20  A.  Again, there are a series of examinations to become a

21  chartered life underwriter.  These examinations deal more

22  with life insurance, and that's all I can say about that

23  one.

24  Q.  How about a chartered financial consultant?

25          What does that mean?

1   A.  Again, there are a series of examinations to be

2   completed for that designation.  Most of those deal with,

3   say, finance, not really insurance, investments, pensions,

4   retirement plans, that sort of thing.

5          MR. GILLILAND:  And can we have the next slide,

6   please?

7   Q.  (By Mr. Gilliland)  Can you give us a general overview

8   of your professional experience, your work experience?

9   A.  Well, I've basically had four major compartments, as you

10  can see here from the slide.  The first one is the General

11  Reinsurance Corporation.  I can get into more detail, but

12  I'll just start with the names.

13         The second one is the Prudential Property &

14  Casualty Insurance Company.

15         The third is the New Jersey Department of

16  Insurance.

17         And, currently, since that time, I've been a

18  consultant with my own consulting firm, O'Neil Consulting

19  Services.

20  Q.  And when did you begin working with General Reinsurance

21  Corporation?

22  A.  I started with General Reinsurance Corporation just

23  after I graduated from college with my master's in

24  statistics.  That would have been 1971.

25  Q.  And what sort of work did you do at General Reinsurance?

A.  At General Reinsurance, I coordinated the placement of

facultative reinsurance policies among the company's various

office.

Q.  Can you tell us what a facultative placement policy is?

A.  A Reinsurance company, quickly, is insurance for

insurance companies.  So although most consumers aren't

aware of it, insurance companies might sell you a policy,

but they don't assume all of the risks for themselves

necessarily.  It might be too much of a burden.

        So they will go to another company called a

reinsurance company and get insurance that would take part

of the losses that insured might occur -- incur.

        So in this case, General Reinsurance Corporation,

they have policies for facultative reinsurance for -- for

particular risks.  They are large risks like insuring

construction of a building or something very large.

        And so the company in this case with multiple

offices was concerned that a broker or an agent might come

to more than one office and get coverage for the same risk,

in which case the company would be exposed for more losses

than they could afford.  So they coordinated the placement

with the main office in New York City where I worked, and

I made sure that that didn't happen.

Q.  And, approximately, how long did you work for General

Reinsurance Corporation?

1    A.   Just close to two years.

2    Q.   And then did you go to Prudential Property & Casualty

3    Insurance Company?

4    A.   I did.

5    Q.   And what -- can you give us just a brief overview of

6    what kind of work you did for Prudential Property and

7    Casualty?

8    A.   Prudential Property and Casualty was a wholly owned

9    subsidiary of Prudential Life Insurance Company.  Prudential

10   Life Insurance Company started up Prudential Property and

11   Casualty Insurance Company because its life insurance agents

12   were in need of additional compensation.

13        Its life company was having trouble with agent

14   retention, and they felt that one of the reasons was

15   compensation.

16        So in order to get compensation for the agent

17   increased, they decided to sell more products.  And so the

18   products now would be in addition to the life insurance

19   product, it would be property and casualty insurance, so the

20   agent could now sell automobile insurance and homeowner

21   insurance and motorcycles and some other smaller things.

22        And being a start-up operation, which is basically

23   they decided not to buy a company, they decided to start

24   their own company from scratch.  And it was brought up here

25   earlier that insurance -- insurance companies are regulated.

1          They're regulated separately by each individual

2     state.   There are separate rules and regulations requiring

3     different things to start up a company and to operate a

4     company.

5          So in order to get this company running, all of

6     that had to be accomplished for every individual state.   The

7     company had to design a rating plan.   They had to get

8     materials together.   They had to train agents in these

9     products and get these agents licensed.   The company itself

10    had to be licensed.   A claim operation had to be

11    established.   Marketing had to be established.   Systems had

12    to be set up to record the policies, and so on.   So it was a

13    very complex project, and the company wanted it done in a

14    two or three-year period.

15         And sometimes state regulators take a fair amount

16    of time even getting back to the company on whether or not

17    they're licensed.   So it was a time of, I guess, blurred

18    lines between departments and between activities.

19         Everybody was working very hard in getting this --

20    this task accomplished, starting up the company.

21    Q.   And let me, if -- interrupt you real quick.

22         Can you give us briefly a description of the

23    different positions and jobs you had while you worked for

24    Prudential Property and Casualty Company -- Insurance

25    Company?

1  A.  Right.  Once the company was established, all the

2  start-up activity was completed, I worked in a number of

3  different departments.  That would be, say actuarial,

4  marketing, financial planning, and administration.

5  Q.  And how long were you with Prudential Property and

6  Casualty?

7  A.  I was at the company for about 11 years.

8  Q.  And then did you go to the New Jersey Department of

9  Insurance?

10  A.  Yes.  I became there the chief actuary there at the

11  New Jersey Department of Insurance.

12  Q.  And can you give us just a -- a brief overview of what

13  kind of work you did for the New Jersey Department of

14  Insurance?

15  A.  Well, as the chief actuary, I was in charge of the

16  property and casualty division, as well as the licensor

17  division in the regulation of insurance companies licensed

18  to practice in New Jersey -- or to sell insurance in

19  New Jersey, I guess would be more appropriate.

20          I also consulted with the commissioner on all

21  issues that came before the department.  There were a lot of

22  special things that would arise regarding new legislation,

23  implementation of legislation, what should be done with a

24  company that might be teetering on solvency.

