```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE EASTERN DISTRICT OF TEXAS

 3                           TYLER DIVISION

 4   INTELLECTUAL VENTURES II LLC, )(

 5        PLAINTIFF,               )(   CIVIL ACTION NO.

 6                                 )(   6:18-CV-299-JRG

 7   VS.                           )(   TYLER, TEXAS

 8                                 )(

 9   GREAT WEST CASUALTY COMPANY,  )(   MARCH 12, 2019

10        DEFENDANT.               )(   8:28 A.M.

11                 TRIAL TRANSCRIPT OF JURY TRIAL

12            BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

13               UNITED STATES CHIEF DISTRICT JUDGE

14
     FOR THE PLAINTIFF: Mr. Derek T. Gilliland
15                      Mr. Ty W. Wilson
                        NIX PATTERSON, LLP
16                      205 Linda Drive
                        Daingerfield, Texas 75638
17
                        Mr. Karl A. Rupp
18                      NIX PATTERSON, LLP
                        Advancial Tower
19                      1845 Woodall Rodgers Tower
                        Suite 1050
20                      Dallas, Texas 75201

21   COURT REPORTER:    Ms. Shelly Holmes, CSR, TCRR
                        Official Court Reporter
22                      United States District Court
                        Eastern District of Texas
23                      Marshall Division
                        100 E. Houston
24                      Marshall, Texas 75670

25   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
```

```
1    FOR THE DEFENDANT: Mr. Michael J. Bettinger
                        Ms. Irene I. Yang
2                       SIDLEY AUSTIN, LLP
                        555 California Street
3                       Suite 2000
                        San Francisco, California 94104
4
                        Mr. Harry Lee Gillam, Jr.
5                       GILLAM & SMITH, LLP
                        303 South Washington Avenue
6                       Marshall, Texas 75670

7                       Mr. Andrew T. Langford
                        SIDLEY AUSTIN, LLP
8                       2021 McKinney Avenue
                        Suite 2000
9                       Dallas, Texas 75206

10                      Ms. Sharon Lee
                        Mr. Samuel A. Dillon
11                      SIDLEY AUSTIN, LLP
                        1501 K Street, N.W.
12                      Washington, DC 20005

13                      Mr. Paul J. Rogerson
                        SIDLEY AUSTIN, LLP
14                      One South Dearborn
                        Chicago, Illinois 60603
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2          (Jury out.)
 3          COURT SECURITY OFFICER:  All rise.
 4          THE COURT:  Be seated, please.
 5          Are the parties prepared to read into the record
 6   those items from the list of pre-admitted exhibits used
 7   during yesterday's portion of the trial?
 8          MR. WILSON:  We are, Your Honor.
 9          THE COURT:  Let's proceed.
10          You gentleman will identify yourselves, and then
11   proceed to make your offer.
12          MR. WILSON:  This is Ty Wilson on behalf of
13   Plaintiff, Intellectual Ventures.
14          During yesterday's portion of the trial, Plaintiff
15   admitted the following exhibits:  PX-205, PX-211, PX-212,
16   PX-213, and GWX-518.
17          THE COURT:  Any objections from Defendant to that
18   offer by Plaintiff?
19          MR. ROGERSON:  This is Paul Rogerson on behalf of
20   Defendant, Great West.
21          No objections.
22          THE COURT:  All right.  Does Great West have a
23   similar rendition to offer?
24          MR. ROGERSON:  It does.
25          THE COURT:  Please proceed.
```

```
1          MR. ROGERSON:  Yesterday, Great West exhibit --

2   admitted the following exhibits:  PX-233, PX-415, PX-417,

3   PX-547, GWX-9, GWX-73, GWX-120, GWX-122, GWX-134, and

4   GWX-484.

5          THE COURT:  All right.  Any objection from

6   Plaintiff?

7          MR. WILSON:  No, Your Honor.

8          THE COURT:  All right.  Thank you, gentlemen.

9          All right.  We completed the day yesterday with the

10  testimony of Mr. Steven Ponder.

11         Defendants, are you prepared to call your next

12  witness?

13         MR. GILLAM:  Yes, Your Honor, we are.

14         THE COURT:  Ask who is up next, Mr. Gillam?

15         MR. GILLAM:  Chris Bakewell.

16         THE COURT:  All right.  Let's bring in the jury,

17  please.

18         COURT SECURITY OFFICER:  All rise for the jury.

19         (Jury in.)

20         THE COURT:  Good morning, ladies and gentlemen.

21         Please have a seat.

22         All right.  Defendant, call your next witness.

23         MR. GILLAM:  Your Honor, Defendant would call

24  Chris Bakewell.

25         THE COURT:  All right.  Mr. Bakewell, if you'll
```

```
 1   come forward and be sworn.
 2            (Witness sworn.)
 3            THE COURT:  Please have a seat on the witness
 4   stand.
 5            THE WITNESS:  Thank you.
 6            MR. GILLAM:  Your Honor, I believe we've already
 7   passed out the notebooks.
 8            THE COURT:  All right.  In that case, you may
 9   proceed with your direct examination.
10            MR. GILLAM:  Thank you, Your Honor.
11            CHRIS BAKEWELL, DEFENDANT'S WITNESS, SWORN
12                      DIRECT EXAMINATION
13   BY MR. GILLAM:
14   Q.  Will you please introduce yourself to the jury, sir?
15   A.  Yes, hi, good morning, my name is Chris Bakewell.
16   Q.  And what are you here to discuss with the jury today?
17            What topics?
18   A.  Well, I'm here to discuss if the issue of damages comes
19   up, I'm here to discuss a reasonable royalty.
20   Q.  Could you tell us a little bit about yourself, where
21   you're from and what you do for a living, sir?
22   A.  Yeah, sure.  I'm from Houston.  I am married.  I've been
23   married for 27 years.  I have three kids, two in college,
24   one who's a junior in high school.  And I value intellectual
25   property for a living.
```

1    Q.  In what particular areas do you value intellectual

2    property?

3    A.  Well, sometimes for patent infringement cases like this.

4    Also, companies have to record amounts on their books when

5    they buy and sell companies.  They have to attribute the

6    amount for intellectual property, and I -- I'll do that.

7           I'll help companies think through how to

8    commercialize their intellectual property rights, so

9    business strategy, consulting assignments.  And I'll help

10   out with licensing once in a while.

11   Q.  Do you have any idea how many times you have valued

12   intellectual property like this over the -- over your

13   career?

14   A.  Well, I've been working for almost 30 years, and I'd say

15   it's easily hundreds of times.

16           MR. GILLAM:  Can we pull up the first slide,

17   please?

18   Q.  (By Mr. Gillam)  Mr. Bakewell, do you have a slide that

19   summarizes your qualifications in this case?

20   A.  Yes.  That's what this slide summarizes.  We just talked

21   a moment ago about where I work in Houston.  I work for a

22   firm called Duff & Phelps.  We have about 3,000 employees

23   around the world now.  When I joined 11 years ago, we had

24   about 300.  So we've been quite successful.  And I lead our

25   Houston office.

1    And on global basis, I lead our -- what's called

2  our intellectual property advisory services practice, and we

3  do the types of things that I described a few moments ago.

4  Q.  Tell us about your educational background, please, sir.

5  A.  Sure.  So I hold two degrees.  I graduated from Bradley

6  University, which is a liberal arts college in -- right in

7  the middle of Illinois in 1990.  And I have a MBA in

8  finance, also information systems, too, and -- from the

9  University of Maryland at College Park.  I graduated there

10  in 1993.

11  Q.  Did you have any honors or receive any honors or

12  recognition as a part of your education?

13  A.  I did.  It says there I was a graduate fellow in

14  graduate school.  And I graduated with honors and had

15  scholarships in undergraduate, and that helped me pay for my

16  own education.

17  Q.  What did you study when you were in college?

18  A.  I studied finance mostly, also information systems and

19  computer science when I was an undergraduate.

20    My first job between undergraduate and graduate

21  school was actually programming computers at Motorola, it

22  was some of the earliest cellular phones that I worked on.

23  Q.  Back to Duff & Phelps for just a moment.

24    What are your responsibilities with that firm?

25  A.  So I lead our Houston office.  We've got about 60 or 70

1    people in that office.  I lead our intellectual property

2    advisory services practice.  I also serve on something

3    called the leadership forum, which is the top group of

4    managing directors in our firm.

5    Q.  In addition to your degrees that you received in

6    college, do you have any other professional certifications?

7    A.  I do.  So those are the two things at the bottom of this

8    page.  I am an accredited senior appraiser, and that's a

9    designation that's about valuation.  And mine is valuation

10   of intellectual property rights.  That's my focus.

11           And then I am a Certified Licensing Professional,

12   that's a designation that is awarded by a group called the

13   Licensing Executive Society.

14   Q.  What does it take to become an accredited senior

15   appraiser?

16   A.  That actually takes quite a bit of time.  It's called

17   the gold standard for valuation.  You have to show 10,000

18   hours of experience valuing intellectual property rights.

19   I had to pass a series of examinations.  I have to -- I have

20   my work product reviewed by my peers, and I have to meet

21   some continuing educational goals every year.

22   Q.  You also mentioned that you're a Certified Licensing

23   Professional.

24           How did that come about?

25   A.  So that's a designation that's intended to recognize

1   people who have expertise in licensing and commercialization

2   of intellectual property rights.  And I got that from my

3   experience in licensing both earlier in my career when

4   I worked for a company that we -- we made specialized power

5   plants that had technology and computerized technology.

6         My work earlier when I programmed computers

7   involved some licensing.  And then as I've been a

8   consultant, I've done the things that I spoke about.  And

9   the Certified Licensing Professional is intended to

10  recognize those skills.

11  Q.  Have you written or been published in the area of

12  intellectual property?

13  A.  I have.  I've had articles published in peer-reviewed

14  journals.  I have a textbook chapter that's -- I think it's

15  in its third edition now.  And from time to time I'm asked

16  to give talks in front of various audiences, business

17  people, the Bar, lawyers have asked me to speak.  I gave a

18  presentation a couple of weeks ago.

19  Q.  Switching gears for a moment, have you actually

20  negotiated patent licenses during your career?

21  A.  I have.  So I mentioned a moment ago that I worked for a

22  company that made these specialized power plants.  And when

23  I was there, I led our investment arm as chief financial

24  officer.  And I also worked in Europe where I led another

25  technology center, and that involved a lot of technology

1  licensing and gave me an opportunity to negotiate a variety

2  of contracts, including licenses.  And then as a consultant,

3  my role is more advisory, but I get involved in those types

4  of negotiations, too.

5       MR. GILLAM:  Your Honor, at this time, we would

6  offer Chris Bakewell as an expert in intellectual property

7  valuation in patent damages.

8       THE COURT:  Is there objection?

9       MR. GILLILAND:  No objection, Your Honor.

10       THE COURT:  All right.  The Court will recognize

11  this expert as -- excuse me, this witness as an expert in

12  the designated fields.

13       Continue, counsel.

14       MR. GILLAM:  You can take down the slide, please.

15  Q.  (By Mr. Gillam)  Mr. Bakewell, now focusing on the work

16  that you did in this case, what -- what were you asked to

17  do?  What was the scope of your work?

18  A.  So I was asked to do a couple of things.  I was asked to

19  review the work of Mr. Lasinski, who we heard from --

20  I guess it was yesterday morning -- and Ms. O'Neil, as well,

21  to the extent that Mr. Lasinski relied upon her work.  And

22  then I was asked to form my own independent opinions

23  regarding a reasonable royalty should the jury get to that

24  question.

25  Q.  What information did you review as a part of the work

1   that you did in this case?

2   A.   So I reviewed everything that Ms. O'Neil and

3   Mr. Lasinski reviewed.   And I also conducted my own

4   research, my own independent research.   We've seen many of

5   those types of materials in court today.

6          There's been -- or over the last few days,

7   deposition transcripts, we saw interrogatories, so there's

8   legal documents.   And then I did my own research and looked

9   at financial documents and those types of things.

10  Q.   Did you also interview anybody in connection with this

11  case?

12  A.   I did.   I interviewed Mr. Foote, and I interviewed

13  Dr. Crovella, the technical expert that we heard from

14  yesterday.

15  Q.   Did you prepare a slide that summarizes your opinions in

16  this case at a high level?

17  A.   Yes.

18          MR. GILLAM:   Pull up the next slide, please,

19  Mr. Simmons?   Thank you.

20  Q.   (By Mr. Gillam)   What are we looking at here,

21  Mr. Bakewell?

22  A.   So this slide summarizes my opinions.   I mentioned a

23  couple times already that I have to assume that there's

24  liability.   So that means I have to assume that the

25  patent -- Claim 14 that's asserted here is not invalid.

1          So as the first arrow shows, if it's found -- if

2     the ladies and gentlemen of the jury find that patent to be

3     invalid or that claim, then there are no damages.  You don't

4     get to that question.

5          And if -- I have to assume that the patent is

6     infringed, even though that might not be true, the ladies

7     and gentlemen of the jury might find that the patent is not

8     infringed.

9          In that case, you don't get to damages.  You don't

10    have to worry about the things that I'm talking about, the

11    testimony that I'm talking about.

12         But if you set those things aside, which -- which

13    is called assuming liability, which is what I have to do, my

14    opinion is that a reasonable royalty is no more than

15    $300,000.00, and that's a lump-sum royalty.  It's based upon

16    real-world evidence that we'll talk about.  I've prepared

17    some additional slides.

18    Q.  Now, by making an assumption of -- if the patent is

19    valid and the patent is infringed, is that only for the

20    purpose of -- of going through this analysis that you have

21    to do?

22    A.  It's just for going through this analysis.  I have to

23    make that assumption, so we sort of set aside the issue of

24    liability.  That's up to you all and the jury.  And if you

25    do get to the question of damages, then I think there's some

1    additional information you should consider in addition to

2    what Mr. Lasinski had to say and Ms. O'Neil.

3    Q.  By making this analysis, you're not suggesting to the

4    jury that -- that Great West owes any damages, are you, sir?

5    A.  Not at all.  I think that Great West actually feels very

6    strongly that it doesn't owe any damages.

7    Q.  Then why are we even talking about damages?  Why did we

8    bring you in this case?

9    A.  Well, Great West has the right, right?  Mr. Lasinski and

10   Ms. O'Neil testified, and you were able to cross-examine

11   them and ask them questions, but I think also Great West has

12   the right to provide additional evidence through a witness

13   and also to have somebody else take a fresh look and review

14   the work that Mr. Lasinski and Ms. O'Neil conducted and

15   identify maybe additional evidence that they didn't that the

16   jury might want to consider, should they get to the question

17   of damages.

