1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF TEXAS

3                TYLER DIVISION

4  INTELLECTUAL VENTURES II LLC, )(

5     PLAINTIFF,           )(   CIVIL ACTION NO.

6                      )(   6:18-CV-299-JRG

7  VS.                )(   TYLER, TEXAS

8                      )(

9  GREAT WEST CASUALTY COMPANY,  )(  MARCH 13, 2019

10     DEFENDANT.         )(  8:26 A.M.

11          TRIAL TRANSCRIPT OF JURY TRIAL

12       BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

13        UNITED STATES CHIEF DISTRICT JUDGE

14

    FOR THE PLAINTIFF: Mr. Derek T. Gilliland
15                  Mr. Ty W. Wilson
                  NIX PATTERSON, LLP
16                  205 Linda Drive
                  Daingerfield, Texas 75638
17

                  Mr. Karl A. Rupp
18                  NIX PATTERSON, LLP
                  Advancial Tower
19                  1845 Woodall Rodgers Tower
                  Suite 1050
20                  Dallas, Texas 75201

21  COURT REPORTER:    Ms. Shelly Holmes, CSR, TCRR
                  Official Court Reporter
22                  United States District Court
                  Eastern District of Texas
23                  Marshall Division
                  100 E. Houston
24                  Marshall, Texas 75670

25  (Proceedings recorded by mechanical stenography, transcript
    produced on a CAT system.)

```
 1  FOR THE DEFENDANT: Mr. Michael J. Bettinger
                       Ms. Irene I. Yang
 2                     SIDLEY AUSTIN, LLP
                       555 California Street
 3                     Suite 2000
                       San Francisco, California 94104
 4
                       Mr. Harry Lee Gillam, Jr.
 5                     GILLAM & SMITH, LLP
                       303 South Washington Avenue
 6                     Marshall, Texas 75670

 7                     Mr. Andrew T. Langford
                       SIDLEY AUSTIN, LLP
 8                     2021 McKinney Avenue
                       Suite 2000
 9                     Dallas, Texas 75206

10                     Ms. Sharon Lee
                       Mr. Samuel A. Dillon
11                     SIDLEY AUSTIN, LLP
                       1501 K Street, N.W.
12                     Washington, DC 20005

13                     Mr. Paul J. Rogerson
                       SIDLEY AUSTIN, LLP
14                     One South Dearborn
                       Chicago, Illinois 60603
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2            (Jury out.)
 3            COURT SECURITY OFFICER:  All rise.
 4            THE COURT:  Be seated, please.
 5            Let me ask if the parties are prepared to read into
 6  the record any items from the list of pre-admitted exhibits
 7  used during yesterday's portion of the trial?
 8            MR. WILSON:  Yes, Your Honor.
 9            THE COURT:  All right.
10            Let's proceed.
11            MR. WILSON:  This is Ty Wilson on behalf of
12  Intellectual Ventures.
13            Plaintiff did not admit any exhibits in the --
14  yesterday's portion of the trial.
15            THE COURT:  All right.
16            MR. ROGERSON:  And this is Paul Rogerson on behalf
17  of Defendant, Great West.  Yesterday, on March 12th, 2019,
18  Great West admitted the following exhibits:  GWX-198,
19  GWX-204, GWX-230, and GWX-261.
20            THE COURT:  Is there any objection from Plaintiff
21  to that rendition from Defendant?
22            MR. WILSON:  No, Your Honor.
23            THE COURT:  All right.  Thank you, counsel.
24            Before I bring the jury in and proceed with the
25  Court's final instructions to the jury, I just want to
```

1  remind those present, including those behind the bar, that

2  closing arguments, together with the Court's final

3  instructions, are the most serious part of a very serious

4  process.

5       Therefore, I don't want any noise.  I don't want

6  any shuffling of papers.  I don't want any people getting up

7  and walking around.  I certainly don't want to see water

8  bottles tilted in the air.  I want everybody to be as

9  respectful and as quiet as possible.

10      So if you need to do any of those things I just

11  mentioned, do them before I bring the jury in, because once

12  I bring the jury in, I expect everybody to be as respectful

13  and quiet and focused as possible so as not to detract or

14  distract the jury from either my final instructions or

15  counsel's closing arguments.

16      With that, are there any questions or issues that

17  need to be raised by either party before I bring the jury

18  in?

19      MR. GILLILAND:  The only thing, Your Honor, is

20  I'm probably going to use the flip chart with closing

21  argument.  Where would you like me to position it?

22      My -- my thought, Your Honor, is if I can put it to

23  the right of the podium, and hopefully, Mr. Bettinger will

24  be able to see it.

25      I don't intend to use it very many times, but that

1  would avoid me from having to walk back and forth too many

2  times, but wherever Your Honor would like me to put it.

3          THE COURT:  Well, I'd like -- I expect counsel to

4  be within the close proximity of the podium.  Sometimes we

5  talk about it being the arm's length rule.  I don't want you

6  to be further than that.

7          One thing I will mention to you that I did not know

8  the first time I tried a case in this courtroom, and that is

9  that podium swivels.  And if you want to turn it

10  45 degrees so that it's facing the jury box, as opposed to

11  the direction in which it's faced now, we can do that.  We

12  don't need to be moving it back and forth.

13          Do either of you have any preference as to whether

14  we leave it where it is or whether we orient it toward the

15  jury?

16          MR. BETTINGER:  Either way is fine, Your Honor.

17          MR. GILLILAND:  Same -- same here, Your Honor.

18  Either way is fine.  I was just trying to figure out where I

19  could place the flip chart so --

20          THE COURT:  Quite honestly, if we swivel it, it may

21  be easier for you to have the flip chart closer to the

22  podium.

23          MR. GILLILAND:  Can we do that now, or when do you

24  want us to try?

25          THE COURT:  I think Mr. Gillam is skilled at that

1   particular move.

2          Do you want to move the podium?

3          MR. GILLILAND:  Yes, Your Honor.

4          THE COURT:  Let's do that.

5          MR. BETTINGER:  Are you going to use the ELMO

6   because I think you can push that in --

7          MR. GILLILAND:  Should I move the flip chart now,

8   Your Honor?

9          THE COURT:  Let's see -- let's put it where you

10  think you're going to put it.

11         Ms. Lockhart, can you help them with that?

12         Just a minute, gentlemen.

13         All right.  Let's go off the record for a minute.

14         (Off the record discussion.)

15         THE COURT:  Let's go back on the record.

16         All right.  Let's bring in the jury, please.

17         COURT SECURITY OFFICER:  All rise for the jury.

18         (Jury in.)

19         THE COURT:  Good morning, ladies and gentlemen.

20         Please have a seat.

21         Ladies and gentlemen of the jury, you have now

22  heard the evidence in this case, and I'll now instruct you

23  on the law that you must apply.  I want you to understand

24  that you're each going to have your own written copy of

25  these final instructions to the jury from me to take with

1   you and to reference in the jury room when you retire to

2   deliberate.  So unless you just particularly want to,

3   there's no need for you to make notes while I give these to

4   you orally since you're going to have your own hard copy

5   when you deliberate.

6          It's your duty, ladies and gentlemen, to follow the

7   law as I give it to you.  On the other hand and as I've said

8   previously, you are the sole judges of the facts in this

9   case.

10          Do not consider any statement that I have made

11   during the course of the trial or may make as a part of

12   these instructions as an indication to you that I have any

13   opinion about the facts in this case.

14          You're about to hear closing arguments from the

15   attorneys.  Statements and arguments from the attorneys,

16   I remind you, are not evidence, and they are not

17   instructions on the law.  They're intended only to assist

18   the jury in understanding the evidence and the parties'

19   competing contentions.

20          A verdict form has been prepared for you.  You'll

21   take this verdict form with you to the jury room, and when

22   you have reached a unanimous decision as to the verdict,

23   you'll have your foreperson fill in the blanks in the

24   verdict form reflecting your unanimous answers, sign it, and

25   date it.

1          Your foreperson should then notify the Court

2     Security Officer that you have reached a verdict.

3          Answer each question in the verdict form from the

4     facts as you find them to be.  Do not decide who you think

5     should win the case and then answer the questions to reach

6     that result.

7          Again, your answers and your verdict must be

8     unanimous.

9          Now, in determining whether any fact has been

10    proven in this case, you may, unless otherwise instructed,

11    consider the testimony of all the witnesses, regardless of

12    who may have called them, and you may consider the effect of

13    all the exhibits received into evidence, regardless of who

14    produced them.

15         As I've told you, you, the jury, are the sole

16    judges of the credibility and believability of each and

17    every witness, as well as the weight and effect to give to

18    all of the evidence in this case.

19         As I've also mentioned previously, the attorneys in

20    this case are acting as advocates for their competing

21    clients, and they have competing claims, and they have a

22    duty to object when they believe evidence is offered or

23    argument is made that should not be permitted by the Court.

24    That's happened over the course of the trial, and I've ruled

25    on those objections.

1          In the situation where the Court has sustained an

2    objection to a question addressed to a witness, you must

3    disregard the question entirely, and you may draw no

4    inferences from its wording or speculate about what the

5    witness would have said if the Court had allowed them to

6    answer the question.

7          However, on the other hand, if an objection

8    addressed to a witness regarding a question was overruled by

9    the Court, then you're to treat the question and the answer

10   just as if no objection had been made.

11         Now, at various times over the course of the trial,

12   it's been necessary for the Court to talk to the lawyers

13   here at the bench or outside of your hearing when you were

14   in the jury room.  This happens during trials because there

15   are often things that arise that do not directly impact or

16   affect the jury.

17         You should not speculate, ladies and gentlemen,

18   about what was said during those discussions that took place

19   outside of your presence.

20         Now, you should understand that there are two types

21   of evidence that you may properly consider in finding the

22   truth as to the facts in this case.

23         One type of evidence is called direct evidence,

24   such as the testimony of an eyewitness.

25         The other is indirect or sometimes called

1    circumstantial evidence, which is the proof of a chain of

2    circumstances that indicates the existence or non-existence

3    of certain other facts.

4         As a general rule, you should understand that the

5    law makes no distinction between direct evidence or indirect

6    evidence but simply requires that you, the jury, find the

7    facts based on the evidence presented during the trial, both

8    direct and indirect.

9         Now, in this case, the parties have stipulated or

10   agreed to some facts in this case.  When the lawyers for

11   both sides stipulate as to the existence of a fact, you

12   must, unless otherwise instructed by me, accept that

13   stipulation as evidence and regard those facts as proven.

14        Also, over the course of the trial, certain

15   testimony has been presented to you through a deposition.  A

16   deposition is a sworn, recorded answers to questions asked

17   of a witness in advance of the trial.

18        If a witness can't be present in person to testify

19   in open court, then the witness's testimony, which has been

20   recorded under oath previously, can be played back to the

21   jury in the form of a deposition.

22        During a deposition, the witness is present, the

23   witness is sworn, and placed under oath -- placed on oath,

24   and a court reporter is present, and lawyers for both of the

25   parties are there.  Questions are asked by the attorneys,

1    and answers are given by the witness.  And those questions

2    and answers are recorded.

3         That deposition testimony is entitled to the same

4    consideration by you insofar as possible as if the witness

5    had testified in person from open court.  And, accordingly,

6    you should judge the credibility and importance of

7    deposition testimony to the best of your ability, just as if

8    the witness had testified before you from the witness stand.

9         Now, while you should consider only the evidence in

10   this case, ladies and gentlemen, you should understand that

11   you are permitted to draw such reasonable inferences from

12   the testimony and the exhibits as you feel are justified in

13   the light of common experience.

14        In other words, you may make deductions, and you

15   may reach conclusions that reason and common sense lead you

16   to draw from the facts that have been established by the

17   testimony and the evidence in the case.

18        However, you should not base your decision on any

19   evidence that -- evidence that was not presented during the

20   trial in open court, including your own personal experiences

21   with any particular web portals.

22        Now, unless I instruct you otherwise, you may

23   properly determine that the testimony of a single witness is

24   sufficient to prove any fact, even if a greater number of

25   witnesses may have testified to the contrary, after

1  considering all of the evidence you believe that single

2  witness.

3         When knowledge of a technical subject may be

4  helpful to the jury, a person who has special training and

5  experience in that technical field, we call them an expert

6  witness, is permitted to state his or her opinions on those

7  technical matters to the jury.

8         However, ladies and gentlemen, you're not required

9  to accept the opinions of any expert witness or any other

10 witness for that matter.

11        It's up to you to listen to their testimony and

12 decide whether you want to give it weight, and if -- if so,

13 what degree of weight you want to give their testimony.

14        Again, you are the sole judges of the credibility

15 and believability of all the witnesses and the evidence in

16 this case.

17        Also, over the course of the trial, certain

18 exhibits have been shown to you which are called

19 demonstratives.  These are illustrations that sometimes are

20 used to help a party describe or picture or model something

21 that's involved in the trial.