25          The primary goal at the insurance department is to

174

1    protect the consumer.  And so during -- you have to make

2    sure the companies remain in business, that they are

3    solvent.  You also have to have to make sure that the rates

4    are complying with the statutory standards.

5          So the companies aren't charging excessive rates,

6    nor are they inadequate or they would become insolvent.

7          So in that case, it's -- it's -- the day-to-day

8    operations, I would be supervising a staff, which might look

9    at petitions by individual insurance companies to change

10   their rates, or I might be assisting other staff in

11   examinations of a company to make sure they are liable.

12         There are financial exams done on companies every

13   three years or so, and there are a lot of companies for

14   which that activity has to take place.

15   Q.  And then from -- excuse me.

16         How long were you with the New Jersey Department of

17   Insurance?

18   A.  That was about two years, as well.

19   Q.  And at that time did you open O'Neil Consulting

20   Services?

21   A.  Yes, following my time at the insurance department, I

22   started O'Neil Consulting Services.

23   Q.  And, approximately, what year would that have been?

24   A.  That was in 1986.

25   Q.  And do you still operate O'Neil Consulting Services

1   today?

2   A.   I do.

3   Q.   And what sort of consulting services do you provide

4   through O'Neil Consulting Services?

5   A.   I have had a number of clients.  Many of them are

6   regulators but not all.

7          I have helped many of these companies, or

8   regulators I should say would be appropriate, to evaluate

9   whether insurance company that comes in and makes a petition

10  for rates, are those rates appropriate according to the

11  statutory standards in that state.

12         I've also helped regulators with financial

13  examinations.

14         I've also done odd assignments as a consultant

15  in -- for example, I've helped calculate pricing for mines,

16  which is rather esoteric.  I've also worked on patent cases,

17  not just this one.  And let's see...

18  Q.   Let me ask you this.  Is this the first lawsuit that

19  you've provided consulting services for?

20  A.   No.

21  Q.   And have you ever had any of your opinions excluded by

22  any court?

23  A.   No.

24         MR. GILLILAND:  Your Honor, we would tender

25  Ms. O'Neil as an expert in the valuation of cost and

1    benefits in the insurance industry.

2          THE COURT:  Is there objection?

3          MR. GILLAM:  No objection, Your Honor.

4          THE COURT:  Then without objection, the Court will

5    recognize the witness as an expert in those designated

6    fields.

7          Let's proceed.

8    Q.  (By Mr. Gilliland)  Ms. O'Neil, what were you asked to

9    do in this case?

10   A.  I was asked to opine on the cost per-user contact, which

11   was developed by Mr. Lasinski, another expert in this case.

12         MR. GILLILAND:  And if we could have the next

13   slide, please?

14   Q.  (By Mr. Gilliland)  Can you walk us through the task you

15   performed to carry out that request?

16   A.  Yes.  I reviewed the '177 patent.  I had miscellaneous

17   and various discussions with Mr. Lasinski, as he proceeded

18   in evolving his expert.  I reviewed the expert report which

19   he prepared.  I reviewed some industry materials.

20   Q.  And when you reviewed the '177 patent, does it

21   specifically address insurance?

22   A.  No, it does not.

23   Q.  How about portals?  Does it specifically address

24   portals?

25   A.  No, it does not.

1   Q.  Do you believe the '177 patent has applicability to the

2   insurance industry, even though it does not address

3   insurance or portals?

4   A.  My -- my understanding of the patent was that it was

5   broad enough to apply to any industry.

6   Q.  And after reviewing the materials, did you reach some

7   opinions in this case?

8   A.  I did.

9        MR. GILLILAND:  And if we could have the next

10  slide.

11  Q.  (By Mr. Gilliland)  What, in general, is this slide

12  showing us?

13  A.  This slide is based on Figure 8 from Mr. Lasinski's

14  report.  It's a summary of the different indicated values

15  which Mr. Lasinski calculated for the cost per-user contact.

16  We haven't defined that yet.  And what we mean by users in

17  this case are portal users.

18       And the idea here is that if someone uses the

19  portal, that means that they are not contacting the company

20  to have a question answered.  And, normally, they would have

21  that question answered by, say, a phone call, maybe mail,

22  maybe email, maybe a fax.

23       So if they can get their question answered, either

24  an agent, an insured, or we'll just stick with agents and

25  insureds -- if they can get that question through the web

1  portal, the company has avoided answering the question

2  internally by a telephone call.  That person didn't call an

3  underwriter or a claims person within the company.  That

4  person in the company then didn't spend the time answering

5  that question because the person went to the portal and

6  answered it for themselves.

7        So what we're trying to calculate here is how much

8  time is saved by having a person go to the portal instead

9  of, you know, making a call.  Even it could be a contact

10  center if it weren't the company itself, as a comparison.

11        So anyway, we're looking at that, and we're looking

12  at five indicators here -- there.  They're numbered 1

13  through 5.

14  Q.  Let me --

15  A.  Sorry.

16  Q.  Let me just interject real quick.

17        Can you tell me what Indicator No. 1 represents?

18  A.  Okay.  I was -- I was getting to that.  There were five

19  indicators.  And the first one is labeled:  Determined cost

20  savings.  And what this one -- how this was calculated was

21  there were -- I guess there were depositions.  I'm not sure

22  exactly, or discovery, wherein the -- one of the witnesses

23  or someone on staff at BITCO, the sister company of

24  Great West, noted that due to the introduction of the

25  portal, there was a savings of some individuals, employees,

1  that they were no longer needed.  So three employees in

2  particular were able to be eliminated.