18           MR. GILLAM:  Let's take this slide down, please.

19   Q.  (By Mr. Gillam)  We heard Mr. Lasinski yesterday talk

20   about the concept of a hypothetical negotiation.

21           Did you use this framework, as well, in your

22   analysis?

23   A.  Yes, I did.

24   Q.  Can you explain to us what a hypothetical negotiation is

25   in the context of -- of analyzing patent damages, and

1    what -- number one, what it is and why you use it?

2    A.  Sure.  So -- I can.  The idea with this hypothetical

3    negotiation is that you go back in time to whatever the

4    appropriate time is that if you assume that there's

5    liability, you have to value -- and I'll say this thing,

6    whatever it is, because this thing can -- in patent damages,

7    it's a patent and it's a reasonable royalty, but the same

8    principle of this hypothetical negotiation exists in other

9    areas.

10        Like if there's a dispute over real estate or over

11   the selling price of a car or a home, you have to go back

12   and figure out what that was worth at a point in time

13   earlier.

14        And there's tools you can use to figure that out,

15   and one of them is you -- you try to figure out who was

16   there and then what the real-world transaction prices were

17   that might -- the parties might consider back -- sort of

18   back in the day whenever the -- the issue was.

19   Q.  And of these statements, IV's counsel talked about a

20   patent being like getting rich, striking oil on property.

21        Do you agree with that particular analogy?

22   A.  No.  There's some problems with that analogy.

23   Q.  What's wrong with that analogy?

24   A.  Well, it's incomplete.  Intellectual property rights,

25   patents, we've heard about this one claim of this one

```
 1   patent.  It's like metes and bounds of property.  And you
 2   have to figure out if you have property and you own it what
 3   exactly it is you own.  And it's multidimensional.  You have
 4   to figure out kind of where the fence boundaries are, where
 5   the hypothetical lines are on your property, but you also
 6   have to know what you own going down, if you own the mineral
 7   rights or not.
 8            And if there's -- if there's oil under your
 9   property and you don't have the -- the mineral rights, well,
10   you're not entitled to any value from that oil.  That's just
11   the way that it is.  You have to look specifically what it
12   is that you own, and the value that you have is limited to
13   that.  And so there's -- there's flaws in that analogy.
14   It's incomplete.
15   Q.  Now, assuming that -- well, taking this concept of the
16   hypothetical negotiation, who would have been the parties --
17   if they had gotten back together in time and negotiated a
18   deal, who would have been the parties at the hypothetical
19   negotiation?
20   A.  So we've heard these two names, Botalini Tera, which is
21   a special company within -- excuse me -- within the
22   Intellectual Ventures ownership structure.  So they're -- on
23   one hand is the licensor, this hypothetical licensor.  And
24   then the hypothetical licensee, on the other hand, is Great
25   West.
```

1  Q.  And so what would have happened at the hypothetical

2  negotiation?

3  A.  Well, they would have negotiated a royalty based upon

4  whatever it is, the metes and bounds or the claim of the

5  specific patent right in this case, a reasonable royalty for

6  that specifically.

7       We have to go back in time and imagine that before

8  there -- any infringement of that claim occurred,

9  hypothetically, right, this is hypothetical, what they would

10 have agreed to as a reasonable amount of a royalty.

11      MR. GILLAM:  Pull up the next slide, please,

12 Mr. Simmons?

13 Q.  (By Mr. Gillam)  Now, you heard Mr. Lasinski testify

14 yesterday, correct?

15 A.  Yes.

16 Q.  Is there anything that you agree with Mr. Lasinski on?

17 A.  Well, we both have to make this assumption.  It says

18 must assume validity and infringement, and we've talked

19 about that several times now.  So that applies to

20 Mr. Lasinski, as well as to me.  Otherwise, you don't get to

21 the question of damages.  It's actually not even zero, it's

22 a null value.

23      This idea of hypothetical negotiation we just spoke

24 about, we -- Mr. Lasinski and I used that same valuation

25 framework, and we considered this case, Georgia-Pacific.

1   There's been other cases and other developments since then.

2   That case is like 50 years old.  But the hypothetical

3   negotiation was discussed in that case.

4          And then we talked about the parties to the

5   hypothetical negotiation just a moment ago, that those are

6   Botalini Tera, that's that special Intellectual Ventures

7   subsidiary, as -- and Great West as the hypothetical

8   licensee.

9   Q.  In addition to Mr. Lasinski, were you here when

10  Ms. O'Neil testified on Friday?

11  A.  I was, yes.

12  Q.  Did the analysis of Mr. O'Neil [sic] and the analysis --

13  I'm sorry, Ms. O'Neil and the analysis of Mr. Lasinski have

14  anything in common?

15  A.  Well, they fit together.  Mr. Lasinski said that he used

16  Ms. O'Neil as a reasonableness check -- her work as a

17  reasonableness check for his conclusions.

18  Q.  Taking the two analyses that they did together, did you

19  see any problems as a part of the analysis that they did?

20  A.  There were a lot of problems, yes, sir.

21  Q.  Can you describe those to the jury, please?

22  A.  Well, their analysis wasn't specific to the claims of

23  the '177 patent that's at issue here.  They valued something

24  broader.  They valued -- or tried to value, and there's

25  issues with even what they tried to do -- a portal that

 1    Great West used.

 2            And -- and the claim of the patent in this case

 3    isn't the entirety of a portal.  It's a very specific thing

 4    that we heard people discuss or we heard read -- I call it a

 5    stipulation.  It might have another word legally.

 6            And then there's other issues in terms of not

 7    considering some evidence.  There's some things that I have

 8    on slides that I think the ladies and gentlemen of the jury

 9    should consider that neither Ms. O'Neil nor Mr. Lasinski

10    discussed.

11    Q.  You said they -- they viewed it too broadly or used the

12    term "broad" or something along those lines?

13    A.  Correct.

14    Q.  Can you tell us what you're talking about there?

15            MR. GILLAM:  And could you please, Mr. Simmons, put

16    up the next slide, please?

17    Q.  (By Mr. Gillam)  What -- what happens -- or what are you

18    talking about when you're talking about they're too broad?

19    Describe that to the jury, please.

20    A.  Sure.  So Mr. Lasinski discussed how he started out

21    somewhere -- he started out somewhere pretty large actually.

22    He included a whole bunch of transactions, and he also

23    included a value that was attributable to an entire portal.

24    And he talked about this word "apportionment."

25            So he started somewhere really big, and then he

1    tried to work his way down.  He didn't work his way down far

2    enough, and there's some issues.

3           But there's problems when you try to use that type

4    of methodology when you value patent rights when you try to

5    start somewhere broad and then apportion down.

6           And I have an analogy here on this slide.  It's

7    like if you're going to value a house, for example, like on

8    Fannin Street in Tyler.  You've got one house and you say,

9    hey, I want to know how much that house is worth.

10          Well, one way, I guess, you could do it but nobody

11   would do it because it's not reasonable, is you'd say, well,

12   let's -- let me look at all of Tyler, the greater Tyler

13   area, and look at the all the tax revenues that have been

14   collected and all the business activities.  And I'll start

15   to subtracting things out.  And I'll just do that until I

16   get down to whatever it is that I'm trying to value.  I

17   mean, I guess you could do that, right, conceptually, but

18   you have to make a lot of assumptions, and you're probably

19   going to make a lot of mistakes, and you're going to get a

20   value that is not accurate.

21          The way to do it, I would suggest, is you do the

22   same thing in real estate as you do -- at least at a high

23   level in valuing intellectual property rights -- is go right

24   to that particular house and see what it had been bought and

25   sold for or maybe a house down the street or around the

1    corner or something like that and focus in on something

2    specific.

3            When you start really big and try to work your way

4    down, called apportionment, that -- especially when you

5    start so far away from what the patent covers, that just

6    introduces the possibility for error, and that's a mistake

7    that Mr. Lasinski and Ms. O'Neil committed.

8            MR. GILLAM:  Next slide, please, Mr. Simmons?

9    Thank you.

10   Q.  (By Mr. Gillam)  We have a slide here entitled Issues

11   with IV's Demand.

12           By "demand," you're talking about -- well, what are

13   you talking about as far as the demand?

14   A.  That's the royalty that Mr. Lasinski submitted

15   yesterday.

16   Q.  The $20 million?

17   A.  $20.3 million.

18   Q.  Is starting too broad, as you've just talked about, one

19   of the reasons that you believe that this demand is -- is

20   not reasonable in this case?

21   A.  It is.

22   Q.  Explain the first bullet point here and what it leads to

23   when you don't do it the correct way?

24   A.  Well, you lead to something -- you lead to a conclusion

25   that is overstated.

1              And Mr. Lasinski had -- like -- he showed a few

2    spreadsheets.  And one of them showed his calculations where

3    he had a number of transactions, and then he multiplied it

4    by that rate.  And then he did a couple of other things.  He

5    did a present value calculation, and he subtracted out some

6    cost.

7              I want to focus on that, the top part of his

8    calculation.  There, he applied -- he tried to figure out

9    what a rate was and a base.  You asked him about that on

10   cross-examination.  That's really where his calculation

11   starts and where the math -- the big numbers really are.

12   And there's issues with both the rate and the base.

13             And then as I mentioned a moment ago, and that's

14   the second X on the bottom, both Mr. Lasinski and Ms. O'Neil

15   disregarded some real-world evidence.

16             MR. GILLAM:  Next slide, please.

17   Q.  (By Mr. Gillam)  So you remember my discussion that

18   I had with Mr. Lasinski about base and rate and how -- could

19   you tell us about how those work together in a case or how

20   they're supposed to work together in a case like this?

21   A.  So the idea -- this is called a running royalty.  And

22   the idea is you try to measure activity by multiplying a

23   base times the rate -- or I put it the other way here, a

24   rate times a base.  And there's issues with both of those.

25   You multiply those together, you get to -- this is at least

1   a starting point in the demand.

2         Again, Mr. Lasinski did a couple of other things

3   after this.  But if you start too broad, you're not going to

4   get down to what the value of a patent rate is supposed to

5   be.

6   Q.  So with respect to the rate and with respect to the

7   base, were there problems that you found with what

8   Mr. Lasinski did and/or with what Ms. O'Neil did that

9   created a problem with their conclusions in this case?

10  A.  Yes, there were problems with both.

11  Q.  First, let's talk about the rate, and regarding the rate

12  found by Mr. Lasinski, are there issues with the rate that

13  he found?

14  A.  Yes.

15  Q.  And we heard Ms. O'Neil testify -- testify about it last

16  week.

17        What problems do you see that Mr. Lasinski came up

18  with and/or Ms. O'Neil came up with, with respect to the

19  rate.

20  A.  Well, for the rate, they looked at activities that

21  related to an entire portal and not specifically what the

22  claims related to within the accused portal.

23        They also didn't really conduct any analysis that's

24  specific to Great West.  And if they didn't do anything

25  specific to Great West, they couldn't have measured values

1   that are attributable to the accused activities.

2        I mean, they talked about a call center -- or call

3   center.  Great West doesn't have a call center.  They talked

4   about a dollar per-unit adds up to $20 million.

5        They didn't talk about how many people that would

6   take or anything like that.  It was just purely theoretical,

7   and it was too broad.

8        MR. GILLAM:  Can you pull up the next slide,

9   please, sir?

10  Q.  (By Mr. Gillam)  This particular slide that we have

11  here, does this deal with the -- the issue of rate that

12  you're talking about now?

13  A.  Yes.

14  Q.  Okay.  Does this slide show some of the problems that

15  Mr. Lasinski had and/or Ms. O'Neil had in the analysis that

16  they did?

17  A.  Yes, well, they both had it.  And you asked Ms. O'Neil

18  some questions, and this summarizes some of the answers.

19        On the left here is a slide that came directly from

20  Ms. O'Neil's presentation.  And then on the right are issues

21  that I think were identified during her testimony.

22  Q.  Okay.  You've got a second bullet point there that says

23  performed incomplete analysis.

24        What problems did you see with what she did?

25  A.  Well, to begin with, I'll go to the left of that slide

1    that Ms. O'Neil had, she described the benefits of web

2    portfolio portals in general.  Not the benefits of this

3    particular claim of the '177.  And she thought that it was

4    reasonable and thought that Mr. Lasinski's analysis was

5    reasonable.

6            Well, it's not if you're not valuing the claims of

7    this patent.  It goes back to the analogy I used a moment

8    ago about if you start too far away when you're trying to

9    value a property here in Tyler, you're going to get a

10   conclusion that's too high.

11           And then on the bottom X where it says performed

12   incomplete analysis, Ms. O'Neil said that she didn't speak

13   with anyone at IV, so nobody at IV or Botalini Tera.  She

14   didn't speak with Dr. Smith, the technical expert, the

15   person who would be able to tell her what the claims of the

16   patent covered specifically.  She didn't -- and Mr. Lasinski

17   said that he didn't look at the portal.  And they didn't use

18   information that was specific to Great West either.  So

19   there's -- those are issues.

20   Q.  So did Mr. Lasinski's analysis suffer from many of the

21   same problems that we look at here on the slide related to

22   Ms. O'Neil?

23   A.  It did.  Ms. O'Neil took this broad view, and she said

24   that what Mr. Lasinski did was reasonable.  So she did

25   something that was too broad and unreasonable, and she's

```
 1   actually saying that what Mr. Lasinski did is unreasonable
 2   if she said it's okay.
 3           MR. GILLAM:  Next slide, please.
 4   Q.  (By Mr. Gillam)  So what does this slide summarize for
 5   us with respect to the rate?
 6   A.  This is just summarizing that they didn't value Claim 14
 7   and that their analysis was overstated, so the value there
 8   is too high.
 9   Q.  Moving to the base, regarding the base that was found by
10   Mr. Lasinski, what are the main issues here?
11           MR. GILLAM:  And can we go to the next slide,
12   please?
13   A.  Yes, so this was a slide that Mr. Lasinski used, too.
14   I took it straight from his presentation.  And you spent
15   some time with him asking him questions about that
16   yesterday.
17           He had, I believe, about 11 million transactions,
18   and you went through, you brought up the spreadsheet that
19   Great West produced that had those transactions, and you
20   marked things in red on the screen.  And Mr. Lasinski said
21   those things are not part of the stipulation, so they
22   shouldn't have been included.
23           And what he said was that if you take those items
24   out that were stricken in red, that that would reduce his
25   number by something like 75 percent.  So there his royalty
```

1  base, the number of units that he counted are too high, and

2  his analysis is overstated there, too.