22        If your recollection should differ from these

23 demonstratives, sometimes called demonstrative exhibits, you

24 should rely on your memory, your recollection.

25 Demonstrative exhibits are not evidence.  They are sometimes

1    called jury aids.

2          And while the demonstrative itself is not evidence,

3    the witness's testimony during which time the demonstrative

4    is used is evidence.

5          Again, you will have to rely on your memory of the

6    evidence in the case.  But demonstratives that have been

7    used by the -- during the trial are not evidence, and

8    I cannot send them to you -- to the jury room if you should

9    ask for them.

10          Now, in any legal action, facts must be proven by a

11    required amount of evidence known as the burden of proof.

12          The burden of proof in this case is on the

13    Plaintiff for some issues, and it's on the Defendant for

14    other issues.  And there are two burdens of proof that you

15    will apply in this case.

16          Those are the preponderance of the evidence and

17    clear and convincing evidence.

18          The Plaintiff, Intellectual Ventures, who you've

19    heard referred to as IV or Intellectual Ventures, has the

20    burden of proving patent infringement by a preponderance of

21    the evidence.

22          Intellectual Ventures, the Plaintiff, also has the

23    burden of proving damages for any patent infringement by a

24    preponderance of the evidence.

25          A preponderance of the evidence means the evidence

1  that persuades you that a claim is more probably true than

2  not true.  This is sometimes talked about as being the

3  greater weight and degree of credible testimony.

4         Now, the Defendant in this case, Great West

5  Casualty Company, who you've heard referred to consistently

6  as simply Great West, has the burden of proving patent

7  invalidity by clear and convincing evidence.

8         Clear and convincing evidence means evidence that

9  produces in your mind an abiding conviction that the truth

10 of the party's factual contentions are highly probable.

11        Now, although proof to an absolute certainty is not

12 required, the clear and convincing evidence standard

13 requires a greater degree of persuasion than is necessary

14 for the preponderance of the evidence standard.

15        If the proof establishes in your mind, ladies and

16 gentlemen, an abiding conviction in the truth of the matter,

17 then the clear and convincing evidence standard has been

18 met.

19        Now, these standards are different from what you've

20 heard about in criminal proceedings where a fact must be

21 proven beyond a reasonable doubt.

22        On a scale of standards of proof, as you move from

23 the preponderance of the evidence on one end to clear -- to

24 beyond a reasonable doubt on the other end of the spectrum,

25 you can consider clear and convincing evidence as being

1  somewhere in between.

2          Now, in determining whether any fact has been

3  proven by a preponderance of the evidence or by clear and

4  convincing evidence, you may -- you may, unless otherwise

5  instructed by me, consider the stipulations of the parties,

6  the testimony of all the witnesses, regardless of who called

7  them, and all the exhibits received into evidence during the

8  trial, regardless of who produced them or introduced them

9  during the trial.

10         Now, as I did at the start of the case, I'll give

11  you a summary of each side's contentions, and I'll then

12  provide you with detailed instructions on what each side

13  must prove to win on each of its contentions.

14         As I've previously told you, this case concerns one

15  single United States patent, that is, U.S. Patent

16  No. 7,516,177, which you've heard referred to throughout

17  this trial as the '177 patent, sometimes called the

18  patent-in-suit or the asserted patent.

19         Now, this patent has within it Claim 14 of this

20  '177 patent, and the Plaintiff claims that Claim 14 of the

21  asserted patent has been infringed by the Defendant.  And

22  the Plaintiff is seeking money damages because of this

23  alleged infringement.

24         Now, the Defendant denies that it has infringed

25  Claim 14 of the '177 patent, and the Defendant contends

1  additionally that Claim 14 is invalid.

2       Your job is to decide whether the Plaintiff has

3  proven that the Defendant has infringed Claim 14 of the

4  patent-in-suit and whether Defendant has proven that

5  Claim 14 is invalid.

6       Infringement and invalidity, ladies and gentlemen,

7  are separate questions and should be considered and answered

8  separately.

9       If you decide that Claim 14 of the '177 patent has

10 been infringed and is not invalid, then you'll need to

11 decide any money damages that are to be awarded to Plaintiff

12 to compensate it for that infringement.

13      Now, at the beginning of the trial, I gave you some

14 general information about patents and the patent system and

15 a brief overview of the patent laws relevant to this case.

16 I'll -- I'll now give you more detailed instructions about

17 the patent laws that relate to the case before us.

18      Before you can decide many of the issues in this

19 case, you need to understand the role of the patent claims.

20      The patent claims are those numbered sentences at

21 the end of the patent.  And each of you have a complete copy

22 of the '177 patent in your juror notebooks.

23      The claims, ladies and gentlemen, are important

24 because it's the words of the claims that define what a

25 patent covers.

1           The figures and the text in the rest of the patent

2    provide a description and examples of the invention, and

3    they provide a context for the claims, but it is the claims

4    that define the breadth of the patent's coverage.

5           Each claim is effectively treated as if it were a

6    sep -- a separate patent, and each claim may cover more or

7    less than any other claim.

8           Accordingly, what a patent covers depends, in turn,

9    what each of its claims covers.

10          Now, claims may describe methods or products such

11   as machines or processes for making or using a product.  In

12   this case, Claim 14 is what's called an apparatus claim.

13          Patent claims may exist in two forms, referred to

14   as independent claims and dependent claims.  In this case,

15   Claim 14 is a dependent claim.

16          An independent claim does not refer to any other

17   claim in the patent.  An independent claim sets forth all

18   the requirements that must be met in order to be covered by

19   that claim.  Therefore, it's not necessary to look at any

20   other claim to determine what an independent claim covers.

21          On the other hand, a dependent claim does not

22   itself recite all the requirements of the claim but refers

23   to at least one or more other claims for some of its

24   requirements.  In this way, the claim depends from another

25   claim.

1          And a dependent claim incorporates all the

2    requirements of the claim or claims to which it refers, or

3    as we sometimes say, from which it depends.  A dependent

4    claim then adds its own additional requirements to those

5    claims to which it refers.

6          Now, to determine what a dependent claim covers,

7    it's necessary to look at both the dependent claim and any

8    other claims to which it refers.

9          Each patent claim sets forth in words a set of

10   requirements in a single sentence.  The requirements of a

11   claim are usually divided into parts, sometimes called

12   elements or limitations.

13         If a device, system, apparatus, or instrumentality

14   satisfies each of these requirements in the claims'

15   sentence, then it's said that the device, system, or

16   apparatus, or instrumentality is covered by the claim and

17   falls within the claim or infringes the claim.

18         For example, a claim that covers an invention of a

19   table may recite within the claim itself a tabletop, four

20   legs, and the glue to secure the legs to the tabletop.

21         In this example, the tabletop, the legs, and the

22   glue are each separate limitations or elements of the claim.

23         Now, the beginning portion, called the preamble of

24   a claim, often uses the word "comprising."  The word

25   "comprising," as used in the preamble of a claim, means

1   including or containing.

2          When comprising is used in the preamble, a product

3   that includes all the limitations or elements of that claim,

4   as well as additional elements, is covered by the claim.

5          For example, a claim to a table, again, comprising

6   a tabletop, legs, and glue would be infringed by a table

7   that includes a tabletop, legs, and glue, even if it also

8   includes wheels on the ends of the legs or some other

9   structure.

10          If a product is missing even one limitation or

11   element required in the claim, then it does not meet all the

12   requirements of the claim and is not covered by the claim.

13   If a product is not covered by the claim, then it does not

14   infringe the claim.

15          Now, you first need to understand each claim term

16   in order to decide whether or not there is infringement of a

17   claim and decide whether or not the claim is invalid.

18          The law says that it's my role as the Judge to

19   define the terms within the claims, and it's your role to

20   apply my definitions to the issues that you're asked to

21   decide in this case.

22          Therefore, as I explained to you at the beginning

23   of the case, I've already determined the meanings of some of

24   the language within the claims, and I've provided those

25   definitions to you in the chart that's included in your

juror notebooks.  You must accept those definitions that I have given you as to those words within the claim as being correct.

It's your job to take those definitions and apply them to all the issues that you are deciding, including the issues of infringement and invalidity.

Now, for any words within the claims for which I did not provide you with a definition or construction, you should apply those terms' plain and ordinary meaning as understood of one of ordinary skill in the art, which is to say in the field of the technology of the patent at the time of the invention of the '177 patent.

Now, the meaning of the words of the patent claims must be the same when deciding the issues of infringement and when deciding the issue of invalidity.

My interpretation of the language should not be taken as an indication that I have a view regarding these issues as to infringement and invalidity.

Those decisions, ladies and gentlemen, are yours to make.  And during your deliberations, you must apply the constructions and definitions that I have given you.

As I mentioned, these are set forth in the chart included in your juror notebook, but I'm going to go over with them -- with you -- I'm going to go over them with you briefly now.

1          The following term has been construed by the Court.

2    This term or phrase from the claim is "centralized access

3    point of a user."

4          The Court's construction is:  A user's network

5    resource that can be used to access content.

6          Another term, phrase, or clause from the claim that

7    the Court has construed is "distributed info" --

8    "distributed information access point."

9          The Court's construction or definition, which I've

10   supplied to you for that term, is:  A network resource which

11   is delivered to one or more users and that enables a user to

12   interact with a centralized access point.

13         An additional term which the Court has construed

14   for you is "administrative interface."

15         The construction or definition I've supplied to you

16   for that term is:  A software management tool that

17   facilitates administrative functions.

18         Also, another term that I have construed or defined

19   for you is "manage any content."

20         The construction or definition that I've supplied

21   to you for that term is:  Manage one or more stored content.

22         Now, with that, I'll instruct you on the specific

23   rules that you must follow to determine whether the

24   Plaintiff has proven that the Defendant has infringed

25   Claim 14 of the '177 patent.

1          To prove infringement, the Plaintiff, Intellectual

2    Ventures, must persuade you that it is more likely than not

3    that the Defendant, Great West, has infringed Claim 14.

4          You must decide whether the Defendant has made or

5    used within the United States a product covered by the

6    asserted claim.

7          You must compare Claim 14 of the '177 patent to the

8    accused product to determine whether every requirement of

9    the claim is included in the accused product.

10         To prove infringement, Plaintiff must prove by a

11   preponderance of the evidence that the Defendant made or

12   used within the United States an accused product that

13   includes each and every limitation of Claim 14.

14         In determining whether the accused product

15   infringes Claim 14, you must compare the accused product

16   with each and every requirement recited in the claim.

17         A claim requirement is present if it exists in the

18   accused product as I have explained the language of the

19   requirement to you, or if I did not explain it, as it would

20   be understood by one of ordinary skill in the art.

21         If the accused product omits even a single

22   requirement or claim, then you must find that the accused

23   product does not infringe that claim.

24         In patent law, a system, device, method,

25   publication, or patent that predated the patent claim at

1    issue is called prior art.

2         Prior art may include items that were publicly

3    known or that have been used or offered for sale or

4    references, such as publications or patents, that disclose

5    the claimed invention or elements of the claimed invention.

6         To be prior art, an item or reference must have

7    been made, known, used, published, patented, or filed as a

8    patent application before the priority date of the

9    patent-in-suit.

10        Defendant has challenged the validity of Claim 14

11   as anticipated by the prior art.  Patent invalidity, ladies

12   and gentlemen, is a defense to patent infringement.

13        Now, even though the U.S. Patent and Trademark

14   Office and the examiner assigned to this patent by that

15   office has allowed Claim 14 of the '177 patent, you, the

16   jury, have the ultimate responsibility of deciding whether

17   Claim 14 is valid.

18        I'll now instruct you on the rules that you must

19   follow in deciding whether the Defendant, Great West, has

20   proven that Claim 14 of the '177 patent is invalid.

21        To prove that Claim 14 is invalid, the Defendant

22   must persuade you by clear and convincing evidence that the

23   claim is invalid.

24        Now, during the course of the trial, the Defendant

25   has presented you with prior art.  In considering that prior

art, you may consider whether the prior art was or was not already considered by the Patent Office before granting the patent.

Prior art differing from the prior art considered by the Patent Office may, but does not always, carry more weight than the prior art that was considered by the Patent Office.

However, as I've told you, it's your job as the jury to determine the amount of weight, if any, to give to all of the evidence in this case.

The fact that any particular piece of prior art was or was not considered by the Patent Office does not change the Defendant's burden of proof.

Claims are construed the same way for determining infringement as for determining invalidity.

In this case, the priority date for the patent-in-suit, the '177 patent, is May the 11th, 2000.

Now, a number of issues relevant to invalidity must be viewed from the perspective of a person of ordinary skill in the art, that is, in the field of the asserted invention as of the effective filing date of the '177 patent.