3      The salaries of these employees range from 60,000

4  per year to 65,000 per year.  So these salaries were

5  averaged and utilized to come up with cost per minute.  And

6  a cost per minute would be derived by taking that salary,

7  say $60,000.00, assuming that the person worked 2,000 hours

8  in the year and that there's 60 minutes in an hour, and you

9  come up with the cost per minute to pay that person their

10 salary.

11     And then you apply to that how long would it take

12 on the telephone to answer their call?  And the call length

13 was discovered to be about 5 minutes and 17 seconds on

14 average.  So that's the call length that was used from those

15 calls.

16     So multiplying those values together, and we come

17 up with these numbers in Line 1, where the lowest value is

18 $2.64 that the company would save, or -- or $2.86 is the

19 higher end of that range, and the average is $2.75.

20 Q.  And then what are you showing on us on Line 2?

21 A.  Line 2, the calculation on this is very similar, except

22 that they were derived from a different starting point.

23     In this case, the starting point is an attempt to

24 look at salaries and more broad basis to get some

25 information from another source.

1          So here, the salaries were taken from the Bureau of

2    Labor Statistics, which puts out insurance company salaries

3    for different positions within an insurance company.

4          So Mr. Lasinski created a table that showed the

5    salaries from the Bureau of Labor Statistics for --

6    I believe it was clerk -- I can look it up if I wanted to be

7    more precise -- underwriters -- let's see, I should look at

8    it -- claims personnel, safety personnel, and perhaps

9    something else, but it was a range of the possible types of

10   individuals which someone might contact within the company

11   to answer a question.

12         And from that, he was able to derive, again, a cost

13   per minute for that person's salary and compensation and

14   then apply the average number of minutes per call to get

15   these values in this range.

16         And the lowest would be clerks at $2.04 per minute,

17   and the highest, I believe, was safety personnel, but

18   I'm not sure about that unless I look, at $4.13 per minute.

19   And then the average of these is $3.09 using that

20   methodology.  It's basically the same methodology as No. 1,

21   but the source of the salary information is different.

22   Q.  And then what about for Line 3?

23         What is that showing us?

24   A.  On Line 3, there's a study by an organization called

25   Strategic Contact.  These are -- this is an organization

1   that specializes in data related to call centers and how

2   much calls might cost.

3          And they produce the value -- well, actually, they

4   produce values for small, medium, and large call centers and

5   also for servicing more complex calls.  And insurance is a

6   more complex product, and you would think that it actually

7   has more complex calls on average.

8          Nonetheless, it does produce these values of --

9   $2.23 is the low value, and it relates to the small call

10  center, the non-complex calls, and then the 50 dollar --

11  $5.59 relates to the more complex calls.  And I just took an

12  average there to show that it's $3.91 based on that study.

13  Q.  And then the fourth line item has another study.

14         What are you showing us on that line item?

15  A.  Right.  ContactBabel is a similar entity where they are

16  specialists in call centers and call center costs, and they

17  provide only one value for the call -- cost at $4.50.  So

18  that's shown there on all three spots.

19  Q.  And that's why both columns have $4.50.  They just

20  provided the one number as opposed to a range?

21  A.  That's correct.

22  Q.  And then for the last line item, it says:  Applied

23  Systems portal [sic].

24         What is that one showing?

25  A.  Proposal.

1   Q.   I'm sorry.  Proposal.

2   A.   Yes.  Applied Systems is a software company that made a

3   proposal to a sister company, Great West, to actually

4   provide a web portal and a call center that would handle all

5   of the questions that might arise from insureds or agents.

6           So looking in that proposal, they actually

7   identified how much it would cost to service a call for each

8   minute.  Their value was $1.00 per minute.  So that being

9   the case, applying the duration of the call to that value of

10  $1.00 per minute allows us to have this range of $5.48,

11  which, again, it's a static number across here.  It's not

12  really a range.

13  Q.   And when you applied all of these -- or put all of these

14  numbers together, you've got a column titled Average.

15          What was the purpose of that Average column?

16  A.   Basically, they had fewer numbers because you want to

17  combine -- you know, I also have a line item as well.  The

18  average on the right is the average for each indicator, so

19  there are five line items with an average.  Then the average

20  at the bottom is the average of each column.

21          So we see what all these things -- if they were

22  considered equally, what it would be, like the low would be

23  $2.98, the high, $4.47.  The overall average for all these

24  indications is $3.91.  But all of these things, all these

25  indicators are not really created equal, even though they're

1   all listed here, and that $3.91 does assume that they are.

2   Q.  And what is -- what did you understand Mr. Lasinski to

3   have picked as his cost-per-call number?

4   A.  Mr. Lasinski chose Line 1, the $2.75 value for the cost

5   per call.

6   Q.  And do you have an opinion as to whether or not that's a

7   conservative or an aggressive number for the cost-per-call?

8   A.  That's -- that's quite conservative in that it's low.

9   Q.  And why do you say that's low?

10  A.  Well, there are a number of reasons.  One is that --

11  well, first of all, the reason for selecting that above the

12  others is because, when one looks at a body of data or

13  indications, we have five indications here, how do we look

14  at that?  We look at that as what's most reflective of what

15  we're trying to measure.  And we're trying to measure the

16  cost-per-call for a particular entity.

17          So in this case, being a sister company, that

18  Line 1 is the most closely related of all these items here.

19  Lines 3 and 4 are not really as closely related.  They're

20  not insurance related, and they're from a study.