3  Q.  (By Mr. Gillam)  Now, did you -- did you -- in addition

4  to watching Mr. Lasinski testify yesterday, did you look at

5  other things and talk with other people to confirm that

6  his -- that his conclusions were inflated?

7  A.  Yes.  I talked to Dr. Crovella, and I listened to the

8  testimony of Great West employees.  I interviewed Mr. Foote,

9  as I mentioned a moment ago, and listened here at trial.

10  Q.  If you take the problems with the rate and you take the

11  problems with the base, what does this mean in general?

12  A.  Well, it's simple -- simple multiplication, right?  So

13  if both numbers are too high, the result is going to be too

14  high.  You can't -- it's not like you can multiply two

15  things that are wrong together and get something that's

16  right.  Two wrongs don't make a right.

17        And so if you go to the next slide, the conclusion

18  is going to be that you're going to get a value that's

19  overstated.

20  Q.  Is there a better way and a more direct way,

21  Mr. Bakewell, to value the '177 patent in this case?

22  A.  There is.  You can look -- we have transactions that

23  neither Mr. Lasinski nor Ms. O'Neil talked about, and we'll

24  talk about those now.

25  Q.  So did Mr. Lasinski disregard that evidence?

1   A.  He did.

2   Q.  Did he present any -- any evidence to this jury about

3   what you're going to talk to us about?

4   A.  He did not present this information.

5   Q.  Now, did Mr. Lasinski and Ms. O'Neil have this

6   real-world evidence available to them?

7   A.  Yes.

8   Q.  What type of information in general did Ms. Lasinski --

9   or Mr. Lasinski and Ms. O'Neil disregard in this case?

10  A.  There's -- this patent has been bought and sold several

11  times, and Intellectual Ventures has some records where they

12  recorded what the value is of the patent.

13  Q.  What about the issues of what's been described -- and

14  we'll talk in more detail about it -- as non-infringing

15  alternatives?

16  A.  That's right.  Another way to look at the value of a

17  patent is non-infringing alternatives.  And we can talk

18  about that, too.

19          MR. GILLAM:  Next slide, please.

20  Q.  (By Mr. Gillam)  And what is this, just a summary slide

21  of their disregarding the rules of evidence?

22  A.  That's right.  It's also good news because we're moving

23  on.  We've gone through these two issues, and now, we'll

24  focus on other evidence.

25  Q.  In discussing the evidence that you looked at,

1   Mr. Bakewell, that IV disregarded in this case, is there a

2   framework that you use for your analysis?

3   A.   There is.  So the way that -- in my profession,

4   valuation of intellectual property rights is like valuation

5   of real estate or valuation of machinery or equipment.  We

6   all use the same economic framework, and it breaks evidence

7   down into three potential categories.

8        One is called the income approach.  That's the --

9   the chart that's there on the left.

10       The next is called the cost approach.  And in

11  intellectual property we talk about non-infringing

12  alternatives.

13       And then on the right, those houses, that's the

14  market approach, and that's by looking at comparable

15  transactions -- what a patent might have been bought and

16  sold for.

17  Q.   Just at a high level, what are you talking about when

18  you say the income approach?

19  A.   So the income approach is a tool where you try to figure

20  out if the patent generates revenues or it generates profit

21  in some way.  And that's what Mr. Lasinski tried to do, but

22  as we've talked about now for some time, he arrived at a

23  conclusion that is much too high.  Even by his own

24  testimony, it's something like -- he could take a reduction

25  of about 75 percent to his numbers before even looking at

1  the $2.75.  That was just from the base.

2  Q.  What's the cost approach generally about?

3  A.  That's about non-infringing alternatives.  That's trying

4  to go back in time.  Remember, we talked about the

5  hypothetical negotiation?  The idea is to go back time in

6  this hypothetical negotiation and figure out if Great West

7  could have said, hey, maybe we'll just do something else,

8  and we'll accomplish the same thing another way, or we'll

9  decide not to use your technology at all, and just take it

10  out.

11       We have to -- it's hypothetical, too, so we have to

12  go back in time.  That's why I've used this street sign.

13  You sort of have to go back to the bottom before you made a

14  decision to go one way, say, okay, we're going to rewind and

15  maybe we could have gone another way.  And then you try to

16  figure out, well, what would have been the impact going this

17  other way.

18  Q.  And, generally, at a high level, again, what's the

19  market approach?

20  A.  The market approach is by looking at transactions.  Like

21  when you buy and sell a house, if you want to know -- at

22  least I would want to know, and I know that my colleagues

23  who do real estate appraisals would want to know what that

24  house had been bought and sold for in the past.

25  Q.  Do you have another slide that shows the values

1    associated with these three approaches?

2    A.   I do.

3         MR. GILLAM:   Next slide, please.

4    Q.   (By Mr. Gillam)   And we have a lot of information on

5    this particular slide.   I want to walk you through it

6    piece-by-piece.

7         Can you -- can you basically tell us what the data

8    points are here?   And then we'll describe them in more

9    detail.

10   A.   Sure.   So the income approach is what Mr. Lasinski and

11   Ms. O'Neil tried to do.   That's on the left.   There's issues

12   there, and we'll recap those in a moment.

13        The cost approach is non-infringing alternatives,

14   and there's different ways to look at values there.   And

15   we'll talk about that in a moment.   Those numbers are less

16   than $100,000.00, as that bar shows.

17        And then there's two transactions -- there's

18   actually three, the $150,000.00 is part of the two

19   transactions that occurred.   That's the sale from the

20   inventor to a company called Mount Hamilton Partners.

21   That's a broker.

22        And then that company Mount Hamilton Partners sold

23   the patent -- the '177 patent, along with a couple of other

24   patent rights, for $300,000.00.   And I'll explain where the

25   $100,000.00 comes from.

1          And then in IV's own records, they have something

2    called a runway system where they keep information.  They

3    have $100,000.00 assigned to the '177 patent.

4          MR. GILLAM:  Next slide, please.

5    Q.  (By Mr. Gillam)  Dealing with the income approach, and I

6    know we've discussed this at some -- at some length already,

7    but what are you showing us on this particular slide with

8    respect to the income approach?

9    A.  Well, we know that the numbers that Mr. Lasinski arrived

10   at are too high.  And if you make just that one reduction to

11   the base before you even address the rate, his number is

12   going to fall by 75 percent.

13         And there's no revenues, we also know, that are

14   attributable to this patent.  And when we look at

15   non-infringing alternatives in a moment, that will also show

16   why there's limited income that's attributable to the

17   specific claim of this patent that's been asserted in this

18   case.

19         MR. GILLAM:  Next slide, please.

20   Q.  (By Mr. Gillam)  This is the cost approach, correct?

21   A.  Or non-infringing alternatives.  They mean the same

22   thing.

23   Q.  All right.  We heard Dr. Crovella being asked about

24   non-infringing alternatives yesterday and why they're

25   relevant.

1          I'd like you to explain to the jury, and take just

2     a moment to do this, to talk about what non-infringing

3     alternatives are --

4          THE COURT:  Just a minute.

5          Mr. Gilliland?

6          MR. GILLILAND:  Yeah, I was waiting for the

7     question to finish, but I object to the question to the

8     extent that it mischaracterizes the testimony.  Dr. Crovella

9     never testified as to a non-infringing alternative.

10         THE COURT:  Well, everyone in the courtroom has

11    heard his testimony, and that's certainly something you can

12    take up under cross at this point.  But at this point, I'm

13    not going to prevent the question from being asked and

14    answered.

15         So I'll overrule your objection.

16         MR. GILLILAND:  Thank you, Your Honor.

17    Q.  (By Mr. Gillam)  Would you take just a moment,

18    Mr. Bakewell, and explain to the jury what non-infringing

19    alternatives are and why they're important in a case like

20    this?

21    A.  So non-infringing alternatives are a way to look at --

22    remember, we talked about the metes and bounds of property

23    and how it can be three-dimensional, whether you have the

24    mineral rights and going down, like, to the creek and

25    turning left and looking at where the property lines are,

1   the same thing applies to a patent, same idea.  You have to

2   figure out what the boundaries are.  And one way you can do

3   that is by considering non-infringing alternatives.

4        So the way that I think about it is, well, what's

5   inside the boundaries of the property and what's outside?

6   What does the patent cover and what doesn't it?  And the way

7   you do that in the context of a patent is, hey, what could

8   we have done instead and then not have violated this patent

9   or infringed this patent right.

10       That's what these points say.  It's like, hey,

11  let's look at the scope and value.  You do it when you go

12  back in time.  What options would you have?  I've described

13  all this.  And then what would the cost be associated with

14  that?  And that's a way of more specifically focusing in on

15  the value of the patent right.

16  Q.  Does this issue relate to liability in this case at all?

17  A.  And we heard -- Dr. Crovella was asked about that, so an

18  expert like him who thinks that the patent is not infringed

19  and is invalid, I have to tell him, like, hey, you have to

20  make an assumption, Dr. Crovella, that's totally different

21  than that.

22       We have to operate in a different world where we

23  assume that Dr. Smith is right.  As much as you might

24  disagree with him, can you make that assumption?  And he

25  talked about that yesterday.  It's the hypothetical, right?

1    And so that's the idea.

2    Q.  On the issue of damages, when you considered this cost

3    approach and non-infringing alternatives, what did you find,

4    sir?

5    A.  So I found that there were options.  I learned from

6    Mr. Foote and Dr. Crovella that there were at least a couple

7    of options that Great West could have done if it had known

8    about this patent instead, and that they didn't -- wouldn't

9    have cost very much to do.

10   Q.  Okay.  Talk to us about that, please.

11   A.  So there were -- there were a couple, and Mr. Lasinski

12   and I actually agree upon one thing.  We -- he was able to

13   estimate what the costs were -- what he called the

14   incremental cost of implementing this specific part of the

15   IBM WebSphere at Great West.

16          And that cost -- he estimated it costs somewhere

17   between 160 and $200,000.00, incrementally, so the whole

18   thing to implement it, cost less -- cost Great West about

19   200,000.  So we're talking about making some changes to that

20   implementation, doing part of it a different way.

21          And there were a couple things that Dr. Crovella

22   said.  One was to use a different sign-in, and another was

23   we heard about yesterday to do some different things with

24   how data is treated.

25   Q.  Did you do anything else to determine if Great West

1  had non-infringing alternatives?

2  A.  Well, I -- I asked Mr. Foote if those could have been

3  done, and I asked him what the cost would be.  And he told

4  me for both of those it would take a couple hundred hours or

5  so, and the labor rates were about $60.00 per hour.  So

6  we're talking about a fraction of that $160,000.00,

7  something more like $10,000.00 or so, just for that specific

8  change or those specific types of changes.

9          MR. GILLAM:  Next slide, please, sir.

10  Q.  (By Mr. Gillam)  So with respect to this cost approach

11  or the non-infringing alternatives, what are you showing us

12  on this particular slide then?

13  A.  So this summarizes it.  It's like, hey, this is the

14  incremental implementation cost of WebSphere.  It's --

15  I used one of the numbers that Mr. Lasinski did, 163,000.

16          Let's look at the piece that relates to this

17  accused functionality.  To do that a different way would

18  cost less than $163,000.00, far less.  And there's a couple

19  of options that -- at least that Dr. Crovella provided and

20  Mr. Foote told me the cost associated with those.  And he

21  told me the impact wouldn't be significant.

22  Q.  So if a company has an ability to implement a

23  non-infringing alternative like this, why don't companies

24  just do it?

25  A.  So a couple of things.  First of all, this exercise is

1    hypothetical, and the idea is to go back and perform a

2    valuation.

3         So if Great West wouldn't have had to do this if it

4    didn't feel like it -- or know that there was a patent out

5    there or didn't feel like it infringed.  And then Great West

6    has the ability to come to court and say, you know, we don't

7    think that we infringe the patent, basically to stand up for

8    its rights and say, well, we don't infringe, and your patent

9    is not valid.

10        And so you can't say, hey, why don't you just do

11   it?  It will be a piece of cake.  Sometimes people have to

12   do things that are right and stand up for what they believe

13   in.  And I think that's the case here.

14        MR. GILLAM:  Next slide, please.

15   Q.  (By Mr. Gillam)  We've discussed the income approach,

16   and we've discussed the cost approach or non-infringing

17   alternative.

18        What's the next step that you want to talk about?

19   A.  These are the transactions that I referred to several

20   times now.

21   Q.  Is this the market approach that you described a few

22   moments ago?

23   A.  Correct.  It's indicated there with the houses on the

24   bottom in the blue colors.

25   Q.  So do we have actual -- or not we, but were there --

```
 1   evidence of actual transactions then involving the

 2   '177 patent in this case?

 3   A.  Yes, this patent has been bought and sold.

 4   Q.  In terms of their amounts, are they anything like what

 5   Mr. Lasinski came up with in this case?

 6   A.  Nothing at all.  There -- the numbers are more like

 7   $300,000.00 or less.

 8   Q.  We'll come back to this.

 9        MR. GILLAM:  But let's go to the next slide,

10   please.

11   Q.  (By Mr. Gillam)  Before we get into those transactions,

12   would it be helpful to see kind of the timeline of events

13   and where things fit in?

14   A.  I think it would be helpful.  I prepared this slide

15   sitting here in court, and it seemed to me that we hadn't

16   gone through these dates, or the jury hadn't heard these

17   dates, and so I thought it would be helpful to provide some

18   context for some of these values to provide them.  And I had

19   to put my glasses on.  Hopefully, this isn't too small.

20   I tried to make it as readable as I could.

21   Q.  All right.  So, generally, starting back in June 2004,

22   walk the jury through the dates that are applicable to your

23   damage analysis here, and then we'll fill in these other

24   things.

25   A.  So we heard briefly, that's when the application to the
```

1    '177 patent, and the '177 is a continuation of a patent

2    called the '010 patent, that's the parent patent, and that

3    was filed in 2000.

4         The patent rights go -- they last for 20 years, so

5    if you go from 2000 to 20 years from then you would go to

6    May 2020.  That's when the '177 patent expires.  That's the

7    bookends of this diagram.

8         The '177 patent actually issued in April of 2009.

9    I show that in the middle.

10        Mr. Lasinski talked about a hypothetical

11   negotiation date in July of 2013, and then there's a gap,

12   and August of 2014 is when Great West launched the agent

13   portal.  And -- and that's when it's accused of infringing

14   for the first time.