It's up to you to -- to decide the level of ordinary skill in the field of the invention.  You should consider all the evidence introduced at trial in making this

1   decision, including:

2           (1) the levels of education and experience of

3   persons working in the field;

4           (2) the type of problems encountered in the field;

5           (3) prior art solutions to those problems;

6           (4) speed with which innovations are made;

7           and, (5), the sophistication of the technology.

8           A person of ordinary skill in the art is a

9   hypothetical person who is presumed to have known all of the

10  relevant prior art at the time of the claimed invention.

11          In order for someone to be entitled to a patent,

12  the invention must actually be new.  In general, an

13  invention is new when the identical product or process has

14  not been made, used, or disclosed before.

15          If an invention is not new, it is considered to be

16  anticipated.

17          Here, the Defendant contends that Claim 14 is

18  invalid because it is anticipated.  Defendant must persuade

19  you by clear and convincing evidence.

20          Defendant may prove anticipation by proving that:

21          (1) the invention was known or used by others in

22  this country or patented or described in a printed

23  publication or in this or a foreign country before the

24  '177 patent;

25          (2) the invention was patented or designed in a

1  printed publication in this or a foreign country or in

2  public use or on sale in this country more than one year

3  prior to the date of the application of the '177 patent in

4  the United States;

5          (3) the invention was publicly used, sold, or

6  offered for sale in the United States more than one year

7  prior to the date of the application for the '177 patent;

8          (4) the invention was described in a published

9  application for a patent by another filed in the United

10 States before the '177 patent;

11         or, (5), the invention was described in a patent

12 granted on an application for patent by another filed in the

13 United States and the application was filed before the '177

14 patent.

15         For a claim to be invalid because it is not new,

16 all of its requirements must have existed in a single system

17 that predates the '177 patent or must have been described in

18 a single printed publication or patent that predates the

19 '177 patent.

20         Now, to understand how a patent -- excuse me, to

21 understand how a prior art system operates, you may rely on

22 multiple pieces of evidence to describe -- that describe the

23 same prior art system for the purpose of finding

24 anticipation.

25         In other words, if you find that a single prior art

1   system existed that meets every element of the claim, then

2   that is enough to find that the claim is invalid as

3   anticipated by the prior art.

4          The prior art must contain all of the limitations

5   or elements of the claim arranged as in the claim.

6          The Defendant must prove by clear and convincing

7   evidence that Claim 14 was anticipated by the prior art.

8          If you find that the Defendant has proven by clear

9   and convincing evidence that Claim 14 was anticipated by the

10  prior art, as I've explained the law to you, you must find

11  that Claim 14 is invalid.

12         If you find that the Defendant has failed to prove

13  by clear and convincing evidence that Claim 14 was

14  anticipated by any prior art, then you must find that

15  Claim 14 is not anticipated.

16         Now, in determining whether or not the invention of

17  Claim 14 is invalid, you must determine the scope and

18  content of the prior art at the time the invention was made.

19         For prior art to anticipate a claim of a patent,

20  the disclosure in the prior art reference does not have to

21  be in the same words as the claim, but all the elements of

22  the claim must be there, either stated or necessarily

23  implied so that someone of ordinary skill in the field of

24  the invention looking at that reference would be able to

25  make and use at least one embodiment of the claimed

1    invention.

2        Anticipation can occur when the claimed invention

3    inherently or necessarily results from the practice of what

4    is disclosed in the written reference, even if the inherent

5    disclosure was unrecognized or unappreciated by one of

6    ordinary skill in the field of the invention.

7        If you find, ladies and gentlemen, that Claim 14 is

8    not new, as I have explained it to you, you should find it

9    to be invalid.

10        If you find that the Defendant has infringed

11    Claim 14 and Claim 14 is not invalid, then you must decide

12    and consider the proper amount of damages, if any, to award

13    to the Plaintiff.

14        I'm not suggesting which party should win on any

15    issue.  If you find that the Defendant has not infringed

16    Claim 14 or that Claim 14 is invalid, then -- then the

17    Defendant is not -- excuse me, then the Plaintiff is not

18    entitled to any damages.

19        If you award damages, they must be adequate to

20    compensate the Plaintiff for any infringement of

21    Claim 14 -- 14 that you may find.

22        You must not award the Plaintiff more damages than

23    are adequate to compensate for the infringement, nor should

24    you include any additional amount for the purpose of

25    punishing the Defendant.  Damages are not meant to punish an

1   infringer.

2        Your damages award, if you reach this issue, should

3   put Plaintiff in approximately the same financial position

4   that it would have been in had the infringement not

5   occurred.

6        Plaintiff has the burden to establish the amount of

7   its damages by a preponderance of the evidence.

8        In other words, you should award only those damages

9   that the Plaintiff establishes that it more likely than not

10  suffered as a result of the Defendant's infringement of

11  Claim 14 of the '177 patent.

12        Now, while the Plaintiff is not required to prove

13  the amount of its damages with mathematical precision, it

14  must prove them with reasonable certainty.

15        A Plaintiff is not entitled to damages that are

16  remote or speculative.  The patent laws specifically provide

17  that damages for infringement may not be less than a

18  reasonable royalty.

19        A reasonable royalty is the amount of royalty

20  payment that a patentholder and the alleged infringer would

21  have agreed to in a hypothetical negotiation taking place at

22  a time immediately prior to when the infringement first

23  began.

24        In considering this hypothetical negotiation, you

25  should focus on what the expectations of the patentholder

and the alleged infringer would have been if they'd entered

into an agree -- into an agreement at that time and had they

acted reasonably in their negotiations.

In determining this, you must assume that both

parties believed Claim 14 of the patent-in-suit was valid

and infringed and that both parties were willing to enter

into an agreement.

The reasonable royalty that you determine must be a

royalty that would have resulted from the hypothetical

negotiation and not simply a royalty that either party would

have preferred.

As I've said, in this case, the Plaintiff seeks a

reasonable royalty.  A reasonable royalty must be in the

form -- excuse me, a reasonable royalty may be in the form

of a lump-sum amount where the patent owner receives a

single, upfront payment as the royalty payment.  You must be

careful to ensure that the award is no more or no less than

the value of the patented invention.

The patent law does not allow you to use the patent

of an entire product or service or the value of the entire

market to determine the damages unless you find that the

Plaintiff has proved that the patent feature of the product

drives the consumer demand for the entire product or

service.

Evidence of things that happened after infringement

began can be considered in evaluating the reasonable royalty, only to the extent that the evidence aids in assessing what the royalty would have resulted -- what royalty would have resulted from the hypothetical negotiation.

In this case, the parties generally agree on when and between whom the hypothetical negotiation for Claim 14 of the '177 patent would have taken place.

The parties also generally agree that the hypothetical negotiation would have resulted in a single lump-sum royalty for the life of the patent.

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began.

Some of the kinds of factors you may consider in making your determination are:

(1) the royalties received by the Plaintiff for licensing of the '177 patent, proving or tending to prove an established royalty;

(2) the nature and scope of the license as exclusive or non-exclusive or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold;

(3) the duration of the patent and the term of the license;

1          (4) the utility and advantages of the patented

2     property over the old modes or devices, if any, that have

3     been used for working out similar results;

4          (5) the nature of the patented invention and the

5     character of the commercial embodiment of it as owned or

6     produced by the licensor and the benefits to those who have

7     used the invention;

8          (6) the extent to which Defendant has made use of

9     the invention and any evidence probative of the value of

10    that use;

11         (7) the portion of the realizable profits that

12    should be credited to the invention as distinguished from

13    the non-patented elements, the manufacturing process,

14    business risks, or similar features or improvements added by

15    the Defendant;

16         (8) the opinion and testimony of qualified experts;

17         (9) the amount that the licensor -- excuse me, a

18    licensor, such as the Plaintiff, and a -- a licensee, such

19    as the Defendant, would have agreed upon at the time the

20    infringement began if both had been reasonably and

21    voluntarily trying to reach an agreement, that is, the

22    amount which a prudent licensee who desired as a business

23    proposition to obtain a license to manufacture and sell a

24    particular article embodying the patented invention would

25    have been willing to pay as a royalty and yet be able to

1  make a reasonable profit and which amount would have been

2  acceptable by a prudent patentee which was willing to grant

3  a license.

4      Now, no one of these factors is dispositive, and

5  you can and should consider the evidence that has been

6  presented in this case on each of these factors.

7      You may also consider, ladies and gentlemen, any

8  other factors that in your mind would have increased or

9  decreased the royalty the infringer would have been willing

10  to pay and the patent owner would have been willing to

11  accept, acting as normally prudent business people.

12      The law requires that any damages awarded to the

13  Plaintiff correspond to the value of the alleged invention

14  and not the value of features of Defendant's accused web

15  portal that are not covered by Claim 14 of the '177 patent.

16  This is particularly true where as here, the accused product

17  has multiple features and multiple components.

18      Plaintiff bears the burden of establishing the

19  amounts attributable to the patented feature.  That is,

20  Plaintiff must give evidence tending to separate and

21  apportion between the patented features and the unpatented

22  features, and such evidence must be reliable and tangible

23  and not conjectural or speculative.

24      In determining the amount of damages, you must

25  determine when the damages begin.  No damages can be awarded

1   for any infringement that occurred before the date the

2   patent was issued.  Damages commence on the date the

3   Defendant began the alleged infringement of Claim 14 of the

4   '177 patent.

5        Now, with these instructions, ladies and gentlemen,

6   we're ready to hear closing arguments from the attorneys in

7   this case.

8        Plaintiff may now present its first closing

9   argument to the jury.

10       Mr. Gilliland, would you like a warning on your

11  time?

12       MR. GILLILAND:  If I could reserve 10 minutes for

13  rebuttal and get a three-minute warning on the opening?

14       THE COURT:  So 30 minutes total.  When you've used

15  17 minutes, I'll warn you, and then you'll complete in about

16  20 minutes with 10 minutes remaining for rebuttal?

17       MR. GILLILAND:  Yes, Your Honor.

18       THE COURT:  Okay.  You may proceed with your first

19  closing argument.

20       MR. GILLILAND:  May it please the Court.

21       Ladies and gentlemen, first things first.  I thank

22  you very much for your time and attention over these last

23  few days.

24       As I said at the beginning of this case, what

25  you're doing now is the second highest service that a

1 citizen of our country can provide, the first, of course,

2 being the armed forces.  And so thank you for that and thank

3 you for being a very important part of this very important

4 process and helping us resolve a big dispute that's been

5 going on for several years.

6      Now, I told you at the beginning of the case that

7 we're here because the Defendant, Great West, failed to

8 ensure that it was not infringing someone else's patent and

9 then refused to accept responsibility for what it had done.

10      And we've walked you through the evidence, and

11 we've proven that to you.  This case, as we said at the

12 beginning, it's about the '177 patent and how the Defendant,

13 Great West, is using that patent.

14      And when you get back to the jury room, there are

15 going to be three questions that you have to answer, and the

16 Court went over those -- His Honor went over those with you.

17      And the first is a question about infringement.

18      The second is a question about validity.

19      And then the third is a question about damages.

20      And so I'd like to spend a few minutes talking to

21 you about each of those questions.

22      Now, the first question is the one that we bear the

23 burden of proof on, and that's that burden of proof by a

24 preponderance of the evidence.  And it's the more likely

25 than not.  Have we presented evidence that indicates that

1   it's more likely than not the Defendant infringed the

2   patent?

3          And if we can, please bring up Plaintiff's

4   Exhibit 1?

5          Plaintiff's Exhibit 1 is the patent, which you've

6   had in your notebooks all week and which you -- if you

7   wanted, you can request the actual exhibit back in the jury

8   room.

9          But the issue in this case and the thing that we

10  are all focused on is on the last page, and that's

11  Claim 14.  And Claim 14 --

12         If we can catch Claim 11 with it, as well,

13  Mr. Cartwright?

14         Claim 14, as you've heard, depends from Claim 11.

15  So Claim 14 includes everything from Claim 11 and the

16  additional requirements of Claim 14.

17         And this -- as you can see when you read the claims

18  themselves and when you read the title of the patent, that

19  it is not about footballs and soccer balls.

20         It's very specific.  It's an apparatus for

21  distributing content through one or more distributed

22  information access points to a centralized access point of

23  the user that then has all of these requirements that you

24  have to prove or that you have to find, and we have to show

25  you under the burden of proof.

```
 1              And we've shown you all of that, and we've shown
 2    you that they can infringe this patent in really two
 3    distinct and different ways.
 4              You've heard the words thrown to you about a
 5    Drivers List By Policy and a Reporting Data Policy.  Those
 6    are two independent ways that the Defendant's web portal
 7    infringes this patent.  Either one of those proves
 8    infringement.
 9              Now, the first one of those, the Drivers List
10    Policy that we've talked about, that's the one where an
11    agent --
12              If we could bring up Exhibit GWX-482, please?
13              The Drivers List Policy is where an agent of
14    Great West can go in and modify, add, or change information
15    about a user.  GWX-482 is an exhibit in this case.  You can
16    ask for it back in the jury room.  You can read how the
17    agent portal operates.
18              And if we go to -- it's physical Page 39 of this
19    document.
20              If we go to 39, it explains all the information
21    about what an agent can do regarding drivers and how they
22    can enter information about them, how they can modify them,
23    order their motor vehicle records, and all of that sort of
24    information.
25              And Dr. Smith, he walked you through all of that
```

1    and how it fits with the claim elements of the patent.  And

2    you also heard that all of that information is very

3    important because it ties back to underwriting and how much

4    risk is Great West taking on when they write insurance for a

5    specific driver.