21          Line 2 is pretty well related because it has

22  Bureau of Labor Statistics for the insurance agency, and

23  Line 5 is also for a sister company.  So if we wanted to

24  look through this table, we would highlight Lines 5, 2, and

25  1 to make our selection.

1          So, now, we pick Line 1.  Now, the question is, why

2    is Line 1 conservative?  One reason would be because the

3    salaries that we were given -- or Mr. Lasinski was given was

4    $60,000, but he did not gross that up to include other

5    overhead costs.  So that's not part of this.  The other --

6    so that's one reason it's conservative.

7          Another reason it's conservative is because we

8    assume that that employee worked a full 2,000 hours.  In

9    fact, most people, when they go to work, don't work exactly

10   the full 8 hours should we say.  They may go to the

11   bathroom.  They may take a break.

12          So we didn't consider any of that.  We just said

13   there was an employee for 100 percent of the time would be

14   working.  And so that's another reason that the value is

15   conservative or, you know, low.

16   Q.  And can you tell us whether or not -- excuse me --

17   whether or not it is your opinion that one of the benefits

18   of the web portal is cost -- calls avoided?

19   A.  Yes.  You're avoiding -- you're avoiding these calls

20   that, you know, for an underwriter or a claims personnel

21   would actually be interruptive to the workflow.

22   Q.  And are there other benefits of web portals that you're

23   aware of?

24   A.  Well, yes.  There's the 24 -- I think it's on the next

25   slide, 24/7 access, electronic availability of information,

1    the fact that the person can just go -- you know, the user

2    can go into the portal and pick up what they want whenever

3    they want to, and the cost efficiencies.

4            So, I mean, if one wanted to, they could take the

5    values of cost savings, and this could be translated to

6    greater profits to insurance companies.  It can be

7    translated from there to even possible lower rates for the

8    insured.

9            So there are -- there are -- these cost

10   efficiencies are quite significant.

11   Q.  And can you tell us whether or not the $2.75 per

12   contact, does it account or include a value for any of these

13   additional benefits?

14   A.  No, they're not part of the cost.  These are the things

15   that are derived from it.

16   Q.  And so that's nothing that's included in the $2.75

17   number that Dr. Lasinski came up with?

18   A.  No.

19   Q.  Mr. Lasinski.  Excuse me.

20   A.  No.

21   Q.  Excuse me.  And in your opinion, would you need to

22   adjust that $2.75 number based on geographic location of the

23   call center?

24   A.  Actually, no, I wouldn't.  If we go back to the next --

25   prior slide, I can explain that.

186

1           I believe one of the rebuttal witnesses suggested

2    that because Line 2 was based on country-wide Bureau of

3    Labor Statistics data, that it was overstated.

4           Well, let's just look at Line 2 and see what we can

5    do about that.  The range that that rebuttal witness gave

6    was that, oh, if we were to look at the Bureau of Labor

7    Statistics data for different regions of the country, say

8    Midwest, West, and so on, that where this company operates,

9    Great West, is more Midwest and that you have a lower

10   starting value.

11          And the range that they came up with was that the

12   low salaries were 50 percent lower than the high salaries.

13   So let's say we're not going to take the lowest, we're going

14   to go to the middle.  So let's take 25 percent off of Line

15   2.  What will we get there for $3.09 would come out to be

16   $2.32.

17          All right.  So that's slightly lower than the 2.75.

18   But let's take that down into the average of all five

19   methods now, and the $3.91 becomes $3.75.  So we're still a

20   dollar under the average of all our methods, even if we

21   lowered that to $2.32.

22          Now, one could say, should we pick $2.32 because

23   it's lower than $2.75?  And the answer is no, because

24   Line 2, let's remember, is insurance industry cost from the

25   Bureau of Labor Statistics.  We have two other estimates

1  here that are more closely related to the situation at hand.

2       Line 1 relates to a sister company, and Line 5

3  relates to a sister company.  So, actually, Line 2 is the

4  third closest value that we should look at when -- when

5  making our evaluation here.

6       With that amended amendment on the $2.32, $2.35,

7  and $5.28, so when I select $2.75, which I believe is low,

8  that's still a very appropriate answer to select.

9  Q.  Thank you, Ms. O'Neil.

10       MR. GILLILAND:  We'll pass the witness, Your Honor.

11       THE COURT:  Cross-examination?

12       Proceed when you're ready, Mr. Gillam.

13                        CROSS-EXAMINATION

14  BY MR. GILLAM:

15  Q.  Good afternoon, Ms. O'Neil.

16  A.  Good afternoon.

17  Q.  You told us a few moments ago that there are rules and

18  regulations, a lot of them in the insurance industry; is

19  that correct?

20  A.  That's correct.

21  Q.  And would you agree with me that Great West must follow

22  certain rules and regulations which govern its portals and

23  its websites, or have you looked at that?

24  A.  To the extent there are such rules and regulations, of

25  course they must follow them.

1  Q.  Have you taken the time to look at that, to see whether

2  or not Great West has rules and regulations which govern its

3  websites and its portals?

4  A.  I have not looked at that.

5  Q.  But you would assume that if there are rules and

6  regulations, that they would be required to follow those

7  rules and regulations?

8  A.  Absolutely.

9       MR. GILLAM:  Could you pull up her slides, please?

10  And go to Slide No. 4, please, the slide deck that you just

11  had there.

12  Q.  (By Mr. Gillam)  As I understand it, you told us that

13  you read the '177 patent, correct?

14  A.  That's correct.

15  Q.  You're not offering any opinion to this jury, are you,

16  on infringement in this case?