15        MR. GILLAM:  Let's have the next slide, please.

16   Q.  (By Mr. Gillam)  Now, on this particular slide, have you

17   added data points regarding a couple of transactions, as

18   well as one other bit of information for us?

19   A.  I have.  So let's walk through these from left to right.

20   Q.  First, let's look at August 2006.  Tell us what happened

21   then.

22   A.  There's a company called HowZone, which owned the --

23   I wrote '177 app, so it was the application to the

24   '177 patent.  The '010 patent, that's the parent patent.

25   And then another application to Mount Hamilton Partners,

1    that's the patent broker I mentioned earlier.   They assigned

2    those rights in August 2006 for $150,000.00.

3          And if the ladies and gentlemen of the jury want to

4    look at that document, I wrote in red sort of like with a

5    stamp, like a meat stamp, the exhibit number.   It's

6    GWX-0204.

7    Q.   Is there another data point or another transaction that

8    you think is important to look at in September of 2008?

9    A.   There is.   But if I could back up to August 2006 for one

10   moment?

11   Q.   Certainly.   I'm sorry.

12   A.   I put a star there, and then go down -- if you go down

13   and read what's at the bottom of that star, there's actually

14   two transactions.

15          First, HowZone agreed to sell the patent rights for

16   115,000 plus a contingent payment, like upside.   And then

17   they waived it a couple of months later in November to a

18   $150,000.00 flat fee.   So they waived their contingent

19   rights and agreed to take $150,000.00 as a lump sum.

20   Q.   All right.   Let's move on to September 2008.

21          What happened in September 2008 that you believe is

22   a transaction applicable to what we should be discussing

23   here?

24   A.   So that's when IV's company, Botalini Tera, purchased

25   these three patent assets, the parent to the '177, the

1    '177 when it was still an application, and another patent.

2    That was in September 2008.  It was for $300,000.00.  And

3    that document or that transaction is documented in

4    Exhibit GWX-0230.

5    Q.  We've added another thing to the timeline here, that's

6    to the right of that, January 2015.

7            What actually happened in January 2015?

8    A.  So that's when the complaint was filed in this case.

9    That's -- we heard the word "notice."  That's when Great

10   West was put on notice, when they were told that

11   Intellectual Ventures thought that they infringed this

12   patent when they were sued.  And that's what Mr. Lasinski's

13   damages start date is, January of 2015.

14   Q.  So after this lawsuit was filed in January 2015, did

15   something else happen that you looked at, which is relevant

16   to what we're discussing here?

17   A.  So then discovery occurred between the parties, right,

18   they can ask each other for information, and they print

19   things out and send it over.

20           And there was a document that was printed from

21   Intellectual Ventures's records called -- it was called an

22   iRunway -- or a runway sheet.  They used that information to

23   explain what they think the values are of the rights that

24   they own and some other details.

25           And in there the '177 patent had issued by then,

1    and they recorded a value of 100,000 for the '177 patent,

2    for the '010 patent, and for the other patent.  So the

3    $300,000.00 was broken up into three pieces, one of which is

4    a $100,000.00 for this '177 patent, which had issued by

5    then.

6              MR. GILLAM:  Let's -- let's skip over a couple of

7    slides if we could.  Let's go to the slide that says

8    IV Records, if we could.

9              There we go.

10   Q.  (By Mr. Gillam)  Is this a particular -- is this a

11   document that you're discussing here, Mr. Bakewell?

12   A.  I am.  This includes actually the asking price that

13   Mount Hamilton Partners asked for, $350,000.00.  So they

14   asked for $350,000.00 from Intellectual Ventures.

15             Intellectual Ventures agreed it's the offer price

16   to pay them 300,000, and the deal closed at that.  So the

17   deal cost was 300,000, and then the cost per asset in

18   Intellectual Venture's own records was recorded at

19   $100,000.00.

20   Q.  And it's hard to see the date on there, but the date --

21   is it June of -- it's down at the very bottom right-hand

22   corner.

23             There we go.

24   A.  That says June 16th, 2015.

25   Q.  Which would be after the date this lawsuit is filed?

1  A.  Correct.

2          MR. GILLAM:  Let's go back to two slides if we

3  could?

4  Q.  (By Mr. Gillam)  So what do we have on this particular

5  slide?  We've added in the various transactions that you

6  found, the 150, the 300,000, and the $100,000.00 value put

7  on it by IV.  And what does this show us in this particular

8  slide, sir?

9  A.  Well, this is another way to show that Mr. Lasinski's

10 damages estimate is not reasonable.  Just for that period of

11 time, that's his damages window.  He says that

12 Great West owes Intellectual Ventures $20.3 million, and

13 that's just not even relative to all this other evidence

14 that we have, in addition to the issues with his

15 methodology.

16          MR. GILLAM:  Go forward, please.

17 Q.  (By Mr. Gillam)  Oh, let me -- let me -- I did not

18 mention this.

19          MR. GILLAM:  If you could go back one slide,

20 please?  I actually want to look at the -- the slide that --

21 there it is.

22 Q.  (By Mr. Gillam)  This $100,000.00 figure, the

23 IV accounting --

24 A.  Yes.

25 Q.  -- that we looked at a few moments ago, for purposes of

1    the record, that's GWX-0261; is that correct?

2    A.   That is.

3    Q.   All right.  And we heard Mr. Lasinski talk yesterday,

4    and you discussed it a few moments ago, about these

5    Georgia-Pacific factors.

6            You remember that?

7    A.   Yes.

8    Q.   And tell us, again, briefly what Georgia -- we know

9    Georgia-Pacific is a paper company.  But what does

10   Georgia-Pacific have to do with anything in this case or in

11   the area of patent damages?

12   A.   Georgia-Pacific is a -- is a paper company and was

13   involved in a lawsuit 50 years ago.  And there were a bunch

14   of cases that came out of that lawsuit.  And one of them,

15   the Judge said, hey, the way you should figure out a

16   reasonable royalty is you should use this hypothetical

17   negotiation tool.  It's that same tool you use for valuing

18   other assets.  And then he listed out 15 factors that he

19   said that you might want to think about in the context of

20   intellectual property and patent damages.

21   Q.   So in addition to the work that you've already described

22   in this case, did you consider those same factors, as well?

23   A.   I did.

24   Q.   Could you explain to us how those are applicable to what

25   you did here, and do we need to discuss them in detail?

1    A.  Well, the good news is we've already discussed them.

2    Q.  Okay.  What factors are applicable as far as the

3    Georgia-Pacific factors in your analysis?

4    A.  There's a -- there's a few.  And I'll just run through

5    them very quickly.

6            1, Georgia-Pacific Factor 1, relates to

7    transactions involving the patent at issue.

8            Georgia-Pacific Factor 3 relates to what's included

9    in this hypothetical license.  Here it's the only the one

10   claim of the '177 patent.

11           Factors 8 and 9, those relate to talking to

12   technical experts and figuring out what the boundaries are

13   of that patent right.

14           And then Factor 13 is something called

15   apportionment, which says, hey, you need to look at

16   specifically what this patent covers and nothing else.

17           Those are the important Georgia-Pacific factors,

18   and I think we've talked about them all.

19           MR. GILLAM:  Next slide, please.

20   Q.  (By Mr. Gillam)  In summary, Mr. Bakewell, how does

21   Intellectual Property's [sic] demand of 20 -- or over

22   $20 million compare to the real-world evidence that you

23   considered in this case?

24   A.  Intellectual Ventures's demand in this case is not

25   reasonable.  It's not reasonable in and of itself.  And then

1  it's not reasonable relative to the other evidence that we

2  have.  That's what this chart shows.

3         I mean, I couldn't even put the scale -- it's --

4  the scale on the left axis goes up to a million dollars.

5  I put an arrow because $20 million doesn't even fit on this

6  page.

7  Q.  Do you have a slide summarizing the appropriate

8  reasonable royalty in this case?

9  A.  Yes.

10        MR. GILLAM:  Could you go to the next slide,

11 please?

12 A.  Well, the evidence that we have says that a reasonable

13 royalty is no more than $300,000.00, and I think that's a

14 much more reasonable conclusion if the ladies and gentlemen

15 of the jury get to the question of damages at all.

16 Q.  And that's based on your analysis of the income

17 approach, cost approach, and these transactions that we

18 discussed; is that right?

19 A.  Yes.

20 Q.  I want to ask you one last thing.  If Claim 14 is found

21 to be invalid, what would the damages be in this case?

22 A.  We don't even get to damages, so it's not even zero.

23 It's null.

24 Q.  And you're aware that Great West disputes infringement

25 in this case, correct?

1    A.  Yes.

2    Q.  If the jury finds non-infringement in this case, what

3    are the damages?

4    A.  They're the same thing.  There's no damages.  You don't

5    get to that question.

6            MR. GILLAM:  Pass the witness.

7            THE COURT:  Cross-examination?

8            MR. GILLILAND:  Your Honor, I have some notebooks

9    for cross.

10            May I pass those out?

11            THE COURT:  You have leave to distribute your

12    notebooks.

13                    CROSS-EXAMINATION

14    BY MR. GILLILAND:

15    Q.  Good afternoon, Mr. Bakewell.

16    A.  Hi, good afternoon.

17            THE COURT:  Good morning, gentlemen.

18            THE WITNESS:  Oh, good morning.

19            MR. GILLILAND:  Good morning.

20            THE WITNESS:  You got me.

21            MR. GILLILAND:  I lost track of time.

22    Q.  (By Mr. Gilliland)  Let's start off -- I want to talk

23    about a few things that you and Mr. Lasinski agree with.

24            First, for the purposes of the hypothetical

25    negotiation, you agree that you have to assume the patent is

1    valid?

2    A.  Correct.

3    Q.  And for purposes of the hypothetical negotiation, you

4    have to assume that the patent is infringed?

5    A.  Correct.

6    Q.  And I believe even in some of your calculations, you

7    agreed with Mr. Lasinski for the discount rate of

8    12 percent?

9    A.  I don't have an issue with that that I raised today.

10   I think there's issues with that, but I'd set that aside for

11   purposes of today.

12   Q.  And you also would agree that Great West does not track

13   the value of the cost savings from its web portal.

14          You would agree with that, wouldn't you?

15   A.  Yes.

16   Q.  And without information from Great West directly, you

17   would agree that it's appropriate to look for other closely

18   related data to come to a conclusion, wouldn't you agree

19   with that?

20   A.  To try, you'd have to do it reasonably.

21   Q.  And I believe you also said -- I guess you've -- you've

22   got a certified licensing professional designation?

23   A.  Yes.

24   Q.  And that's from the Licensing Executive Society?

25   A.  Correct.

1    Q.  Did you get that while Mr. Lasinski was president of the

2    organization?

3    A.  I don't know.

4    Q.  Have you ever held any offices within the Licensing

5    Executive Society?

6    A.  Not within that organization.

7    Q.  I want to talk briefly about one of your slides.

8            MR. GILLILAND:  If we could bring up -- I think

9    it's Slide 23?

10   Q.  (By Mr. Gilliland)  Okay.  And this is a slide where

11   you're talking about prior purchases related to the

12   '177 patent family?

13   A.  Correct.

14   Q.  And in this $150,000.00 purchase in August of 2006, at

15   that time, the '177 patent was just a patent application,

16   right?

17   A.  That's why it says '177 app there.

18   Q.  That's an abbreviation for application?

19   A.  That's correct.

20   Q.  And an application means that it's in the Patent Office,

21   but the patent has not yet been granted, right?

22   A.  That's true.

23   Q.  And so you don't know yet what the metes and bounds

24   of that deed are even going to be or what that patent are

25   going to be, right?

1  A.  You have an idea, but there's more refinement that he

2  could potentially be done.

3  Q.  And there's no guarantee that it will actually issue as

4  a patent, is there?

5  A.  True.

6  Q.  And then this -- this transaction in 2006, that was for

7  a family -- what we call a patent family, right?

8  A.  Correct.

9  Q.  And that means it included the parent and the two child

10  patent applications, right?

11  A.  Yes.

12  Q.  And then in 2006 when that family was sold again, it was

13  sold for $300,000.00, right -- or in 2008, excuse me?

14  A.  It wasn't right.  I think you meant in 2008.

15  Q.  Yeah, I caught myself at the end, that's right.

16       So from August of 2006 to September of 2008, that

17  patent family sold for over twice the amount it sold for in

18  2006?

19  A.  True.

20  Q.  So it doubled in value in just those two years, right?

21  A.  That's true.

22  Q.  And at that time in 2008, the '177 patent was still just

23  an application?

24  A.  Correct.  It was like several months before it issued.

25  Q.  Right.  But it was still no guarantee that it was going

1    to issue by that date, was there?

2    A.   True.

3    Q.   It was sort of like the glimmer in the inventor's eye as

4    opposed to an actual deed to an invention?

5    A.   That's false.

6    Q.   Well --

7    A.   That's very false.

8    Q.   It wasn't an issued application, was it -- or an issued

9    patent?

10   A.   That, I agree with.

11   Q.   Okay.  And so in just that two short years, that patent

12   family had doubled in value just looking at sales of the

13   family, right?

14   A.   The numbers are what they are.  They went from 150 to

15   300 in two years.

16   Q.   And in the last 11 years, you want to say that it's had

17   no additional value?  That's what you're telling this jury

18   is that it should stay at 300, even though 11 years had

19   passed?

20   A.   Actually, I told the ladies and gentlemen of the jury

21   something more specific.  I said that in this case, we need

22   to look at the metes and bounds or the claim that's been

23   asserted of one piece of that, one piece of those three

24   patents for one potential licensee, and that's a subset of

25   all of that.  And so that's what I'm saying is that piece of

1   that transaction is worth less.

2           MR. GILLILAND:  I'll object as non-responsive, Your

3   Honor.

4           THE COURT:  Overruled.

5           MR. GILLILAND:  Now, if we could go to -- well,

6   before we go to this other slide -- you can take that one

7   down.

8   Q.  (By Mr. Gilliland)  But you -- you started your

9   testimony off by saying that -- something to the effect of

10  Great West did not have to call you as a witness, right?

11  A.  I don't know if I said that, but I agree with that.

12  Q.  Okay.  They didn't have to present you as a witness on

13  damages, did they?

14  A.  Correct.

15  Q.  But they made the decision to have you come in here and

16  testify on this jury to this much lower number than

17  Mr. Lasinski, right?

18  A.  They called me up.  I answered the questions, they asked

19  questions.