6           And so all of that information is -- is the

7    foundation, essentially, of their business, and that's one

8    way they infringe.

9           The other way they infringe is when an employee

10   logs in to the system.

11          And if we could bring up GWX-484?

12          Now, this is the second type of infringement or the

13   second infringement they engage in.  And it's when an

14   employee uses the portal, when an employee logs in to the

15   portal and does what's been referred to as a Reporting Data

16   Policy.

17          And if we could go to physical Page 79?

18          There you go.

19          And this is the Report Rate Work list.  And

20   starting on this page and continuing through the next page

21   and for several pages after that, it describes how an

22   employee can go in and enter data about miles driven, units,

23   et cetera.

24          If we can go to the next page, please,

25   Mr. Cartwright?

1          And see here at the top of the page, you can see

2    where they get to enter all of that information.  And

3    there's been some discussion and some dispute about whether

4    or not they're creating new policies or just saving over old

5    policies.  But you can see right here -- let me see, if --

6    in Item No. 2 where it's describing how it operates, it

7    says:  After a report date is selected, some changes occur.

8    The availability of the report type, actual estimate, and

9    correction is based on previous report types entered for the

10   selected month.

11         But then it says:  The equipment unit count fields

12   and the applicable combined rates are populated.  That means

13   that content is already filled in on that form.

14         And when the employee goes in, they're modifying

15   content.  They're managing the content just like Claim 14

16   requires.

17         And this, GWX-484, is also an exhibit you can

18   request, and you can see how the employee portal works.

19   And, again, this is starting around Page 76 that it goes

20   through this reporting date of policy.

21         Now, either one of those ways will infringe the

22   patent.  And so what evidence did we put on to help

23   demonstrate this to you?

24         Well, we brought in Dr. Smith, and he took the

25   witness stand, and he walked methodically through all of the

1 claim elements.

2          And if we could bring up the -- the Claim 14 slide.

3          And you'll recall this slide from Dr. Smith's

4 testimony.  And this is -- Dr. Smith broke out each of the

5 elements to make it easier to follow.

6          But the first part here, A through E, preamble

7 through E, are the elements of Claim 11, which, you know, as

8 you see in Claim 14, it says the apparatus of Claim 11 with

9 the additional requirement of Claim 14.

10          And Dr. Smith went through and methodically showed

11 where he looked at evidence, where he looked at deposition

12 testimony, where he looked at documents like the two we just

13 saw and identified every element that was in Claim 14 for

14 you.  And he did that to satisfy our burden of proof that

15 the Defendants infringe the patent.

16          And then the -- the Defendants, as -- as you

17 recall, they brought up some issue about whether drivers are

18 users.  And even Mr. Foote, when he walked you through all

19 that, Mr. Foote testified, he made the point that, look, the

20 user system stores information in what's called the LDAP.

21          And if we could see from the big deck,

22 Slide No. 11?

23          And this was the high-level architecture of how

24 their system operates, and the user information -- even

25 Mr. Foote agreed with Dr. Smith, the user information gets

1  stored up here in the LDAP.

2         And you recall, there are three different types of

3  user information that he talked about.  There were some

4  abbreviations that went with them.  There was AGT for agent,

5  CUS for customer, and EMP for employee.  Those were the

6  three types of users that use the system.

7         Now, the data that's important for the work that

8  Great West does, and that's the policy data, the types of

9  wrecks that have occurred, et cetera, all of that data gets

10  stored and used in a completely different place.  And that's

11  where who a driver is, how long he's been working, what his

12  motor vehicle record looks like.  Even Mr. Foote told you

13  all that gets stored in a completely different place.

14  That's down here in this IBM DB2 and VSAM tables.  That's

15  completely separate and different than the user data that's

16  up in the LDAP.

17         And, now, they're trying to confuse you.  They're

18  trying to pull a fast one on you by saying, well, drivers

19  are users.  Well, sometimes drivers are users, but that's a

20  different type of data in this system if somebody is a user.

21  They fall under one of those three things.

22         And a driver, as far as this system goes, is a

23  piece of important separate content that's necessary for

24  them to underwrite claims.

25         Now, the Defendants also brought Dr. Crovella in,

1  and I don't know if you caught it.  You had to really be

2  paying attention, but he did give you a non-infringement

3  opinion, and it took about two questions where he just said,

4  no, we don't infringe.  He didn't do all the work that

5  Dr. Smith did.  He didn't walk you through all the evidence

6  and claim elements to show that this is why.  He simply said

7  no and moved on.

8       And as His Honor said, you are the judges of the

9  credibility of the witnesses in this case.  And so it's up

10 to you to decide whether or not to believe Dr. Crovella.

11      And when you're making that decision, remember,

12 unlike what His Honor said, where the meanings of the claim

13 terms mean the same thing, whether it's infringement or

14 validity, Dr. Crovella said things may mean something

15 depending on whether he's giving his deposition months ago

16 or testifying live in court.  He was happy to change what

17 different -- what content was and what his opinions were

18 based on what was going on around him.

19      So I think you'd agree with me that Dr. Crovella

20 was completely uncredible when it came right down to it.

21      And because of that, when you get to the first

22 question on the jury charge, I believe we've provided more

23 than a preponderance of the evidence that either one and

24 both of those two systems infringe.  And so when you address

25 Question No. 1, your answer should be yes.

1        And then that will bring us to Question No. 2 which

2   is validity.  And here's where the burden shifts to the

3   Defendants because they're asking you to tear this patent up

4   for all time.  Because if you find that this patent, the

5   '177 patent is invalid, it's invalid for everything, for all

6   situations, not just this case.  And that's why they have a

7   higher burden because the patent has been checked out by the

8   examiners at the Patent Office.

9        And what do they present you for -- for their

10  validity argument?  Well, again, they rely on Dr. Crovella

11  who -- words meaning what he wants them to mean whenever

12  it's convenient.

13       And then they showed you some diagrams that you can

14  have back in the jury room.

15       Can we bring up GWX-122?

16       GWX-122 is their anticipation reference.  It's the

17  Pellegrino patent.  And if you ask for it, you can have the

18  whole patent, not just the screenshots the Defendants gave

19  you.

20       And if you look at the whole patent, you'll see

21  that it does not disclose all of the claim elements.

22  Everything that was on that chart I showed you, everything

23  in Claim 11, and everything in Claim 14 has to be in

24  Pellegrino for it to invalidate the patent.  That's what

25  anticipation means.

1          And, one, Dr. Crovella did not check all those

2    boxes.

3          And, two, whenever they showed you any information

4    about Pellegrino, they showed you their own colored-up and

5    modified versions of the -- the images and figures in there.

6          If we could go to the -- Slide 43 of the big deck?

7          This is one of the images they showed you.  This is

8    not the Pellegrino image.  What this is, is their version of

9    the Pellegrino image with things added and things

10   highlighted.  And that's because they know Pellegrino by

11   itself doesn't get them there.

12         And all of their arguments about validity at the

13   end of the day amount to little more than lawyer fluff, much

14   like Mr. Ponder's marketing fluff.  This time we've got

15   lawyer fluff.

16         And so for that reason when you get to

17   Question No. 2 on validity and you consider the lawyer fluff

18   that they put up and Dr. Crovella's testimony, we'll submit

19   to you that that doesn't come anywhere close to clear and

20   convincing evidence, to an abiding conviction that it's

21   highly probable.

22         They failed to meet their burden.  They failed to

23   come anywhere close because Pellegrino doesn't get them

24   there even with Dr. Crovella who is willing to say whatever

25   he needs to say.

1        And so when you get to Question No. 2, your answer

2   should be, no, they have not proven that Claim 14 of the

3   '177 patent is invalid.

4        And so when you're done with that, then you need to

5   move to the final question.  And that involves the damages

6   to assess in this case.  And His Honor told you that in this

7   case, we're talking a reasonable royalty.  And you've heard

8   that throughout the case.

9        And also, this -- back to damages is when we get

10  back to the preponderance of the evidence standard where

11  it's our burden to prove more likely than not what the

12  damages are.

13       And so consider the evidence that we've presented

14  to you.

15       One -- if we could bring up Plaintiff's

16  Exhibit 212?

17       This is Mr. Ponder's marketing fluff, as he called

18  it.  But even Mr. Ponder's marketing fluff notes that in the

19  second sentence up here in the first paragraph that the

20  newly designed insured portal allows insureds to access

21  information on their own without needing to call their

22  agent.

23       And, of course, the portal is going to give the

24  agent the ability to access information without needing to

25  call anybody.  We have their own admission that the portal

1 eliminates the need for phone calls.

2          And we also have -- and you can request this back

3 in the jury room -- Plaintiff's Exhibit 213 that discusses

4 the portal.  This is Mr. Ponder talking to his boss.

5          But on the second page -- third page, excuse me,

6 you see right there in the middle of the page it notes that

7 this agent portal is critical to business development, and

8 that's why they spend considerable time and attention and IT

9 resources on it.

10          So Mr. Lasinski said:  Look, it is valuable.  They

11 recognized that it's valuable.  They recognized that it

12 helps avoid phone calls.  So let's look at how it helps

13 avoid phone calls.

14          And so Mr. Lasinski walked us through --

15          Could we bring up Slide 38, please?

16          He walked us through a calculation of how he came

17 up with the number.

18          I'm sorry, maybe the next one, the one with the

19 full calculation on it.

20          31, my apologies.

21          He walked us through Slide 31, and he said, look,

22 when you look at the exhibits in this case -- for example,

23 Plaintiff's Exhibit 233 -- over just the period from when

24 the lawsuit was filed, January 2015 up until August of 2018,

25 when he had to put together his estimate of damages, his

1  valuation, he looked at the use, and he looked at how many

2  times people had hit the portal.  And he had taken documents

3  like Exhibit 233, and he had added up all of those portlet

4  views.

5  Now, the Defendants are trying to say -- or the

6  Defendant is trying to say he overvalued things.  Well,

7  Mr. Lasinski, he didn't take all of those views.  He didn't

8  take the 35.7 million times people went to this portal.

9  THE COURT:  Counsel, you've used 17 minutes.

10  MR. GILLILAND:  Thank you, Your Honor.

11  He didn't take that number and multiply by the cost

12  of each phone call.  That -- then we'd be in here asking for

13  something like a hundred million dollars.  He didn't.  He

14  apportioned it down.  He said, look, we've got to take the

15  landing pages, where they go when they first hit.

16  We've got to take out when employees look at it

17  because we assume employees may be responding to an agent,

18  and so we don't want to double count.  Or employees may be

19  using it for internal products.  But he reduced that all the

20  way down to just what was an estimate of how many unique

21  times somebody had looked at those pages.

22  And then he calculated, well, how long does an

23  average phone call and how much per minute does that cost.

24  And because Great West didn't keep the data, he used BITCO

25  data, their sister company.  And he came up with 2.75 per

1    phone call, and that got him to 30 million.

2         But then he gave them the benefit of a 12 percent

3    interest rate and knocked that even farther down to the 20.5

4    million and subtracted out the cost.  He did a lot of work

5    to come up with that number.  And when he did and when --

6    and I would submit to you when you get to Question No. 3 and

7    you're considering damages, that a reasonable royalty for

8    use of this invention should be $20,300,000.00.

9         And you've got all the work and Mr. Lasinski's

10   credibility to help you understand that.  And I would

11   suggest that Defendant's expert's short-circuit rendition of

12   just give them what they paid for -- well, you know -- you

13   know better than that.

14        They bought this patent in 2008 when it was just an

15   application.  It was just a glimmer in the eye of -- at that

16   time when they acquired it, Intellectual Ventures, that it

17   would ever result in a patent.  And he wants you to give him

18   that number.  You know that's not right, especially when

19   they've used it as much as these Defendants have.  So don't

20   let them play you.  Don't let them mislead you with lawyer

21   fluff and just make them accept responsibility for their

22   infringement.

23        Thank you.

24        THE COURT:  All right.  Defendant may now present

25   its closing argument.

1          Mr. Bettinger, would you like a warning on your

2     time?

3          MR. BETTINGER:  Your Honor, three minutes, please?

4          THE COURT:  All right.  I'll warn you with three

5     minutes remaining.