17  A.  No, I'm not.

18  Q.  You're not telling this jury that Great West infringed

19  the '177 patent?

20  A.  No, that's -- that's an underlying assumption if -- if

21  you're going to evaluate costs.

22  Q.  You're not offering any opinion to this jury on the

23  validity of the '177 patent, are you?

24  A.  No, I'm not.

25  Q.  Now, you understand that the Plaintiff in this lawsuit

```
 1   is Intellectual Ventures, correct?
 2   A.  That's correct.
 3   Q.  You've got on your slide here that you had discussions
 4   with expert, Mr. Lasinski?
 5   A.  Correct.
 6   Q.  You reviewed his expert report?
 7   A.  Correct.
 8   Q.  You reviewed industry materials?
 9   A.  Correct.
10   Q.  But Intellectual Ventures is the actual Plaintiff in
11   this case, correct?
12   A.  That's correct.
13   Q.  Intellectual Ventures is the company that's asking this
14   jury to award them $20 million in this lawsuit?
15   A.  That's right.
16   Q.  How many times have you spoken with Intellectual
17   Ventures?
18   A.  None.
19   Q.  And all the work that you did in this case, did you ever
20   consult with anybody with Intellectual Ventures?
21   A.  No.
22   Q.  And so your assignment in this case, as I understand it,
23   was to try to confirm the cost per-user content -- excuse
24   me; is that correct?
25   A.  That's correct.
```

1    Q.  And you're not offering any opinion today with respect

2    to the incremental value of Claim 14 to the Great West

3    portal, are you?

4    A.  No.

5    Q.  In fact, the jury has not heard from Mr. Lasinski yet,

6    right?

7    A.  That's correct.

8    Q.  Mr. Lasinski is actually the economic expert that

9    Intellectual Ventures hired to do all these calculations

10   that lead up to this $20 million that they're asking for,

11   correct?

12   A.  That's my understanding.

13   Q.  You didn't perform any economic analysis to arrive at

14   any number like that?

15   A.  No, I did not.

16   Q.  Now, the jury heard from Dr. Smith earlier today who

17   testified with respect to -- he was Great -- he was

18   Intellectual Ventures's infringement expert in this case.

19            Do you remember him?

20   A.  I did see -- listen to his testimony.

21   Q.  Before your testimony today or before hearing his

22   testimony, did you ever talk to Dr. Smith about this case?

23   A.  I just met Dr. Smith, I think, yesterday.

24   Q.  Before you ever met Dr. Smith yesterday, did you ever

25   talk to him about this case?

1  A.  No.

2  Q.  In fact, isn't it true that you've had no discussion

3  with anyone about the accused features and the capabilities

4  of the accused portal?

5  A.  That was rather broad.  You included the capabilities.

6  I'm not sure if that's -- I'm not sure about that.

7  Q.  Have you had any discussions with anyone concerning the

8  accused features of the accused portal?

9  A.  Well, I believe Mr. Lasinski was looking at some of the

10  features of the portals, as well, and so that would have

11  been part of our discussions at times perhaps.

12  Q.  You didn't do any network yourself?

13  A.  No.

14  Q.  But you understand that Mr. Lasinski relied on

15  Dr. Smith?

16  A.  That's correct.  He states that in his report.

17  Q.  As part of your analysis, Ms. O'Neil, in this case, you

18  assumed that the scope of infringement was the entire

19  portal, correct?

20  A.  Whatever Mr. Lasinski assumed on that point is what

21  I assume, so that's correct.

22  Q.  So if Mr. Lasinski says it relates to the entire portal,

23  you agree with him?

24  A.  I have no opinion on that.  I am evaluating what

25  Mr. Lasinski put forth.  And he relied on Dr. Smith, and I'm

1    relying on that same information.

2    Q.  I'm sorry, you say you didn't have any opinion?

3    A.  I didn't make a separate opinion on that point.

4    Q.  Okay.  So you have no separate opinion as to the scope

5    of the infringement, other than what Mr. Lasinski says who

6    relies on what Dr. Smith says?

7    A.  Correct.

8    Q.  And if they say -- or if Mr. Lasinski has the opinion

9    that the entire portal violates the patent, regardless of

10   whether the user can manage the content or not, then you go

11   with that opinion?

12   A.  Again, I wasn't asked to make that -- an opinion on that

13   point, so, yes.

14          MR. GILLAM:  Could you go to the next slide,

15   please, Slide No. -- excuse me, Slide No. 5?

16   Q.  (By Mr. Gillam)  Now, did you actually create this table

17   yourself, or was this part of Mr. Lasinski's report?

18   A.  This table is derived from Mr. Lasinski's report.

19   I created this particular version of it.  It's very similar

20   to his Figure 8 as is shown in the footnote there by the

21   source, but I added a few things to his Figure 8.

22   Q.  Let's talk about No. 1, the one that's highlighted.  It

23   says:  Determined cost savings.

24          You see that one?  It says $2.75?

25   A.  Yes.

1    Q.  And that is actually the number that Mr. Lasinski goes

2    with and that you agree with him on as far as the cost per

3    view, correct?

4    A.  Correct.

5    Q.  Now, this particular lawsuit is about the Great West

6    portal, is it not?

7    A.  Yes, it is.

8    Q.  It's not about some portal of some other insurance

9    company, is it?

10   A.  That's right.

11   Q.  Look at Footnote 1, if you would, please.

12         You see that?

13   A.  Yes.

14   Q.  For the first factor, determined cost savings of $2.75,

15   your source for that is insurance company information, isn't

16   it?