20  Q.  And they could have also -- well, let -- let me start

21  this over.

22          You're not an insurance industry expert, are you?

23  A.  True.

24  Q.  And they could have called an insurance industry expert

25  to comment on what Ms. O'Neil said, couldn't they?

1  A.  Sure.

2  Q.  And, in fact, you had actually talked to an insurance

3  industry expert for Great West when you drafted your report,

4  didn't you?

5  A.  I did.

6  Q.  And did you see that gentleman sitting in the courtroom

7  for a great part of this trial?

8  A.  I've seen him.

9  Q.  And -- but you realize he's not going to be called to

10 testify, is he?

11 A.  Apparently not.

12 Q.  And you're also, in addition to not being an insurance

13 industry expert, you're not a technical expert in this case,

14 are you?

15 A.  That's true.

16 Q.  And so you are not rendering any opinions on

17 infringement, are you?

18 A.  Correct.

19 Q.  And you're not rendering any opinions on validity

20 either, are you?

21 A.  That's true.  Those are assumptions that I make.

22 Q.  Okay.  And you're not testifying to this jury -- well,

23 rendering any opinions to this jury as to what is a

24 non-infringing alternative?

25 A.  Correct.  I'm making assumptions based upon what I was

1    told by Dr. Crovella and Mr. Foote.

2    Q.  And you're having to rely on Dr. Crovella and

3    Mr. Foote's testimony for any of those kind of technical

4    non-infringement issues?

5    A.  And Dr. Smith, too.

6    Q.  And Dr. Smith, too.

7           But you're not rendering those opinions for this

8    jury, right?

9    A.  I'm making assumptions based upon what those three

10   gentlemen have said, and then I'm incorporating those into

11   my analysis.

12   Q.  But you're not rendering or giving this jury a

13   non-infringement opinion yourself, are you?

14   A.  Correct.

15          MR. GILLILAND:  And let's go to --

16   Q.  (By Mr. Gilliland)  So you had this slide up earlier

17   where you had issues with Ms. O'Neil.

18          You remember this slide?

19   A.  I don't have issues with her.  I just think that her

20   analysis was off.

21   Q.  Okay.

22   A.  I don't have any issues with her at all.

23   Q.  But one of the criticisms you had had was that she did

24   not speak with Dr. Smith.

25          Do you see that?

1    A.   Correct.

2    Q.   And that's a criticism of Ms. O'Neil, right?

3    A.   In part.  Also, Mr. Las -- she said that Mr. Lasinski's

4    conclusion was reasonable, even though she hadn't done that,

5    and she focused on a portal.  And if I was in Mr. Lasinski's

6    shoes, I would have said, whoa, I'm not supposed to be

7    valuing a portal here, and he should have gone back and

8    rethought it.

9              MR. GILLILAND:  I'll object as non-responsive.

10             THE COURT:  I'll sustain that.

11             Mr. Bakewell, you need to limit your answers to the

12   questions asked.

13             THE WITNESS:  Yes.

14             THE COURT:  You're well aware that Mr. Gillam will

15   get to follow up with additional questions.  So limit your

16   answer to the questions Mr. Gilliland asks, all right?

17             THE WITNESS:  Yes, sir, Your Honor.

18             THE COURT:  Okay.  Let's continue.

19   Q.   (By Mr. Gilliland)  And -- but you know that

20   Mr. Lasinski did speak to Dr. Smith, don't you?

21   A.   He did.

22   Q.   And you criticize Ms. O'Neil for not looking at the

23   portal, right?

24   A.   Yes, that applies to both of them.

25   Q.   Yes.  And that applies to you, doesn't it?

1    A.   I don't think so.

2    Q.   Well, in the materials you considered when you wrote

3    your report, you did not identify the portal as anything

4    that you evaluated, did you?

5    A.   That's not correct.  That's not correct.

6    Q.   So among the facts and data of materials considered on

7    Page 9 of your report, you do not on there anywhere say you

8    looked at the accused portal; isn't that correct?

9    A.   That's false.  It doesn't include those words, but

10   drawing that conclusion that you're drawing is incorrect.

11   I looked at the portal in detail.

12   Q.   So you didn't put the words in your report, but we're

13   supposed to make that assumption based on your testimony

14   today?

15   A.   Yes.  I read the infringement contentions, and I read

16   Dr. Smith's report, and I also went to the Internet and

17   looked at IBM WebSphere.  I discussed WebSphere in detail.

18   This is an implementation of IBM WebSphere.  You can look at

19   YouTube videos and see how the functionality works, and so

20   I did look at it.

21   Q.   But you did not bother putting that in your report, did

22   you?

23   A.   I did put that stuff in my report.

24   Q.   Well, if you'll look at page --

25   A.   I -- I'm sorry.

1          THE COURT:  One at a time, gentlemen.

2          MR. GILLILAND:  Sorry, Your Honor.

3   Q.  (By Mr. Gilliland)  If you'll look at Page 9 and 10 of

4   your report, which is in front of you in that binder?

5   A.  Yes.

6   Q.  Starting with Section 1.4, the title of which is Facts,

7   Data, and Information Considered.

8          Do you see that on Page 9 and 10?

9   A.  I do.

10  Q.  And then you list the facts and information considered.

11  And nowhere in that list do you include YouTube videos or

12  online investigation of WebSphere, do you?

13  A.  I don't use those words, but I also point to Attachment

14  C which has pages and pages of Bates numbered documents, and

15  I also describe WebSphere in pages in my report.

16         MR. GILLILAND:  I'll object as non-responsive, Your

17  Honor.

18         THE COURT:  Sustained.

19         The question was are they on those pages, and your

20  answer was that they're not, and then you went on to offer

21  other explanation.  You need to limit your answer to the

22  question asked.

23  Q.  (By Mr. Gilliland)  Now, you also criticized Dr. Smith

24  for not using -- or Ms. O'Neil, excuse me, for not using

25  Great West information.

1          That's what you put, right?

2   A.  Yes.

3   Q.  But you understand, one, based on the interrogatory

4   responses, Great West did not have information related to

5   the cost savings, right?

6   A.  There was an interrogatory response that said that

7   information wasn't captured.

8   Q.  But you also know from having sat in here and listened

9   to the testimony that Mr. Lasinski used Great West data on

10  how many times people viewed the portal pages, right?

11  A.  Correct.

12  Q.  And so he did use that data, data about use, right?

13  A.  I discussed that, yes.

14  Q.  And you discussed that with Mr. Gillam just a moment

15  ago, didn't you?

16  A.  I did.

17  Q.  Now, one of the things that you understand that the jury

18  is going to have to decide in this case, if they get to

19  damages, is they have to decide what a reasonable royalty

20  will be, right?

21  A.  Correct.

22  Q.  And under the law, you understand, as -- as I expect the

23  Court will instruct the jury, that in no event -- excuse me,

24  that the -- that upon a finding for Plaintiff, the Court

25  shall award the Plaintiff damages adequate to compensate for

1    the infringement, but in no event less than a reasonable

2    royalty for use of the invention.

3           Do you understand that that's likely to be the

4    instruction?

5    A.  I don't understand -- well, I -- I don't know what the

6    instructions will be, but I think that that's likely.

7    Q.  And you're familiar with the statute that lays that out,

8    aren't you?

9    A.  Yes.

10   Q.  And, in fact, you cited -- you cited to that statute in

11   your report, didn't you?

12   A.  Correct.

13   Q.  And this -- this -- these transactions between the

14   inventors and Mount Hamilton Partners, those had nothing to

15   do with use, did they?

16   A.  I disagree.

17   Q.  Well, there wasn't any evidence of use that went into

18   those calculations, was there?

19   A.  I disagree with that, too.

20   Q.  Well, there was no evidence that Mount Hamilton Partners

21   was using the invention when they sold it to IV, was there?

22   A.  Mount Hamilton Partners was a broker, so it wouldn't use

23   it.

24   Q.  And there's no evidence that IV acquiring it for use, is

25   there?

1   A.  Actually we know that IV didn't intend to use it.

2   Q.  But there is evidence that Great West has used the

3   invention, isn't there?

4   A.  That, I don't know the answer to because I have to

5   assume liability.  That's up to the jury.

6   Q.  Understand.  But you heard Dr. Smith testify to this

7   jury that Great West does use the invention, didn't you?

8   A.  That's what he said.

9   Q.  Now, one of the things you relied on in your report were

10  conversations with -- with Mr. Ponder, right?

11  A.  Yes.

12  Q.  And when you talked to Mr. Ponder, did he give you --

13  did he tell you that the information he was providing to you

14  was marketing fluff?

15  A.  I actually have to correct my prior answer.

16          I think that I briefly interviewed him, but

17  I remember his deposition transcript more.

18  Q.  Okay.

19  A.  And I heard him testify in trial, so that's why

20  I answered yes.

21  Q.  Okay.  Well, you cite to him in your report, too, don't

22  you?

23  A.  That's fair.

24  Q.  And when you talked to him, I guess during this brief

25  conversation, did he explain to you that a lot of the

1    documents contain marketing fluff?

2    A.  He used different words, but I think that he described

3    that I needed to look carefully at -- at things from a

4    technical point of view.

5    Q.  And -- and at the time that was going on, you already

6    knew Great West was a Defendant in this case, right?

7    A.  Yes.

8    Q.  Now, one of the documents you pointed to earlier --

9         MR. GILLILAND:  If we could bring up GWX-0261, or,

10   actually, let's go to this slide.

11   Q.  (By Mr. Gilliland)  Okay.  And on this slide, you're

12   pointing to a page out of GWX-0261, right?

13   A.  Yes.

14   Q.  And the information on this page is about the

15   transaction between Mount Hamilton Partners and Botalini

16   Partners, right?

17   A.  Correct.

18   Q.  And that transaction occurred all the way back in 2008,

19   right?

20   A.  Correct.

21   Q.  But you told the jury that this is what IV allocated in

22   June of 2015, correct?

23   A.  That's what's in the document that was dated June of

24   2015.

25   Q.  And when you say that's what's in the document, you're

1  relying on this footer down here in the bottom, right?

2  A.  A couple of things I'm relying upon.  That's one of the

3  things that I'm relying upon.

4  Q.  And a footer in the document, you realize that that's

5  likely the date this document was printed for purposes of

6  this litigation.

7          Don't you understand that?

8  A.  I do.

9  Q.  Okay.  In your work on this case, have you come to

10  understand how underwriting operates?

11  A.  Yes.  I have some understanding of that from other

12  areas, so -- and I've learned a little bit more in this

13  case, sure.

14  Q.  Sure.  And in this case, the Defendant insures truck

15  drivers, right?

16  A.  Correct.

17  Q.  And one of the processes of underwriting is evaluating

18  how much risk a potential trucking company presents to

19  Great -- Great West.

20          Isn't that part of what underwriting considers?

21  A.  I think that's true.

22  Q.  And they've got to consider how risky is this company so

23  we can decide whether to insure them or not?

24  A.  In part.  That's part of what the thought process is, as

25  I understand it.

1  Q.  And another part -- part of that thought process is

2  how -- if -- well, let me start that over.

3          One of the other things underwriting has to

4  consider is how risky the company is so they can decide how

5  much of a premium to charge for selling them insurance,

6  right?

7  A.  I would think so.

8  Q.  And a big factor -- well, let me start that over.

9          At least a factor in how risky a company is, is who

10  are the drivers for that company, right?

11  A.  It can be.

12  Q.  It can be.  And that's why I think -- as you saw in

13  here, some of the information and data that can be uploaded

14  and put into the portal is how many years of experience an

15  individual driver has.

16          Did you see that?

17  A.  I saw that.

18  Q.  And another thing that the portal allows for is

19  requesting the motor vehicle record or MVR for a particular

20  driver, right?

21  A.  We've heard about that MVR, sure.

22  Q.  And I think Mr. Foote said -- even in the driver

23  database, the driver stays in there so if they're involved

24  in a wreck, the driver stays connected to that wreck in the

25  database in case they turn up again?

1   A.   I'm not sure he said exactly that, but what you're

2   saying seems reasonable to me.

3   Q.   And it was the general gist of what he said, right?

4   A.   I actually thought he said something else, but what

5   you're saying, I think I can also agree with.

6   Q.   Okay.  And all of those are reasons why it's important

7   from top to bottom for Great West to be able to gather

8   information about the drivers?

9   A.   Sure.

10  Q.   And when -- when a claim is made -- well, strike that.

11       MR. GILLILAND:  Let's bring up Plaintiff's

12  Exhibit 212.

13  Q.   (By Mr. Gilliland)  Okay.  And I'm showing you

14  Exhibit 212.

15       We discussed this yesterday with Mr. Ponder.

16  I think it's in your notebook, but I'm not a hundred percent

17  sure.

18  A.   I think so.

19  Q.   Well -- and we've got it on the screen.  I'll just ask

20  you a couple of questions about it.

21  A.   Oh, I found it.

22  Q.   Oh, you found it, good.  I did not find it in my binder.

23  A.   It's in the other tab.  It's actually -- if you look at

24  213, that's where 212 is -- 213 is behind 212.

25  Q.   Ah, they're out of order, I guess.

1   A.  I found them.

2   Q.  Okay.  Well, let me --

3          THE COURT:  Now that you gentlemen -- now that you

4   gentlemen had a conversation about it, let's ask a question.

5          MR. GILLILAND:  Yes, sir, Your Honor.

6          THE COURT:  Okay.

7   Q.  (By Mr. Gilliland)  You heard Mr. Ponder testify about

8   Plaintiff's Exhibit 212 yesterday?

9   A.  Yes.

10  Q.  And you see up here in the top of Exhibit 212 where it's

11  talking about the insured portal, it has -- the second

12  sentence reads:  The newly designed insured portal allows

13  insureds to access information on their own without needing

14  to call their agent, underwriter, or safety representative

15  for assistance.

16         Do you see that?

17  A.  Yes.

18  Q.  Did you make any attempt to value the cost savings of

19  those avoided phone calls?

20  A.  I did.

21  Q.  Okay.  And how did you do that?

22  A.  Well, I considered whether or not there's other ways of

23  accomplishing the same thing.

24  Q.  Okay.  But did you ever calculate how much it

25  would -- each of those calls would cost to pay somebody

1    to take them if they were not served using the insurance

2    portal?

3    A.   I don't think that's the right way to do it.  You can do

4    things another way.

5           MR. GILLILAND:  I'll object as non-responsive, Your

6    Honor.

7           THE COURT:  Restate the question, Mr. Gilliland.

8           MR. GILLILAND:  Okay.

9    Q.  (By Mr. Gilliland)  Did you attempt to calculate a value

10   of those avoided phone calls?