6          You may proceed.

7          MR. BETTINGER:  Thank you, Your Honor.  Thank you

8     to all the Court personnel through the last couple days.

9          Ladies and gentlemen, I know I speak for everyone

10    on our team in thanking you for your time, your attention,

11    and your patience.  The last few days have been busy.

12    There's been a lot of new terms and a lot of new faces.  We

13    appreciate that you've taken the time to sit through and

14    listen to the evidence in the case.

15         As Judge Gilstrap said at the beginning of the case

16    in his opening remarks, our country is unique in the way we

17    resolve disputes.  We resolve them to a jury, a jury of our

18    peers.  We resolve them with our fellow citizens, and you

19    are our fellow citizens.

20         This is our opportunity to review the evidence that

21    has been presented over the last three to four days and put

22    it in order and make sense of it.

23         I emphasize evidence because Judge Gilstrap has

24    told us it is your job to make a decision in this case based

25    on the evidence.

1          Ladies and gentlemen, attorney argument is not

2   evidence.  Attorney questions that are worded in a way to

3   suggest that a witness is somehow changing the truth,

4   accusations that you're switching horses in the case,

5   accusations, lawyers are engaging in fluff, accusations that

6   a defense wasn't disclosed and it's being disclosed for the

7   first time, that is not evidence.  None of that is.  It is

8   simply attorney bluster.

9          From the outset of this case, our goal has been to

10  provide you with evidence, evidence that you need to make a

11  decision in the case.  We brought the witnesses.  We put

12  them on the stand so that you could look them in the eye,

13  size them up, and figure out what is really going on here.

14  In other words, we showed up.  We put Mr. Foote and

15  Mr. Ponder on the stand.

16          You also had an opportunity to see Mr. Arends on

17  video.  Seeing these witnesses, getting a real feel for who

18  Great West is, what it does, that's evidence.  Learning that

19  all three of the witnesses, Foote, Ponder, and Arends, each

20  have worked for Great West for around 25 years --

21  25, 24, and 27 years, respectively.  That says something

22  about a company.  That says something about the witnesses

23  when you're there that long.

24          We showed up.  We are the ones who explained the

25  patent.  We are the ones who gave you some idea what

1  Claim 14 was. The elements it requires, a centralized

2  access point that allows one to manage content that is

3  contributed by them.

4       By doing so, we signalled to IV, go ahead, question

5  our witnesses, ask the questions you want. We'll answer

6  your questions straight up. That's what presenting evidence

7  at trial is all about.

8       We explained our website. We explained it has

9  three portals, one for the truckers, one for agents, and one

10  for employees. We showed you the document. Showed you our

11  copy. There -- showed you more documents. We have nothing

12  to hide. We put it all on the table, and that's the thing.

13  When you show up, there is nothing to hide. It's there for

14  everyone to see, for you to see, to take a look to make a

15  decision in this case.

16       Well, that's not what happened with IV. They were

17  nowhere to be found. They came into this court asking for

18  $20.3 million and did not have the common decency to show

19  up, to take the witness stand, and answer questions.

20       The way I was raised, you want that kind of money,

21  show up, tell me how, tell me why. Let me -- let me take a

22  look in your eyes. Let me see how you testified. Let me

23  see. Let me get a real feel for who you are. That's what

24  you do when you come in and ask for that kind of money. You

25  come into court, and you explain it. Why would you win?

1  Why IV, why you should win?  Get on the stand and explain

2  it.

3          Let this -- let the ladies and the gentleman of the

4  jury, let you take a look at the witness, figure out where

5  they're coming in, look them in the eye, see what type of

6  person they really are.  That's how you present evidence.

7          What is not evidence and in my view just not right

8  is to send in lawyers and paid experts while you sit in some

9  high rise office building in Seattle waiting for a big score

10  on a patent that you bought for a couple hundred thousand

11  dollars.

12          Folks, that's not the way it works.  Have the

13  courtesy, the decency to show up and make your case.  And

14  when the lawyers go into court, don't have them try and

15  belittle witnesses who do show up.

16          Remember when IV's counsel was questioning

17  Mr. Foote -- if we could put Slide 2 up -- the guy who had

18  been here from the start of trial, and he suggested that

19  Mr. Foote was somehow shading his testimony.  You've been

20  doing your very best so far not to harm through your

21  testimony at Great West.

22          And Foote gave him really real answers.  He's a

23  real guy who said:  No, I've been trying to answer

24  accurately and honestly.

25          Come on, you're going to go after Mr. Foote.  The

1  guy doesn't have a mean bone in his body.  He's been sitting

2  in court this entire time.  He answered every question put

3  to him.

4           But it got worse.  Remember, counsel suggested

5  Mr. Foote was somehow changing the inflection in his voice

6  when he answered no.  Really?  That's all you've got is to

7  try to smear Mr. Foote?  That's not evidence, and that's

8  just not right.

9           Here's the deal.  The idea of buying a patent and

10  then hiring lawyers and experts to go out and try to make

11  money on it.  Well, that might work on Wall Street.  But not

12  here where decisions are based on evidence.

13          So what I want to do this morning is review the

14  evidence that was presented to allow you to make a decision

15  in this case because your decision is based on evidence.

16          And I want to focus on two issues, the infringement

17  and the invalidity evidence because as you heard yesterday,

18  you don't reach the issue of damages if this patent is not

19  infringed and if this patent is invalid.

20          So let's turn first to infringement and look at

21  that evidence.

22          And just to orient ourselves, remember, Claim 14

23  requires you have a centralized access point, and the two

24  have been identified in here.  There's been -- the parties

25  agree, it's the agent portal and it's the Drivers List By

1   Policy page on the agent portal, okay, right?  That's the

2   first thing they say we -- that infringes.

3          The second thing they say is the employee portal,

4   and it's the homepage.  Nothing else.  Those two pages.

5   That's all that's at issue in this case.  Do those two pages

6   infringe Claim 14?  Those are our centralized access points.

7          If we could go to the next slide?

8          And then that centralized access point, you have to

9   be able to manage and contribute content.  You have to

10  manage and contribute content.

11         So the centralized access point, those two pages,

12  you have to show that you manage content -- you contribute

13  it and that you manage it.

14         Well, who took you through -- what's content?  Did

15  you ever hear one word from them on -- as to what content

16  is?  We took you through, hey, look, there's this -- the way

17  the patent talks about is content is, it's these articles.

18  It tells you something.  That's what content is.

19         And we showed you Exhibit 45 from the patent.  The

20  patent is PX-001.  And then -- and showed you, hey, this

21  paragraph here, that's content.  And then we asked the same

22  question of their expert, Dr. Smith.

23         We said:  Dr. Smith, at Figure 45, are you familiar

24  with that screen called clearing clogged drains?

25         He says:  Yes, I've seen it before.

1          And then shows the content contribution which is

2    clearing clogged drains.  That's content, correct?

3          He says:  Yes, that's correct.

4          So you agree that Screen 45 is showing us content?

5          Yeah, it shows us content.

6          We're the one who explained that.  That's what

7    content is.  It's those articles.  It's something that

8    says -- it's a description.  That's how the patent uses the

9    term "content."

10          If we could go to the next slide?

11          And then what we also know is what content is not,

12    and this is the uncontested facts.  And as the jury

13    instructions Your Honor has read, is that's like it was

14    proven in court here.  What content does not include, it

15    can't be those articles.  It does not include information

16    about users.  That's a fact and proven here in this court.

17    That's what the instructions say.  Content does not include

18    information about users.

19          So if we could go to the next slide?

20          Both experts agreed.

21          We asked -- asked Smith:  You agree scope of

22    content does not include information about users?

23          Dr. Smith:  Yes.

24          Professor Crovella:  My opinion, and it's

25    consistent throughout all my reports, is that information

1  about users is not content.

2  The next one.

3  And then, you know, further on, we had this whole

4  point about is a driver a user -- driver is a user, and why

5  that's a problem.  And it kills their case is the drivers

6  are users.  Information about users isn't content, right?

7  So they had to try to fight hard on that.  Oh, we can't --

8  we can't have the drivers be users because once that

9  happens, all that information is information about the

10 use -- the driver who's a user, then it's not content.

11 But -- but on the -- their first witness they put

12 up, Dr. Smith, we asked him point blank:  So the driver is a

13 user of the Great website -- Great West website, correct?

14 And his answer is:  Yes, correct.

15 Right there he's telling us, he knows drivers are

16 users of the website, for goodness sake.  Earlier -- you

17 heard today they're not even going to fight it anymore.

18 They -- they gave up.

19 And so -- all right.  And as a user of that

20 website, they have a user name password and a user name,

21 correct?

22 Correct.

23 So, now, they're a user?

24 And he says:  Correct.

25 So the drivers are users of the website.

1          If we could go to the next slide?

2          We asked the same question of Mr. Foote.  He would

3    know best.  He designed the website.  We brought him in

4    here, and we asked:  Hey, so once the driver is logged in,

5    can they use the website?

6          He goes:  Yes.

7          Is there any reason they couldn't do that?

8          And he says:  No.  They can do that.

9          And, again, we asked:  Once the trucker is granted

10   credentials, could they become a user of the website?

11         Yes.

12         So that's out.  We know users include the drivers.

13   Drivers are users of the website.

14         If we could go to the next slide there?

15         So why does that matter?  Because here's the first

16   page that they say is the centralized access point, Drivers

17   List By Policy.  It's GWX-494.  GWX-494 is the Driver List

18   By Policy.

19         And you recall the testimony from Mr. Foote, if you

20   click on that driver name -- in this one Anthony Made over

21   on the left -- it takes you to the screen called Driver

22   Detail, which is GWX-493 -- GWX-493.

23         And so what I want to do is walk you through --

24   okay, you click on that driver.  That information is there

25   on the Driver List By Policy.  What can an agent do?  What

1  can they do to that page because that's where they're

2  claiming the content is that has to be modified?

3        So let's -- if you click on that name from -- you

4  go to GWX-493, and in the agent manual, which is Exhibit 482

5  at Page 49, those -- the different categories in the driver

6  detail are listed in what they call collapsed form.  They

7  show you the different areas where you can go in and what

8  you can do with the -- with the information in the Driver By

9  Policy List.

10       And there's only three buttons, and you heard this

11  testimony from Mr. Foote.  There's only three buttons that

12  you can click on to do anything there.  There's an edit

13  button for the driver personal information.  There's an add

14  license for the licenses.  And there's an add account for

15  the Great West employment information.

16       So if they have any case at all, if you're going to

17  have to modify content, you got to -- it's got to be through

18  one of these three buttons.  You have to be able to click on

19  one of those three buttons to go in and modify the content

20  because you can't get to anything else.

21       So let's take a look at what each of the three

22  buttons are.

23       And if we could, please, go to the next slide.

24       So when you click on that Driver Personal

25  Information, you click on that button Edit, it takes you --

1  and you can see this in the -- in the agent manual, 482 at

2  Page 51 -- it takes you to the Update Driver Personal

3  Information where you can go in and update first name,

4  middle name, last name, suffix, gender, date of birth, years

5  of experience.  That's all you can update.

6        Well, folks, that's information about a user.  We

7  know that the truckers are users, and that's information

8  about a user.  So it can't be content.  That's been our

9  position from the outset.  It can't be content under their

10  own patent because it's information about a user.

11        If we could hit the next slide?

12        And even Dr. Smith admitted:  If all you're doing

13  is managing information about a user, you are not managing

14  content, correct?

15        And he said:  Yep, I'd agree with you on that.

16        So if all you're doing is managing information

17  about a user, the driver's name, a driver's date of birth,

18  you're not managing content.  If you're not managing

19  content, you're not infringing Claim 14.

20        Mr. -- Dr. Smith went further.

21        The next slide, please.

22        If all you're managing is information about users,

23  you're not managing content, correct?

24        Correct.

25        And if you're not managing content, you can't

1  infringe, correct?

2          That would be correct.

3          There was more evidence.

4          If we could go to slide -- the next slide.

5          So then he said, well, okay -- well, then,

6  information about users, it's not content.  So then what did

7  Dr. Smith do?  He had to take a position that makes

8  absolutely no sense in this case.

9          And I asked him straight out:  So just to be clear,

10 it's your position that all those entries, first name,

11 middle name, last name, suffix, gender, all that, for a

12 driver who has password and user name is a user of the Great

13 West system, that information about that user is not

14 information about that user?

15         I asked him:  Is that your position?

16         And he said:  Yes, that's not information about the

17 user.

18         Come on.  That's exactly what it is.  It's the --

19 the title of the -- of the thing says information about

20 drivers.  It's exactly what it is, but it forces them into

21 this position.  It makes no sense at all where you're having

22 to say personal information about a user is not user

23 information.