17   A.  Actually, no.  I mean, it's -- that's -- that's a broad

18   statement.  The correct answer in terms of being more

19   detailed is that BITCO salaries for its audit employees --

20   audit employees.

21   Q.  So what you've got in your footnote is incorrect?

22   The insurance company's --

23   A.  It's not really incorrect; it's more general.  You've

24   got to be more specific.

25         THE COURT:  Just a minute.  It's important that you

1  all speak one at a time.

2       THE WITNESS:  Sorry.

3       THE COURT:  So please wait until one's finished

4  before the other starts.

5       All right.  Let's continue.

6  Q.  (By Mr. Gillam)  What you've got in your footnote is

7  insurance company information, but what you're telling this

8  jury today is, is that rather than look at Great West

9  information, you took information from BITCO and used that.

10       Is that what you're telling us?

11  A.  I'm saying that, actually, I believe there was no

12  information available on a comparable basis from Great West,

13  and, therefore, the sister company, BITCO, was the best

14  available information.

15  Q.  Isn't it true, Ms. O'Neil, that you never personally

16  visited any Great West portal?

17  A.  I did not have the log-in credentials that I was able to

18  do that.

19  Q.  Did you ever in your role as an expert in this case ever

20  ask for log-in credentials?

21  A.  I was provided with information in document form as to

22  what was available.

23       MR. GILLAM:  Objection, nonresponsive.

24       THE COURT:  Sustained.  You need to answer the

25  question.

1          THE WITNESS:  Sorry.

2  A.  Could you repeat the question?

3  Q.  (By Mr. Gillam)  Did you ever request as an expert

4  witness in this case -- did you ever request access

5  information -- information which would allow you to access

6  the Great West portal?

7  A.  I do not recall.  I may have in early discussions, but

8  I do not recall at this point if I specifically asked that

9  or not.

10  Q.  Well, if you did ask for it, you never accessed it, did

11  you?

12  A.  No, I did not.

13  Q.  And you understand as an expert witness in a case,

14  because you've been an expert witness before, you have the

15  right to request inspection of things if you need to do so,

16  do you not?

17  A.  One can ask for many things, and it's not always

18  delivered.

19  Q.  Do you have the right to ask?

20  A.  Correct.  You can ask for anything, that's right, that

21  might be relevant.

22  Q.  And so what you've got here is you've got a situation

23  where you did not use Great West information but used

24  information from BITCO, correct?

25  A.  That's correct.  That's all that was available.

1  Q.  Would you agree with me, Ms. O'Neil, that BITCO and

2  Great West are different companies?

3  A.  They are different companies.

4  Q.  BITCO and Great West have different clientele, do they

5  not?

6  A.  Yes, they do.

7  Q.  They have different policy lines, don't they?

8  A.  Yes, they do.

9  Q.  They have different management, don't they?

10  A.  Yes.

11  Q.  They have different IT systems, do they not?

12  A.  I would expect they would, yes.

13  Q.  And yet the information that you used to come up with

14  this $2.75 figure was information that did not relate

15  directly to Great West; isn't that correct?

16  A.  That's correct for the reasons I've stated.  And I might

17  add that if one looks at this chart, all of the other

18  values --

19          THE COURT:  Ms. O'Neil?

20          THE WITNESS:  Sorry.

21          THE COURT:  You don't get the option to add if you

22  want to.  Plaintiff's counsel is going to get a chance to

23  ask you further questions if they want to, so please limit

24  your responses to the questions asked.

25          Go ahead, counsel.

197

1  Q.  (By Mr. Gillam)  You made the determination in this case

2  to use BITCO information instead of Great West information?

3        Yes or no?

4  A.  That's not a yes or no answer.  I'm sorry.  It's no,

5  because I didn't have anything else.

6  Q.  You didn't use Great West information, did you?

7  A.  No.

8  Q.  Look at No. 2, insurance industry costs, and I have a

9  question or two for you about that.

10       Your source of that is labor statistics from the

11 Bureau of Labor Statistics from May 2013, correct?

12 A.  Correct.

13 Q.  Those are national statistics, are they not?

14 A.  Yes, they are.

15 Q.  They include labor costs that include costs in places

16 like New York City?

17 A.  Correct.

18 Q.  Would you agree with me that labor costs vary from

19 geographic region to geographic region in our country?

20 A.  Yes, that's right.

21 Q.  And Great West is a regional company, is it not?

22 A.  It has a predominance in a certain region, that's

23 correct.

24 Q.  It's based in South Sioux City, Nebraska, not New York

25 City, isn't it?

1  A.  Well, that's not what you asked me.  You asked me

2  where -- exactly where it -- where it would be relevant, not

3  where the home office is.

4        MR. GILLAM:  Objection, nonresponsive.

5  A.  Sorry.  It is based in Nebraska, that's correct.  That's

6  the home office.

7        THE COURT:  All right.  Let's take a deep breath

8  here.

9        Ms. O'Neil, he's entitled to ask whatever questions

10  he wants, and your job is to answer them.

11        THE WITNESS:  All right.  Thank you.

12        THE COURT:  And make your responses limit to the

13  questions asked.  And that's the way we do this, and then

14  Mr. Gilliland is going to get a chance to ask you anything

15  he thinks needs to be filled in because your answer was

16  limited to the question Mr. Gillam asked.  So let's do it

17  that way from this point forward.