11   A.   No, and I can explain why.

12   Q.   Now -- and I'm sure Mr. Gillam will give you the

13   opportunity if you'd like.

14          Let me ask another question.

15          Did -- you had -- you had talked a lot about

16   comparable sales, I guess, using a real estate analogy?

17   A.   Yes.

18   Q.   And if you -- if you are not careful when you're trying

19   to use -- well, let me start that over.

20          Does -- comparable sales does not take into account

21   the amount of use, does it?

22   A.   It does.

23   Q.   Well, comparable sales looks at how much other

24   transactions of similar properties would sell for, that's

25   what comparable sales is about, isn't it?

1  A.  That's true.

2  Q.  And if you're not real careful selecting your

3  comparables, you could severely undervalue a piece of

4  property, couldn't you?

5  A.  You could.

6  Q.  But the comparable sales is not looking at the value of

7  a piece of property for someone who's actually going to put

8  it to use, is it?

9  A.  That's false.

10  Q.  Okay.  Well, let me ask you this then:  If you were to

11  value a piece of property, would it make a difference in the

12  price of that property if it was on a lake or way down in an

13  isolated area where you couldn't even access it, and it was

14  all overgrown with weeds?

15       Would that make a difference?

16  A.  I think there's probably other things that you'd need to

17  consider, but those certainly would be aspects that you'd

18  want to think about.

19  Q.  And let's say you owned a piece of property where a

20  new -- or owned a golf course, would that generally be more

21  valuable than one that's not on a golf course, everything

22  else being equal?

23  A.  No.

24  Q.  Okay.

25  A.  I mean, maybe I would say but --

```
 1   Q.  Maybe, okay.  Well --
 2   A.  But I don't think you can say "yes" or "no."
 3   Q.  And -- and let me ask you this then:  If -- would it
 4   make a difference in valuing property if you valued it
 5   11 years before a nice golf course was put in that abutted
 6   that property?
 7            Would the value be different?
 8   A.  It might.
 9   Q.  And -- and it might because if you valued it back before
10   anybody even thought about putting that golf course in, the
11   value of it would likely be a whole lot less than the value
12   after the golf course had been put in?
13   A.  That's the part that depends.  It depends what was there
14   before.
15   Q.  Okay.  And if there wasn't anything going on, if it was
16   just a glimmer in a developer's eye, then it might not be
17   worth near as much 11 years earlier as it is today, isn't
18   that true?
19   A.  I don't understand your question.
20   Q.  Sure.  Here's what I'm getting at is, the application
21   that became the '177 patent was like that piece of rural
22   property back in 2008, and today it's more like the property
23   that's on the new Byron Nelson golf course in Dallas,
24   there's a significant difference when you look at the time
25   and the use of the property and the value of the property,
```

1   isn't there?

2   A.  In that hypothetical?  Are -- are you asking me in that

3   hypothetical?  I don't understand your question then.

4   Q.  Sure.  Sure.  I'm sure that's true.

5        I'm just saying that it depends a lot on the

6   conditions surrounding the piece of property, doesn't it?

7   A.  It can.  You have to look at what's changed, sure.

8   I agree with that.

9   Q.  And that goes for whether it's real property or

10  intellectual property?

11  A.  I agree.

12        MR. GILLILAND:  Pass the witness, Your Honor.

13        THE COURT:  Redirect?

14                   REDIRECT EXAMINATION

15  BY MR. GILLAM:

16  Q.  Mr. Bakewell, would you tell us whether it was in the

17  page that Mr. Gilliland pointed out to you or somewhere else

18  in your report what you did to look at the portal that's

19  involved in this case?

20  A.  Sure.  So the page that Mr. Gilliland was pointing to

21  described the deposition transcripts and then, generally

22  speaking, the materials that I reviewed.  And there was a

23  sentence in there that said:  I reviewed the materials in

24  Attachment C.  And that's what I was referring to earlier

25  when he asked me that question.

1          That -- Attachment C has I don't know how many

2    pages, but it's many, many pages of what are called Bates

3    numbered documents.  Those are the little numbers that we've

4    been seeing in the bottom right-hand corner of the documents

5    on the screen sometime.  And I've got columns and pages of

6    things that are listed there.

7          And in there are materials -- printouts of the

8    website that I reviewed.

9          And then also are listed are all of what's called

10   the legal pleadings.  And one of the documents in there is

11   the infringement contentions and a complaint.

12         I also reviewed Dr. Smith's report and

13   Dr. Crovella's reports.  And in those, there's printouts and

14   descriptions of how the system works.

15         And then I also described that how on my own,

16   I conducted my own research, and I discussed that in my

17   report, too.  And I went to look at YouTube videos on how

18   IBM WebSphere works, where people had modified to different

19   clients.

20         And I did research on Great West.  And from all

21   that information, you can assemble it in your mind and see

22   how the system actually works.  So I think that I did look

23   at the accused portal and the functionality that's accused.

24   Q.  Was there anything that you heard from Ms. O'Neil or

25   Mr. Lasinski that even hints that they looked at it at all?

1   A.  They said that they didn't at all, they -- that's what

2   they said.

3   Q.  Now, Mr. Gilliland asked you about Exhibit 212 a few

4   moments ago.  That was the thing that said insured portal.

5        Do you remember that?

6   A.  Yes.

7   Q.  Did you look at -- or have you had a chance to look at

8   the uncontested facts that were stipulated to between the

9   parties in this particular case?

10  A.  I did.

11  Q.  You understand that insured portal is no longer part of

12  this case based upon that stipulation?

13  A.  That's my understanding.

14  Q.  Nevertheless, let's talk about it for a second.

15        You pointed out -- or I asked you why didn't you

16  make an attempt to value -- I think you said unmade phone

17  calls or something of that nature?

18  A.  I know what you're talking about.  I remember, yes,

19  those questions.

20  Q.  Yes.  And you were going to give him a question, and he

21  said, well, I could ask you about that, so I'm going to ask

22  you about it.

23        Did you make an attempt?  And if so, what did you

24  find?  And if not, why not?

25  A.  Well, I did, and I looked at non-infringing

1  alternatives.  That's the part that we were talking about,

2  he was asking me about, and I wanted to answer.

3          The -- the way that you figure out a problem like

4  that is you don't just look at adding stuff up immediately.

5  You try to figure out what else you could have done.  You

6  have to go back in time.

7          Remember, I had that street sign for non-infringing

8  alternatives.  You have to go back before you get to the

9  fork in the road and figure out what else you could have

10  done and how much that would have cost.

11         And that's what I asked Dr. Crovella and Mr. Foote

12  about, and that's where I got answers about, well, how much

13  it cost to incrementally implement this functionality and

14  how much it would have cost to make a change.  And it's less

15  than $100,000.00.

16         MR. GILLAM:  Could you pull up GWX-261, please?

17         Take that down, and let me make sure I've got my

18  exhibit right.

19  Q.  (By Mr. Gillam)  You remember the discussion

20  Mr. Gilliland had with you about the last 11 years and how

21  things had progressed and that type of thing?

22  A.  Yes.

23  Q.  What's the hypothetical negotiation date that

24  Mr. Lasinski used in this case?

25  A.  He used 2013.

1    Q.   Okay.  So what we -- is his damage period 2013 through

2    what day?

3    A.   Well, his damages period starts in 2015, and then he

4    goes for a few years after that.  That was on that timeline

5    in the area that I marked out in red.

6              MR. GILLAM:  Pass the witness, Your Honor.

7              THE COURT:  Additional cross-examination?

8              MR. GILLILAND:  Yes, Your Honor.

9                      RECROSS-EXAMINATION

10   BY MR. GILLILAND:

11   Q.   Now, Mr. Bakewell, you had just referred to the fact

12   that there were a whole bunch of documents and things listed

13   in Exhibit C to your report, right?

14   A.   Yes, Attachment C.

15   Q.   Attachment C.  And it would be misleading to say you've

16   read everything in Attachment C, wouldn't it?

17   A.   I haven't read all of those myself.  I work together

18   with a team of people.  Some people help me review those

19   documents that work for Duff & Phelps.

20   Q.   And -- and you relied on the other people that reviewed

21   those documents and provided you summaries of a lot of those

22   documents?

23   A.   Sometimes.

24   Q.   Okay.  And that's what you -- that's how you did it?

25   You didn't actually read every single thing that's on there,

1    did you?

2    A.   Sure.  I work with some people that I value their input,

3    and they help me.

4    Q.   And when was this lawsuit filed?

5    A.   2015.

6    Q.   January of 2015, right?

7    A.   That sounds correct.

8    Q.   And in the last four years, Great West has not

9    implemented one single non-infringing alternative, have

10   they?

11   A.   Not to my knowledge.

12         MR. GILLILAND:  Pass the witness, Your Honor.

13         THE COURT:  Any further direct?

14         MR. GILLAM:  Yes, Your Honor, one more thing.

15         I would like you to pull up GWX-261, please.

16                      REDIRECT EXAMINATION

17   BY MR. GILLAM:

18   Q.   Now, you see at the bottom -- at the very bottom corner,

19   the 6/16/2015?

20         MR. GILLILAND:  Your Honor, I would just object to

21   this as being beyond the scope of my recross.

22         THE COURT:  I'll allow it.  Overruled.  Continue.

23   Q.   (By Mr. Gillam)  You see the bottom where it says

24   6/16/2015, and Mr. Gilliland said that -- that must be a

25   printing date?

1          Do you see that?

2    A.  Yes.

3    Q.  All right.

4          MR. GILLAM:  You can take down the box there.

5    Q.  (By Mr. Gillam)  Would you look at the bottom of this

6    document itself, though, the bottom --

7          MR. GILLAM:  Block that that you got the little

8    cursor by, block that out.

9          Could you raise that up for me?

10   Q.  (By Mr. Gillam)  What is the date -- the historical deal

11   notes date back with Cassandra Braget, what's the date on

12   that?  Not the printing date that Mr. Gilliland talked

13   about, but what's the date on that particular part of the

14   document?

15   A.  That's February 12th, 2015.  This is a live document

16   that's continually updated.  It's the runway system is what

17   it's called at Intellectual Ventures, and they keep all of

18   the information live about the -- the assets they have, and

19   that's what this is.

20         THE COURT:  Mr. Bakewell, he didn't ask you all

21   that.  He asked you what the date was.  Answer the question,

22   but don't go beyond the question that's asked, okay?

23         THE WITNESS:  Yes, sir, Your Honor.

24         THE COURT:  All right.

25   Q.  (By Mr. Gillam)  So what is the date, not the printing

1    date, but what's the date, the historical deal note date

2    noted by Cassandra Braget on this particular document?

3    A.   It's February 12th, 2015.

4    Q.   After this particular lawsuit was filed?

5    A.   Correct.

6              MR. GILLAM:  Pass the witness.

7              THE COURT:  Further cross?

8              MR. GILLILAND:  Briefly, Your Honor.

9              Could we bring up the same document?

10                     RECROSS-EXAMINATION

11   BY MR. GILLILAND:

12   Q.   Okay.  And if -- Mr. Bakewell, this document,

13   Defendant's Exhibit -- or GWX-0261 is talking about a

14   transaction that occurred back in 2008, right?

15   A.   In part.

16   Q.   In part?

17             MR. GILLILAND:  Well, let's zoom in on the notes,

18   if you will, Mr. Cartwright?

19   Q.   (By Mr. Gilliland)  All of the kind faded information

20   there is entirely about the transaction between

21   Mount Hamilton Partners and Intellectual Ventures's entity,

22   called Botalini Tera, right?

23   A.   That's what shows up in that window right there.

24   Q.   And that's about the -- the actual sale between Botalini

25   and Mount Hamilton Partners that occurred back in 2008,

1    right?

2    A.  What shows up right there in that window, yes.

3    Q.  Okay.  And if we look at the rest of the document --

4         MR. GILLILAND:  If we zoom out, please?

5    Q.  (By Mr. Gilliland)  The rest of the document is just

6    documenting a transaction that occurred in 2008, except for

7    this one note that Ms. Braget -- Braget made about a change

8    in entity status in 2015, right?

9    A.  That's all that shows up on that printed page.

10   Q.  And that's what this document shows is just that in

11   2015, there was a change in the entity structure?

12   A.  That's all that's on that printed page.

13   Q.  Thank you.

14        MR. GILLILAND:  Pass the witness.

15        THE COURT:  Further direct?

16        MR. GILLAM:  Could you keep it back up there,

17   please?

18                REDIRECT EXAMINATION

19   BY MR. GILLAM:

20   Q.  And when you say about all this --

21        MR. GILLAM:  And could you pull up the same box

22   that Mr. Gilliland had there a few moments ago -- pull that

23   up?

24   Q.  (By Mr. Gillam)  When you see this is all on the printed

25   page, you see the little bar over there on the right side?

1    A.  Yes.

2    Q.  It's hard to describe this, but the bar that's on the

3    right side of something like this, if you pull the bar down

4    or you pull the bar up, what does it show?

5           What -- what happens when you do that on a page

6    like this?

7    A.  It's called a scroll bar.  You can scroll through other

8    data that doesn't show up when the -- when it's printed out.

9    So there's more information here.  This just happens to be

10   how this was printed.

11   Q.  So what we happen to see on this particular document,

12   this printed page, is the scroll bar up to the top which

13   gives the early part of the history, correct?

14   A.  Correct.

15   Q.  What we don't have is what's at the bottom -- if you

16   were to pull that scroll bar down, what would be at the

17   bottom of that page?

18   A.  Yes.

19   Q.  But what we do know is that Cassandra Braget, whoever

20   she is, made some entry with respect to this particular

21   patent on February 12th of 2015?