24         So I -- the position has never made any sense, and

25 Dr. Smith had to give it up in the -- in his testimony.

1          If we could hit the next slide, please?

2          The second button you can hit is Add License to

3     Driver.  That's the second area.  But there, you can't

4     modify any existing content.  All you can do is add a

5     driver's license.  And it was undisputed in this case, just

6     adding information is not managing it.  Just adding

7     information does not mean you're managing.  You'd have to

8     take information that exists and go in and do something to

9     it to manage it.

10          If we show on the -- and this is, by the way,

11     GWX-490.  If you want to see that Add License to Driver,

12     it's GWX-490.

13          If we go to the next slide.

14          We asked both experts:  You can't delete the old

15     license.  You can only add a new one, right?

16          That's correct.

17          So you can't edit any -- or delete any of this

18     driver's license information?

19          No.

20          So you're not managing anything by adding a

21     driver's license?

22          And Dr. Smith said the same thing -- if you go to

23     the next slide -- we asked:  So adding a user is not

24     managing; it's contributing; is that right?

25          Yes.  Adding the user is not managing, it's

1  contributing.

2          So adding a license is not managing.

3          Okay.  That leaves one more button that you can

4  click to do anything to try to establish that you're

5  managing content.

6          If we could go to the next slide?

7          And that's the Update Employment Information.  You

8  can -- you can click on that button.  That was the testimony

9  of Mr. Foote.  And at GWX-482 at Page 57, we look, and

10  that's the only information you can update is the customer,

11  the status, and the hire date.  It's information about a

12  user.  That's all you can do.

13          And this is so far removed from what content is in

14  the patent, which is an article.  But even if you go down

15  this road, this is the only thing that you can change is

16  this information.  That's not content, so under Claim 14,

17  you're not managing content.  And that's what our position

18  has been all along.

19          So those are the three buttons where you can do

20  anything.

21          If you look at the other four -- on the next slide,

22  please.

23          Oh, and Dr. Smith agreed:  You're aware, sir, that

24  when a driver is deleted from -- so if you delete a driver

25  from the Drivers By Policy List, they're not removed from

1  the website?

2       He agreed:  They're not removed.

3       So you're not getting rid of a driver.  You're just

4  removing them from attached to that policy, and Mr. Foote

5  said the same thing.

6       You see down at the box, there's a sentence:  After

7  the customer relationship has ended, the driver is still on

8  the Great West master list.

9       Do you see that?

10      Yes.

11      What does that mean?

12      Well, we can't lose that information, so we do not

13 delete the driver.

14      And then he went on to explain why.

15      You can't argue, oh, you're managing because you're

16 deleting a driver.  Because you're not.  You're not deleting

17 a driver.  It remains in the system.  You're detaching them

18 from a policy.

19      So if we could then go to slide -- the next slide?

20      The other four:  Great West Driver Status

21 Information, General License Information, MVR Violations,

22 and Great West Claims and Reported Incidents.

23      The testimony was consistent from both witnesses

24 that you can't do anything there.  You can't -- you can't

25 edit.  You can't delete.  You can't touch any of that

 1    document.  And as an example, if we go -- for example, just

 2    the status information, Dr. Smith:  So for this information,

 3    the agent can't do anything to change that?

 4              And he says:  No, not -- not from this screen.

 5              And Mr. Foote agreed.  He said:  Can the agent

 6    delete any of this information?

 7              No.

 8              From any other screen?

 9              No.

10              And the testimony was consistent for all four of

11    those, the MVR screen and -- and the others.

12              So where does that leave us in -- and if you could,

13    Mr. Simmons, go to Slide 33?

14              I'm sorry, go back, please, to 20 -- yeah.

15              That then leaves us with looking at the Report

16    Rates on -- which is Slide 28.  And when we go to the Report

17    Rates, which is the other one, the testimony was consistent

18    across the board.  You're only creating new reports.  You

19    can't do anything with the old reports.  They have to stay

20    in the system.  It's required by state regulations.  You

21    can't get rid of any of this information.  So you go to

22    change anything here, you keep the old report, you have to

23    create a new report.

24              If we could go to Slide 29, please?

25              Dr. Smith agreed with us.  So each time that a new

1  policy is created, the old policy is kept, correct?

2          Yep, that's my understanding.

3          So you would be adding a new policy -- the

4  correction would be adding a new policy?

5          Okay.  I agree.

6          It's a new policy.  It's not managing an old

7  policy.  You're not changing it.  You're creating a new one.

8  So you're not managing content by doing that.

9          If we look at Slide 30?

10         Mr. Foote explained the same thing.  All these

11 reports are new reports.  How about once a report is

12 entered, can it ever be changed?

13         No.

14         Can an employee edit or delete?

15         No.

16         So with the Report Rates, it's the same thing.

17 With Claim 14, you can't manage any content.  You can't

18 manage what's there.  You can only create new or add, and

19 everyone agrees that adding is not managing.  That goes to

20 the contributing part.

21         So if we go to the next slide, please?

22         Where we're at is when you get to the question of

23 infringement, and this is what your question will look like

24 on your jury questionnaire:  Did IV prove by a preponderance

25 that Great West has infringed?

1          The answer is, no.

2          They didn't show that you could manage any of the

3   content on that Driver List By Policy page because

4   information about users is not content.  And if you can't

5   edit, delete, or do anything to the content, you're not

6   managing it.  That was the evidence on infringement.  That's

7   what we have been saying all along, and we, as shown here,

8   presented you with evidence on that point.

9          Turn briefly to the invalidity.

10          If we go to the next slide.

11          In this case, there is a -- the parties have agreed

12   that Claim 11 -- remember, invalidity, Claim 11, and then

13   you have Claim 14?  Claim 11, the independent claim, the

14   parties have agreed, and IV admits, that Claim 11 is

15   invalid.

16          If you look at the next slide, what we also know is

17   that IV did not contest anything about our analysis of Claim

18   11.  All those steps that Dr. Crovella went through to show

19   every element of Claim 11 was met, IV did not contest any

20   one of those.

21          So the only issue we're left with -- if they're not

22   contesting, then, look, that Pellegrino teacher reference,

23   that has all the elements of Claim 11.  So the only thing

24   we're looking at now is, all right, what about Claim --

25   Claim 14, does it have the elements of Claim 14?  That's all

1   we're left with.

2          And if you go and look -- we -- we would need to

3   show that you're managing content.  So we have the apparatus

4   of Claim 11.

5          Can you go back for a minute, Mr. Simmons?

6          We have the apparatus of Claim 11.  All you have to

7   now show is can you manage the content, and can you

8   contribute the content?  And the evidence on this was

9   undisputed.

10         Why?  IV never brought any witness to talk about

11  invalidity.  They brought no one into this court to defend

12  their patent.  Smith didn't talk about it.  They didn't

13  bring anybody.

14         So we're looking at only the evidence that Crovella

15  presented.  They're not disputing it.

16         And if we go to the next slide, here it is.

17         So it was pointed to -- it's Figure 5 of the

18  Pellegrino patent, which is GWX-122.  And if you look at

19  that slide, Lesson Element 160 includes both text and audio

20  material, so you're contributing content.

21         And here what I would say is, well, here, you're

22  really talking about content.  This is how the patent talks

23  about content.  It's an article about clearing clogged

24  drains.  Well, here's an article about the -- the space

25  program -- the United States space program.  That's content.

1    Those are words.  That's saying something.  And that's

2    exactly what Pellegrino does.  And the teacher can

3    contribute that content.

4           If we go to the next slide.

5           The teacher can then manage the content.  Manage

6    that lesson that they're going to do on the astronauts, they

7    can go in there and they want to change something, so at --

8    the Pellegrino patent, which is, again, GWX-122, if you want

9    to take a look at it, at Lines -- Column 24, Lines 62

10   through 64, the teacher can go in and modify the lesson.

11          Okay.  Now, you actually are managing content then.

12   You're changing the words on the screen.  That's all that's

13   left with Pellegrino is those two elements, and they don't

14   bring anybody to say we're wrong, and they can't.  That's

15   exactly what the reference shows.

16          So as you heard -- if we could get the next slide?

17          As you heard -- and by the way, Dr. Crovella was

18   clear that there is content -- there is content in the

19   Pellegrino reference.

20          If we hit the next slide, what you know and have

21   been told is, okay, we've got to show this by clear and

22   convincing evidence, clear and convincing evidence that that

23   Claim 14 is invalid.

24          Well, we know Claim 14 has all the elements of

25   Claim 11 because of that independent/dependent.  They don't

1    dispute that.  IV doesn't dispute Claim 11.

2        And then we know on Claim 14, the two elements,

3    managing -- contributing content and managing it, they're

4    both there.  They're both disclosed in the patent.

5        Okay.  Well, if we go to the next slide.

6        And by the way, Dr. Crovella had no -- he was asked

7    by counsel for IV:  And you maintain that it is clear and

8    convincing that Claim 14 is invalid, don't you?

9        And he had no reservations, but absolutely it is.

10   Absolutely, given this record.  And then nobody from IV got

11   up to dispute it.  They didn't call anybody on that point.

12   They presented no evidence.

13       So what's the impact of that?  It's not only clear

14   and convincing evidence.  It's the only evidence.  That's

15   all that's on this record is that that -- that that

16   Pellegrino patent invalidates Claim 14.

17       THE COURT:  You have three minutes remaining.

18       MR. BETTINGER:  Thank you, Your Honor.

19       So what do you hear from counsel?  Oh, you take

20   away our patent, you take away everything.  No, we don't.

21   They only sued us on Claim 14.  It's only Claim 14 that

22   we're asking be taken away because it's invalid.  That's

23   what they chose to sue us on.  It's Claim 14.

24       And remember their expert when they went and bought

25   the patent, those three patents, they bought three patents,

1    didn't they?  So we take away one claim of one patent, and

2    they come in here and say, oh, you're taking away everything

3    we have.  No, we're not.  We're taking away one claim.  Why?

4    Because Pellegrino invalidates it.  And they didn't put up

5    any evidence to suggest otherwise.

6           So where does that leave us?  When you get to the

7    verdict form -- if you could, Mr. Simmons -- we have a

8    question:  Did Great West prove by clear and convincing

9    evidence that Claim 14 is invalid?

10          Yes.

11          I don't know how there could be any other answer.

12   We put the only evidence on in the case.  None of it has

13   been disputed.

14          So let me turn just for a moment to damages.

15   And -- and recall, we don't say you get to this because the

16   patent isn't infringed, and the patent is invalid.  If Claim

17   14 is not infringed, then Claim 14 is not valid.  It's

18   invalid.  So, therefore, you don't get to damages.  You just

19   don't get to it.

20          But I want to hit on it for one -- one reason.

21          If you could put up the next slide?

22          Remember, yesterday Mr. Bakewell testified.  He

23   kind of had a chart like this and said, well, I didn't --

24   I couldn't put those to scale because if I did, that red

25   line would go off the chart.  Well, what we went back and

1    I asked our -- our team to do is, hey, put it to scale.

2    What's it look like when you're asking for $20.3 million

3    over on the right?  And what's it look -- what do the rest

4    of these look like?  And that's to scale.  That's to scale.

5          So as you can see, drawing to scale, that's what

6    the patent had been valued before this lawsuit, all the way

7    through.  We were sued in January of 2015.  Purchase, sales,

8    all those things are going on.  That's the value of the

9    patent in 2015.  And they come in here four years later and

10   say they want to $20.3 million.

11         Look, once the Wall Street boys got ahold of this

12   patent, hired some lawyers, and paid some experts, they

13   hatched a plan.  They tried to make it look like the patent

14   was worth $20.3 million when they knew that wasn't the case.

15         I can just see them all in their conference room.

16   Hey, we've got a really good one here.  We're going to turn

17   that thing into $20.3 million.  This patent talking about

18   content being managed -- contributed and managed on a

19   website.

20         Maybe we can confuse some folks.  Maybe we can pull

21   a fast one.  Maybe we can go after witnesses and attorneys

22   rather than present evidence.  Maybe we can just avoid the

23   evidence.  Maybe we can get a company like

24   Great West.  Hey, maybe they'll pay a whole bunch of money

25   in settlement.

1          THE COURT:  Counsel, your time has expired.  Take a

2   few -- few seconds and finish up.

3          MR. BETTINGER:  Yeah.

4          So -- but you know what they overlooked, this is

5   about the evidence -- the evidence that you heard in this

6   case, the documents we just showed you.

7          So, ladies and gentlemen, you're the check in the

8   system.  You get to require a Plaintiff to show up, look

9   them in the eye, size them up.  And when they -- when they

10  decide to hide, you get to consider that, too, and you get

11  to do the right thing.  Fair is fair.

12         Thank you.  And we appreciate your time.

13         THE COURT:  All right.  Plaintiff may present its

14  final closing argument.

15         Mr. Gilliland, you have 10 minutes and 33 seconds

16  left.

17         Would you like a warning?

18         MR. GILLILAND:  If I could have a warning at two

19  minutes, Your Honor?