18        THE WITNESS:  Sorry.

19        THE COURT:  Let's proceed.

20  Q.  (By Mr. Gillam)  You would agree with me, would you not,

21  that Great West is based in South Sioux City, Nebraska,

22  which is not New York City.

23  A.  Correct.

24  Q.  It's not Florida.

25  A.  Correct.

1   Q.  It's not Los Angeles.

2   A.  Correct.

3   Q.  It's not Houston.

4   A.  That's right.

5   Q.  It's the midwest of the United States of America.

6   A.  That's right.

7   Q.  No. 3 is Public Study - Strategic Contact.  And what

8   you've got there is based on Cost Structure and Distribution

9   in Today's Contact Centers, Strategic Contract -- Contact of

10  March 2008.

11        Is that a study from March 2008?

12  A.  To my knowledge, it is.

13  Q.  This case that we're dealing with here today and that

14  this jury has to decide deals with insurance, does it not?

15  A.  Yes, it does.

16  Q.  This particular study does not just deal with insurance,

17  does it?

18  A.  That's correct.

19  Q.  This study deals with call centers of all kinds across

20  our country, does it not?

21  A.  That's right.

22  Q.  Call centers which could vary as much as trying to call

23  in and figure out how you install a washing machine.

24  A.  Was that a question?

25  Q.  Yes, ma'am.

1   A.  I'm sorry.  Could you say it again?  I'm sorry.

2   I really missed it.

3   Q.  Certainly.

4        Call centers in our country are not limited to call

5   centers dealing with the insurance industry, are they?

6   A.  Oh, not at all.

7   Q.  You've got call centers for all kinds of things, TV

8   repair, all kinds of things, car repair, correct?

9   A.  That's right.

10  Q.  So this particular study that you're looking at here

11  does not apply only to insurance companies, does it?

12  A.  No, it doesn't.

13  Q.  In fact, if you look at the second one, the next one

14  down there, the Public Study, ContactBabel -- is it Babel or

15  Babel (pronouncing)?

16  A.  I think it's Babel.

17  Q.  Babel?

18        It's the same thing here.  That's a study of call

19  centers that apply to everything, not simply the

20  insurance -- insurance industry, which is what we're dealing

21  with here in this case; isn't that correct?

22  A.  That's correct.

23  Q.  The fifth one is:  Applied System Proposal.

24        Now, did you learn in this case that the Applied

25  System Proposal, this particular one, was -- that's actually

1  an agency owned by Great West?

2  A.  Right.  I referred to it as a sister company, but, yes,

3  an agency would be appropriate, I guess.

4  Q.  And as I understand it, you're saying that this agency

5  guy had a call center module or something that had a dollar

6  per minute; is that right?

7  A.  Yes.

8  Q.  And that somebody then came in and said we're going to

9  figure out the average call -- average time per minute of

10  how long?

11  A.  Of like 17 seconds or 5.28  minutes.

12  Q.  Okay.  Did you do any research yourself to determine the

13  average call time on a call like this?

14  A.  No, I did not.

15  Q.  Did you know that this particular portal -- or the

16  portal we're talking about in this case was implemented in

17  2013?

18  A.  Yes.

19  Q.  Did you know that this particular agency was contracted

20  for in 2014?

21  A.  I'm not quite sure of that date.  That may be correct.

22  Q.  Would that surprise you?

23  A.  Not really because I don't know what the exact date is,

24  so...

25  Q.  But this particular -- this particular number is

1   actually cost expended, is it not?  It's money expended;

2   it's not cost savings.

3   A.  This table is, I believe -- I think I'm understanding

4   you to ask me what the $5.28 is; is that right?

5   Q.  You've told this jury that you got $1.00 per what?

6   A.  Per minute.

7   Q.  $1.00 per minute?

8   A.  Yes.

9   Q.  Did you do any research to determine that yourself?

10  A.  That was part -- no.  I relied on Applied Systems'

11  proposal.  I got it right out of that report.

12  Q.  And so you -- you rely on them for the report itself,

13  but didn't do any research yourself to determine whether

14  it's 5 minutes and 17 seconds per call or anything like

15  that?

16  A.  Well, that's from the ContactBabel report --

17  Q.  Ah.

18  A.  -- the 5 minutes and 17 seconds.

19  Q.  So what you did was you took the ContactBabel report

20  which doesn't apply to just insurance companies, you applied

21  it to call centers all over the country and then came in and

22  applied that to this $1.00 per minute, and that's how you

23  come up with $5.28?

24  A.  That's the mathematics, yes.

25  Q.  Do you know whether Great West even had a call center or

1   what technology that call center uses?

2   A.  I do not.

3          MR. GILLAM:  Pass the witness, Your Honor.

4          THE COURT:  Redirect?

5          MR. GILLILAND:  Briefly, Your Honor.

6          THE COURT:  Proceed when you're ready,

7   Mr. Gilliland.

8                 REDIRECT EXAMINATION

9   BY MR. GILLILAND:

10  Q.  Ms. O'Neil --

11          MR. GILLILAND:  If we could bring up the slide

12  you've got there with the numbers.  Yeah.

13  Q.  (By Mr. Gilliland)  Ms. O'Neil, these numbers that are

14  in the calculation, first of all, can you tell the jury

15  whether or not you were asked to evaluate Great West's

16  portal?

17  A.  No, I wasn't.

18  Q.  And what exactly was your role in this case?

19  A.  My role was to opine on the applicability of these

20  values on this exhibit that were actually created by

21  Mr. Lasinski and included in his report.  I was merely

22  opining as to the applicability of these values to

23  insurance.