22   A.  That's correct.

23          MR. GILLAM:  That's all I have, Your Honor.

24          Pass the witness.

25          THE COURT:  Further cross?

```
 1              MR. GILLILAND:  Nothing further, Your Honor.

 2              THE COURT:  All right.  Mr. Bakewell, you may step

 3   down.

 4              THE WITNESS:  Thank you, Your Honor.

 5              THE COURT:  Defendants, call your next witness.

 6              MR. GILLAM:  Your Honor, Defendant rests at this

 7   time.

 8              THE COURT:  All right.  Does Plaintiff have

 9   rebuttal witnesses to call?

10              MR. GILLILAND:  The Plaintiff does not.  The

11   Plaintiff rests, Your Honor.

12              THE COURT:  So both Plaintiff and Defendant rest

13   and close, subject to final jury instructions and closing

14   argument, correct?

15              MR. GILLILAND:  Correct, Your Honor.

16              MR. GILLAM:  Yes, Your Honor.

17              MR. BETTINGER:  Yes, Your Honor.

18              THE COURT:  All right.  Thank you, gentlemen.

19              Ladies and gentlemen of the jury, that means you

20   have heard all the evidence in this case.

21              There are additional things the Court must take up

22   with counsel, but those additional things that come next are

23   to be taken up outside of your hearing.

24              What I'm getting to, ladies and gentlemen, is I'm

25   about to give you the rest of the day off.  I expect it will
```

1    take most of the remainder of the day to -- for me to go

2    through the things I'm required to with counsel and be

3    prepared to give you my final instructions on the law and

4    then proceed to closing arguments.

5            It's my intention to do that first thing in the

6    morning.  So in a moment, I'm going to excuse you for the

7    remainder of the day, but I do want you back tomorrow

8    morning ready to go at 8:30, assembled shortly before that

9    in the jury room.

10           And if everything goes as I anticipate during the

11   remainder of the day, then I'll begin tomorrow with my final

12   instructions to you, followed by arguments -- closing

13   arguments by Plaintiff and Defendant.

14           After that, I'll instruct you to retire and

15   deliberate on your verdict.

16           Follow all the instructions throughout the trial

17   that I've given you as relates to your service as jurors,

18   including, of course, not to discuss the case among

19   yourselves or with anyone else.

20           We are -- we are getting close to the end.  It

21   would be a real travesty if any of these instructions were

22   to be disregarded or violated.  So be very careful about

23   that.

24           Enjoy the remainder of the day, but be back

25   tomorrow morning ready to go at 8:30.  And with that, ladies

 1    and gentlemen, you're excused.

 2            COURT SECURITY OFFICER:  All rise for the jury.

 3            (Jury out.)

 4            THE COURT:  All right.  Please be seated.

 5            Counsel, it's my intention to take a short

 6    recess.  I understand we just received by email the

 7    updated and revised final jury instructions and verdict

 8    form which you've submitted pursuant to my order

 9    yesterday.

10            After a short recess, I'll return to the bench, at

11    which time I'll take up and hear any motions either party

12    wish to make under Rule 50(a).

13            We certainly don't need any electronic devices

14    making noise.  I don't know whose phone just beeped, but

15    make sure it's off, and be thankful it happened when the

16    jury was out of the courtroom.

17            After I've heard motions under Rule 50(a), I'll

18    then conduct an informal charge conference in chambers where

19    we can jointly review and discuss, and I'll hear input from

20    both sides regarding the latest version of the charge and

21    verdict form.

22            After that's complete, I'll generate what I believe

23    to be the appropriate and final jury instruction and verdict

24    form.  And having given both sides an opportunity to review

25    it, I'll then conduct a formal charge conference on the

1    record where any party may make what objections they believe

2    are appropriate and necessary.

3            All right.  Are there questions before we take a

4    short recess?

5            MR. RUPP:  Just one matter, Your Honor.  May all

6    remaining witnesses who have not yet been excused be

7    excused?

8            THE COURT:  Both sides have closed their cases, so

9    all the witness who have both testified or who were called

10   to testify but haven't been presented are excused.

11           MR. RUPP:  Thank you, Your Honor.

12           MR. BETTINGER:  No issues from Defendant, Your

13   Honor.

14           THE COURT:  All right.  Gentlemen, it's -- counsel,

15   it's about 10 minute after 10:00.  Let's take 15 minutes,

16   and I'll be back, and we'll take up motions under Rule

17   50(a).

18           The Court stands in recess.

19           COURT SECURITY OFFICER:  All rise.

20           (Recess.)

21           (Jury out.)

22           COURT SECURITY OFFICER:  All rise.

23           THE COURT:  Be seated, please.

24           All right.  Counsel, the Court will now proceed to

25   take up any motions from either party to be offered under

```
 1   Rule 50(a) of the Federal Rules of Civil Procedure.
 2          Let me first ask just for purposes of
 3   identification, does Plaintiff have motions to offer under
 4   Rule 50(a)?
 5          MR. GILLILAND:  We do, Your Honor.
 6          THE COURT:  All right.  Would you --
 7          MR. GILLILAND:  Oh, and if I may ask the Court,
 8   Mr. Bettinger and myself are going to ask if we could be
 9   excused for the motions to begin working on closing
10   argument, and Mr. Rupp will handle the motions with
11   Mr. Wilson for Plaintiff?
12          THE COURT:  You can -- let's do this -- okay.
13   Well --
14          MR. GILLILAND:  Whatever --
15          THE COURT:  I have -- I have no problem with
16   counsel being absent from both this process and the charge
17   conference process as long as you're adequately staffed, and
18   both sides are.
19          So those of you that are going to deliver closing
20   arguments tomorrow are free to absent yourselves from the
21   remainder of today's activities.
22          My plan, unless we hit an unexpected impediment
23   along the way, my plan is to begin tomorrow morning with my
24   final jury instructions and then go directly into closing
25   arguments.
```

1          So if you and Mr. Bettinger are going to be the

2   sole presenters for closing argument tomorrow, then you

3   certainly have leave to be absent for the remainder of the

4   day.

5          MR. GILLILAND:  Thank you.

6          MR. BETTINGER:  Thank you, Your Honor.

7          THE COURT:  Okay.  Now, stay or leave, gentlemen,

8   it's up to you.

9          MR. GILLILAND:  I wasn't sure on the appropriate

10   time to make our --

11          THE COURT:  Right now.

12          MR. GILLILAND:  Okay.

13          THE COURT:  All right.  So having clarified that,

14   let me ask someone from Plaintiff to identify just topically

15   the areas in which you intend to move for judgment as a

16   matter of law under Rule 50(a).

17          MR. RUPP:  Your Honor, the Plaintiff will intend to

18   move for judgment as a matter of law under Rule 50(a) with

19   respect to the question of patentability under Section 101.

20          THE COURT:  All right.  Any other area, Mr. Rupp?

21          MR. RUPP:  No, Your Honor.

22          THE COURT:  All right.  Does Plaintiff [sic] intend

23   to offer motions under Rule 50(a)?

24          MR. LANGFORD:  Your Honor, Andrew Langford for

25   Great West.

1              We have four motions we intend to bring.

2              THE COURT:  All right.

3              MR. LANGFORD:  Number one, no infringement as a

4    matter law.  Number two, invalidity for anticipation as a

5    matter of law.  Number three, Step 2 of the patent

6    eligibility analysis as a matter of law.  And, number four,

7    no damages as a matter of law.

8              THE COURT:  All right.  Well, let me -- let me

9    clarify one thing right now, and that is, previously the

10   Court has taken up and ruled on the patent eligibility issue

11   related to Section 101 of the Patent Act.

12             And by order and opinion docketed under

13   Docket No. 236, the Court has already said that the Court

14   finds that Claim 14 of the '177 patent is not directed to an

15   abstract concept under Alice Step 1.

16             Now, at the time I entered that order, out of an

17   abundance of caution, I went on to address Step 2 and said

18   there are questions there that need to be resolved, but that

19   was primarily to get us past that point as far as motion

20   practice.  It was not to in any way limit or circumscribe

21   the effect of my ruling on the Step 1 analysis.

22             It's the Court's finding as a matter of law that

23   Claim 14 of the patent-in-suit is not directed to an

24   abstract concept.  Therefore, it is eligible for patent

25   protection.  And the 101 issue is decided already, as far as

1    the Court's concerned.

2           And the Court does not intend to present

3    instructions or a question in the verdict form to the jury

4    on it.  And I do not intend to take it up under Rule 50(a),

5    because in my opinion, that matter has been addressed in a

6    matter that's final and complete pursuant to my order

7    docketed under 236 in this case.

8           So we can save ourselves some time on the

9    101 issue, all right?

10          MS. YANG:  Your Honor, may I just address a comment

11   very briefly?  Just to explain why it was that we did

12   present some evidence of the Step 2 analysis with

13   Dr. Crovella.

14          THE COURT:  I'll certainly give you a brief

15   opportunity to make whatever statement you want for the

16   record, Ms. Yang.

17          MS. YANG:  Thank you.

18          THE COURT:  If you would -- if you would go to the

19   podium, though.

20          MS. YANG:  Yes.

21          THE COURT:  And then we're going to move on.

22          MS. YANG:  Yes, Your Honor, understood.

23          So upon review of Your Honor's order on the Section

24   101 summary judgment motion, we did note that Your Honor had

25   identified that there was a question of material fact as to

1    Step 2 of the 101 analysis.

2         And so we have been in discussions with the

3    Plaintiff as to whether we needed in that -- as a result to

4    present that question to the jury in -- in view of the

5    identified question of material fact.

6         And so our understanding from conversations with

7    the Plaintiff -- with Plaintiff's counsel at the pre-trial

8    conference was that both sides believed that that was

9    something that was appropriate to present to the jury, and,

10   therefore, we requested that Dr. Crovella study this issue

11   and present it to the jury.

12        We understand the Court's position and ruling that

13   that is not something that is intended to be presented to

14   the jury, and simply wanted to note for the record that that

15   was the reason why we -- why we did so.

16        THE COURT:  All right.  The Court accepts your

17   statement, but to leave no doubt, the Court has already

18   ruled on the 101 issue.

19        MS. YANG:  Understood, Your Honor.

20        THE COURT:  All right.  That being the case, the

21   Plaintiff's indication that they want to move with regard to

22   Section 101 and the Defendant's indication that they want to

23   move under 50(a) with regard to Step 2 of the

24   101 analysis are denied as moot.

25        That leaves us the infringement,

1  validity/anticipation, and damages issues to be presented by

2  Defendant under Rule 50(a).

3          Let me hear brief argument from Defendant on the

4  matter of infringement under Rule 50(a) at this time.  And

5  then I'll hear a brief response from Defendants [sic].

6          We'll do this by substantive topic.  I don't want

7  to hear all the arguments on all the motions.  We'll do them

8  one at a time.

9          MR. LANGFORD:  Thank you, Your Honor.

10          THE COURT:  Go ahead.

11          MR. LANGFORD:  With respect to infringement,

12  Plaintiff -- or, sorry, Defendant moves for judgment as a

13  matter of law because Plaintiff did not prove infringement

14  of Claim 14 as a matter of law in this case.

15          Claim 14 requires the centralized access point of

16  Claim 11 to be further operative to enable a user to manage

17  any content contributed by them.

18          In this case, it's an uncontested fact that

19  Plaintiff is accusing only two pages on the Great West

20  website of being a centralized access point and for

21  collecting the notice of uncontested facts of Docket 283,

22  and I'll address each of those two pages.

23          But we're entitled to judgment as a matter of law

24  because neither of those two accused pages is the claim

25  centralized access point operative to enable a user to

1    manage any content contributed by them.

2          Now, the first page that is accused here is the

3    Drivers List By Policy page on Great West's agent portal, an

4    example of which is GWX-494.

5          Now, IV did not meet its burden of proving the

6    Drivers List By Policy page is a centralized access point

7    operative to enable a user to manage any content contributed

8    by them because to the extent anything could be managed via

9    the Drivers List By Policy page, it is not content.  It's an

10   uncontested fact that information about users is not

11   content, as required by Claim 14, as reflected in the notice

12   of uncontested facts of Docket 283.

13         And the Drivers List By Policy page only enables

14   users to manage information about users, not content, so it

15   cannot be the centralized access point of Claim 14 -- for

16   example, information like the name of the driver, the

17   driver's experience, or employment status.

18         There is no dispute that drivers can and do use

19   Great West's website -- excuse me.  For example, Dr. Smith

20   conceded that drivers can be users of Great West's accused

21   website.

22         Mr. Foote gave unrebutted testimony that drivers do

23   use Great West's portal.  They can and do use it.

24         And that is -- that shows that the Drivers List By

25   Policy page cannot be the centralized access point of

 1   Claim 14.

 2          Now, the other page that is accused of being a

 3   centralized access point is the homepage on Great West's

 4   employee portal.  And the allegation here is a little more

 5   nuanced, but the allegation of a Plaintiff is that via that

 6   homepage, I can access another page called Report Rate.  And

 7   on that Report Rate page I allegedly can contribute and

 8   manage content in the form of reports.

 9          But uncontradicted evidence shows that reports,

10   once entered, cannot be edited or deleted.  The Report Rate

11   feature only allows new reports to be entered into the

12   system, and, therefore, there is no management of content as

13   required by Claim 14.

14          Dr. Crovella testified that you are not managing

15   content if you are merely entering a new report and the old

16   report is unchanged.

17          Mr. Foote offered unrebutted factual testimony that

18   only new reports can be entered into the website through the

19   Report Rate feature.  Once entered, they cannot be edited,

20   deleted, or updated in any way.

21          Dr. Smith conceded on cross-examination that

22   through the Report Rate feature, quote, data cannot be

23   removed.  That's at the March 8th afternoon transcript

24   between 110:19 and 111:13.

25          THE COURT:  Slow down a little bit, please.

1          MR. LANGFORD:  I apologize, Your Honor.

2          THE COURT:  That's all right.  Just slow down.

3          MR. LANGFORD:  Sure.

4          And he understands that that information must be

5     maintained by a regulation.

6          He also admitted that a corrected report is simply

7     adding a new -- a new policy.  It's not managing an old one.

8          Therefore, the employee homepage and the Report

9     Rate page does not show infringement of Claim 14 because

10    users are not enabled to manage any content contributed by

11    them.  And, therefore, we respectfully request judgment as a

12    matter of law that Great West does not infringe Claim 14,

13    Your Honor.

14          THE COURT:  All right.  Let me hear a response from

15    Plaintiff.

16          MR. RUPP:  Your Honor, Plaintiff poses the Rule 50

17    motion with respect to infringement on the following basis:

18          As to the Drivers List By Policy contention made by

19    Defendants, this is not an undisputed fact or undisputed

20    contention that is there is no content.  Rather, that this

21    constitutes information about users.

22          On the contrary, that is a hotly disputed fact, as

23    demonstrated by the testimony of Dr. Smith on that very

24    issue, as demonstrated by the cross-examination evidence

25    elicited from Mr. Foote with respect to the differentiation

1  that the Great West portal system makes between information

2  about users being the user name and the password stored in

3  the LDAP, and content, on the other hand, being substantive

4  policy data that's stored in a different part of the system

5  and accessed in different ways.