20         THE COURT:  All right.  I'll do that.  And you may

21  proceed.

22         MR. GILLILAND:  Thank you.

23         Ladies and gentlemen, that was a very interesting

24  argument, I'll say, by Mr. Bettinger.  But I'll submit to

25  you that that's just marketing fluff -- I mean, lawyer fluff

1  from the same company that brought you marketing fluff.  And

2  we're going to walk through just a few of the things.

3          They say they've got nothing to hide, that they're

4  being candid and honest with you.  They put up -- you

5  noticed every one of those slides he put up.  I think every

6  single one of them had the -- the three little periods,

7  ellipses or whatever, you know, and that means we're not

8  showing you the whole truth.  We're not showing you

9  everything.

10          Everything single thing they've shown you, they've

11  cut something out of it, removed something off of it, or

12  tried to hide it from you.

13          As a matter of fact, if we could bring up -- let's

14  bring up GWX-761.

15          And these are some of the stipulations that they've

16  talked about over and over.  And if we could go to the next

17  page, I want to point out to you -- one of the things, you

18  heard them complain and contest infringement.

19          And we brought you evidence on infringement because

20  that was our burden to prove infringement.  Well, they've

21  contested and raised all these issues about it, and they've

22  shown you pieces of the stipulations.

23          But if we could go down to No. 14.

24          Not once -- not one single time did these

25  Defendants admit -- that they'll at least admit the

1    administrative interface is there.

2         They didn't even -- even with their own expert and

3    even when Mr. Bettinger is telling you they've got nothing

4    to hide, they never pointed out that, we'll at least admit

5    that much, that when you look at Claim 11 in the back of the

6    patent and you see an administrative interface, we'll admit

7    that we have an administrative interface.  Not once did they

8    tell you that.

9         Instead, they keep picking from other parts of this

10   and just showing you pieces, bits and pieces of what's going

11   on.

12        And what we've tried to do is bring you the truth,

13   bring you the evidence to demonstrate to you that they do,

14   in fact, infringe.  They do, in fact, use Intellectual

15   Ventures's patent, Intellectual Ventures's property.

16        You can take that down, Mr. Cartwright.  And if you

17   will -- let's see, can you bring up the testimony from

18   yesterday afternoon?

19        They complain that we did not bring up -- or bring

20   evidence of validity.  Well, you know as well as I do

21   because His Honor told you that that is their burden, and

22   it's their burden to prove that the patent is invalid by

23   clear and convincing evidence, to create in your minds

24   enough evidence to create a clear and abiding conviction

25   that it is highly probable than not.  That's their burden.

1          If they don't get there, if they don't cross that

2     clear and convincing finish line, it is not my job or

3     Intellectual Ventures's job to go out and pick them up and

4     drag them the rest of the way.

5          And they didn't get there, and you know they didn't

6     get there because if we could go to Page 133, this is just

7     one example.  I'm sure you remember several others because

8     you heard the testimony.  You don't have to rely on some

9     lawyer fabricated slide created last night to understand the

10    testimony.

11         If we look at Page 133.  This is their expert,

12    Dr. Crovella, on the witness stand.  And my colleague,

13    Mr. Rupp, asked him:  Said that at that time, November 30th,

14    2018, your answer of whether or not a user adding their

15    address or submitting a change of address into the Great

16    West portal system was or was not contributing content, and

17    your answer at that time under oath was:  Yes, that is user

18    contributing content.

19         His answer:  At that time, in that context, yes.

20         So about six months ago, he agreed with us that a

21    user adding their address and submitting a change of address

22    was content.

23         But today, questioned by Mr. Rupp -- and this is

24    just yesterday afternoon:  Today you have a different

25    opinion -- or two days ago in the afternoon, I'm sorry,

1    Monday afternoon -- but today you have a different opinion

2    on that very subject; is that right?

3            Answer:  We're sitting here today in this context,

4    that's correct.

5            What do you think changed between November of last

6    year and his testimony in this courtroom today that caused

7    him to change his mind?  He had no explanation for that.

8    Well, I think we all know what happened with that.  I think

9    there was a little seed planted in his mind whether by an

10   insurance company or whether by a lawyer, but they

11   encouraged him to change his mind.

12           Now, they've given Intellectual Ventures a hard

13   time for not having anybody here.  I'm sorry, I should have

14   been more clear in opening and voir dire, but Mr. Win, who

15   has sat here with us every day, is from Intellectual

16   Ventures.  And he is not from Wall Street, all right?  He's

17   not any guy in a big double breasted suit in a tall building

18   up in New York.  He's been here every day.

19           But there's nothing Mr. Win needed to tell you to

20   help understand their system.  They're the people that have

21   the information you need to answer the questions on this

22   verdict form, not Intellectual Ventures.

23           And they -- they talk about the price of the

24   patent.  And Mr. Bettinger had him create a slide,

25   supposedly last night, putting into scale because

 1  Mr. Bakewell was unable to do that.  Well, let's put that

 2  into context a little bit.

 3        They say that this number should just be -- they

 4  might have pumped a lot of oil off of our property.  They

 5  might have taken a lot of water from our reservoir.  But

 6  they should only have to pay for $300,000.00.  That's all he

 7  says you should get, just what Intellectual Ventures paid

 8  for this patent when it wasn't even a patent yet.  It was

 9  just a glimmer in the eye of an inventor.

10        Well, let's put that into context, and if we can

11  pull up GWX-389?

12        This is one of the rating policy documents that

13  we've talked about.

14        Let's go to -- I think it's the third page and zoom

15  in, if you will, to the center of the page there.

16        This is one of those where they can go in, and they

17  can enter the mileage, and it helps calculate how much the

18  premium that company owns.  And this is a company that

19  just -- it's got 65 power units.  It's one truck -- one

20  trucking company, excuse me.  One trucking company.  And

21  their rating policy data shows that for one year -- just one

22  year, that company is going to pay Great West $217,000.00.

23  It's kind of blurry, but you can see it.  $217,000.00, the

24  price of a one-year trucking policy for one customer is what

25  Mr. Bakewell says they owe for hitting our invention, for

1  hitting that portal over 35 million times in just a short

2  three-year period, from January 2015 to August 2018.

3         Now, if we were to count all the other times

4  they've used it and are still using it today, you know that

5  number would sky rocket.  But we're -- we and Mr. Lasinski

6  have tried to be reasonable with the use.

7         And then, finally, let's just talk just briefly

8  about the dam -- I mean, about the testimony.  Again,

9  they've given you a hard time about -- or given us a hard

10  time -- oh, let me back up.

11         Actually, can we bring up GX-122, please?  I'm

12  shifting gears back to this validity question.

13         And they've talked about and they've said that

14  Dr. Crovella, who plays the ground is flat depending on

15  which day of the week it is or where he happens to be.

16  Well, they've shown you -- this is the Pellegrino patent,

17  and they've shown you bits and pieces with a lot of artistic

18  rendering to it.

19         But if we could go to Page 17 of the Pellegrino

20  patent.

21         Here's something they didn't show you.  This is the

22  figures out of the Pellegrino patent.  And the top figure is

23  a lesson that a teacher is building.  They're adding

24  content.  But they haven't contributed yet.  They haven't

25  published it.  And if we scroll down just a little bit to

1    the figure below, I'm not going to modify this.  This is

2    straight out of the patent.  And if you look right here

3    above where it says Copy Lesson No. 374, it says:  Lesson

4    had been published and cannot be modified.

5           Pellegrino, in the figures that they didn't bother

6    showing you, demonstrate Pellegrino does not teach managing

7    content.  They didn't come anywhere close to the clear and

8    convincing finish line that they needed to cross.

9           THE COURT:  Two minutes remaining.

10          MR. GILLILAND:  Thank you, Your Honor.

11          So we did not have to put on a witness to try and

12   drag them across their own finish line.

13          And, finally, talking about people you will not

14   hear from.  Well, Mr. Foote took the stand, and some of the

15   information Mr. Foote gave you came from Mr. Posson sitting

16   out here in the gallery.  And he's the general counsel for

17   Great West.  He's their in-house lawyer.  He never took the

18   witness stand.  He could have gotten up here and told you

19   that information himself, but he didn't.

20          But what he will do is he will wait patiently for

21   you to come out that door with your verdict.  And when you

22   do, he's going to walk right out of this courtroom, and he's

23   going to get on his phone and he's going to make a phone

24   call.  And that phone call is either going to say, hey, we

25   played that East Texas jury.  We got away with it.  Or it's

1  going to say:  Guys, the gig is up.  Even insurance

2  companies have to follow the rules.  Even insurance

3  companies have to accept responsibility and pay for things

4  they use.  And which way that phone call goes, ladies and

5  gentlemen, is up to you.

6          Thank you, Your Honor.

7          THE COURT:  All right.  Ladies and gentlemen, I'd

8  like to provide you with a few final instructions before you

9  begin your deliberations.

10         You must perform your duty as jurors without bias

11 or prejudice as to any party.  The law does not permit you

12 to be controlled by sympathy, prejudice, or public opinion.

13         All parties in this case expect that you will

14 carefully and impartially consider all the evidence, follow

15 the law as I have given it to you, and reach a just verdict,

16 regardless of the consequences.

17         Answer each question in the verdict form from the

18 facts as you find them from this case, following the

19 instructions that the Court has given you.

20         Do not decide who you think should win and then

21 answer the questions accordingly.  Again, your answers and

22 your verdict must be unanimous.

23         You should consider and decide this case as a

24 dispute between persons of equal standing in the community,

25 of equal worth and holding the same or similar stations in

1  life.  This is true in patent cases between corporations,

2  partnerships, and individuals.

3       A patent owner is entitled to protect its rights

4  under the laws of the United States.  This includes bringing

5  a suit in a U.S. District Court for money damages for

6  infringement.

7       The law recognizes no distinction among types of

8  parties.  All corporations, partnerships, and other

9  organizations stand equal before the law, regardless of

10 their size, regardless of who owns them, and they are to be

11 treated as equals.

12      Now, when you retire to the jury room to deliberate

13 on your verdict, as I've said, you'll each have a copy of

14 these final instructions from the Court to you to take with

15 you.

16      If you desire during your deliberations to review

17 any of the exhibits which the Court has admitted into

18 evidence, then you should advise me by a written note given

19 to the Court Security Officer and signed by your foreperson.

20 And I will then send that exhibit or those exhibits to you.

21      Once you retire, you should first select your

22 foreperson and then conduct your deliberations.  If you

23 recess during your deliberations, follow all the

24 instructions the Court has given you about your conduct

25 during the trial.

1          After you've reached your verdict, your foreperson

2    is to fill in the answers in the verdict form which reflect

3    your unanimous decisions.  Do not reveal your answers until

4    such time as you're discharged unless otherwise directed by

5    me.  And you must never disclose to anyone, not even to me,

6    your numerical division on any question.

7          Any notes that you've taken over the course of the

8    trial are aids to your memory only.  If your memory should

9    differ from your notes, then rely on your memory and not

10   your notes.  The notes are not evidence.  And a juror who

11   has not taken notes should rely on his or her own

12   independent recollection of the evidence and should not be

13   unduly influenced by the notes of other jurors.

14         Notes are not entitled to any other -- any greater

15   weight than the recollection or impression of each juror

16   about the testimony.

17         If you want to communicate with me at any time

18   during your deliberations, you should give a message or a

19   question to the Court Security Officer, which has been

20   signed by your foreperson.  The Court Security Officer will

21   then bring it me.

22         I'll respond as promptly as possible, either in

23   writing or by having you brought back into the courtroom

24   where I can address you orally.

25         I will always first disclose to the attorneys in

1   the case your question and my response before I answer any

2   question.

3          After you have reached a verdict and I've

4   discharged you from your job as jurors, I want you to

5   understand you are not required to talk with anyone about

6   your service in the case.

7          But by the same token, at that time, you will be

8   free to discuss your service in this case with anyone of

9   your choosing.  The choice is yours at that point in time,

10  ladies and gentlemen, and yours alone.

11         I'll now hand eight copies of the verdict -- excuse

12  me, the instructions from the Court to the jury and the

13  verdict form to the Court Security Officer to deliver to the

14  jury in the verdict -- to deliver to the jury during

15  deliberations.

16         Ladies of -- ladies and gentlemen of the jury, you

17  may now retire to the jury room to deliberate.  We await

18  your verdict.

19         COURT SECURITY OFFICER:  All rise for the jury.

20         (Jury out.)

21         THE COURT:  Be seated, please.

22         Counsel, you are more than welcome to wait here in

23  the courtroom if you desire.  By the same token, if you are

24  not in the courtroom, please make sure that my staff has an

25  active, working cell phone number where we can reach you in

1  the event the Court receives either a note from the jury or

2  a verdict.

3          Pending a question from the jury or a return of

4  their verdict, the Court stands in recess.

5          COURT SECURITY OFFICER:  All rise.

6          (Recess.)