24  Q.  And can you tell the jury whether or not talking to

25  somebody at Intellectual Ventures would have helped you or

1    changed your opinions in any way?

2    A.   It would not.

3    Q.   Can you tell them whether or not looking at the portal,

4    the Great West portal would have changed your opinions in

5    any way?

6    A.   No, it would not.

7    Q.   Now, would having Great West's actual cost information

8    have helped your opinion in any way?

9    A.   Yes, it would.

10   Q.   And what is your understanding of the cost information

11   available for Great West in this case?

12   A.   My understanding is that there was none available.

13   Q.   And so in the absence of the information from the

14   Defendant, what was the next best information to use?

15   A.   From one of its sister companies, BITCO, as in Line 1.

16           MR. GILLILAND:  Pass the witness, Your Honor.

17           THE COURT:  Further cross-examination?

18           MR. GILLAM:  No, Your Honor.

19           THE COURT:  You may step down, Ms. O'Neil.

20           Ladies and gentlemen, we're going to recess for the

21   evening at this point.  We will continue Monday morning when

22   we reconvene.

23           Let me explain a little bit to you about how I

24   intend to proceed going through the remainder of the trial

25   next week.

1           Since I've been on the bench, I've tried something

2    over 70 jury trials like this.  And in every one of them,

3    the jury tells me we would rather start early and go late

4    and be away from our homes and our businesses a fewer number

5    of days than to stretch things out with a banker's hours

6    approach and be gone another day or two or three that we

7    would have to be otherwise.

8           So, consequently, my practice in trying cases has

9    tended to follow that guidance, and we tend to not stop at

10   5:00 o'clock, as you can see, but hopefully that means we

11   get through and you get back to your homes and your families

12   and your businesses a day or so earlier than you would have

13   otherwise.

14          So, consequently, I'm going to ask you to be back

15   Monday morning in the jury room by about 8:15, and I'm going

16   to be prepared -- or be prepared rather to come in, and we

17   will start again as close to 8:30 as possible.

18          There are a few things I take up each day outside

19   of your presence that don't involve the jury, so it's not an

20   exact science.  We may start at 8:25.  We may start at 8:35.

21   We'll target 8:30 to start.

22          And we'll also target something between 5:30 and

23   6:00 to end each day.  That, again, is not an exact science.

24   When you have a witness on the witness stand, it's really

25   difficult to break them in the middle of their testimony,

1   and so it helps if we can get completely finished with a

2   witness like we just have with Ms. O'Neil.

3          So that's the approach the Court's going to take

4   with scheduling going forward, and you can factor that into

5   your plans for next week.  I hope when we're finished,

6   you'll agree that we've saved you some days away from your

7   other business by starting a little earlier and going a

8   little later.

9          I know it's Friday.  I know it's been a long day.

10  I thank you for your attentiveness.  I'm going to ask you as

11  you leave the jury box in just a few moments to take your

12  juror notebooks and leave them closed on the table in the

13  jury room.  They'll be there for you Monday morning when we

14  come back.

15         I'm going to remind you to follow all the

16  instructions we've talked about today, including, chief

17  among them, not to discuss this case with anyone.  Like I

18  told you, unless you live alone, somebody's going to ask you

19  when you walk in the door tonight what's happened in federal

20  court.

21         Just tell them you'll talk about it after the case

22  is over, but until the case is over and you've been

23  released, you really can't discuss anything about the case.

24  It's just that critical.

25         Follow all the other instructions I've given you.

1   I hope you have a good weekend, and I will see you back here

2   Monday morning.

3           With that, the jury's excused.

4           COURT SECURITY OFFICER:  All rise for the jury.

5           (Jury out.)

6           THE COURT:  Be seated, please.

7           Counsel, let me remind you that before I bring the

8   jury in Monday, I'll expect a representative of both parties

9   to be prepared to read into the record any items from the

10  list of pre-admitted exhibits that have been used during

11  today's portion of the trial.

12          Also, I'll be in chambers by 7:30 if there are

13  disputes that need the Court's guidance prior to beginning

14  with the next witness from the Plaintiff on Monday.

15          I remind you, you have an ongoing obligation to

16  diligently meet and confer and try to narrow and solve those

17  issues to the fullest extent possible.

18          If that's not able to be accomplished, I'll be

19  available to give you guidance by -- by 7:30 on Monday

20  morning.

21          Is there anything from either Plaintiff or

22  Defendant that needs to be raised with the Court at this

23  juncture?

24          MR. GILLILAND:  Nothing from the Plaintiff, Your

25  Honor.

1          MR. GILLAM:  Nor from the Defendants, Your Honor.

2          THE COURT:  All right.  Mr. Gilliland, am I correct

3    the Plaintiff has one additional witness?

4          MR. GILLILAND:  That's correct, Your Honor.

5          THE COURT:  Okay.  And does Defendant know at this

6    point how many witnesses they'll be calling?

7          MR. BETTINGER:  Yes, Your Honor.

8          THE COURT:  How many do you expect to call,

9    Mr. Bettinger?

10          MR. BETTINGER:  Four.

11          THE COURT:  All right.  If there aren't questions

12    for the Court, counsel, I will see you Monday morning.

13          With that, the Court stands in recess.

14          COURT SECURITY OFFICER:  All rise.

15          (Recess.)

16

17

18

19

20

21

22

23

24

25

1                              <u>CERTIFICATION</u>

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9    <u>/S/ Shelly Holmes</u>            <u>3/8/19</u>
     SHELLY HOLMES, CSR, TCRR          Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25