6       With respect to the employee homepage and the

7  reporting policy infringement read, the contention of the

8  Defendant that there is no management of the content is

9  likewise hotly disputed.

10      The jury has heard conflicting evidence on that

11 point, mainly through the testimony on direct examination of

12 Dr. Smith wherein he testified expressly that that does

13 constitute management of the contents because the subject

14 matter on which a report is based is being changed by the

15 addition of a new or different report that has different

16 contents.

17      Those same factual components were developed

18 through the cross-examination of Mr. Foote and the

19 cross-examination of Dr. Crovella.  Each of those witnesses

20 conceded that the underlying information, which is the

21 content, for example, the mileage -- the Court will recall

22 that particular testimony -- is at variance between the

23 original report and the amended or corrected report.

24      Accordingly, we submit that Plaintiff has amply

25 satisfied its burden, and there is more than sufficient

1    evidence for the jury to consider.

2           THE COURT:  All right.  With regard to the

3    Defendant's motion for judgment as a matter of law

4    concerning the issue of infringement --

5           MR. LANGFORD:  Your Honor, if I may?

6           THE COURT:  Do you have something else?

7           MR. LANGFORD:  Yeah.  I apologize, Your Honor.  If

8    I could briefly just raise one other point.

9           THE COURT:  All right.  I'm not -- I'm not

10   intending to let this be Mr. Gillam and Mr. Gilliland back

11   and forthwith -- Mr. Bakewell again.

12          MR. LANGFORD:  It will not be, Your Honor.

13          Understood.

14          THE COURT:  All right.  It will not be.

15          Go ahead.

16          MR. LANGFORD:  Your Honor, I just had one

17   additional point that I wanted to make for the record, and

18   this goes to a claim construction issue the Court decided

19   earlier in the case adversely to Great West.

20          And we just wanted to -- begging the Court's

21   indulgence, state our position on that on the record to

22   preserve the record.

23          The Court entered an order at Docket 279 construing

24   the claim term "manage any content" to mean manage one or

25   more stored content.

1        THE COURT:  Let me ask you this, counsel.  Why am I

2   hearing this in the middle of an argument on infringement on

3   Rule 50(a)?

4        MR. LANGFORD:  Because, Your Honor, if -- if the

5   Court had entered our proposed instruction, then the

6   evidence of record in this case would have established

7   non-infringement as a matter of law.  And out of an

8   abundance of caution, we simply wished to state that for

9   the record, Your Honor.

10       THE COURT:  And you didn't think it was appropriate

11  to make that as a part of your initial argument under

12  Rule 50(a) regarding infringement?

13       MR. LANGFORD:  Apologies, Your Honor.

14       THE COURT:  Okay.  I'm going to rule on the one --

15  on the infringement issue.  You can come back to the claim

16  construction issue before we conclude argument under matters

17  related to 150 -- to Rule 50(a).

18       I certainly don't mind you preserving what you

19  think needs to be preserved in the record, but we'll cover

20  this before we complete the process.  I don't see that this

21  is necessary to be a part of the infringement argument.

22       MR. LANGFORD:  Understood, Your Honor.  Thank you.

23       THE COURT:  All right.  I'm denying the motion by

24  Defendant under Rule 50(a) with regard to the issue of

25  infringement.

1          We'll next take up the issue of invalidity, and

2     I'll hear Defendant's argument in support of their motion

3     for judgment as a matter of law under Rule 50(a) regarding

4     the issue of invalidity.

5          MR. LANGFORD:  Yes, Your Honor.  We respectfully

6     move for judgment as a matter of law that Claim 14 is

7     invalid under 35 U.S.C. 102, under the Pellegrino reference.

8          Now, Dr. Crovella, our expert, exhaustively

9     explained at trial how the Pellegrino patent discloses each

10    and every element of Claim 11 and 14 and, therefore,

11    anticipates Claim 14 of the patent.  Plaintiff has offered

12    no rebuttal case, whatsoever.

13         As Your Honor discovered, Plaintiff had a rebuttal

14    expert, Dr. Gray, ready to go, and he was, in fact, in court

15    yesterday, and then at 7:00 p.m. last night we were informed

16    that Dr. Gray would not be called.

17         The result being that the record has no evidence

18    contradicting Pellegrino's -- Dr. Crovella's testimony that

19    Pellegrino discloses all the elements of Claim 14.  And we

20    cannot -- cannot envision how now there will be anything

21    more than lawyer argument challenging the evidence in this

22    case that Pellegrino anticipates Claim 14 of the

23    '177 patent.

24         And, therefore, we respectfully request judgment as

25    a matter of law on the issue of anticipation by Pellegrino,

1    Your Honor.

2          THE COURT:  All right.  Let me hear a responsive

3    argument from Plaintiff.

4          MR. RUPP:  Your Honor, with respect to the Rule 50

5    motion on invalidity, Plaintiff does not agree that there

6    was no rebuttal evidence, whatsoever, as to Dr. Crovella's

7    testimony on direct examination as to his perspective on

8    whether or not Pellegrino anticipates each element in

9    Claim 11, and the additional requirement of Claim 14.

10          On the contrary, through cross-examination of

11   Dr. -- excuse me, of Dr. Crovella, evidence was elicited

12   from the witness that aspects of the Pellegrino reference,

13   and specifically with respect to whether or not it addresses

14   and discloses content as opposed to links to content, is

15   more than adequate to demonstrate that the Defendant has

16   failed to meet its burden of establishing invalidity by

17   clear and convincing evidence as a matter of law.

18          THE COURT:  All right.  Well, with regard to

19   Defendant's motion for judgment as a matter of law under

20   Rule 50(a) concerning the issue of invalidity, that motion

21   is denied.

22          Let me hear the Defendant's motion under

23   Rule 50(a) -- argument in support of Defendant's motion

24   under Rule 50(a) regarding the issue of damages.

25          MS. LEE:  Good morning, Your Honor.  Sharon Lee on

1  behalf of Defendant, Great West.

2          THE COURT:  Good morning, Ms. Lee.  Please proceed.

3          MS. LEE:  Defendant, Great West, moves under

4  Rule 50(a) for judgment as a matter of law that Plaintiff

5  has failed to carry its burden of proof on damages because

6  the record does not reflect evidence sufficient to award

7  damages as a matter of law.

8          Plaintiff's damages case rests upon Mr. Lasinski's

9  damages opinion.  His royalty calculation is made up of two

10  components:  An alleged cost savings for Great West for

11  alleged contact which Mr. Lasinski valued at 2.75 and an

12  alleged number of avoided user contents due to the accused

13  web portals.

14          Both of these figures are untethered from the

15  allegedly infringing features of Great West's accused

16  portals, and neither have a legally sufficient evidentiary

17  basis.

18          First, with respect to the rate, Mr. Lasinski's

19  alleged cost savings to Great West per avoided contact is

20  not based on any actual cost savings to Great West.  Rather,

21  they're based on cost savings to an entirely different

22  company, BITCO.

23          Mr. Lasinski provided no basis or justification for

24  using BITCO's cost savings information to assess Great --

25  Great West's cost savings attributable to the allegedly

1    infringing features of the accused portal.

2         And, in fact, both Mr. Lasinski and Ms. O'Neil, on

3    whom Mr. Lasinski relied, admitted that Great West and BITCO

4    have different clientele, different policy lines, different

5    management, and different IT systems.

6         Mr. Lasinski did not even know the type of

7    insurance that BITCO sells.

8         And, in addition, Mr. Lasinski admitted that he did

9    not know whether Great West's accused portal has the interim

10   audit functionality that BITCO attributed its cost savings

11   to.

12        And in any event, Mr. Lasinski admitted that such

13   functionality is not accused of infringement in this case.

14        As such, BITCO's data is an improper basis for a

15   damages award, and Mr. Lasinski's opinion using BITCO's cost

16   savings is unrelated to any accused feature of Great West's

17   accused portal.

18        With respect to the base, Mr. Lasinski's base is

19   legally insufficient because he failed to properly apportion

20   the number of portlet views which he equates with avoided

21   user contacts due to the accused portals.

22        It's undisputed that IV's infringement allegations

23   are limited to two web pages that allegedly meet the

24   centralized access point limitation of Claim 14, and that

25   the Drivers List By Policy page on the agent portal and the

1    homepage on the employee portal.

2           Nevertheless, Mr. Lasinski admitted to including

3    royalty based page views of web pages that are not alleged

4    to infringe Claim 14 of the '177 patent, including all of

5    the pages in the insured portal and the claim detail, policy

6    detail, claim status, policy list, accident detail, and

7    claims list by policy pages of the agent portal.

8           This failure to apportion caused Mr. Lasinski, by

9    his own admission, his base to be overstated by at least

10   75 percent.

11          Mr. Lasinski also relied on Ms. O'Neil as a

12   reasonableness check, but her opinion was based on her

13   incorrect assumption that the extent of infringement was the

14   entire accused portal.

15          And as we know from both the notice of uncontested

16   facts between the parties and the testimony of both

17   technical experts, her assumption was incorrect, and,

18   therefore, Mr. Lasinski's reliance on Ms. O'Neil for the

19   reasonableness of his calculation was also incorrect.

20          There's also no evidence in the record that

21   establishes that a single page view on any of the portal

22   pages results in one avoided user content to Great West.

23          And because both the rate and base that

24   Mr. Lasinski used to calculate his damages are legally

25   insufficient, we request judgment as a matter of law on the

1    issue of damages.

2            THE COURT:  Let me hear Plaintiff's response,

3    please.

4            MR. RUPP:  Your Honor, Plaintiff maintains with

5    respect to this Rule 50 motion by Defendants that

6    Intellectual Ventures has adequately discharged its burden

7    to reach the jury with respect to the question of damages

8    through the testimony of Mr. Lasinski, as well as amplified

9    by the cross-examination evidence elicited from the

10   Defendant's damages expert, Mr. Bakewell.

11           The testimony that the jury heard was that a

12   willing licensee using the appropriate methodology as

13   described by Mr. Lasinski would pay to a willing licensor a

14   reasonable royalty of $20.3 million, that's at Page 14 of

15   the transcript of Mr. Lasinski's testimony.  He described in

16   great detail the approach and methodology by which he

17   reached that determination.

18           The issue with respect to reliance on evidence from

19   an analogous company as one input to Mr. Lasinski's opinions

20   is not sufficient to support a Rule 50 motion, as testimony

21   in the record was that that was the best available on --

22   evidence on this point.  That was uncontested by the

23   Defendants and was the subject of sworn testimony by both

24   Mr. Lasinski and Ms. O'Neil.

25           The balance of the Defendant's arguments with

1    respect to damages go to -- exclusively to the reliability

2    or accuracy of the damage's approach that was espoused by

3    the Plaintiff and by the Plaintiff's expert in his sworn

4    testimony.  And that is an improper basis for a Rule 50

5    motion.  Those are questions of credibility that must be

6    measured by the jury, not determined as a matter of law

7    pursuant to a Rule 50 motion.

8            THE COURT:  All right.  With regard to Defendant's

9    motion for judgment as a matter of law pursuant to

10   Rule 50(a) concerning the issue of damages, that motion is

11   denied.

12           Now, I'll hear argument from Defendants at this

13   juncture with regard to what is perceived by the Court to

14   effectively be their motion for reconsideration concerning

15   the Court's claim construction concerning the term "any."

16           Mr. Wilson [sic], I'll be happy to hear from you at

17   this time -- I'm sorry, Mr. Langford.

18           MR. LANGFORD:  Thank you, Your Honor.

19           So as I said a moment ago, and I'll be brief, the

20   Court entered an order shortly before trial construing

21   "manage any content" in Claim 14 to mean "manage one or more

22   stored content," whereas, Great West proposed a claim

23   construction of "manage all stored content" for the reasons

24   stated in our briefing.

25           And we wish to state for the record, Your Honor,

1   that under Great West's proposed construction, there would

2   be no infringement as a matter of law because Great West's

3   employee portal allows employees to contribute content that

4   cannot be managed, for example, through the Report Rates

5   feature, as I just described in my argument earlier, and a

6   similar functionality is available to agents.

7           We just wanted to make that brief statement on the

8   record, recognizing that Your Honor has voiced an opinion on

9   this issue.

10          THE COURT:  All right.  With regard to that matter,

11  the Court denies any request for reconsideration or other

12  action in response to Defendant's arguments and leaves

13  undisturbed its current construction with regard to the term

14  "any."

15          Thank you, Mr. Langford.

16          All right.  Are there any other matters, counsel,

17  to urged by either party seeking judgment as a matter of

18  law?

19          MR. RUPP:  Nothing from the Plaintiff, Your Honor.

20          MS. YANG:  Nothing from the Defendant, Your Honor.

21          THE COURT:  All right.  It is approximately 11:15.

22          Let me be candid with you all about my schedule.

23  I have a meeting at 12:15 that involves certain

24  administrative matters that I'm going to have to be involved

25  in concerning my position as Chief Judge of the district.

1          I expect that meeting not to last more than 30 or

2    40 minutes.  Given the time that we have in light of how the

3    evidence has progressed, I see no reason why we can't begin

4    the informal charge conference in chambers at 1:00 o'clock.

5    That will give you an extended lunch hour, but given the

6    demands on my schedule between now and then, I don't know

7    how we can begin and complete it and still allow me to be at

8    that other meeting.

9          So we're going to recess at this point, and I'll

10   see counsel for both sides in chambers at 1:00 o'clock, at

11   which time I'll conduct an informal charge conference.

12         Let me make this clear.  I welcome the attendance

13   and participation by all the counsel on both sides.  This is

14   often an opportunity where young lawyers who don't get a

15   chance to take witnesses during the trial have an

16   opportunity to be involved and perhaps enter into the more

17   informal input and discussion regarding both the proposed

18   charge and the verdict form.

19         So please feel free, and I would encourage you to

20   bring everybody on your trial teams, other than those that

21   are obviously absent preparing for closing arguments.

22         But I will see those who are participating in the

23   informal charge conference in chambers at 1:00 o'clock.  And

24   until then, we stand in recess.

25         COURT SECURITY OFFICER:  All rise.

1          (Recess.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            CERTIFICATION

2

3           I HEREBY CERTIFY that the foregoing is a true and

4     correct transcript from the stenographic notes of the

5     proceedings in the above-entitled matter to the best of my

6     ability.

7

8

9      /S/ Shelly Holmes                    3/12/19
       SHELLY HOLMES, CSR, TCRR             Date
10    OFFICIAL REPORTER
       State of Texas No.: 7804
11    Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25