7          (Jury out.)

8          COURT SECURITY OFFICER:  All rise.

9          THE COURT:  Be seated, please.

10         All right.  Counsel, we've received a note from the

11 jury.  It's signed by Ms. Edwards, who I assume to be Juror

12 No. 1, as the juror foreperson.

13         I'm going to mark the note in the upper right-hand

14 corner as No. 1 for identification.  I'll hand the original

15 note to the Courtroom Deputy.

16         I have two copies of the note for each side.  If

17 you'll approach the bench.

18         MR. BETTINGER:  Okay.  Thank you.

19         THE COURT:  Let me go over it with you, and then

20 we'll talk about an appropriate response.

21         The jury requests six specific exhibits.  They've

22 given them by exact exhibit number, and I've already pulled

23 them and placed them in the same order that they requested

24 them in the note.  Beyond those six exhibits, the note says:

25 And Uncontested Facts Listing.

I assume that's the stipulated facts.

MR. BETTINGER: Yes, Your Honor.

THE COURT: And we ought to be able to hand them that document.

Then it says: And Dr. Crovella's testimony transcript.

Obviously, I can't give them the transcript of his testimony. And I'll tell them that in the note.

With regard to the Uncontested Facts Listing, is that an exhibit? Is it a document filed on the document? What's the best way for us to agree on what that is and produce it so that I can send it back to them?

MR. BETTINGER: It's Exhibit 761.

MR. GILLILAND: It is, Your Honor.

MR. BETTINGER: GWX-761.

THE COURT: Plaintiff's?

MR. GILLILAND: Defendant's Exhibit.

MR. BETTINGER: GWX is the --

THE COURT: GWX?

MR. BETTINGER: Yes.

THE COURT: What's the number again?

MR. BETTINGER: 761.

THE COURT: 761.

MR. BETTINGER: Yes.

THE COURT: All right. Ms. Lockhart, if you'll

1  pull that one.

2          Notice of Uncontested Facts.  Good.  I'll put that

3  in the list.

4          All right.  Counsel, I'll tell you what, I'm going

5  to recess briefly.  And I'll prepare a written response to

6  go back to the jury with these exhibits, and I'll be back as

7  soon as that's ready and go over it with you and get your

8  approval before I send it to the jury.

9          So don't leave the courtroom, but the Court stands

10  in recess.

11          COURT SECURITY OFFICER:  All rise.

12          (Recess.)

13          (Jury out.)

14          COURT SECURITY OFFICER:  All rise.

15          THE COURT:  Be seated, please.

16          All right.  Counsel, I've got a written response to

17  the jury's question prepared.  If a representative from each

18  side will approach, I have two copies of the proposed

19  response to give you.

20          I'll read my response into the record, and then

21  I'll take comments from counsel for the parties with regard

22  to the same.  This is the response to Jury Note No. 1.

23          Members of the jury, in response to your note,

24  I am sending you the six specific exhibits which you

25  requested, being:

GWX-482, GWX-493, GWX-494, GWX-484, GWX-389, GWX-490.

Additionally, and regarding your question for the, quote, Uncontested Facts Listing, close quote, I am sending you Exhibit GWX-761, which is that document.

Finally, as to your request for Dr. Crovella's testimony transcript, I cannot send that transcript to you.

As I told you in my first set of instructions at the beginning of the trial, transcripts of witness testimony will not be available for you to view in the jury room while you deliberate.

Consequently, you must rely on your memories of the evidence and testimony given by each witness during the trial.

That's the Court's proposed response to be sent in together with the actual exhibits as identified.

Does Plaintiff have any objection to that response?

MR. GILLILAND: No objection, Your Honor.

THE COURT: Does Defendant?

MR. BETTINGER: No, Your Honor.

THE COURT: All right. Then I'll execute the original response and hand it, together with the actual exhibits, to the Court Security Officer, and direct that he deliver them to the jury in the jury room.

With that, counsel, and pending either another note

1 from the jury or the return of a verdict, we stand in

2 recess.

3          COURT SECURITY OFFICER:  All rise.

4          (Recess.)

5          (Jury out.)

6          COURT SECURITY OFFICER:  All rise.

7          THE COURT:  Be seated.

8          Off the record.

9          (Off the record discussion.)

10          THE COURT:  All right.  Let's go back on the

11 record.

12          Counsel, the Court has received a second note from

13 the jury.  I have two copies for each side if you want to

14 approach.

15          I'll mark it as Item 2 in the upper right-hand

16 corner.  I'll read it into the record.

17          Jurors, please request Pellegrino

18 Patent No. 6,149,441.  Thank you.

19          Signed by Ms. Edwards, as foreperson.

20          I'll hand the original note to Ms. Lockhart to be

21 included in the papers of this case.

22          It appears, counsel, that the exhibit they're

23 asking for is GWX-122, the Pellegrino patent, the '441

24 patent.  I've already pulled that exhibit, and I've prepared

25 a response that I've given you a copy of that effectively

1   says:

2          In response to your note, attached is GWX-0122,

3   which is the Pellegrino patent, Patent No. '441.

4          Any objection to me sending that response with the

5   exhibit itself to the jury in compliance with their request?

6          MR. GILLILAND:  No objection from the Plaintiff.

7          MR. BETTINGER:  No objection, Your Honor.

8          THE COURT:  All right.  I'll execute the written

9   response and ask the Court Security Officer to deliver it

10  with the exhibit to the jury.

11         And with that being completed, subject to either

12  another note being received from the jury or the return of a

13  verdict, we stand in recess.

14         COURT SECURITY OFFICER:  All rise.

15         (Recess.)

16         (Jury out.)

17         COURT SECURITY OFFICER:  All rise.

18         THE COURT:  Be seated, please.

19         All right.  Counsel, the Court's received the

20  following note from the jury:

21         We have reached a verdict.

22         Signed by Ms. Nicole Edwards, as foreperson, and

23  dated with today's date.

24         I'll deliver the original note to the court

25  security -- Courtroom Deputy to be included in the papers of

1    this case.

2            And I'll direct the Court Security Officer to bring

3    in the jury.

4            COURT SECURITY OFFICER:  All rise for the jury.

5            (Jury in.)

6            THE COURT:  Please be seated.

7            Ms. Edwards, I understand that you're the

8    foreperson of the jury; is that correct?

9            THE FOREPERSON:  Yes, sir.

10           THE COURT:  Has the jury reached a verdict?

11           THE FOREPERSON:  Yes, sir.

12           THE COURT:  Would you hand the completed verdict

13   form to the Court Security Officer, who will bring it to me?

14           Ladies and gentlemen of the jury, I'm going to

15   announce the verdict into the record at this time.  I'm

16   going to ask each member of the jury to listen very

17   carefully, because after I have done that, I'm going to poll

18   the jury to make sure that this is, in fact, the unanimous

19   verdict of all eight members of the jury.

20           Turning to the verdict form and beginning on

21   Page 3 where Question 1 is found:

22           Did Intellectual Ventures prove by a preponderance

23   of the evidence that Great West has infringed Claim 14 of

24   the '177 patent?

25           The jury's answer is:  Yes.

1          Turning to Page 4 of the verdict form where

2    Question 2 is located:

3          Did Great West prove by clear and convincing

4    evidence that Claim 14 of the '177 patent is invalid?

5          The jury's answer is:  No.

6          Turning to Question 3 on Page 5 of the verdict

7    form:

8          What sum of money, if any, paid now in cash do you

9    find by a preponderance of the evidence would fairly and

10   reasonably compensate Intellectual Ventures for the

11   infringement by Great West of Claim 14 of the '177 patent?

12         The jury's answer is:  $1,500,000.00,

13   $1,500,000.00.

14         Turning next to Page 6, which is the last page of

15   the verdict form, I find that it is dated with today's date,

16   and it is signed by Ms. Edwards, as the foreperson of the

17   jury.

18         Ladies and gentlemen of the jury, let me poll you

19   at this time to make sure this verdict unanimously reflects

20   the decision of all eight members of the jury.

21         If this is your verdict as I have read it, would

22   you please stand?

23         (Jury polled.)

24         THE COURT:  Thank you.  Please have a seat.

25         Let the record reflect that the jury -- all eight

1  members immediately stood and rose in response to the

2  Court's question to poll the members of the jury with regard

3  to the unanimous nature of this verdict.

4          The Court finds that this is the unanimous verdict

5  of all eight members of the jury, and I'll deliver the

6  original verdict to the Courtroom Deputy.

7          The Court accepts the jury's verdict in this case.

8          Ladies and gentlemen, this now completes the trial

9  of this case.  From the very beginning, I have repeatedly

10  mentioned to you over and over about not discussing this

11  case with anyone, including with yourselves, until you had

12  heard all the evidence.  I also gave you various other

13  instructions.

14          I'm releasing you from all those instructions now.

15  At this point in time, you are free to discuss the case with

16  anyone to whatever extent you would like to, you are also

17  free not to discuss the case with anyone.

18          I want you to understand that it's been the

19  practice in this district since I got out of law school, and

20  that's a long time ago, that when a verdict is returned

21  after a jury trial, the lawyers involved cannot initiate a

22  conversation with the members of the jury about their

23  service.

24          If you want to have a conversation with them, you

25  will have to initiate it.  And to facilitate that and to

1  encourage them not to camp out at the door of the courthouse

2  so that you have to walk right by them when you leave the

3  building in hopes that you'll stop and want to talk to them,

4  I have secured four cell phone numbers, two from the

5  Plaintiff's side and two from the Defendant's side.  And I'm

6  going to give you those in the jury room in a moment.

7        And if any of you would like to call any or all of

8  the numbers listed there and talk about your service in this

9  case, I guarantee you they'll all be happy to hear your

10  comments and your suggestions and anything you have to say.

11        By the same token, ladies and gentlemen, if you do

12  not wish to talk to any of the lawyers in this case about

13  your service, you are not obligated to in any way.  And if

14  you're sure you don't want to do that, then just don't pick

15  up a copy of those phone numbers when I make them available

16  to you in the jury room.  The decision it 100 percent yours

17  and yours alone.

18        Now, with regard to other persons besides counsel

19  that have been active in this case, again, it is your

20  decision and your decision alone.

21        If as I suggested early on somebody on the first

22  day met you at home when you came in and asked you what

23  happened in federal court in Tyler, you can now answer those

24  questions.  You can now talk about it if you want to.  But

25  you're not obligated to.

1           That -- that is the practice that we've

2    consistently and traditionally followed in this district and

3    that's the practice we're going to follow in this case.

4           Also, ladies and gentlemen, I want to tell you as

5    sincerely and as seriously as I can how much the Court

6    appreciates your service in this case.  This has been a

7    sacrifice for every member of the jury to serve in this

8    case.  And everybody in this courtroom recognizes that.

9           Every one of you have had important things to do in

10   your own respective lives over the last several days, and

11   those matters have been put on hold so that you could serve

12   as the jury in this case, and that is no small thing.

13          Quite honestly, ladies and gentlemen, without good

14   citizens like yourselves being willing to present yourself

15   and serve when selected and make the sacrifice that that

16   requires, the court system would come to a standstill.

17          Our rights as Americans under the Seventh Amendment

18   to the trial by jury in a civil case would effectively be

19   lost if we didn't have citizens like you who would step up

20   and respond appropriately and serve when called upon.  You

21   have done very, very real and important public service by

22   serving on this jury.  And it warrants recognition by the

23   Court.

24          In fact, ladies and gentlemen, I'm going to ask a

25   favor of you at this point, and I do this in every jury

1  trial where I've accepted the jury's verdict.

2       I'm going to discharge you from your service as

3  jurors.  And when I do that, you're free to leave.

4       But rather than immediately get up and walk out of

5  the courthouse, if when I discharge you, if you would do me

6  a personal favor and go back to the jury room for just a few

7  minutes, I'd like to come into the jury room, and I'd like

8  to shake each hand, I'd like to look each one of you in the

9  eye and thank you by name for the service that you've

10  rendered, because, quite honestly, I believe it warrants

11  that, and it's that important.

12       You're not required to do that, but if you would

13  afford me that privilege, I will not keep you very long, but

14  I think -- I think it's something that is warranted in this

15  case and in every case where a jury's made a sacrifice like

16  you have.

17       If you if you will consider doing that, I would

18  consider it a very great privilege.

19       With that, ladies and gentlemen, the Court accepts

20  the verdict, the Court discharges you as members of the jury

21  in this case, and if you will do me that privilege,

22  I will meet you in the jury room in just a minute.

23       Counsel, that completes the trial of this case, and

24  you are excused.

25       COURT SECURITY OFFICER:  All rise.

1          (Jury out.)

2          (Court adjourned.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9     /S/ Shelly Holmes                    3/13/19
      SHELLY HOLMES, CSR, TCRR             Date
10   OFFICIAL REPORTER
      State of Texas No.: 7804
11   Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25